**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| IN RE F45 TRAINING HOLDINGS, INC. SECURITIES LITIGATION | Case No. 1:22-CV-01291-DAE |
| | <u>CLASS ACTION</u> |
| | <u>JURY TRIAL DEMANDED</u> |

**<u>AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT ........................................................................1

II.   JURISDICTION AND VENUE.....................................................................10

III.  THE PARTIES ..............................................................................................10

    A.    Plaintiffs ............................................................................................10

        1.    Lead Plaintiff Pledge Capital ................................................10

        2.    Detroit P&F ............................................................................11

    B.    Defendants .........................................................................................11

        1.    The Corporate Defendants .....................................................11

        2.    The Director Defendants.........................................................13

        3.    The Controlling Entity Defendants ........................................14

        4.    The Underwriter Defendants...................................................15

IV.   COMPANY BACKGROUND.........................................................................18

    A.    Background of F45 .............................................................................18

    B.    F45 Was an Unprofitable Company Focused on Exponential Growth
        Predominantly in the U.S. ..................................................................20

    C.    F45's Business Model Was Unsustainable .........................................22

    D.    The Pandemic Delayed F45's Initial Public Offering.........................23

    E.    F45 Completes Its Initial Public Offering in July 2021 ......................24

    F.    F45 Issues Strategic Update Including A Significant Decrease in New
        Franchises Sold And CEO Departs Company: July 26, 2022 ..............28

    G.    Shake-Up of F45's Executive Team ...................................................29

V.    DESCRIPTION OF CONFIDENTIAL WITNESSES....................................30

VI.   F45 CONSISTENTLY FAILED TO MAINTAIN EFFECTIVE ICFR AND DCP
    DURING THE CLASS PERIOD.....................................................................31

A.      Material Weakness in Internal Controls Over Financial Reporting Disclosed, But Still Not Remediated Almost Two Years Later ..........................31

B.      Internal Controls Over Financial Reporting ........................................................38

C.      F45 Is Required to Design and Implement Two Kinds of Control Systems: ICFR And DCP ..........................................................................................41

D.      F45 Identified the Need for Internal Control Procedures, But Failed to Set an Appropriate Tone at the Top and Maintain an Effective Control Environment ........................................................................................45

VII.    SECURITIES ACT ALLEGATIONS ..............................................................47

A.      Background of the Securities Act Claims ............................................................47

B.      The IPO Materials Contained Material Misstatements and Omissions ...............49

        1.      Misstatements and Omissions About F45's Unit-Economic Model ........49

        2.      Misstatements and Omissions Related to the Increasing Percentage of Multi-Unit Franchisee Systems Being Sold .........................................55

        3.      Misstatements and Omissions About F45's Potential for Growth in the U.S. ...........................................................................................57

        4.      Misstatements and Omissions About the Quality of F45's Franchisees ....................................................................................59

        5.      Misstatements and Omissions About F45's Deficient Internal Controls Over Financial Reporting .........................................................62

        6.      The IPO Risk Warnings Were Inadequate and Contained Material Misstatements and Omissions ...............................................................63

C.      F45 Issues Strategic Update On July 26, 2022 ...................................................66

D.      The Corporate Defendants, Director Defendants, and Underwriter Defendants Failed to Exercise Reasonable Care or Conduct a Reasonable Investigation in Connection with the IPO ...........................................................67

VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ...........................69

COUNT I For Violation of Section 11 of the Securities Act Against the Corporate Defendants, the Director Defendants, and the Underwriter Defendants .........................69

COUNT II For Violation of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants ................................................................................................72

COUNT III For Violation of Section 15 of the Securities Act Against Defendants
　　　Gilchrist, Payne, the Director Defendants, and the Controlling Entity Defendants..........75

IX.　　EXCHANGE ACT ALLEGATIONS ...............................................................78

　　A.　　Background of the Exchange Act Claims ..........................................78

　　　　1.　　F45 Was Selling Franchises "to Anyone" ...............................84

　　　　2.　　F45 Prioritized Multi-Unit Franchisees...................................84

　　　　3.　　F45 Inks Deal With Large Multi-Unit Franchisees Right Before
　　　　　　IPO to Inflate Franchise Sales.................................................87

　　　　4.　　F45 Changes Definition of "Initial Studio Openings" to Artificially
　　　　　　Inflate Growth Metric ...........................................................91

　　　　5.　　F45 Obtains Additional Financing Facilities and Hosts "All Star"
　　　　　　Event In Las Vegas to Squeeze Contingent Multi-Unit Franchise
　　　　　　"Deals" Out of Current Franchisees ........................................92

　　　　6.　　Fortress Financing Is Pulled and Multi-Unit "Deals" Made at All-
　　　　　　Star Event Ultimately Evaporate.............................................96

X.　　DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
　　AND OMISSIONS...................................................................................97

　　A.　　July 2021 Statements in the IPO Materials ......................................98

　　　　1.　　Misstatements and Omissions About F45's Unit-Economic Model........98

　　　　2.　　Misstatements and Omissions Related to the Increasing Percentage
　　　　　　of Multi-Unit Franchisee Systems Being Sold .....................104

　　　　3.　　Misstatements and Omissions About F45's Potential for Growth in
　　　　　　the U.S. ...............................................................................106

　　　　4.　　Misstatements and Omissions About the Quality of F45's
　　　　　　Franchisees...........................................................................108

　　　　5.　　Misstatements and Omissions About F45's Deficient Internal
　　　　　　Controls Over Financial Reporting ........................................111

　　　　6.　　The IPO Risk Warnings Were Inadequate and Contained Material
　　　　　　Misstatements and Omissions................................................112

　　B.　　July 2021 Interviews .....................................................................115

　　C.　　2Q 2021 Results............................................................................120

D.    3Q 2021 Results..........................................................................................129

E.    ICR Conference: January 10, 2022............................................................134

F.    4Q and Full Year 2022 Results..................................................................138

G.    1Q 2022 Results.........................................................................................150

XI.    THE TRUTH IS DISCLOSED ...............................................................................159

XII.    SUBSEQUENT EVENTS .....................................................................................161

XIII.    ADDITIONAL ALLEGATIONS OF SCIENTER ..................................................166

A.    Defendants Gilchrist and Payne Controlled the Company's Messaging to the Investing Public..................................................................................167

B.    Defendants' Ability to Maintain Substantial Growth by Selling Franchises and Opening New Studios Was Critical to the Company's Core Operations.....169

C.    F45, Gilchrist, and Payne Closely Monitored Franchise Sales, Studio Openings, and the Performance of Opened Studios ...........................................170

D.    Defendants Gilchrist And Payne Spoke Repeatedly To Investors About The Sustainability of F45's Business Model And The Company's Ability To Maintain Substantial And Rapid Growth......................................................175

E.    The Departures of Defendants Gilchrist and Payne Support a Strong Inference of Scienter ..............................................................................176

XIV.    LOSS CAUSATION ............................................................................................177

XV.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR.................................178

XVI.    PRESUMPTION OF RELIANCE ..........................................................................178

XVII.    CLASS ACTION ALLEGATIONS........................................................................180

XVIII.    CLAIMS FOR RELIEF .......................................................................................182

COUNT IV For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Corporate Defendants ........................................182

COUNT V For Violation of Section 20(a) of the Exchange Act  Against the Corporate Defendants, Director Defendants, and Controlling Entity Defendants .........................184

XIX.    PRAYER FOR RELIEF .......................................................................................188

XX.    JURY DEMAND ................................................................................................188

Lead Plaintiff Pledge Capital, LLC ("Lead Plaintiff") and additional plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit P&F," together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following based upon Plaintiffs' personal knowledge as to their own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which included a review of: U.S. Securities and Exchange Commission ("SEC") filings by F45 Training Holdings, Inc. ("F45" or the "Company"); securities analysts' reports and advisories about F45; press releases and other public statements issued by the Company; media reports about the Company; interviews with former F45 employees, former F45 franchise owners, and other individuals with knowledge of the matters alleged herein; and consultation with experts in the areas of loss causation and damages.[1] Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.    PRELIMINARY STATEMENT

1.      This is a federal securities class action on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of F45 during the period from July 15, 2021 through July 26, 2022, inclusive ("Class Period"), including those who purchased shares of F45 common stock pursuant and/or traceable to the registration statement and

---

[1] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2). All CWs will be described in the masculine to protect their identities.

prospectus issued in connection with F45's Initial Public Offering ("IPO") on July 15, 2021, and were damaged thereby (the "Class"), seeking to pursue remedies under §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      The claims are alleged against: (i) F45, former CEO Adam Gilchrist, former CFO Christopher Payne (together "the Corporate Defendants"), (ii) the Controlling Entity Defendants (defined below), (iii) the Underwriters Defendants (defined below) who took F45 public in July 2021, and (iv) members of the Company's Board of Directors who signed the registration statement for the IPO.

3.      F45 is a fitness franchisor with more than 1,900 locations in over 70 countries. As one of the fastest growing global franchises, the Company's largest markets are in the United States (with more than 700 fitness studios) and Australia (with more than 600 fitness studios). These fitness studios' offerings include, in large part, 45-minute high-intensity workouts.

4.      Despite the presence of F45 studios on several continents, the Company has not turned a profit due to large expenses for the marketing and support of its franchisee base and limited sources of recurring revenue. F45's revenue is primarily derived from fees charged to its franchisees, including upfront establishment fees and monthly recurring franchise fees. Thus, prior to the IPO and during the Class Period, F45's business model was centered around unprecedented growth through the sale of single and multi-unit franchises to new and existing franchisees.

5.      Under the aggressive leadership of the Company's former CEO Adam Gilchrist, F45 sought to be "bigger than a McDonald's and a Starbucks" as a franchisor and was "going to run through walls to make that happen." Based on the false and materially misleading numbers provided in the Company's filings with the SEC related to its IPO on July 15, 2021, F45 certainly

appeared as if it could be a contender.   Indeed, in its IPO Materials (defined below), F45 represented that if it could maintain its substantial rate of growth and scale its operations dramatically, the Company could report consistent profits. For example, a Guggenheim analyst report dated August 9, 2021 stated, "Bottom line, the fundamental FXLV growth story, at least over the next five years, appears promising and simply tied to one basic premise—can the company effectively expand a franchised brand with a differentiated experience and compelling studio-level returns at a consistently-healthy pace."  As this analyst stressed, the key to F45's financial success and well-being was consistent growth ***at a healthy pace***.

6.    F45 filings with the SEC prior to the IPO touted that one of its largest multi-unit franchisees, Club Sports Group LLC ("Club Sports Group" or "CSG")[2] had agreed to open 300 F45 studios over the course of three years.   But this representation was materially misleading in that investors were unaware that CSG was not required to open all 300 studios and was not required to target opening any specified number of studios per year. Indeed, CSG didn't even have to open new F45 studios, it could take over studios from existing F45 franchise owners. Defendants failed to disclose that F45 had "sold" to CSG an exclusive right to open studios in some of the most desirable U.S. territories including in "all metro areas," which limited F45's ability to expand its studio base with other franchisees in those areas.  Similarly, prior to the IPO, F45 announced two additional multiunit deals with the Company's private equity sponsors each for more than 70 studios which also were designed to artificially inflate the Company's New Franchise Sold metric. In reality, the CSG deal and the multiunit deal with the Company's PE Sponsors allowed F45 to

---

[2] Club Sports Group LLC was originally known as Club Franchise Group LLC until it changed its name on September 14, 2021. Club Sports Group LLC was an affiliate of KLIM.

appear to be growing at a rapid pace when much of that growth was illusory because those multiunit franchises would never open.

7.      The Registration Statement and Prospectus, issued right before F45's IPO, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.  For example, Defendants falsely stated in the IPO Materials (defined below), that:

(a)      "We recently entered into long-term multi-unit studio development agreements with three financial partners, including an affiliate[3] of Kennedy Lewis Management, or KLIM, one of our principal stockholders. Pursuant to each such agreement, we have granted to the financial sponsor the right to develop, and *the financial sponsor has agreed to develop, an agreed number of studios within certain territories in the United States . . . with KLIM agreeing to at least 300 studios over 36 months*."

(b)      "*We believe there is a significant opportunity to meaningfully expand our franchise studio footprint in the United States*. . . . Based on current franchises sold in Australia per capita as of June 30, 2021*, we believe there is a long-term studio potential for us to open over 7,000 studios in the United States.*"

(c)      "*As a franchisor, we have employed an economic model that[] . . . has been predictable, asset light and cash flow generative and has enabled us to open new studios at an accelerated pace versus the owner-operator model that is common in the studio fitness landscape*."

---

[3] Club Sports Group was the affiliate of KLIM.

(d)    "*As our network of total studios grows, we expect recurring revenue as a percentage of total revenue to increase*."

(e)    "*Our sales team identifies and contacts 'marketing qualified leads' to discuss fit and interest, as well as to determine suitability and optimal territory for a potential studio*."

8.    However, at the time of the IPO, Defendants failed to disclose that F45's business model and the Company's substantial growth were results of undisclosed and unsustainable practices that the Company followed simply to maximize the number of Total Franchises Sold (as opposed to profitable studios operating), including:

(a)    misleading potential franchisees with respect to certain key profitability metrics in order to convince them to purchase a franchise license so F45 could record the deal in its closely watched metric "Total Franchises Sold;"

(b)    failing to conduct proper due diligence on potential franchisees to ascertain whether they were credit-worthy enough to purchase, open, and maintain one or more F45 franchises;

(c)    failing to provide franchisees with proper training and/or guidance once they opened a studio to assure a better likelihood of studio success (meaning increased royalties and other fees for F45);

(d)    failing to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth;

(e)    failing to disclose that a significant number of its franchisees' studios were in financial distress and were not profitable – certainly not within the time frame represented by the Company;

(f)    providing to certain preferred franchisees undisclosed modified payment terms and failing to properly account for those modified terms. This ultimately resulted in, among other problems, ballooning account receivables for F45 and delayed cash inflows for the Company's growth initiatives;

(g)    "selling" exclusive franchise rights to multi-unit franchisees without regard to whether those franchisees could financially or would ultimately open those franchises and in doing so, the Company artificially inflated the number of reported "Total Franchises Sold," a key metric followed closely by analysts and investors. Indeed, much of the committed franchise store development was conditional on near-100% external financing of this growth, which included the Company's guarantee to support novel financing arrangements that ultimately fell through; and

(h)    failing to adequately remediate identified material weaknesses in internal controls over financial reporting.

9.    Former F45 employees, franchise owners, and other individuals with knowledge confirm that: (i) F45 sold franchises in territories that had no chance to succeed because the Company was only "looking to make sales"; (ii) F45's agreement with Club Sports Group "handicapped" the Company's growth as F45 had to turn business away because Club Sports Group owned the rights to key metro territories, but had no requirement to open studios on any particular timeline; (iii) the Company did not conduct any financial due diligence on franchisees besides telling them how to borrow money; and (iv) "over 50 percent" of F45 franchises were delinquent and "few gyms" paid their franchise and equipment fees on time.

10.     Moreover, throughout the duration of the Class Period (July 15, 2021 through July 26, 2022), Defendants continued to inflate F45's Total Franchises Sold metric and issued false and misleading misstatements and omissions—which failed to disclose the Company's unsustainable business model and its inability to maintain substantial growth.

11.     On July 26, 2022, after market close, on that day, the unsustainability of the Company's business model and its sheer inability to maintain substantial growth was revealed to the market.  That day, F45 issued a "Strategic Update" and filed a Form 8-K with the SEC to inform investors about "strategic updates to align the Company more closely with macroeconomic conditions and current business trends and prepare for the next phase of studio and membership growth."  F45 shocked investors by announcing:

(a)     a dramatic cut in the number of new studios the Company would open in 2022 – down approximately 60% from 1,000 studios to a range of 350 to 450 new studios;

(b)     an extraordinary cut in the number of new franchises that the Company would sell in 2022 – down approximately 70% from 1,500 to 350 to 450 new franchises;

(c)     a significant reduction in the Company's financial guidance for full-year revenue from a range of $255 to $275 million to a range of $120 to $130 million;

(d)     the immediate termination of a $250 million credit line for franchisee studio acquisitions;

(e)     the reduction of approximately 45% of F45's workforce;

(f)     the departure of CEO Adam Gilchrist that was effective June 24, 2022;

(g)     the appointment of Board Member Ben Coates as Interim CEO; and

(h)     the payment of a $2.4 million retention bonus to CFO Payne to ensure he would stay on as CFO until at least October 15, 2022 (10 additional weeks).

12.     On this news, F45's common stock plunged more than 60% from a close of $3.51 on July 26, 2022, to close of $1.35 on July 27, 2022 on trading volume of 31.8 million shares - more than 69 times F45's average trading daily volume. This drastic price drop represented more than a 91.5% decline from F45's offering price of $16.00 per share on July 16, 2021.  As a result, investors incurred hundreds of millions of dollars in losses.

13.     Based on the Company's disclosures, multiple analysts withdrew their previous ratings and/or cut their price targets on F45 in the wake of this news.  On the same day, July 27, 2022, an F45 shareholder sent a letter to the Company's Board of Directors attributing the "destruction in shareholder value" to the revelation of "the true reality of FXLV's business following a 12-month period since IPO in which management have made a series of claims about the business upon which investors relied, which now appear likely to have been false."

14.     On August 15, 2022, after the end of the Class Period, F45 released its second quarter 2022 financial results in which F45 disclosed that during the second quarter of 2022: (i) total franchises sold declined by 175 in the region; (ii) gross profit decreased 9% from the prior period; (iii) gross profit margin fell to 65.5% from 80.6% for the prior year period; and (iv) franchise gross profit declined 8.9% to $17.4 million compared to $19.1 million in 2Q21. During the conference call held later that day, Defendant Payne confirmed that "The franchises sold in the U.S. were comprised of 132 gross franchise sales, <u>less 307 terminations during the quarter.</u>  <u>The</u> <u>(at least) 307 franchises that terminated during 2Q22 did so purportedly because of an "inability</u> <u>of franchisees to access the financing facilities we announced at the end of Q1 2022</u>." [4]  In addition, to the 307 franchises that terminated, another 300 franchises were still in question as F45 "continue[d] to explore financing options for our franchise partners."  Thus, almost all of the 706

---

[4] All emphasis added unless otherwise stated.

franchises announced as "sold" in 1Q22 were not real franchise agreements, but were conditional agreements that contained significant financing contingencies.

15.     After the release of F45's second quarter 2022 financial results, credit and cash flow conditions at F45 materially worsened. At the end of 2Q22, ending net cash was $11 million including more than $40 million of accounts receivable, in part, from undisclosed modified payments terms. The state of cash flows and available liquidity is currently at emergency levels at the Company.

16.     On March 16, 2023, F45 announced its Report on Form 10-K for the year ended December 31, 2022 would not be timely filed because "the Company expects to report a material weakness similar to the material weakness reported in its Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed with the U.S. Securities and Exchange Commission on March 23, 2022, related to the proper design of the Company's financial closing and reporting processes, and appropriate processes to monitor, review, and record transactions in compliance with generally accepted accounting principles."

17.     On May 10, 2023, F45 filed with the SEC a Report on Form 12b-25 (Notification of Late Filing of Form 10-Q) detailing that the Company's Report on Form 10-Q for the first quarter ended March 31, 2023 also would not be timely filed.

18.     As of May 18, 2023, F45's stock trades at less than $1.00 per share, down from its July 15, 2021 IPO price of $16.00 per share.  In addition, the Company is non-compliant with NYSE listing requirements due to its inability to timely file periodic financial reports.

19.     As a result of Defendants' misstatements and omissions, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

20.     The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o, as well as Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

21.     This Court has jurisdiction over the subject matter of this Action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C.§ 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

22.     Venue is proper pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 17 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this District.  Many of the acts alleged in this Complaint, including the dissemination of materially false or misleading information, occurred in, or emanated from, this District.  In addition, certain of the Defendants reside, are headquartered, and/or maintain substantial operations in this District.

23.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III.     THE PARTIES

### A.     Plaintiffs

#### 1.     Lead Plaintiff Pledge Capital

24.     Court-appointed Lead Plaintiff Pledge Capital LLC ("Lead Plaintiff" or "Pledge Capital") is a New York-based boutique investment firm founded in 2016.  Pledge Capital serves

as a Registered Investment Advisor and has received an assignment of claims transferring all rights and title to prosecute all causes of action relating to transactions in F45 common stock from several of its clients, including Lillian & Alexander Chang, Shun-Sheng Liao, Ko Feng Won, Malinda Chen, and Ernest Fu.  As set forth in the Certification previously filed with the Court (ECF No. 22-1), Pledge Capital purchased shares of F45 common stock directly traceable to the Company's IPO, and purchased additional shares of F45 common stock during the Class Period and was damaged thereby.

### 2.    Detroit P&F

25.    The Police and Fire Retirement System of the City of Detroit ("Detroit P&F") is an additional plaintiff and purchased shares of F45 common stock during the Class Period and was damaged thereby. As set forth in the attached Certification (Exhibit 1), Detroit P&F also purchased shares of F45 common stock directly in the Company's IPO and purchased additional shares of F45 common stock directly traceable to the Company's IPO and was damaged thereby

### B.    Defendants

### 1.    The Corporate Defendants

26.    Defendant F45 is a Delaware corporation with its corporate headquarters located at 3601 South Congress Avenue, Building E, Austin Texas, 78704.  F45 is a holding company whose subsidiaries conduct substantially all of F45's operations and own substantially all of F45's assets and intellectual property.

(a)    The Company is primarily owned by its officers and directors, including Kennedy Lewis Capital Partners Master Fund III LP and Kennedy Lewis GP III LLC.  F45 and its subsidiaries franchise and license the F45 Training brand to fitness facilities in multiple countries.

(b)    Since the F45's IPO in July 2021, the Company's common stock trades publicly on the New York Stock Exchange ("NYSE") under the ticker symbol "FXLV."  As of

11

November 11, 2022, the Company had approximately 97,315,803 shares of common stock outstanding.

27.    Adam Gilchrist ("Gilchrist") co-founded F45 in 2013 along with Rob Deutsch. He served as F45's CEO from 2014 until his exit from the Company in July 2022 and served as Chairman of the Board of Directors (the "Board") from 2017 until April 21, 2023. Defendant Gilchrist signed the Registration Statements and Prospectuses for the IPO and F45's Report on Form 10-K for the year ended December 31, 2021. In addition, Gilchrist served as a member of F45's Chief Operating Decision Maker ("CODM") group, which reviewed the operating results, including revenue and gross profit for each of the Company's reportable segments, in order to assess performance and allocation of resources.

28.    Christopher E. Payne ("Payne") served as F45's CFO from June 2018 until November 2022. He also served as the Company's Treasurer and as a member of the Board of Directors from March 2019 until November 2022. Defendant Payne signed the Registration Statements and Prospectuses for the IPO. Payne also signed the Company's quarterly reports during the Class Period and F45's Report on Form 10-K for the year ended December 31, 2021. In addition, Payne served as a member of F45's Chief Operating Decision Maker ("CODM") group, which reviewed the operating results, including revenue and gross profit for each of the Company's reportable segments, in order to assess performance and allocation of resources.

29.    Defendants Gilchrist and Payne ("Individual Defendants" and together with F45, the "Corporate Defendants") participated in the preparation of the Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. Gilchrist and Payne signed the Registration Statement and/or were directors of F45 at the time the filing of the part of the registration with respect to which their liability is being asserted,

participated in the IPO, and solicited the purchase of F45's common stock, to serve their financial interest and those of the Company. Defendants Gilchrist and Payne, in their capacity as senior executives and/or directors of F45, reviewed, edited, and approved the Registration Statement.

### 2. The Director Defendants

30. Michael Raymond served as a member of F45's Board of Directors since March 2019. He was appointed to the Board by MWIG LLC, a special purpose private investment vehicle led by FOD Capital and Defendant Mark Wahlberg, pursuant to MWIG's director designation rights under a Stockholders' Agreement executed between MWIG and F45 on March 15, 2019.[5] Defendant Raymond has served as a Manager of FOD Capital since December 2017. Defendant Raymond signed the Registration Statements and Prospectuses for the IPO and F45's Report on Form 10-K for the year ended December 31, 2021.

31. Darren Richman served as a member of F45's Board of Directors from October 2020 until October 2022. Defendant Richman signed the Registration Statements and Prospectuses for the IPO and F45's Report on Form 10-K for the year ended December 31, 2021. Richman co-founded Kennedy Lewis with David Chene in 2017 and served as the Co-Portfolio Manager of Kennedy Lewis and Co-Chair of its Investment Committee and Executive Committee. Defendant Richman resigned as a member of the Company's Board in October 2022, prior to the appointment of his replacement.

32. Mark Wahlberg is a well-known actor, producer, and entrepreneur who has served as a member of F45's Board of Directors since March 2019. He was appointed to the Board by

---

[5] This Stockholder' Agreement was subsequently amended on May 6, 2019, October 6, 2020 in connection with the issuance and sale of our convertible notes, December 30, 2020 in connection with that certain Stock Purchase Agreement (dated as of December 30, 2020), and July 14, 2021 in connection with the IPO, by and among the Company, MWIG, GIL, KLIM, and the L1 Capital Funds.

MWIG LLC, a special purpose private investment vehicle he leads with FOD Capital. Defendant Wahlberg signed the Registration Statements and Prospectuses for the IPO and F45's Report on Form 10-K for the year ended December 31, 2021. Defendant Wahlberg currently serves as the Company's Chief Brand Officer since his appointment in March 2023.

33.     Each of the Director Defendants participated in the preparation of the Registration Statement and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. The Director Defendants signed the Registration Statement and were directors of F45 at the time the filing of the part of the registration with respect to which their liability is being asserted, participated in the IPO, and solicited the purchase of F45's common stock, to serve their financial interests and those of the Company. The Director Defendants, in their capacity as senior executives and/or directors of F45, reviewed, edited, and approved the Registration Statement.

### 3.     The Controlling Entity Defendants

34.     Defendant MWIG LLC ("MWIG") is a special purpose private investment fund led by FOD Capital LLC, a family office investment fund, and Defendant Wahlberg, that invested in F45 in March 2019 through an acquisition of convertible preferred stock. MWIG held a substantial ownership stake in F45 before, during, and after the Company's IPO, and is listed as a "Principal Stockholder" in the IPO Registration Statement and Prospectus. MWIG's headquarters are located in Key West, Florida.

35.     Defendant Kennedy Lewis Management LLC ("KLIM"), along with its affiliated entities (the "KLIM Entities"), [6] is a global investment manager with its headquarters in New York,

---

[6] Kennedy Lewis Management LP (the "Adviser") is the investment adviser to Kennedy Lewis Capital Partners Master Fund LP ("KLIM Fund I" and, collectively with KLIM Fund II, the "KLIM Funds") and KLIM Fund II. KLM GP LLC ("KLM") is the general partner of the Adviser. Kennedy Lewis Investment Management LLC ("KLIM") is the owner and control person of KLM.

New York.  The KLIM Entities held a substantial ownership stake in F45, before, during, and after

the Company's IPO, and is listed as "Principal Stockholder" in the IPO Registration Statement and

Prospectus. Indeed, following the IPO, KLIM Entities owned approximately 11.4% of F45.

### 4.   The Underwriter Defendants

36.   Defendant Goldman Sachs & Co. LLC ("Goldman") served as the qualified

independent underwriter, and joint leading book-running manager and representative of the

underwriters, for the IPO, helping to draft and disseminate the Registration Statement and solicit

investors to purchase the F45 stock issued pursuant thereto.  During the IPO, Goldman sold

millions of F45 shares, receiving certain fees and commissions.  As a leading book-running

manager and representative of the underwriters, Goldman must have participated in the preparation

of the registration statement and performed its typical standard of due diligence with respect to

that registration statement.  Moreover, Goldman assumed the customary responsibilities of acting

as a leading book-running manager and representative of the underwriters in conducting due

diligence and reviewing and participating in the preparation of the IPO Registration Statement and

Prospectus.  In the IPO, Goldman was allocated 7,718,750 shares to sell to the investing public.

---

David K. Chene and Defendant Richman are the managing members and control persons of KLIM. Each of the Adviser, KLM and KLIM may be deemed to exercise voting and investment power over securities held by each of the KLIM Funds due to their relationship with the KLIM Funds. Kennedy Lewis GP LLC ("Fund I GP") is the general partner of KLIM Fund I. Kennedy Lewis Investment Holdings LLC ("Holdings I") is the managing member of Fund I GP. Messrs. Chene and Richman are the managing members of Holdings I. Each of Fund I GP and Holdings I may be deemed to exercise voting and investment power over securities held by KLIM Fund I due to their relationship with KLIM Fund I. Kennedy Lewis GP II LLC ("Fund II GP") is the general partner of KLIM Fund II. Kennedy Lewis Investment Holdings II LLC ("Holdings II") is the managing member of Fund II GP. Messrs. Chene and Richman are the managing members of Holdings II. Each of Fund II GP and Holdings II may be deemed to exercise voting and investment power over securities held by KLIM Fund II due to their relationship with KLIM Fund II. Messrs. Chene and Richman, in their capacities as managing members of KLIM, and managing members of each of Holdings I and Holdings II, may be deemed to exercise voting and investment power over securities held by each of the KLIM Funds due to their relationships with the KLIM Funds.

37.   Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as a leading book-running manager and representative of the underwriters for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the F45 stock issued pursuant thereto.  During the IPO, J.P. Morgan sold millions of F45 shares, receiving certain fees and commissions.  As a leading book-running manager and representative of the underwriters, J.P. Morgan must have participated in the preparation of the registration statement and performed its typical standard of due diligence with respect to that registration statement.  Moreover, J.P. Morgan assumed the customary responsibilities of acting as a leading book-running manager and representative of the underwriters in conducting due diligence and reviewing and participating in the preparation of the IPO Registration Statement and Prospectus.  In the IPO, J.P. Morgan was allocated 7,718,750 shares to sell to the investing public.  At the time of IPO, J.P. Morgan was considered a lender in light of a term facility and revolving facility provided to F45.  A portion of the net proceeds that F45 received from the IPO was used to repay borrowings under a term facility and a revolving facility that an affiliate of J.P Morgan, J.P. Morgan Chase Bank, N.A., provided to the Company.  Accordingly, J.P. Morgan Chase Bank, N.A. received more than 5% of F45's net proceeds from the IPO.

38.   Defendant Robert W. Baird & Co. Incorporated ("Baird") served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the F45 stock issued pursuant thereto.  During the IPO, Baird sold millions of F45 shares, receiving certain fees and commissions.  In the IPO, Baird was allocated 812,500 shares to sell to the investing public.

39.   Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase

the F45 stock issued pursuant thereto.  During the IPO, Cowen sold millions of F45 shares, receiving certain fees and commissions.  In the IPO, Cowen was allocated 812,500 shares to sell to the investing public.

40.     Defendant Guggenheim Securities, LLC ("Guggenheim") served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the F45 stock issued pursuant thereto.  During the IPO, Guggenheim sold millions of F45 shares, receiving certain fees and commissions.  In the IPO, Guggenheim was allocated 812,500 shares to sell to the investing public.

41.     Defendant Macquarie Capital (USA) Inc. ("Macquarie") served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the F45 stock issued pursuant thereto.  During the IPO, Macquarie sold millions of F45 shares, receiving certain fees and commissions.  In the IPO, Macquarie was allocated 812,500 shares to sell to the investing public.

42.     Defendant MUFG Securities Americas Inc. ("MUFG") served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the F45 stock issued pursuant thereto.  During the IPO, MUFG sold millions of F45 shares, receiving certain fees and commissions.  In the IPO, MUFG was allocated 812,500 shares to sell to the investing public.

43.     Defendant Roth Capital Partners, LLC ("Roth") served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase the F45 stock issued pursuant thereto.  During the IPO, Roth sold millions of F45 shares, receiving certain fees and commissions.  In the IPO, Roth was allocated 812,500 shares to sell to the investing public.

44.    The Defendants referenced in ¶¶ 36-43 are collectively referred to as the "Underwriter Defendants." The Underwriter Defendants are investment banking houses which specialize, inter alia, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than $25 million in fees paid to the underwriting syndicate.

## IV.    COMPANY BACKGROUND

### A.    Background of F45

45.    F45 is a fitness franchisor that offers consumers functional 45-minute workouts that are community-driven.  The Company's workouts combine elements of high-intensity interval, circuit, and functional training distributed primarily through its digitally connected global network of studios, which are connected through its technology-enabled platform.

46.    F45 operates in a competitive fitness industry with other boutique fitness brands (*i.e.*, smaller fitness studios that offer specialized workouts), including CrossFit, Orange Theory, Barry's, and Body Fit Training.  Despite any differences between F45 and its competitors, they all compete in the same type of boutique fitness - high intensity interval training (HIIT) and functional strength workouts.  HIIT is a type of training exercise that incorporates alternating short periods of intense exercises with brief recovery periods.  Functional training is a type of training that focuses on movements that help you function and move better in your everyday life.

47.    In an effort to distinguish itself from competitors, F45 pays celebrities to promote its brand.  For example, F45 has entered into promotional agreements with the following celebrities (or their affiliated entities): Greg Norman, Magic Johnson, Cindy Crawford, Joe Montana, David Beckham, and Timothy Kennedy.  This also includes Defendant Wahlberg, who, in addition to being a member of the Company's board of directors, also has a promotional agreement with F45.

48.    As a franchisor, F45 claims that its franchise model is extremely scalable due to its innovative concept, where the same 45-minute high-intensity circuit training class is offered to all

F45 members around the globe each day through the Company's digital platform and centralized hub at F45 headquarters.  Moreover, F45 states that its franchise concept and its components can be replicated quickly and easily, as all F45 studios have the same equipment and general layout.

49.    F45 was founded in 2013 in Sydney, Australia by Robert Deutsch and Luke Istomin.  Mr. Deutsch opened the first F45 studio in Paddington, Sydney in 2012 and then hired Defendant Gilchrist, who at the time was considered a franchise expert, as a business partner.  The first F45 franchise was sold in 2013 in Sydney and the Company began its franchise roll-out in 2014.  Franchises were then sold offshore, including New Zealand, the United States, and the United Kingdom.  By the time of the IPO, F45 had sold over 2,800 franchises worldwide.

50.    F45 markets two categories of franchise sales: franchise agreements and multiunit development agreements.

(a)    **Franchise agreements** are for single and multi-unit owners who signed standard franchise agreements, which generally apply to franchisees that own between one to five franchises.  Under a franchise agreement, a franchisee pays an initial establishment fee for each agreement and agrees to standard terms, such as a fee start date and equipment ordering date.[7]  Under the franchise agreement, F45 grants its franchisees the right to an exclusive area or territory to operate their studio(s).

(b)    **Multiunit development ("MUD") agreements** grant franchisees the right to develop multiple territories within an area defined by that development agreement over a certain period of time, usually 3 to 5 years.  These deals typically require an upfront payment.  As part of

---

[7] F45's "backlog" refers to the difference in Total Franchises Sold (defined below) and Total Studios (defined below).

the agreement, the development partner enters into a single franchise agreement for each territory when development commences.[8]

**B.    F45 Was an Unprofitable Company Focused on Exponential Growth Predominantly in the U.S.**

51.    Despite the Company's substantial growth in, among other places, Australia, F45 has not recorded a profit since 2018.[9]  For fiscal years 2020 and 2021, F45 reported a net loss of $25 million and $182 million, respectively.  F45's net losses were due, in large part, to hefty expenses associated with the general marketing and support provided to its franchisees—which are attributable to, among other things, the Company's selling, general, and administrative (SG&A) expenses.

52.    The Company's business model is centered around rapid growth through the franchising of low-overhead fitness studios.  F45's revenue and profits are primarily derived from franchise establishment fees and monthly franchise fees from opened studios.  The Company's growth is dependent on selling franchises to new and/or existing franchisees and opening new studios with these franchisees.

53.    F45 reported critical growth metrics to investors by using the following defined terms:

- "**Total Franchisees Sold**" – is defined as (i) the total number of signed franchise agreements in place as of any specified date for which an establishment fee has been paid and (ii) the total number of franchises committed in a multi-studio agreement in place as of such date for which an upfront payment has been made, in each case that have not been terminated, as of such date.

---

[8] During the Class Period, multi-unit development agreements accounted for only a small percentage of F45's total studio footprint, but they accounted for approximately one half of the Company's total "backlog."  F45's "backlog" refers to the difference in Total Franchises Sold (defined below) and Total Studios (defined below).

[9] While F45 has reported net income for specific quarters, the Company's fiscal-year earnings results show that it was ultimately unable to report a profit in those periods.

Each new franchise is included in the number of Total Franchises Sold from the date on which such franchise first satisfies the condition in clause (i) or (ii) above, as applicable. Total Franchises Sold includes franchise arrangements in all stages of development after signing a franchise agreement, and includes franchises with Total Studios. Franchises are removed from Total Franchises Sold upon termination of the franchise agreement..

- "**New Franchises Sold**" – means, for any specific period, the number of franchises sold during such period using the methodology set forth above for Total Franchises Sold.

- "**Initial Studio Openings**" – means the number of studios that were determined to be first opened during such period. [A]n Initial Studio Opening [] occur[s] in the first month in which the studio first generates monthly revenue of at least $4,500. Initial Studio Openings are not adjusted downward for studios that were temporarily closed due to the COVID-19 pandemic or otherwise.[10]

- "**Total Studios**" – means, as of any specified date, the total cumulative Initial Studio Openings as of that date less cumulative permanent studio closures as of that date. Neither Initial Studio Openings nor Total Studios are adjusted downward for studios that were temporarily closed due to the COVID-19 pandemic or otherwise.

- "**Open Studios**" – means the number of studios that were open for business as of a certain date. A studio may be classified as an Open Studio regardless of whether or not it generated minimum monthly revenue of $4,500.

---

[10]During the March 14, 2022 Earnings Call, and again in the 2021 10-K filed on March 23, 2022 (defined below), F45 disclosed that it had changed the definition of "Initial Studio Openings," a key metric for the Company, on October 1, 2021, but the Company had not disclosed the change to the market at the time. The 2021 10-K reported: "Prior to October 1, 2021, we classified an Initial Studio Opening to occur in the first month in which the studio first generates monthly revenue of at least $4,500. Starting on October 1, 2021, we classify an Initial Studio Opening to occur in the month in which we record the initial studio opening in our internal systems. Any studios that did not have an Initial Studio Opening under the prior definition are included as of October 1, 2021. We classify Total Studios, as of any specified date, as the total cumulative Initial Studio Openings as of that date less cumulative permanent studio closures as of that date. Neither Initial Studio Openings nor Total Studios are adjusted downward for studios that were temporarily closed due to the COVID-19 pandemic or otherwise.

54.     Under the aggressive leadership of Defendant Gilchrist, F45 sought to be "bigger than a McDonald's and a Starbucks" as a franchisor and was "going to run through walls to make that happen."

55.     To develop into a company capable of churning a consistent profit and maintaining investor interest, F45 relies on its ability to continuously grow at a rapid pace by, as discussed above, selling franchises and opening more studios.  In turn, this growth would enable F45 to scale its operations, decrease its costs, and increase its recurring fees from franchisees.

56.     Defendants reiterated in F45's IPO Materials and then throughout the Class Period, that growth was essential for the Company.  For example, F45's IPO Registration Statement listed the Company's ability to grow as one of its risk factors, stating, "If we fail to successfully implement our growth strategy, which includes new studio development by existing and new franchisees, our brand and ability to increase our revenue and operating profits could be materially and adversely affected."

57.     According to F45, the fitness industry that the Company operated within provided the opportunity for such growth.  For example, F45's IPO Registration Statement and Prospectus stated that "only 64.2 million Americans ages six and older having health club memberships according to IHRSA, we believe there is significant opportunity for further growth in fitness engagement and membership in the United States."

### C.     F45's Business Model Was Unsustainable

58.     As a growth company, F45's business model involved selling as many franchises, and opening as many studios, as possible to increase recurring franchise fees—the Company's most important source of revenue.  In doing so, F45 mislead potential franchisees with respect to a number of key considerations for determining whether to purchase a franchise license.  For example, in one of the many lawsuits filed against F45, Functional HIIT Fitness, LLC ("FHF," a

franchisee that owns and operates three F45 studios) sued the Company for, *inter alia*, fraudulently inducing FHF into purchasing three franchise agreements in April and September 2019. Moreover, FHF's complaint noted that F45 had misrepresented: (i) estimated "break-even points" and earnings for newly opened studios; (ii) estimated costs relating to leasehold improvements per studio; and (3) the exclusivity of a franchisee's territory—as the Company claimed that franchisees cannot solicit customers from each other's territory, yet mandated that franchisees advertise to customers in neighboring territories.

59.    According to FHF's lawsuit, the Company's "representations and commitments that were being made were outdated and otherwise inaccurate, incomplete, unfair, deceptive, and/or misleading on account of, among other things: (i) its experience with franchising in Australia; (ii) its experience with franchising in the European Union; and (iii) its experience with franchising in the United States."

60.    As a result of F45's misrepresentations, FHF estimated that it lost approximately $1,262,926 to date, and was separately obligated on a a million-dollar lease and a Small Business Administration loan of $323,410.

**D.    The Pandemic Delayed F45's Initial Public Offering**

61.    On or around January 16, 2020, F45 confidentially filed for an IPO in the United States.

62.    Both the period leading up to the IPO, and the filing of the IPO Materials (as defined herein) took place during the COVID-19 pandemic. Due to the pandemic, in March of 2020, public health orders closed many gyms in some of largest markets in which F45 operates, including the United States and Australia. Although many of the gyms in affected markets could open in some capacity during the summer of 2020, spikes in COVID-19 infections led to renewed shutdowns several times in 2020 and 2021. For instance, a COVID-19 variant spreading late in

2021 precipitated new public health orders that again closed gyms for months at a time in many of the F45's key markets.

63.    Like other fitness facilities, many F45 studios had to pause operations for stretches of time due to outbreaks of COVID-19.  As the gyms were allowed to reopen, the Company represented that those studios were able to quickly build up revenue and remain viable businesses.

64.    As a result of COVID-19's effect on the Company's operations and an ongoing legal battle with Body Fit Training (one of its competitors) regarding the infringement of certain patents, F45 put its plans to go public on hold.

**E.    F45 Completes Its Initial Public Offering in July 2021**

65.    On June 21, 2021, F45 filed with the SEC a registration statement on Form S-1 for the IPO which, after two amendments, was declared effective on July 14, 2021 (the "Registration Statement").

66.    In the Registration Statement filed on June 21, 2021, the Company announced that it had entered into a long-term multi-unit studio agreement with Club Franchise Group LLC, an affiliate of KLIM.[11]  The IPO Registration Statement described the deal with Club Franchise Group as follows:

> On June 15, 2021, we entered into a long-term multi-unit studio development agreement, or the Development Agreement, with Club Franchise Group LLC, or Club Franchise, an affiliate of KLIM. Pursuant to the Development Agreement, we have granted to Club Franchise the right to develop, and Club Franchise has agreed to develop, at least 300 studios in certain territories in the U.S. over 36 months, with the first 150 studios to be opened within 18 months of the date of the Development Agreement, or December 15, 2022.[12]

---

[11] Club Sports Group was known as Club Franchise Group LLC until September 2021.

[12] Prior to the IPO, F45 also entered into Multiunit Development agreements with two additional Private Entity sponsors including a 70 plus unit deal to be opened over 7 years, and an 87 plus unit

67.    On July 15, 2021, F45 conducted the IPO pursuant to an IPO Registration Statement and Prospectus that the Company filed with the SEC on June 21, 2021 and July 16, 2021, respectively.

68.    On July 16, 2021, F45 filed a Prospectus for the IPO on Form 424(b)4, which incorporated and formed part of the IPO Registration Statement and included a lock-up agreement with the underwriters that barred F45's "directors, executive officers and substantially all of [the Company's] stockholders, including [MWIG LLC]," from selling any F45 shares of common stock for 180 days after the date of the prospectus.  Accordingly, the lockup period was set to expire on January 12, 2022.[13] The IPO Registration Statement was signed by Defendants Gilchrist, Payne, Raymond, Richman, and Wahlberg.

69.    By means of the IPO Materials, F45 offered and sold 19,057,889 shares of common stock (including 307,889 shares that were sold on August 17, 2021 to the underwriters pursuant to exercise of their over-allotment option) and MWIG LLC offered and sold 2,794,055 shares of F45 common stock (including 1,231,555 shares that were sold on August 17, 2021 to the underwriters pursuant to the exercise of their over-allotment option) at a public offering price of $16.00 per share, resulting in aggregate gross proceeds to F45 and MWIG LLC of approximately $304.9 million and $44.7 million, respectively. Defendants priced the IPO at $16.00 per share.

70.    F45's IPO Registration Statement provided the following graph that reported consistently significant growth in terms of year-over-year Total Franchises Sold:

---

deal to be opened over 6 years. These related party deals also were designed to artificially inflate the number of franchises sold prior to the IPO.

[13] Based on publicly available information, additional F45 shares sold by insiders only entered the market starting in mid-March 2022.



71.    As displayed in the graph above, F45's IPO Registration Statement stated that the Company's Total Franchises Sold had grown from 84 franchises in 2014 to 2,801 franchises in 2021 as of June 30, 2021 (representing a ***3,234% increase*** in growth over the seven-year period) and from 2,244 franchises in 2020 to 2,801 franchises in 2021 (representing nearly a 25% increase in growth for the year at that point in time).

26

72.    Similarly, F45's IPO Registration Statement highlighted the Company's ability to scale to 2,801 Total Franchises Sold in 63 countries, and have 1,555 Total Studios as of June 30, 2021:



73.    The Company's core markets are within the United States and Australia.  At the time of the IPO, F45 reported that it had 1,379 franchises sold and 556 Total Studios in the United States and 785 franchises sold and 628 Total Studios in Australia.

74.     As part of its growth strategy, F45 sought to significantly expand its franchise studio footprint in the United States.  Specifically, F45's IPO Registration Statement and Prospectus emphasized that "[t]he fitness industry represents a large market that has historically exhibited attractive growth characteristics due to various secular consumer trends. According to IHRSA, the global health club market size was estimated to be $97 billion in 2019, with the U.S. segment of this market representing $35 billion."  Moreover, the IPO Registration Statement and Prospectus stated, "we believe there is a long-term studio potential for us to open over 7,000 studios in the United States."

75.     F45 also sought opportunities to expand into new channels by exploring opportunities to partner with major universities, hospital operators, corporations, and military facilities.

**F.     F45 Issues Strategic Update Including A Significant Decrease in New Franchises Sold And CEO Departs Company**: **July 26, 2022**

76.     On July 26, 2022, about one year after the IPO, F45 issued a "Strategic Update" and filed a Form 8-K with the SEC that shocked the market by announcing:

(a)     a dramatic cut in the number of new studios the Company would open in 2022 – down approximately 60% from 1,000 studios to a range of 350 to 450 new studios;

(b)     an extraordinary cut in the number of new franchises that the Company would sell in 2022 – down approximately 70% from 1,500 to 350 to 450 new franchises;

(c)     a significant reduction in the Company's financial guidance for full-year revenue from a range of $255 to $275 million to a range of $120 to $130 million;

(d)     the immediate termination of a $250 million credit line for franchisee studio acquisitions;

(e)     the reduction of approximately 45% of F45's workforce;

(f)    the departure of CEO Adam Gilchrist that was effective June 24, 2022;

(g)    the appointment of Board Member Ben Coates as Interim CEO; and

(h)    the payment of a $2.4 million retention bonus to CFO Payne to ensure he would stay on as CFO until at least October 15, 2022 (10 additional weeks).

77.    On this shocking news, F45's common stock plunged more than 60% from a close at $3.51 on July 26, 2022 to close at $1.35 on July 27, 2022—representing more than a 91.5% decline from its offering price of $16.00 per share on July 16, 2021.  As a result, investors incurred hundreds of millions of dollars in losses.

**G.    Shake-Up of F45's Executive Team**

78.    As mentioned above, on July 26, 2022, the Company announced it had parted ways with CEO Adam Gilchrist on July 24, 2022.  Gilchrist remained on the Company's Board of Directors until April 21, 2023.

79.    On July 24, 2022, Board Member Ben Coates was appointed as interim CEO. Coates served in that position until March 29, 2023.

80.    On October 12, 2022, Defendant Richman resigned as a member of F45's Board of Directors before the appointment of his replacement (to be nominated by KLIM).

81.    In November 2022, the Company announced that Chris Payne, F45's CFO, Treasurer and a Member of its Board of Directors was leaving the Company.

82.    On December 20, 2022, Richard Grellman, who served as acting Chair of the Board of Directors at the time and Lead Independent Director of the Board, notified F45 that he was resigning from the Board effective immediately.

83.    In February 2023, the Company announced that Robert Madore was appointed interim Chief Financial Officer, a position he still held as of May 15, 2023.

84.     On March 30, 2023, F45 announced that Tom Dowd would take over as President CEO and Board Member and Mark Wahlberg would serve as F45's new Chief Brand Officer, with Dowd receiving $1 million annually as CEO and Wahlberg receiving $1.00 per year.

## V.    DESCRIPTION OF CONFIDENTIAL WITNESSES

85.     Several former F45 employees, franchise owners and affiliates, and former Club Sports Group employees have provided information to Plaintiffs that adds further context and corroboration to Plaintiffs' allegations herein.

86.     CW-1 was a Franchise Consultant for F45 from September 2020 – December 2022. CW-1 worked for three F45 studios in Florida - two in Orlando, Florida (which were owned by the same owner) and one in Lake Mary, Florida.  According to CW-1, his main responsibility was to advise his two F45 franchise owners on how to increase their revenues.

87.     CW-2 was the Owner and Operator of an F45 franchise in the United Kingdom from before the F45 IPO through June 2022.

88.     CW-3 joined F45 in January 2021 as a contract employee in the role of Accounts Receivable Manager and departed in May 2021, two months prior to the Company's IPO.  CW-3 was responsible for collecting franchise and equipment fees from delinquent F45 franchises.  CW-3 reported to Finance/Accounting Operations Associate Matt Padavick, who in turn reported to U.S. Controller Christian Torres.

89.     CW-4 was an F45 Franchise Sales Executive in Texas from November 2021 – August 2022.  CW-4 was responsible for selling new franchises and expanding the portfolios of existing F45 franchisees. CW-4 reported directly to Chief Revenue Officer Luke Armstrong.

90.     CW-5 was a member of the sales team.[14]  CW-5 reported directly to Chief Revenue Officer Luke Armstrong, who reported to co-founder and former CEO Adam Gilchrist.  CW-5 was responsible for selling F45 franchises to new and existing franchisees.

91.     CW-6 was employed by Club Sports Group (CSG) as the Regional Director, Florida and Michigan from February 2022 – August 2022.  CW-6 noted that he was one of three area directors for Club Sports Group.  According to CW-6, all three area directors reported to former CSG President Rammy Harwood who reported to former CSG COO Nancy Dornbush and former CSG CEO Jay Galluzzo.  CW-6 explained that he joined Club Sports Group before any studios were operating in Florida (only two letter of intents (LOIs) signed for sites in Jacksonville, Florida) or Michigan as a part of the agreement between F45 and CSG.  CW-6 stated that he was a part of the entire process of getting studios open from site selection to leases to hiring staff to run the prospective locations.

92.     CW-7 was a Financial Service Specialist at F45 in January 2022. CW-7's responsibilities included reviewing contracts. CW-7 reported to Global Accounts Receivable Manager Brad Parrish.

## VI.   F45 CONSISTENTLY FAILED TO MAINTAIN EFFECTIVE ICFR AND DCP DURING THE CLASS PERIOD

### A.   Material Weakness in Internal Controls Over Financial Reporting Disclosed, But Still Not Remediated Almost Two Years Later

93.     In its IPO Materials, throughout the Class Period, and through at least May 2023, F45 has reported a material weakness in internal controls over financial reporting ("ICFR").  For example, in the IPO Materials, the Company disclosed: "***We have identified certain material***

---

[14] Plaintiffs believe that the details of the responsibilities of all the CWs contained herein are sufficient to satisfy the requirements of the PSLRA.  However, Plaintiffs can provide CW-5's title and additional specificity regarding his role to the Court through an *in camera* submission.

*weaknesses in our internal control over financial reporting and if our remediation of such material weaknesses is not effective, or if we fail to develop and maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired."*

94.    The material weaknesses identified in the IPO Registration Statement and Prospectus specifically related to:

> • a failure to properly design our financial closing and reporting process to record, review and monitor compliance with generally accepted accounting principles for transactions on a timely basis. This includes an inadequate level of precision in management's reviews of accounting documentation and journal entries, including a lack of evidence to support that a review had been performed.
>
> • a lack of segregation of duties existed in certain key financial reporting processes, including a lack of separation between the preparer and reviewer of journal entries; individual users with administrative access to the general ledger, billing and payroll systems also having access to post journal entries; and insufficient implementation of the automated approval hierarchy for invoices in our billing system to ensure reviews were being performed by the appropriate personnel.
>
> • a lack of formal documentation of policies and internal controls being followed by us existed, including, but not limited to, entity-level controls involving risk assessment procedures and conclusions, tools to prevent a cybersecurity breach and controls designed to prevent or detect fraud.

95.    The Company concluded that these material weaknesses in internal control over financial reporting occurred "because, prior to this offering, we were a private company and did not have the necessary business processes, systems, personnel and related internal controls necessary to satisfy the accounting and financial reporting requirements of a public company."

96.     Despite disclosing this material weakness, the Company represented that it had taken (and would continue to take) comprehensive steps to ameliorate the material weakness in every respect, including:

> • we have hired additional accounting personnel to implement more robust internal controls and enhanced reporting, including a Chief Financial Officer in June 2018, a Financial Analyst in December 2018, a VP FP&A in June 2019, a Staff Accountant (Australia/ROW) in April 2020, a Chief Accounting Officer in November 2020, a Financial Controller (US) in January 2021, a Financial Controller (Australia/ROW) in March 2021, a Director of Revenue Accounting and SEC Reporting in March 2021, and a Senior Accountant (Australia/ROW) in March 2021. As we build out our team, we will continue to supplement our internal resources with third-party consultants;
>
> • we are maintaining sufficient accounting personnel so that journal entries and account reconciliations are reviewed by someone other than the preparer, including retaining evidence of the reviews performed by management; and
>
> • we are implementing a more robust enterprise resource planning, or ERP, system than the one we have previously employed. This ERP implementation process initiated in 2020 and is still in progress; we experienced delays with the implementation process because of COVID-19. This ERP system will assist with the monthly close process, segregation of duties and the timely review and recording of financial transactions.
>
> We also plan to take additional steps to remediate the identified material weaknesses and improve our accounting function, including:
>
> • adopting formal internal control processes and documentation related to controls that address the elements of the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control Framework; and
>
> • restricting access to our financial systems to appropriate personnel and implementing proper segregation of duties within our finance and accounting processes.

97.     Similarly, in the Company's Report on Form 10-K for the year ended December 31, 2021, the Company again reported a material weakness in internal controls over financial

reporting.  Specifically, the Company disclosed: "***We have identified certain material weaknesses in our internal control over financial reporting and if our remediation of such material weaknesses is not effective, or if we fail to develop and maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.***" The material weaknesses related to the same three factors related to F45's financial reporting process and processes, specifically:

> • a failure to properly design our financial closing and reporting process to record, review and monitor compliance with generally accepted accounting principles for transactions on a timely basis. This includes an inadequate level of precision in management's reviews of accounting documentation and journal entries, including a lack of evidence to support that a review had been performed.

> • a lack of segregation of duties existed in certain key financial reporting processes, including a lack of separation between the preparer and reviewer of journal entries; individual users with administrative access to the general ledger, billing and payroll systems also having access to post journal entries; and insufficient implementation of the automated approval hierarchy for invoices in our billing system to ensure reviews were being performed by the appropriate personnel.

> • a lack of formal documentation of policies and internal controls being followed by us existed, including, but not limited to, entity-level controls involving risk assessment procedures and conclusions, tools to prevent a cybersecurity breach and controls designed to prevent or detect fraud.

98.    Again, the Company represented to investors that it had taken (and would continue to take) comprehensive steps to ameliorate the material weakness in every respect, including:

**Financial Close Process**

\* \* \*

As of December 31, 2021, management evaluated the design and operational effectiveness of our internal controls and has concluded

that the previously reported material weakness remains unremediated related to our financial closing and reporting process.

Based on deficiencies identified above, the Company has identified and implemented additional processes, procedures and controls as noted below to improve the effectiveness of our internal control over financial reporting and disclosure controls and procedures in this area. The Company initiated and implemented the following corrective actions:

• developed, formalized and implemented additional management review controls across the organization in order to add more comprehensive levels of review and approval for significant transactions;

• enhanced and refined our quarterly and annual financial analysis and procedures to allow for more timely and substantive review of financial results before the filing of the quarterly reports of Form 10-Q and Annual Report on Form 10K;

• commenced the implementation of certain modules within our accounting system to automate and provide better tracking and more timely reporting of certain processes; and

• retained an outside consultant to assist the Company in refining and testing the internal controls over financial reporting that are in place at the Company, including within the financial close process.

…The Company will continue to monitor the effectiveness of these controls and will make further changes management determines appropriate.

* * *

***Changes in Internal Control Over Financial Reporting***

**Remediation of Previously Report[ed] Material Weaknesses**

The Company previously reported material weaknesses in our prospectus filed in July 2021. As more fully described below, the Company has identified and implemented additional processes, procedures and controls to improve the effectiveness of our internal control over financial reporting and disclosure controls and procedures. The Company regularly reviewed our progress toward remediating these material weaknesses with our audit committee during 2021.

* * *

In an effort to remediate the identified material weakness, the Company initiated and implemented the following corrective actions:

• hired additional accounting personnel to implement more robust internal controls and enhanced financial reporting;

• maintain sufficient accounting personnel so that journal entries and account reconciliations are reviewed by someone other than the preparer, including retaining evidence of the reviews performed by management;

• implemented a more robust enterprise resource planning, or ERP, system to assist with the monthly close process, segregation of duties and the timely review and recording of financial transactions; and

• restrict access to our financial systems to appropriate personnel and implementing segregation of duties within our finance and accounting processes.

99.     Despite these purported efforts to address the material weakness in internal controls over financial reporting over the course of more than 20 months, from before the IPO in July 2021 to May 16, 2023, the material weakness remained uncorrected.

100.    Indeed, on March 16, 2023, F45 filed a Report on Form 12b-25 disclosing that the Company's Report on Form 10-K for the year ended December 31, 2022 would not be timely filed. The Company disclosed:

> F45 Training Holdings Inc. (the "Company") has determined that it is unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the "Annual Report") within the time period prescribed primarily because the Company and its independent registered public accounting firm require time to complete certain items with respect to its financial statement preparation and review processes, including management's assessment of the effectiveness of the Company's internal controls over financial reporting for the period covered by the Annual Report.
>
> Based on currently available information, the Company expects to report a material weakness similar to the material weakness reported in its Annual Report on Form 10-K for the fiscal year ended

December 31, 2021, filed with the U.S. Securities and Exchange Commission on March 23, 2022, related to the proper design of the Company's financial closing and reporting processes, and appropriate processes to monitor, review, and record transactions in compliance with generally accepted accounting principles. The Company and its independent registered public accounting firm require additional time to finalize management's assessment of progress made by the Company on previously disclosed material weaknesses for the reporting period for the fiscal year ended December 31, 2022. In addition, previously disclosed transitions in the Company's executive leadership team, including the recent appointment of its Interim Chief Financial Officer, have contributed to the delay in filing the Annual Report.

101.    On May 10, 2023, F45 filed with the SEC, a Report on Form 12b-25 (Notification of Late Filing of Form 10-Q) detailing that the Company's Report on 10-Q for the fiscal period ended March 31, 2023 also would not be timely filed.  The filing stated:

F45 Training Holdings Inc. (the "Company") has determined that it is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the fiscal period ended March 31, 2023 (the "Quarterly Report") within the time period prescribed, as its focus is on the preparation, finalization and audit and review of the Company's financial statements to be included in its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report").

The delay in filing the 2022 Annual Report is a consequence of the time required by the Company and its independent registered public accounting firm to complete certain items with respect to its financial statement preparation and review processes, including management's assessment of the effectiveness of the Company's internal controls over financial reporting for the year covered by the 2022 Annual Report.

In addition, previously disclosed transitions in the Company's executive leadership team, including the recent appointment of its Interim Chief Financial Officer and new Chief Executive Officer, have contributed to the delay in filing the 2022 10-K. The Company does not expect to file the Quarterly Report on or before the expiration of the five-calendar day extension period provided in Rule 12b-25 of the Securities Exchange Act of 1934, as amended. The Company plans to file the Quarterly Report as soon as practicable following the completion of the 2022 Annual Report.

**B.      Internal Controls Over Financial Reporting**

102.    Federal law requires that the CEO and CFO of public companies certify their company's quarterly and annual reports filed with the SEC and the procedures established by those companies to prepare the financial statements and disclosures.

103.    Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX")— designed to ensure that a public company's CEO and CFO take a proactive role in their company's public disclosures and to instill investors with confidence concerning the accuracy, quality, and reliability of a company's periodic SEC reports—requires that a CEO and CFO of a public company address the following topics in annual SEC filings (a Form 10-K for F45): (1) the material accuracy and fair presentation of the report's disclosures; (2) establishment and maintenance of "disclosure controls and procedures" ("DCP"); and (3) any material changes to the company's internal controls over financial reporting ("ICFR").  The CEO and CFO must certify that: (1) they have reviewed the periodic report; (2) it does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (3) based on their knowledge, the financial statements and other financial information fairly present the financial condition and operations of the company; (4) they have maintained disclosure controls and internal controls and have designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (5) they have disclosed to the audit committee and auditors all significant deficiencies and material weaknesses in the design or operation of internal controls.  These certifications communicate to investors that all material information required to be disclosed is contained in the report.

104.    Section 404 of SOX, 15 U.S.C. § 7262, requires management of public companies such as F45 to establish and maintain a system of internal controls relating to, among other things,

financial reporting.  Section 404 further requires management to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal controls over financial reporting on an annual basis. Ultimately, Section 404 requires that management of a public company annually evaluate the effectiveness of the company's ICFR and disclose the conclusion, including any material weaknesses, to investors.

105.    Section 404 of SOX was "intended to bring information about material weaknesses in [internal controls] into public view."  SEC Release 33-8810.  Under Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3), "[m]anagement is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting."

106.    Section 404 of SOX requires management of public companies to select an internal control framework and then assess and report on the design and operating effectiveness of those internal controls on an annual basis.  According to the Company's filings, F45 adopted the "Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control Framework." (Form S-1 p. 107).

107.    The COSO Framework states: "[i]nternal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.

108.    COSO identifies five interrelated components of internal control: (i) control environment, (ii) risk assessment, (iii) control activities, (iv) information and communication, and

(v) monitoring activities.  COSO requires that: "[e]ach of the five components of internal control and relevant principles is present and functioning [and that] [t]he five components are operating together in an integrated manner."  COSO also identifies that these components are relevant to an entire entity and to the entity level, its subsidiaries, divisions, or any of its individual operating units or functions.

109.    COSO states that the "control environment" is "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization" and recognizes that "[t]he board of directors and senior management establish the tone at the top regarding the importance of internal control and expected standards of conduct."  With respect to the "control environment," COSO requires that "[t]he board of directors demonstrate[] independence from management and exercises oversight of the development and performance of internal control," and that "[m]anagement establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives."  The "control environment" also requires that the "organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives."

110.    The "risk assessment" component requires that the Company "identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed."  It also requires that "[t]he organization identifies and assesses changes that could significantly impact the system of internal control."

111.    The "control activities" component requires that an "organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels"; "selects and develops general control activities over technology to support

the achievement of objectives"; and "deploys control activities through policies that establish what is expected and procedures that put policies into action."

112.    The "information and communication" component requires that an "organization obtains or generates and uses relevant, quality information to support the functioning of internal control"; "internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control"; and "communicates with external parties regarding matters affecting the functioning of internal control."

113.    The "monitoring activities" component requires that an "organization selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning," and "evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate."

## C.    F45 Is Required to Design and Implement Two Kinds of Control Systems: ICFR And DCP

114.    Public companies like F45 are required to design and implement two kinds of control systems to ensure the accuracy of their financial and non-financial representations to investors: (1) DCP and (2) ICFR.

115.    DCP ensure that information a company must disclose under the federal securities laws is communicated to company management and its board sufficiently in advance of the company's filing dates, to allow ample time for those groups to consider the information before disclosing it to investors.  *See* 17 C.F.R. § 240.13a-15(e).  The Exchange Act defines DCP to mean "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is

recorded, processed, summarized and reported, within the time periods specified" by the SEC.  *See* 17 C.F.R. § 240.13a-15(e).

116.    The SEC defines ICFR as "a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]."  *See* 17 C.F.R. § 240.13a-15(f).

117.    The Exchange Act states that ICFR specifically includes "policies and procedures" that "(1) [p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;" [and] (2) [p]rovide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with [GAAP], and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer."  Company management is required to review and evaluate these controls quarterly to determine their effectiveness.

118.    A company's DCP and ICFR cannot be considered effective if a "material weakness" exists.  A "material weakness" in ICFR is "a deficiency, or a combination of deficiencies, in [internal controls over financial reporting] such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."  SEC Release No. 33-8810 § II.A, p. 9, n.18. Likewise, a material weakness in DCP arises when there is a reasonable possibility that the company's controls will fail to timely prevent or detect a material misstatement in a public disclosure.  A reasonable possibility arises when the chance of a future event occurring (*e.g.*, a material misstatement) is more than slight.  SEC Release No. 33-8810 § II.B, p. 34, n.47.

119.    A deficiency in ICFR may pertain to either a deficiency in the design or operation of a control.  SEC Release No. 33-8810 § I, pp. 4-5.  A design deficiency "exists when (a) necessary controls are missing or (b) existing controls are not properly designed so that, even if the control operates as designed, the financial reporting risks would not be addressed."  SEC Release No. 33-8810 § II.A.1.b., p. 15, n.29.  An operating deficiency "exists when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or competence to perform the control effectively."  SEC Release No. 33-8810 § II.A.2., p.21.  In other words, a material weakness exists regardless of any error in the financial statements if any design or operating deficiency gives rise to a reasonable possibility that a material misstatement will not be prevented or detected.

120.    An evaluation of ICFR begins with the identification and assessment of the risks to reliable financial reporting.  SEC Release No. 33-8810, § II.A., pp. 9-10.  While undertaking this evaluation, F45 should have considered the sources and potential likelihood of misstatements occurring within its financial statements.  SEC Release No. 33-8810, § I., p. 4.  Specifically, and as the SEC emphasizes, management should have "perform[ed] more extensive testing in high-risk areas."  SEC Release No. 33-8810, § I, p. 5.  In particular, the SEC observes that the likelihood that a control would fail to operate was an important consideration in focusing management on those areas most critical to evaluate.  SEC Release No. 33-8810, § II.A.1.b, pp. 25-26.

121.    Next, management evaluates whether its ICFR is in place to address those risks (*i.e.*, the design of ICFR).  SEC Release No. 33-8810, § II.A.1, p. 12.

122.    Finally, management should ensure that testing procedures are performed regarding the operating effectiveness of those ICFR.  SEC Release No. 33-8810, § II.A.2, p. 21.  The COSO Framework characterizes such testing as part of an entity's monitoring of ICFR because

"[m]onitoring ensures that internal control continues to operate effectively." COSO Framework, Ch. 9, Monitoring, p. 124.

123.    If management is aware, or determines, that a control is not designed or operating effectively, a deficiency exists that must be evaluated. SEC Release No. 33-8810, *see* § II.A.1.b, p. 15. Management's evaluation of the severity of a control deficiency does not guarantee that a material misstatement has already occurred. SEC Release No. 33-8810, *see* § II.B.1, p.35. Rather, the evaluation focuses on whether a reasonable possibility of a material misstatement existed. This evaluation focuses on the likelihood of the risk occurring and the impact if the misstatement were to occur. Likelihood is assessed as higher in consideration of factors such as whether the defect is known to be present as opposed to vulnerability to the defect, whether a history of similar defects have occurred, and the presence of any mitigating controls. Impact is assessed higher in consideration of factors such as financial materiality, the business area affected, the business processes affected, effect on the entity's reputation, expected response of external stakeholders, as well as mitigating controls.

124.    Ultimately, prior to making the SOX 302 and SOX 404 certifications, management was required to conduct an appropriate evaluation. In doing so, the SEC expected management's evaluation to focus on "areas of weakness or continuing concern." (SEC Release No. 33-8238 § II.E.). This is because the "required evaluation should help to identify potential weaknesses and deficiencies in advance of a system breakdown, thereby ensuring the continuous, orderly and timely flow of information within the company and, ultimately, to investors and the marketplace." (SEC Release No. 33-8124 § VII.).

### D.   F45 Identified the Need for Internal Control Procedures, But Failed to Set an Appropriate Tone at the Top and Maintain an Effective Control Environment

125.    Effective ICFR is critical to support a public company's operations. When a company expects to grow rapidly, that growth often puts a strain on internal controls that has the potential to materially impair the business. (F45 July 13, 2021 Form S-1, p.11: "Our planned growth could place strains on our management, employees, information systems and internal controls, which may materially and adversely impact our business.")

126.    Despite the strain that management expected to exert on ICFR, in F45's IPO Registration Statement filed on July 13, 2021, F45 disclosed the presence of three material weaknesses as follows: (*see* pp. 58 and 106).

| No. | Material Weakness | Components |
|---|---|---|
| 1 | A failure to properly staff and design our financial closing and reporting team and processes to maintain compliance with generally accepted accounting principles (GAAP) on a timely basis. | An inadequate level of precision in management's reviews of accounting documentation and journal entries, including a lack of evidence to support that a review had been performed. |
| 2 | A lack of segregation of duties in certain key financial reporting processes. | A lack of separation between the preparer and reviewer of journal entries; individual users with administrative access to the general ledger, billing and payroll systems also having access to post journal entries; and insufficient implementation of the automated approval hierarchy for invoices in our billing system to ensure reviews were being performed by the appropriate personnel. |
| 3 | A lack of formal documentation of policies and internal controls, including, but not limited to, controls involving risk assessment procedures, tools to prevent a cybersecurity breach and controls designed to prevent or detect fraud. | Including entity-level controls involving risk assessment procedures and conclusions, tools to prevent a cybersecurity breach and controls designed to prevent or detect fraud. |

127.    Consequently, the material weaknesses identified had a pervasive effect on F45's Financial Statement Close Process.  <u>As seen in the table above, at that time of its IPO, F45 did not have an appropriate level of staffing or staffing with adequate expertise to ensure that the Company could produce financial statements in compliance with GAAP</u>.  Indeed, management failed to review financial information or even secure sufficient segregation of duties to validate that the disclosures provided to investors were complete and reliable.  Moreover, management failed to appropriately assess the risk of such breakdowns in control—including the breakdown of controls required to prevent or detect fraud.  Unless these material weaknesses were cured on a timely basis, F45's financial statements were a ticking time bomb.

128.    On March 23, 2022, F45 filed its 2021 Form 10-K.  At that time, F45 disclosed that ICFR continued to be ineffective due to the failure to cure the material weaknesses (F45 2021 Form 10-K pp.126-127).  The components of the three material weaknesses at that time mirrored those disclosed nine months earlier in the Company's prospectus.  At that time, however, F45 assured investors that it had implemented sufficient improvements to ICFR that the material weaknesses would be remediated. (*Id.*)

129.    Throughout fiscal 2022, F45's material weaknesses continued to be present— indicating that management provided false assurances regarding the state of remediation in F45's 2021 Form 10-K.  Then, on March 16, 2023, F45 announced that it would not timely file its 2022 Form 10-K.  Also at that time, F45 disclosed that it expected to conclude that the previously reported material weaknesses in ICFR continued to persist.  Put differently, F45 failed to remediate the material weakness disclosed in July 2021 Form 10-K during fiscal 2021 or the entirety of fiscal 2022.

130.    An effective control environment, which is "the set of standards, processes, and structures that provide the basis for carrying out internal controls across the organization," is premised on several principles, perhaps none more important than what is referred to as the "tone at the top."  It was incumbent on F45 directors and officers to set the tone at the top, which is to "demonstrate through their directives, actions, and behavior the importance of integrity and ethical values to support the functioning of the system of internal control."  Considering that the need for control procedures was identified as far back as July 2021, yet remained uncured as of March 2023, it is evident that F45 management failed to set an appropriate tone at the top and maintain an effective control environment.

## VII.    SECURITIES ACT ALLEGATIONS

### A.    Background of the Securities Act Claims

131.    In this section of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based in the Securities Act on behalf of themselves and the members of the Class who purchased or otherwise acquired F45 common stock pursuant and/or traceable to F45's IPO, which occurred on or about July 15, 2021, and suffered damages as a result.

132.    Plaintiffs' claims under the Securities Act do not sound in fraud, and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of their claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

133.    As alleged below, F45 and the other Securities Act Defendants made a series of materially untrue statements and omissions of material facts in F45's IPO Registration Statement

and IPO Prospectuses (together, the "IPO Materials"), and in the Company's public filings incorporated by reference into and therefore deemed part of the IPO Materials.

134.    The Securities Act Claims seek to recover such losses suffered by Class members who purchased shares of F45 common stock pursuant and/or traceable to, the false and misleading IPO Materials.

135.    As set forth above, on June 21, 2021, F45 filed with the SEC a registration statement for the IPO on Form S-1, which, after two amendments, was declared effective on July 14, 2021.

136.    On July 15, 2021, F45 conducted the IPO pursuant to the IPO Registration Statement and Prospectus that the Company filed with the SEC on June 21, 2021 and July 16, 2021, respectively.

137.    On July 16, 2021, F45 filed a Prospectus for the IPO on Form 424(b)4, which incorporated and formed part of the IPO Registration Statement and included a lock-up agreement with the underwriters that barred F45's "directors, executive officers and substantially all of [the Company's] stockholders, including [MWIG LLC]," from selling any F45 shares of common stock for 180 days after the date of the prospectus.  Accordingly, the lockup period was set to expire on January 12, 2022. The IPO Registration Statement was signed by Defendants Gilchrist, Payne, Raymond, Richman, Wahlberg.

138.    By means of the IPO Materials, F45 offered and sold 19,057,889 shares of common stock (including 307,889 shares that were sold on August 17, 2021 to the underwriters pursuant to exercise of their over-allotment option) and MWIG LLC offered and sold 2,794,055 shares of F45 common stock (including 1,231,555 shares that were sold on August 17, 2021 to the underwriters pursuant to the exercise of their over-allotment option) at a public offering price of $16.00 per

share, resulting in aggregate gross proceeds to F45 and MWIG LLC of approximately $304.9 million and $44.7 million, respectively. Defendants priced the IPO at $16.00 per share.

## B.    The IPO Materials Contained Material Misstatements and Omissions

### 1.    Misstatements and Omissions About F45's Unit-Economic Model

139.    The IPO Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

140.    Specifically, the IPO Registration Statement and Prospectus included the following false and misleading statements about F45's unit-economic model.[15]

> We operate a nearly 100% franchise model that offers compelling economics to us and our franchisees. ***We believe our franchisees generally benefit from a relatively low initial investment and low four-wall operating expenses, which in turn can generate strong returns on franchisee investments.*** The optimized box layout of our studios, which requires as little as approximately 1,600 square feet of training area, contributes to the relatively low initial investment and operating costs of our franchisees, and allows our studios to be located in a wide array of attractive prospective retail locations. ***We believe this flexibility will enable us to capitalize on our estimated long-term global opportunity of over 23,000 studios.*** Based on the Franchise Survey conducted prior to the COVID-19 pandemic, ***we estimate that a typical F45 Training franchise in a normalized operating environment requires an aggregate initial investment of approximately $315,000 and, in its third year of operation can produce average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%***.
>
> ***We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation***, and has helped to facilitate our rapid growth and strong financial performance prior to the COVID-19 pandemic . . . which we believe underscores the resilience of our business model. Between 2018 and 2020 we grew our Total Franchises Sold at the annual rate of 33% and our Total Studios at the rate of 34%. ***From***

---

[15] Plaintiffs allege that the statements highlighted in ***bold and italics*** within this Section were materially false, misleading, and omitted to disclose material information.

*June 30, 2020 to June 30, 2021, our Total Franchises Sold increased by 36% and our Total Studios increased by 22%.*

141. The IPO Prospectus also stated:

*Compelling Franchisee Studio Economics*

*We believe we offer a compelling business opportunity for franchisees to generate strong returns driven by a relatively low initial investment combined with healthy AUV and low four-wall operating expenses.* Prior to the COVID-19 pandemic and based on data collected through our booking systems and the Franchise Survey, *we estimate that in a normalized operating environment, a typical F45 Training franchise requires an aggregate initial investment of approximately $315,000 and, in its third year of operation can produce an AUV of approximately $354,000, average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%.*

Across the F45 network, we believe that many studios that have re-opened following the onset of the COVID-19 pandemic have demonstrated the ability to ramp up AUV levels. Further, we believe that many studios that have re-opened following the onset of COVID-19 have been able to return to or lower their pre COVID-19 operating costs. During the six months ended June 30, 2021, studios that were open for the full period experienced an AUV increase of approximately 27% compared to the same period in 2020.

142. Moreover, the IPO Registration Statement and Prospectus stated:

*Attractive Franchisee Return Profile*

*Our franchise model has the potential to generate strong returns for franchisees as a result of a relatively low initial investment and favorable operating cost structure driven by our purpose-built studio design and proprietary technology-enabled ecosystem.* We believe that our scale provides us with cost advantages that allow us to offer our equipment to our franchisees for a significantly lower cost than if they were to acquire it on their own. We recommend that our franchisees typically staff one lead trainer and at least one assistant trainer during business hours. We also provide ongoing back-office support through our customer relationship management capabilities to assist with day-to-day booking and operation of the business. *We believe the modest initial investment, combined with limited staffing needs, creates the potential for strong financial performance and expands the universe of potential franchisees.*

Prior to the COVID-19 pandemic and based on data collected through our booking systems and the Franchise Survey, *we estimate that in a normalized operating environment, a typical F45 Training franchise requires an aggregate initial investment of approximately $315,000, which includes all of the required studio equipment contained in the World Pack, and, in its third year of operation can produce an AUV of approximately $354,000, average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%.*

143.    The IPO Registration Statement and Prospectus also stated, *"Our platform enables the rapid scalability of our model and helps to promote the success of our franchisees."*

144.    Further, the IPO Registration Statement and Prospectus stated, *"We have created a highly efficient franchisee development platform that leverages strong consumer demand for our fitness concept and the potential for attractive returns for new franchisees."*

145.    The IPO Registration Statement and Prospectus stated:

We believe the upfront and ongoing support that we offer to our franchisees is a key differentiator in our value proposition and has been a critical contributor to our success. Our new franchisees undergo a comprehensive and multi-day training program that covers membership marketing and day-to-day operations prior to opening the studio to ensure the F45 Training experience is standardized across our global footprint. All head trainers must pass a standardized fitness test and undergo a two-day training program to better understand our functional training programs, so that they are able to correct our members' movements and foster a collaborative and welcoming environment.

*We maintain a robust ongoing support program for our franchisees, with dedicated performance managers overseeing the health of the franchisee network within their designated geographies.* Performance managers are directly focused on driving strategies to support the performance of studios in their portfolio. Our studio support program is vital to maintaining the overall health and quality of our franchisee network.

146.    The statements set forth in ¶¶ 140-145 were materially false and misleading because the IPO Registration Statement and Prospectus failed to disclose that F45's business model and the Company's substantial growth was a result of undisclosed and unsustainable practices that the

Company followed simply to maximize the number of Total Franchises Sold (as opposed to profitable studios operating), including:

(a)    misleading potential franchisees with respect to certain key profitability metrics in order to convince them to purchase a franchise license so F45 could record the deal in its closely watched metric "Total Franchises Sold;"

(b)    failing to conduct proper due diligence on potential franchisees to ascertain whether they were credit-worthy enough to purchase, open, and maintain one or more F45 franchises;

(c)    failing to provide franchisees with proper training and/or guidance once they opened a studio to assure a better likelihood of studio success (meaning increased royalties and other fees for F45);

(d)    failing to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth;

(e)    failing to disclose that a significant number of its franchisees' studios were in financial distress and were not profitable – certainly not within the time frame represented by the Company;

(f)    providing to certain preferred franchisees undisclosed modified payment terms and failing to properly account for those modified terms. This ultimately resulted in, among other problems, ballooning account receivables for F45 and delayed cash inflows for the Company's growth initiatives;

(g)    "selling" exclusive franchise rights to multi-unit franchisees without regard to whether those franchisees could financially or would ultimately open those franchisees and in

doing so, the Company artificially inflated the number of reported "Total Franchises Sold," a key metric followed closely by analysts and investors; and

(h)    failing to adequately remediate identified material weaknesses in internal controls over financial reporting.

147.    Several different sources provide information demonstrating the falsity of the statements in the IPO Materials.  For example, in one of the many lawsuits filed against F45, plaintiff Functional HIIT Fitness, LLC (a franchisee that owns and operates three F45 studios) asserted that the Company misrepresented: (i) estimated "break-even points" and earnings for newly opened studios; (ii) estimated costs relating to leasehold improvements per studio; and (3) the exclusivity of a franchisee's territory—as the Company claimed that franchisees cannot solicit customers from each other's territory, yet mandated that franchisees advertise to customers in neighboring territories.

148.    Plaintiffs spoke with additional franchise owners who confirmed that the Company misrepresented the profitability of F45 studios.

149.    For example, CW-2, an Owner and Operator of an F45 franchise in the UK from before the F45 IPO through June 2022, confirmed that F45 told him that he would be cash flow positive within nine months of opening his studio, which was not true and his actuals were not close to that.  Specifically, CW-2 recalled that he spoke to current F45 Chief Revenue Officer Luke Armstrong directly and that Armstrong promised CW-2 that he would be profitable within nine months of opening his F45 studio.  CW-2 added that Armstrong said he owned his own F45 studio in Sydney, Australia that was "managing itself," which appealed to CW-2 because he purchased an F45 franchise an as investment and was not looking to actively manage it.  According

to CW-2, his communications with Armstrong were mainly by phone, but they met in person in London in 2017.

150.    CW-2 recalled that his F45 franchise was barely breaking even before COVID and it closed in June 2022. CW-2 stated that he never received any brand support from F45 and that there was no promotion or brand awareness for the F45 brand outside of London. CW-2 explained that F45 does not provide support for studios located in "bad" markets and is only looking to make sales. CW-2 suggested that "standalone" F45 studios were never going to be successful. CW-2 added that after he signed his franchise agreement, he only communicated with F45 about compliance issues and the Company never provided him with business advice.

151.    CW-2 confirmed that F45 does not conduct due diligence for potential studio locations prior to opening in a new territory. CW-2 suggested that F45 should have done due diligence before opening franchises in certain markets because franchisees were "relying on their expertise." According to CW-2, it was his opinion that F45 sold franchises in territories that had no chance to succeed in the UK because the Company was only "looking to make sales." CW-2 added that F45 had no "idea what the market was like outside of London" and never tested the price point in the territory they sold him. CW-2 explained that most F45 studios outside of London, including F45 franchises in Manchester, Bristol, Reading and Bath, have closed.

152.    F45 also sought to sell additional studios to franchisees whose studios were not doing well. According to CW-2, F45 offered to discount either franchisee fees or setup fees by 50% to franchise owners who opened a second studio. According to CW-2, when F45 approached him about opening a second franchise during COVID, he asked why he should open a second studio when his current franchise was struggling. CW-2 recalled that F45 blamed him for his franchise failing and told him that he was not marketing correctly. When CW-2 inquired about

which territory he should open a second studio in, the Company did not provide any guidance and instructed him to conduct his own due diligence.

153.   CW-2 stated that F45 was not setting up franchisees to succeed and that the Company blamed franchise owners when their studios failed.  CW-2 noted that F45's culture was that "they were great, and everyone was shit."  CW-2 added that he spoke to other franchisees who told him that F45 had also blamed them when their studios failed.

### 2.   Misstatements and Omissions Related to the Increasing Percentage of Multi-Unit Franchisee Systems Being Sold

154.   The IPO Materials also included false and misleading statements and omissions related to the increasing percentage of multi-unit franchisee systems being sold.

155.   For example, the IPO Registration Statement and Prospectus stated:

> The majority of our franchisees today consist of owner-operators that manage single locations. ***Going forward, we intend to seek opportunities to develop multi-unit franchise systems with select financial partners. As of March 31, 2021, approximately 51% of our franchises sold were owned by multi-unit franchisees, up from approximately 41% as of December 31, 2019, which highlights the strong market demand for multi-unit franchise opportunities.***
>
> ***We recently entered into long-term multi-unit studio development agreements with three financial partners, including an affiliate of Kennedy Lewis Management, or KLIM, one of our principal stockholders. Pursuant to each such agreement, we have granted to the financial sponsor the right to develop, and the financial sponsor has agreed to develop, an agreed number of studios within certain territories in the United States***, with one sponsor agreeing to develop at least 70 studios over a 7 year period, another to at least 87 studios over 6 years ***and the sponsor affiliated with KLIM agreeing to at least 300 studios over 36 months***. In certain cases, we have also agreed to a right of first refusal in favor of the financial sponsor developer within their territories with respect to any new concepts developed by us.

156.    Likewise, the IPO Registration Statement and Prospectus stated:

**Franchising Strategy**

We utilize an attractive franchise model that has allowed us to scale our business rapidly. As of June 30, 2021, we had a global network of 2,801 Total Franchises Sold, including 1,555 Total Studios, of which 1,415 had re-opened following one or more temporary COVID-related closures. Approximately 49% of Total Franchises Sold are owned by single-unit franchisee owners, with the other 51% owned by multi-unit franchisees. As of March 31, 2021, our largest franchisee owns 24 franchises, representing approximately 1% of our Total Franchises Sold. ***As we pursue opportunities to develop multi-unit franchise systems with financial partners, we expect the percentage of multi-unit franchisees to increase over time***.

157.    The IPO Registration Statement and Prospectus also stated:

During 2019, we sold a net average of 52 new franchises per month. …In addition, ***300 of the net franchises sold during the 18 months ended June 30, 2021 were sold pursuant to pursuant to [sic] a long-term multi-unit studio development agreement with Club Franchise Group LLC***.

158.    Similarly, the IPO Registration Statement and Prospectus stated:

**Franchise Agreement**

***For each franchise license, we enter into an agreement with the franchisee covering standard terms and conditions***. We grant our franchisees an exclusive area or territory under the franchise agreement, and territories are determined as agreed with us using our internal analysis, after taking into account population density and demographics.

159.    The IPO Registration Statement and Prospectus also stated:

**Equipment and merchandise revenue**

***We require our franchisees to purchase fitness and technology equipment directly from us and payment is required to be made prior to the placement of the franchisees' orders.*** Revenue is recognized upon transfer of control of ordered items, generally upon delivery to the franchisee, which is when the franchisee obtains physical possession of the goods, legal title has transferred, and the franchisee has all risks and rewards of ownership. The franchisees

are charged for all freight costs incurred for the delivery of equipment. Freight revenue is recorded within equipment and merchandise revenue and freight costs are recorded within cost of equipment and merchandise revenue.

160.   The statements set forth in ¶¶ 155-159 were materially false and misleading for the reasons explained in ¶¶ 146(f),(g).

161.   Several former F45 employees have provided information that gives further context and corroboration for the fact that the Company provided preferential terms to certain franchisees.

162.   For example, CW-1 recalled that he heard of F45 waiving franchisee fees for owners who were "doing better than others."

163.   CW-5 stated that the Company always offered incentives to investors during his tenure at F45, especially to larger investors and developers.  CW-5 confirmed that, for example, F45 would waive the franchise fee to franchisees who purchased the Company's equipment pack.

**3.      Misstatements and Omissions About F45's Potential for Growth in the U.S.**

164.   The IPO Registration Statement and Prospectus stated, ***"We believe there are several attractive opportunities to continue to drive the long-term growth of our business."***

165.   Similarly, the IPO Registration Statement and Prospectus stated, "***We believe there is a significant opportunity to meaningfully expand our franchise studio footprint in the United States***. . . . Based on current franchises sold in Australia per capita as of June 30, 2021, *we believe there is a long-term studio potential for us to open over 7,000 studios in the United States*."

166.   Moreover, the IPO Registration Statement and Prospectus stated: ***"Our opportunities to drive the long-term growth of our business include: [. . .] expanding our studio footprint in the United States[.]"***

167.    The IPO Registration Statement and Prospectus also stated:

Our long-term growth will depend in part on our continued ability to sell new franchises. ***We are still in the early stages of growth and expansion, particularly in the United States and ROW, and we believe we can significantly grow our franchisee base.***

168.    Further, the IPO Registration Statement and Prospectus also stated:

Our long-term growth will depend in part on our continued ability to open new studios. ***We believe that we will experience continued expansion of new studio openings in the United States and ROW.*** However, if delays or difficulties are encountered and new studio openings do not occur as quickly as we would like, our operating results may be adversely affected.

169.    Moreover, the IPO Registration Statement and Prospectus stated, ***"We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation***, and has helped to facilitate our rapid growth and strong financial performance prior to the COVID-19 pandemic."

170.    The IPO Registration Statement and Prospectus also stated:

**Predictable, Asset-Light Model Driving Rapid Growth**

As a franchisor, ***we have employed an economic model that***, other than due to the unprecedented global shutdown of our network due to the COVID-19 pandemic, ***has been predictable, asset light and cash flow generative and has enabled us to open new studios at an accelerated pace versus the owner-operator model that is common in the studio fitness landscape***. For the majority of franchises that we sell, we receive an upfront payment from the franchisee, which varies by geography. Once a new studio has opened, we receive contractual, recurring franchise fee revenue streams that provide us with a high degree of revenue visibility. During the most challenging months of the COVID-19 pandemic, we offered franchisees temporary relief from contractual franchise fees. ***As our network of total studios grows, we expect recurring revenue as a percentage of total revenue to increase.***

171.    The statements set forth in ¶¶ 164-170 were false and misleading for the reasons explained in ¶¶ 146(a),(c)-(g) and because the IPO Registration Statement and Prospectus failed

to disclose that F45's existing multiunit franchisees, such as Club Sports Group, had already been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth.

172.    Several former F45 employees and franchises provide information that gives further context and corroboration for the alleged falsity of these statements. For example:

173.    CW-1 recalled that F45 was at its peak in the first half of 2021.  CW-1 stated that he noticed a decline in new F45 studio openings in mid-2021 which he attributed to F45 headquarters "not protecting the franchisees."

174.    CW-1 explained that F45 allowed multiple studios to open in the same vicinity and to charge different membership fees to customers, which forced some F45 studios to close.  CW-1 stated that if you do not put the F45 franchisees first "things crumble."

175.    Indeed, only a small percentage of the Club Sports Group F45 studios have opened to date.

### 4.    Misstatements and Omissions About the Quality of F45's Franchisees

176.    The IPO Registration Statement and Prospectus stated:

**Highly Engaged Franchise Community**

***We believe that F45 Training franchisees are highly motivated business owners who are financially, and often personally, invested in improving the wellbeing of their members.*** Franchisees typically fall into two categories: "owner-operators" and "investors." Owner-operator franchisees are individuals who usually serve as the lead in-studio trainer and handle day-to-day management of the studio. These franchisees include former personal trainers or fitness enthusiasts who previously developed a strong connection with F45 Training as members before becoming franchisees. Investor franchisees generally hire outside staff to lead workouts and handle day-to-day management of the studio.

While the majority of our franchisees today consist of owner-operators that manage single locations, in the coming years we expect the number of investor franchisees to accelerate.

177.    The IPO Registration Statement and Prospectus also stated:

***When evaluating potential new franchisee partners, we generally look for the following criteria:***

- strong commitment to health and fitness;

- personal accountability for the success of a business;

- ability to work in a standardized operational environment;

- passion for delivering high quality service;

- ability to attract and develop talented people; and

- willingness to make a minimum commitment of five years.

We divide the franchisee selection process into four distinct phases:

- Prospects phase: ***Our sales team identifies and contacts "marketing qualified leads" to discuss fit and interest***, as well as to determine suitability and optimal territory for a potential studio.

- Reservations phase: A potential franchisee reserves a territory, after which they complete an online interview, file disclosure documents, review the business model and review the terms of our franchise agreement.

- Contract sent phase: A contract is sent to potential franchisees. During this time, the sales team further educates the potential franchisee about the opportunity to become a franchisee. The majority of deals that reach this phase become F45 Training franchisees.

- Contract sold phase: The closing of the franchise sale typically occurs within six months of initial contact.

178.    The statements set forth in ¶¶ 176-177 were materially false and misleading because for the reasons explained in ¶¶ 146(b),(e),(g).

179.    Several former F45 employees have provided information that gives further context and corroboration for the alleged falsity of these statements.

180.    For example, CW-2 recalled that when he purchased his F45 franchise, the Company did not conduct any financial due diligence on him and other franchisees besides telling franchisees how to borrow money.  CW-2 recalled that F45 did not run a credit check on him prior to his F45 studio acquisition.  However, CW-2 recalled negotiating the parameters for his F45 studio location.  CW-2 stated that F45 would have sold his UK franchise "to anyone."

181.    According to CW-3, it was his perception that "over 50 percent" of F45 franchises were delinquent and "few gyms" paid their franchise and equipment fees on time.  CW-3 recalled that the delinquent F45 franchises' debt ranged from $100,000 to $500,000.  CW-3 stated that the West Coast F45 franchises were the most delinquent because of state COVID regulations and that franchises in major cities like New York City had "pretty extensive expenses."  CW-3 recalled that market saturation also caused F45 franchises to struggle.  CW-3 added that some F45 studios were not operating before COVID due to market saturation.

182.    CW-3 further recalled that collecting fees from delinquent F45 franchises was a "balancing act" for the Company because they were "not trying to make much noise due to the IPO."

183.    According to CW-3, F45 accepted payment plans on debt owed starting in around March 2021 and April 2021 because studios were struggling to pay their fees all at once.  CW-3 noted that delinquent F45 franchises who did not pay their debts were escalated to F45's legal department.  CW-3 added that he escalated delinquent F45 franchises who did not pay their debts to Christian Torres, who in turn escalated them to the Company's legal department.  CW-3 stated that he departed F45 because he did not like "their approach" and the Company's "practices stood out" to him.  CW-3 recalled that management pitted him against his co-worker to see who collected

more fees every month from delinquent F45 franchises.  CW-3 explained that F45 tracked how

close it was to collecting all outstanding fees and that he had a quota he had to collect each month.

### 5. Misstatements and Omissions About F45's Deficient Internal Controls Over Financial Reporting

184.    While the IPO Registration Statement and Prospectus did disclose that the

Company had identified a material weakness in internal controls over financial reporting, it falsely

stated that: **"We believe we have taken the necessary actions to substantially address each of the**

**material weaknesses discussed above, and we plan to take additional steps to improve our**

**accounting function**."

185.    In the section entitled, "Internal Control Over Financial Reporting," the IPO

Registration Statement and Prospectus addressed purported steps the Company had taken to

address the material weakness in internal controls over financial reporting.  Specifically, the

Company reported the following:

> **In order to remediate these material weaknesses, we have taken**
> **and plan to continue to take the following actions**:
>
> - we have hired additional accounting personnel to implement
>   more robust internal controls and enhanced reporting,
>   including a Chief Financial Officer in June 2018, a Financial
>   Analyst in December 2018, a VP FP&A in June 2019, a Staff
>   Accountant (Australia/ROW) in April 2020, a Chief
>   Accounting Officer in November 2020, a Financial
>   Controller (US) in January 2021, a Financial Controller
>   (Australia/ROW) in March 2021, a Director of Revenue
>   Accounting and SEC Reporting in March 2021, and a Senior
>   Accountant (Australia/ROW) in March 2021. As we build
>   out our team, we will continue to supplement our internal
>   resources with third-party consultants;
>
> - we are maintaining sufficient accounting personnel so that
>   journal entries and account reconciliations are reviewed by
>   someone other than the preparer, including retaining
>   evidence of the reviews performed by management; and

- we are implementing a more robust enterprise resource planning, or ERP, system than the one we have previously employed. This ERP implementation process initiated in 2020 and is still in progress; we experienced delays with the implementation process because of COVID-19. This ERP system will assist with the monthly close process, segregation of duties and the timely review and recording of financial transactions.

***We also plan to take additional steps to remediate the identified material weaknesses and improve our accounting function, including***:

- adopting formal internal control processes and documentation related to controls that address the elements of the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control Framework; and

- restricting access to our financial systems to appropriate personnel and implementing proper segregation of duties within our finance and accounting processes.

186.    The statements set forth in ¶¶ 184-185 were materially false and misleading for the reasons explained in Section VI and ¶ 146(h).[16]

### 6.    The IPO Risk Warnings Were Inadequate and Contained Material Misstatements and Omissions

187.    The IPO Materials violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, the IPO Materials violated Item 105 of SEC

---

[16] Notably, Deloitte & Touch LLP, who served as the independent auditor for F45's Registration Statement and Prospectus, explicitly stated in its "Basis for Opinion" that "[a]s part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion."

Regulation S-K, 17 C.F.R. § 229.105, to include "adequately describe[] the risk[s]" that make the "offering speculative or risky."

188.    Specifically, the failure of the IPO Materials to disclose that F45's businesses model was unsustainable and that the Company was unable to maintain substantial growth for the reasons explained in ¶¶ 146 violated 17 C.F.R. § 229.303(b)(2)(ii) because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  This failure also violated 17 C.F.R. § 229.105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in F45 common stock speculative or risky.

189.    Further, F45 included certain "Risk Factors" in the IPO Materials that were materially false and misleading when made as the conditions described had already materialized at the time of the issuance of the IPO Registration Statement and Prospectus.

190.    For example, F45's IPO Registration Statement and Prospectus contain the following "Summary of Risk Factors":

- ***If we fail to identify, recruit and contract with qualified franchisees, our ability to open new franchised studios and increase our revenue could be materially adversely affected.***

- ***If we are unable to renew our franchise agreements with our existing franchisees, our business, results of operations and financial condition would be materially and adversely affected.***

- We have limited control with respect to ***the operations of our franchisees, which could have a negative impact on our business, and our franchisees are impacted by factors that are beyond our control***.

- ***If we fail to successfully implement our growth strategy, which includes new studio development by existing and new franchisees, our brand and ability to increase our revenue and operating profits could be materially and adversely affected.***

- *If we and our franchisees are unable to identify and secure suitable sites for new franchise studios, our revenue growth rate and operating profits may be negatively impacted.*

191.    Likewise, the Company listed "Risks Related to Our Franchise Business Model and

Strategy" in its IPO Registration Statement as follows:

> Our financial results are affected by the number of franchises sold and studios we open and by the operating and financial results of such studios, which impact will become more significant as we continue to implement a variable franchise fee structure.

> \* \* \*

> *If our franchisees are not successful in operating their studios, they may not be able to pay required monthly franchise fees to us, which could harm our operating results through reduced franchise fee revenue.*

192.    Similarly, the IPO Registration Statement and Prospectus stated:

> If we fail to identify, recruit and contract with qualified franchisees, our ability to open new franchised studios and increase our revenue could be materially and adversely affected.

> *The opening of additional franchised studios depends, in part, upon the availability of prospective franchisees who meet our criteria. We may not be able to identify, recruit or contract with suitable franchisees in our target markets on a timely basis or at all. Although we have developed criteria to evaluate and screen prospective franchisees*, our franchisees may not ultimately have the business acumen or be able to access the financial or management resources that they need to open and successfully operate the studios contemplated by their franchise agreements with us.

> \* \* \*

> *Our business and operations may consume resources faster than we anticipate*. In the future, we may need to raise additional funds through the issuance of new equity securities, debt or a combination of both. However, the lapse or waiver of the lock up restrictions discussed above or any sale or perception of a possible sale by our stockholders, and any related decline in the market price of our common stock, could impair our ability to raise capital.

*  *  *

***Our planned growth could place strains on our management, employees, information systems and internal controls, which may materially and adversely impact our business.***

Over the past several years, we have experienced significant growth in our business activities and operations, including an increase in the number of system-wide studios. ***Our past expansion has placed, and our planned future expansion may place, significant demands on our administrative, operational, financial and other resources. Any failure to manage growth effectively could seriously harm our business***. To be successful, we will need to continue to implement and improve our management information systems and our operating, administrative, financial and accounting systems and controls. We will also need to train new employees and maintain close coordination among our executive, accounting, finance, legal, human resources, risk management, marketing, technology, sales and operations functions. These processes are time-consuming and expensive, increase management responsibilities and divert management attention, and we may not realize a return on our investment. In addition, we believe the culture we foster at our studios is an important contributor to our success. However, as we expand, we may have difficulty maintaining our culture or adapting it sufficiently to meet the needs of our expanded operations. These risks may be heightened as our business continues to scale. Our failure to successfully keep pace with our planned expansion of studios could materially and adversely impact our business.

193.    The statements set forth in ¶¶ 190-192 were materially false and misleading for the reasons explained in ¶ 146 and Section VI.

## C.    F45 Issues Strategic Update On July 26, 2022

194.    On July 26, 2022, after market close, F45 issued a "Strategic Update" and filed a Form 8-K with the SEC to inform investors about "strategic updates to align the Company more closely with macroeconomic conditions and current business trends and **prepare for the next phase of studio and membership growth**." The Company revealed:

(a)    a dramatic cut in the number of new studios the Company would open in 2022 – down approximately 60% from 1,000 studios to a range of 350 to 450 new studios;

(b)     an extraordinary cut in the number of new franchises that the Company would sell in 2022 – down approximately 70% from 1,500 to 350 to 450 new franchises;

(c)     a significant reduction in the Company's financial guidance for full-year revenue from a range of $255 to $275 million to a range of $120 to $130 million;

(d)     the immediate termination of a $250 million credit line for franchisee studio acquisitions;

(e)     the reduction of approximately 45% of F45's workforce;

(f)     the departure of CEO Adam Gilchrist that was effective June 24, 2022;

(g)     the appointment of Board Member Ben Coates as Interim CEO; and

(h)     the payment of a $2.4 million retention bonus to CFO Payne to ensure he would stay on as CFO until at least October 15, 2022 (10 additional weeks).

195.    F45's stock plunged ***more than 60%*** in direct response to these revelations, from $3.51, on the close trading day on July 26, 2022, to close at $1.35 on July 27, 2022 on extremely heavy trading volume.

**D.    The Corporate Defendants, Director Defendants, and Underwriter Defendants Failed to Exercise Reasonable Care or Conduct a Reasonable Investigation in Connection with the IPO**

196.    None of the Corporate Defendants, Director Defendants, or Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials were accurate and complete and not misstated in all material respects.

197.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.  Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a

verification process.  At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings.  Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

198.    Had the Corporate Defendants, Director Defendants, and Underwriter Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

199.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the IPO Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

200.    The Underwriter Defendants could not simply rely on the work of F45's outside auditors because the investing public relies on underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed.  The Underwriter Defendants must conduct their own, independent (and reasonable) investigation.  Had the Underwriter

Defendants conducted a reasonable investigation, they would have known that the IPO Materials contained material misstatements and omissions concerning F45's unsustainable business model.

201.    Similarly, the Corporate Defendants and Director Defendants signed the IPO Registration Statement and failed to conduct a reasonable investigation into the statements contained in the IPO Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.  Had these Corporate Defendants and Director Defendants conducted a reasonable investigation, they would have known that the IPO Materials contained material misstatements and omissions about F45's unsustainable business model.

202.    The Underwriter Defendants were sophisticated in finance issues given their collective industry experience, yet they failed to reasonable inquire as to the Company's misstatements and omissions.

## VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I
**For Violation of Section 11 of the Securities Act**
**Against the Corporate Defendants, the Director Defendants, and**
**the Underwriter Defendants**

203.    Plaintiffs repeat and reallege each and every allegation contained above only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

204.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the IPO Materials.  This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the IPO Materials are specifically excluded from this Count, except that any challenged statements of opinion or

belief made in connection with the IPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the offering.

205.    This claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of themselves and all persons and entities that purchased or otherwise acquired F45 common stock pursuant and/or traceable to F45's IPO during the Class Period and suffered damages as a result, against the Corporate Defendants, the Director Defendants, and the Underwriter Defendants, and does not sound in fraud.

206.    The IPO Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed to adequately disclose material facts as described above.

207.    The Company is the registrant for the IPO.  As the issuer of the shares, F45 is strictly liable to Plaintiffs and to the relevant members of the Class within the scope of this count for the material misstatements and omissions contained in the IPO Materials.

208.    Defendants Gilchrist, Payne, and the Director Defendants were signatories of the IPO Materials and are liable under Section 11 of the Securities Act, 15 U.S.C. § 77k.

209.    The Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 12(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As underwriters, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the IPO Materials.

210.    None of the Corporate Defendants, Director Defendants, or Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials were true and without omissions of any material facts and were not misleading.

211.    Indeed, none of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials were true and without omissions of material facts and were not misleading. By virtue of each of the Defendants' failure to exercise reasonable care, the IPO Materials contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.

212.    The Defendants named in this claim issued, caused to be issued and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the IPO Materials, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

213.    Additional named plaintiff Detroit P&F and/or members of the Class acquired F45 stock directly in and/or traceable to the IPO in which common stock was offered and/or sold pursuant to the above-described IPO Materials.  At the time of their purchases, additional plaintiff Detroit P&F and members of the Class were without knowledge of the facts concerning the omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

214.    Plaintiff Detroit P&F and/or members of the Class have sustained damages. The value of F45's stock purchased or otherwise acquired pursuant and/or traceable to the materially false and misleading IPO Materials has declined substantially from the dates of the IPO to the date of the filing of the complaint.

215.     This claim is brought within one year of when Plaintiffs discovered or reasonably could have discovered the untrue statements and omissions in the IPO Materials and within three years of their effective dates.

## COUNT II
### For Violation of Section 12(a)(2) of the Securities Act
### Against the Underwriter Defendants

216.     Plaintiffs repeat and reallege each and every allegation contained above only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Underwriter Defendants to defraud Plaintiffs or members of the Class.

217.     This Count is based on the Underwriter Defendants' statutory liability for false and materially misleading statements or omissions in the IPO Materials.  This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the IPO Materials are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the IPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the offering.

218.     This claim is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all purchasers of F45 common stock who purchased directly from the Underwriter Defendants in the IPO and does not sound in fraud.

219.     The Underwriter Defendants were statutory sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the IPO Materials in connection with the IPO, serving as underwriters in the IPO.

220.     Each of the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective IPO Materials.  The actions of solicitation by the Underwriter Defendants included participating in the preparation of the false

and misleading IPO Materials and marketing the IPO to investors, such as Detroit P&F and the other members of the Class within the scope of this cause of action.

221.    On July 15, 2021, Detroit P&F purchased 20,447 shares of F45 common stock at $16.00 per share directly in the IPO directly from an Underwriter Defendant.

222.    On January 10, 2022, before the lockup expired, Lead Plaintiff purchased a total of 21,250 shares of F45 common stock traceable to the false and misleading IPO Materials.

223.    The IPO Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Underwriter Defendants' actions of solicitation included participating in the preparation of the untrue and misleading IPO Materials and serving as underwriters in the IPO.

224.    The Underwriter Defendants served as the underwriters for the IPO, as alleged herein, and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(1). As such, the Underwriter Defendants participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Registration Statement. The Underwriter Defendants, as underwriters of the securities offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Underwriter Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, the Underwriter Defendants are liable under Section

11 of the Securities Act to Plaintiffs and to the relevant members of the Class within the scope of this cause of action.

225.    Plaintiffs and other members of the Class that purchased F45 common stock from the Underwriter Defendants did so pursuant to the defective IPO Materials.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the IPO Materials.

226.    Plaintiffs, individually and representatively, hereby offer to tender to the Underwriter Defendants the common stock that Plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own common stock purchased from the Underwriter Defendants, in return for the consideration paid for that common stock together with interest thereon.

227.    By reason of the conduct alleged herein, the Underwriter Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and members of the Class who hold F45 common stock purchased in the IPO from the Underwriter Defendants have the right to rescind and recover the consideration paid for their F45 shares and, hereby elect to rescind and tender their F45 common stock to the Underwriter Defendants sued herein.  Class members who purchased from the Underwriter Defendants and have sold their F45 common stock are entitled to recessionary damages.

228.    This claim is brought within one year of when Plaintiffs discovered or reasonably could have discovered the untrue statements and omissions in the IPO Materials and within three years of their effective dates.

**COUNT III**
**For Violation of Section 15 of the Securities Act**
**Against Defendants Gilchrist, Payne, the Director Defendants, and the Controlling Entity**
**Defendants**

229.    Plaintiffs repeat and reallege each and every allegation contained above only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Individual Defendants, the Director Defendants, or the Controlling Entity Defendants to defraud Plaintiffs or members of the Class.

230.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the IPO Materials.  This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the IPO Materials are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the IPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the offering.

231.    This claim is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of themselves and all persons and entities that purchased or otherwise acquired F45 common stock either pursuant and/or traceable to F45's IPO and suffered damages as a result, against the Corporate Defendants, the Director Defendants, and the Controlling Entity Defendants and does not sound in fraud.

232.    Defendants Gilchrist and Payne were control persons of F45 by virtue of their positions as directors and/or as senior officers of the Company.  Gilchrist and Payne were control persons of F45 within the meaning of Section 15 of the Securities Act by virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual

performance, and their power to control public statements about F45.  Therefore, Defendants Gilchrist and Payne had the power and ability to control the actions of F45 and its employees.

233.    Defendants Gilchrist and Payne, at the time they held positions with F45, were able to, and did, exercise substantial control over the operations of F45, including control of the materially untrue and misleading statements, omissions and course of conduct complained of herein.

234.    Each of the Controlling Entity Defendants (MWIG and the KLIM Entities) also controlled F45 by virtue of their share ownership, power to appoint directors, and agreements with the Company.  For example, the IPO Registration Statement characterized MWIG LLC as a "Principal Stockholder" that held 38.3% of F45's outstanding shares as of June 30, 2021, stating that after the IPO, MWIG LLC would continue to own 28.6% of the Company's outstanding shares.  Pursuant to a stockholders' agreement, MWIG LLC had the right to designate a nominee for F45's board of directors, prior to the IPO, because it "beneficially own[ed] at least 30% of [the Company's] convertible preferred stock or 30% of the shares of common stock issued or issuable upon conversion of [the Company's] convertible preferred stock[.]"

235.    Similarly, the IPO Registration Statement characterized the KLIM Entities as a "Principal Stockholder" that held 14.4% of F45's outstanding shares as of June 30, 2021, stating that after the IPO, the KLIM Entities would continue to own 11.4% of the Company's outstanding shares.  Pursuant to a stockholders' agreement, the KLIM Entities were entitled to designate a nominee of F45's board of directors for as long as it "continue[d] to beneficially own 30% of the aggregate dollar amount of [F45's] convertible notes or equivalent number of shares of common stock issued or issuable upon conversion of [the Company's] convertible notes[.]"

236.    Collectively, the Controlling Entity Defendants constituted 52.7% of F45's outstanding shares prior to the IPO (as of June 30, 2021) and 40% of the Company's outstanding shares after the IPO.

237.    Accordingly, the Controlling Entity Defendants were, at the time of the wrongdoing alleged herein and as set forth herein, controlling persons of F45 within the meaning of Section 15 of the Securities Act because they were majority (or near-majority) owners and controlled the Company before, during and after the IPO and the SPO.  In addition to controlling a majority of F45's voting shares, the Controlling Entity Defendants also appointed and had significant influence over F45's management and members of its Board of Directors.

238.    Each of the Director Defendants were control persons by virtue of their positions as a director of the Company.  Defendants Raymond and Richman beneficially owned approximately 38.3% and 14.4% of F45's outstanding shares prior to the IPO (as of June 30, 2021), and 28.6 and 11.4% of F45's outstanding shares after the offering, respectively.

239.    Moreover, both MWIG LLC and the KLIM Entities were controlled or beneficially owned by at least one of the Director Defendants.  Specifically, FOD Capital LLC (an entity that is managed by Defendants Raymond)[17] and Defendant Wahlberg own approximately 65% and 26% of the membership interests in MWIG LLC, respectively.  And Defendant Richman is a managing member and control person of the KLIM Entities.

240.    Defendants Raymond and Wahlberg's control over and/or ownership of MWIG LLC, and Defendant Richman's control over and/or ownership of the KLIM Entities further

---

[17] According to F45's IPO Registration Statement and Prospectus, Defendant Raymond is the sole manager of FOD Capital LLC and "as such may be deemed to beneficially own the shares of [the Company's] common stock beneficially owned by MWIG.

demonstrate that the Director Defendants were control persons of F45 within the meaning of Section 15 of the Securities Act.

241.    Defendants Gilchrist, Payne, and each of the Director Defendants and Controlling Entity Defendants were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Claims One and Two above, based on having signed the IPO Materials and/or having otherwise participated in the process that allowed the IPO to be completed successfully.

242.    As a result of the foregoing, Plaintiffs and the other members of the Class within the scope of this Count have suffered damages.

## IX.    EXCHANGE ACT ALLEGATIONS

243.    This section of the Complaint contains claims and allegations separate and apart from the Securities Act Allegations pled above in Sections VII - VIII.  Unlike the Securities Act Allegations, the Exchange Act Allegations arise from Defendants' fraudulent wrongdoings that arise from materially false or misleading statements and omissions to investors.  Accordingly, Plaintiffs seek remedies under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, for the Class of investors that were damaged as a result of Defendants' misrepresentations.  The claims are alleged against the Corporate Defendants, the Director Defendants, and the Controlling Entity Defendants.

### A.    Background of the Exchange Act Claims

244.    Plaintiffs' independent investigation, including interviews with confidential witnesses, has obtained evidence that corroborates these allegations and provides additional insights into the misleading nature of F45's franchise unit-economic model.

245.    For example, CW-2, an Owner and Operator of an F45 franchise in the UK from before the F45 IPO through June 2022, confirmed that F45 told him that he would be cash flow

positive within nine months of opening his studio, which was not true and his actuals were close to that. Specifically, CW-2 recalled that he spoke to current F45 Chief Revenue Officer Luke Armstrong directly and that Armstrong promised CW-2 that he would be profitable within nine months of opening his F45 studio. CW-2 added that Armstrong said he owned his own F45 studio in Sydney, Australia that was "managing itself," which appealed to CW-2 because he purchased an F45 franchise an as investment and was not looking to actively manage it. According to CW-2, his communications with Armstrong were mainly by phone, but they met in person in London in 2017.

246.    CW-2 recalled that his F45 franchise was barely breaking even before COVID, and it closed in June 2022. CW-2 stated that he never received any brand support from F45 and that there was no promotion or brand awareness for the F45 brand outside of London. CW-2 explained that F45 does not provide support for studios located in "bad" markets and is only looking to make sales. CW-2 suggested that "standalone" F45 studios were never going to be successful. CW-2 added that after he signed his franchise agreement, he only communicated with F45 about compliance issues and the Company never provided him with business advice.

247.    CW-2 confirmed that F45 does not conduct due diligence for potential studio locations prior to opening in a new territory. CW-2 suggested that F45 should have done due diligence before opening franchises in certain markets because franchisees were "relying on their expertise." According to CW-2, it was his opinion that F45 sold franchises in territories that had no chance to succeed in the UK because the Company was only "looking to make sales." CW-2 added that F45 had no "idea what the market was like outside of London" and never tested the price point in the territory they sold him. CW-2 explained that most F45 studios outside of London, including F45 franchises in Manchester, Bristol, Reading and Bath have closed.

248.    F45 also sought to sell additional studios to franchisees whose studios were not doing well.  According to CW-2, F45 offered to discount either franchisee fees or setup fees by 50% to franchise owners who opened a second studio.  According to CW-2, when F45 approached him about opening a second franchise during COVID, he asked why he should open a second studio when his current franchise was struggling.  CW-2 recalled that F45 then blamed him for his franchise failing and told him that he was not marketing correctly.  When CW-2 inquired about which territory he should open a second studio in, the Company did not provide any guidance and instructed him to conduct his own due diligence.

249.    CW-2 stated that F45 was not setting up franchisees to succeed and that the Company blamed franchise owners when their studios failed.  CW-2 noted that F45's culture was that "they were great, and everyone was shit."  CW-2 added that he spoke to other franchisees who told him that F45 had also blamed them when their studios failed.

250.    CW-1, a Franchise Consultant for F45 from September 2020 – December 2022, recalled that F45 was at its peak in the first half of 2021.  CW-1 stated that he noticed a decline in new F45 studio openings in mid-2021 which he attributed to F45 headquarters "not protecting the franchisees."  CW-1 explained that F45 allowed multiple studios to open in the same vicinity and to charge different membership fees to customers, which forced some F45 studios to close.  CW-1 stated that if you do not put the F45 franchisees first "things crumble."

251.    According to CW-3, an Accounts Receivable Manager at F45 from January 2021 – May 2021, it was his perception that "over 50 percent" of F45 franchises were delinquent and "few gyms" paid their franchise and equipment fees on time.  CW-3 recalled that the delinquent F45 franchises' debt ranged from $100,000 to $500,000.  CW-3 stated that the West Coast F45 franchises were the most delinquent because of state COVID regulations and that franchises in

major cities like New York City had "pretty extensive expenses." CW-3 recalled that market saturation also caused F45 franchises to struggle. CW-3 added that some F45 studios were not operating before COVID due to market saturation.

252.    CW-3 recalled that collecting fees from delinquent F45 franchises was a "balancing act" for the Company because they were "not trying to make much noise due to the IPO."

253.    According to CW-3, F45 accepted payment plans on debt owed starting in around March 2021 and April 2021 because studios were struggling to pay their fees all at once. CW-3 noted that delinquent F45 franchises who did not pay their debts were escalated to F45's legal department. CW-3 added that he escalated delinquent F45 franchises who did not pay their debts to Christian Torres, who in turn escalated them to the Company's legal department. CW-3 stated that he departed F45 because he did not like "their approach" and the Company's "practices stood out" to him. CW-3 recalled that management pitted him against his co-worker to see who collected more fees every month from delinquent F45 franchises. CW-3 explained that F45 tracked how close it was to collecting all outstanding fees and that he had a quota he had to collect each month.

254.    CW-6, a Regional Director at Club Sports Group, stated that he got the sense that F45 was taking advantage of military veterans and getting them to sign up without being fully aware of the costs associated with opening and running a franchise.

255.    CW-6 also explained that there was no training or education for staff and that the studios that did manage to open were "terrible." According to CW-6, franchisees were only subjected to a 12-day "generic" training. CW-6 recalled attending one of the trainings for new franchisees and multi-unit studio owners, and he and the other CSG employees were asking everyone a lot of questions about their franchises. CW-6 noted that by the end of the training everyone was coming to them to ask questions because it was clear that they were much more

prepared to open studios than the others there and much more knowledgeable about as to how to do it best than the F45 instructors. CW-6 explained that it was "no surprise at all" that F45 appears to be headed into bankruptcy and the leadership and decision making at the top contributed to his departure from CSG.

256.    CW-6 stated that $315,000 was a fair estimate for opening a franchise as a general franchise owner, but CSG's studios were costing closer to $250,000. CW-6 stated that the difference was due to the industry know-how of the CSG employees and not any assistance or deals F45 was providing.

257.    According to CW-6, the franchises he was opening on behalf of Club Sports Group would waive the customer sign-on fees or charge $1 just to get customers to provide credit card information and then there would be no charges until the gym opened and classes prior to the grand opening would be free for those who had reserved their spot. CW-6 explained that these gyms generated as many as 700-800 "leads" and open with as many as 200 initial members whereas typical F45 practices would be to charge $49.99 to $69.99 to reserve your spot and that would get customers $10 off per month and that this would generate closer to 100-200 leads and 20-70 pre-sales. CW-6 recalled Corporate "blasting" him every week about his approach, but he continued to push forward with what was proven to work.

258.    CW-6 explained that successful studios will generate approximately $75,000 in profit per month, which will require 300-400 members paying approximately $180 per month. CW-6 stated that in order to break-even, a studio needs to make approximately $50,000 to $60,000 per month. Nevertheless, CW-6 confirmed that F45 would get its royalties from franchisees whether the studios performed well or not and would also receive the payments for franchise rights, a percentage of equipment, and a percentage of "everything" the franchisee bought.

259.    CW-6 explained that F45's membership fees were too expensive and the market too saturated for F45 to be successful in taking the approach suggested by F45 Corporate. According to CW-6, the approach F45 was taking to signing up potential customers was hurting the franchisees and CW-6 estimated that 1% were making a profit, 40% were breaking even, and the remaining 59% were "drowning."

260.    CW-6 noted that there were budget gyms in the $19.99 to $29.99 per month range with 30,000 square feet that offered similar classes to F45 and there were high-end gyms at a higher price point with other perks such as pools and recovery areas. CW-6 recalled F45's price point being a topic on weekly calls.  CW-6 stated that F45's price point was less of a concern for CSG, but a "huge deal" for F45 Corporate.

261.    CW-7, a Financial Services Specialist at F45, stated that F45's contracts were "weird" and "a little deceptive" because they included specific timelines that franchisees had to pay their franchise and equipment fees.  CW-7 noted that there were "consequences" if the franchisees did not update their equipment.  CW-7 confirmed F45 required its franchises to regularly update their equipment, which was "very expensive."  According to CW-7, F45 claimed that it enforced this requirement because the Company wanted to be like Planet Fitness and make sure that all of its franchises' equipment was branded universally.  However, CW-7 suggested that F45 required its franchises to update their equipment to collect fees or receive a "kickback."

262.    CW-7 recalled that a lot of F45 franchisees "didn't know what they were getting into."  According to CW-7, it was his understanding that some F45 franchisees did not have "financial literacy" and were told by F45 that it would be easier to operate a successful franchise than it was.

263.    CW-7 also stated: "I do remember the aggressive expansion plans and holds on accounts etc.   I remember the studios having to finance and make payment plans for their equipment and our email correspondence was often related to needing financial support or special payment plans with more leniency since covid was killing business."

### 1.    F45 Was Selling Franchises "to Anyone"

264.    As a part of F45's business model and aggressive growth strategy, F45 sought to sell as many franchises as possible with little to no due diligence for the potential franchisee's creditworthiness and/or ability to successfully manage a fitness studio.

265.    For example, CW-2 recalled that when he purchased his F45 franchise, the Company did not conduct any financial due diligence on his and other franchisees besides telling franchisees how to borrow money.  CW-2 added that F45 did not run a credit check on him prior to his F45 studio acquisition.  However, CW-2 did recall having to negotiate the parameters for his F45 studio location.  CW-2 stated that F45 would have sold his UK franchise "to anyone."

266.    Likewise, CW-6 recalled that through conversations with other F45 franchisees at the induction training, it became apparent that F45 was "one of the easiest franchises to get into."

### 2.    F45 Prioritized Multi-Unit Franchisees

267.    During the Class Period, a key aspect of F45's business and growth model was to focus on selling multi-unit franchises to new and existing franchisees.  The obvious reason for the prioritization of multi-unit franchisees is that they provided F45 with the opportunity to sell the right to develop multiple franchises over a certain period of time. In turn, F45 would typically be entitled to an upfront payment. Although multi-unit development agreements accounted for only a small percentage of F45's total studio footprint, they accounted for approximately one half of the Company's total backlog as multi-unit franchisees had up to five years to open a studio.

268.    But, importantly, F45 would be able to report a greater number of "new franchises sold" - a key growth metric used to value the Company - regardless of whether these multi-unit franchisees ever opened all of the studios they contracted for.

269.    F45's prioritization of multi-unit franchisees involved preferential treatment for this preferred group of potential franchisees, including the waiver of certain fees and undisclosed modified payment terms.

270.    The favorable treatment for multi-unit franchisees was problematic for two reasons. **First**, the multi-unit franchisees were able to contract for multiple franchises and reserve the right to operate studios in specific geographic locations without ever actually opening any of these studios.

(a)    For example, CW-6 explained that F45 had sold the right to so many locations with no intention of actually opening studios in those locations. According to CW-6, F45 was more interested in receiving payments for the franchise rights and being able to tout the number of new studios that planned to open.  CW-6 explained that this helped when negotiating with vendors to get better deals by promising them that a greater number of studios would exclusively be using them in the future. According to CW-6, the market saturation and lack of real estate in some areas made it clear that there was little chance a viable gym could be opened, let alone run.

271.    **Second**, the waiver of franchise fees and modified payment terms helped induce franchisees into signing contracts for multiple franchises, but limited F45 revenue and constrained the cash inflows that could be used to support future growth.  As explained above (¶ 52), franchise fees were a substantial portion of F45's revenue.  Thus, the waiver of franchise fees for preferred franchisees deprived F45 of revenue that should have been obtained in exchange for the rights to

operate a studio in an exclusive location.  Likewise, modified payment terms, such as the deferment of significant fees, caused F45's accounts receivable to balloon and limited F45's cash on hand and, thus, the Company's ability to finance potential growth initiatives.

272.    CW-1, a Franchise Consultant at F45 from September 2020 to December 2022, recalled that he heard of F45 waiving franchisee fees for owners who were "doing better than others."

273.    CW-2, a former F45 Franchisee, Director and Operator, confirmed that F45 gave preferential treatment to multi-unit franchisees and friends.  For example, according to CW-2, F45 offered to discount either franchisee fees or setup fees by 50% to F45 owners who opened a second franchise. CW-2 also recalled that F45 provided more support and advice to an Australian F45 franchisee (name not recalled) who owned multiple F45 studios in London, and that F45 waived franchise and monthly fees for James Haskell, a former rugby player who owned a franchise in Bath, United Kingdom and served as an F45 brand ambassador.  According to CW-2, the F45 studio in Bath closed even with this preferential treatment.  CW-2 explained that Haskell was given "bad advice" by F45, explaining that the studio's annual rent was £80,000 and was located in a tourist town with "no local foothold."

274.    CW-4, a Franchise Sales Executive at F45 from November 2021 – August 2022, described several incentives offered to franchisees to order to increase franchise numbers. According to CW-4, during his tenure, the Company twice offered a deal where if a franchisee purchased an equipment pack, for approximately $150,000, by a certain date then F45 would waive the franchise fee of approximately $50,000.  CW-4 explained that the discussion of the promotions occurred amongst his sales team, but it was well known that the promotions "all came down from Adam [Gilchrist]."  CW-4 confirmed that he saw the first promotion of this type in December 2021

or January 2022 and then again in late February or March 2022. According to CW-4, the second promotion he recalled was to waive the franchise fee with the purchase of an equipment pack was March 25, 2022. CW-4 explained that each franchisee was required to purchase the F45 equipment pack anyway, so the promotion was intended to get more money up front and that this purpose was acknowledged.

275. Similarly, CW-7, a Financial Services Specialist, described that holding groups and multi-unit franchisees received "white glove treatment" from F45, explaining that these franchises received greater attention from the Company and that he would escalate their questions about contract terms. CW-7 recalled that he escalated questions from multi-unit franchisees regarding their contracts and outstanding balances to Finance/Accounting Operations Associate Matt Padavick, Global AR Manager Brad Parrish, and U.S. Controller Christian Torres. CW-7 suggested that F45 was "extorting" smaller franchise owners during his tenure.

### 3. F45 Inks Deal With Large Multi-Unit Franchisees Right Before IPO to Inflate Franchise Sales

276. On June 15, 2021, F45 entered a long-term multi-unit studio agreement with Club Franchise Group LLC.[18] F45 publicly announced the deal on June 21, 2021, when the Company filed its registration statement with the SEC on Form S-1. The IPO Registration Statement described the deal with Club Franchise Group as follows:

> On June 15, 2021, we entered into a long-term multi-unit studio development agreement, or the Development Agreement, with Club Franchise Group LLC, or Club Franchise, an affiliate of KLIM. Pursuant to the Development Agreement, we have granted to Club Franchise the right to develop, and Club Franchise has agreed to develop, at least 300 studios in certain territories in the U.S. over 36 months, with the first 150 studios to be opened within 18 months of the date of the Development Agreement, or December 15, 2022.

---

[18] Club Sports Group was known as Club Franchise Group LLC until September 2021.

277.   CW-6, a Regional Director for Club Sports Group, confirmed that Club Sports Group had purchased the rights to be the owners and operators of 300 F45 franchises.  According to CW-6, CSG had territories in: (i) New Jersey, (ii) Minnesota, (iii) Connecticut, (iv) Texas, (v) Chicago, and (vi) Seattle.  CW-6 explained that some of these territories were from acquisitions of gyms previously owned by other franchisees.  CW-6 noted that F45 wanted CSG to purchase underperforming franchises and that they were provided a right of first refusal on acquisitions of existing franchises and territories.  CW-6 explained that CSG also acquired gyms performing well that had owners who were not interested in continuing to grow, such as those in New Jersey and Texas.

278.   CW-6 explained that it was his understanding that CSG had purchased a bunch of equipment or "World packs" and that the Company had them in "reserve," so they could be shipped on request when a gym was opened.

279.   CW-6 described the situation at CSG and F45 as a "[expletive] show across the board." According to CW-6, he was setting up the business licenses for the studios and they even lacked TAX ID numbers, so he was forced to include his personal social security number on documents with vendors such as Mindbody. CW-6 stated that he received tax documentation from Mindbody this year for revenue that was made by a studio that looks like was made by him as an individual.

280.   CW-6 explained that the area directors and Harwood had weekly calls to discuss studio progress and issues. CW-6 added that leadership was not equipped or experienced enough to carry out the plans to open 150 studios in 18-months and 300 studios in 36-months as per the agreement with F45. CW-6 stated that the area directors "did not have a voice" and were unable to make the most of their years of experience.

281.    CW-6 also confirmed that the area directors had weekly calls with the F45 franchise

coaches. According to CW-6, he also had separate calls with former CSG COO Dornbush because

he had prior experience in human resources and was working on separate projects with her in that

area.

282.    CW-6 explained that there was no timeline or benchmarks for studio openings to

complete their obligations to F45 and that the "blind" were leading them. According to CW-6, F45

and CSG had "vision" but "no direction."

283.    F45 also entered into a long-term multi-unit studio development agreement with

two other financial partners before the Company's IPO.  Although F45 did not disclose these multi-

unit franchisees by name, the IPO Registration Statement provides the following details

surrounding these two multi-unit studio development agreements:

> **We recently entered into long-term multi-unit studio development agreements with three financial partners**, including an affiliate of Kennedy Lewis Management, or KLIM, one of our principal stockholders. Pursuant to each such agreement, **we have granted to the financial sponsor the right to develop, and the financial sponsor has agreed to develop, an agreed number of studios within certain territories in the United States, with one sponsor agreeing to develop at least 70 studios over a 7 year period, another to at least 87 studios over 6 years** and the sponsor affiliated with KLIM agreeing to at least 300 studios over 36 months. In certain cases, we have also agreed to a right of first refusal in favor of the financial sponsor developer within their territories with respect to any new concepts developed by us.[19]

284.    Based on these numbers alone, F45 was able to rack up 457 New Franchises Sold

from only three franchisees.  For reference, the F45's IPO Prospectus disclosed that it had 554

---

[19] Prior to the IPO, F45 also entered into Multiunit Development agreements with two additional Private Entity sponsors including a 70 plus unit deal to be opened over 7 years, and an 87 plus unit deal to be opened over 6 years. These related party deals also were designed to artificially inflate the number of franchises sold prior to the IPO.

New Franchises Sold during the Company's second quarter 2021 financial results. Thus, the franchise sales to the three disclosed multi-unit franchisees accounted for over 82% of New Franchises Sold for that Quarter. From a year-over-year comparison perspective, F45 was able to obtain **only three** New Franchises Sold in the Company's second quarter 2020 financial results, meaning that the results for second quarter 2021 represented a whopping **454% increase**.

285.    Unbeknownst to investors, this huge spike in New Franchises Sold was by no means as it appeared. As explained above, F45 had sold franchise rights without any intention of opening studios because they were more interested in receiving payments for the franchise rights and being able to tout the number of studios that were being planned to be open (¶ 270(a)). Thus, only a small fraction of the 554 franchise rights sold would develop into studio openings capable of churning recurring revenue.[20]

286.    Moreover, according to CW-4, Club Sports Group had "hundreds" of territories reserved including "all metro areas," which really frustrated some customers with cash who were ready to open studios but were blocked from prime areas.

287.    While F45 would still theoretically be able to financially benefit from these dubious deals with multi-unit franchisees on the front end through establishment fees, investors were also unaware of the fact that F45 had agreed to waive franchise fees and/or provide modified payment terms to preferred, multi-unit franchisees (¶¶ 271-274).

288.    Further, large sales to multi-unit franchisees provided the perfect opportunity for F45 to manipulate key metrics to impress investors. For example, CW-6 explained that F45 had

---

[20] Notably, an analyst report issued by J.P. Morgan on May 19, 2022 pointed to the fact that "the 'Club Sports' franchisee, as of March 31, 2022, had opened no stores per its June 15, 2021 agreement to open 'at least' 300 stores in the US over 36 months and 150 stores within 18 months of the agreement. As long-time restaurant analysts, it is unusual for a company to book revenue from franchisees yet to open stores."

sold the right to so many locations with no intention of actually opening studios in those locations. According to CW-6, F45 was more interested in receiving payments for the franchise rights and being able to tout the number of new studios that planned to open.

### 4. F45 Changes Definition of "Initial Studio Openings" to Artificially Inflate Growth Metric

289.    On October 1, 2021, F45 changed the definition of Initial Studio openings from "the first month in which the studio first generates monthly revenue of at least $4,500" to "the month in which we record the initial studio opening in our internal systems."

290.    However, this cryptic definition change was not disclosed until March 14, 2022. This undisclosed change enabled F45 to report "Record Fourth Quarter and Full-Year Fiscal 2021 Results." Specifically, the new definition was designed to artificially spike the Company's Net Initial Studio Openings to 131 compared to the 63 reported in the previous quarter—representing a 107.9% increase quarter-over-quarter.

| F45 NET NEW STUDIO OPENINGS | | | |
|---|---|---|---|
| Quarter | Number of New Studio Openings | YoY Quarter Comparison | % Difference Prior Quarter |
| 2Q21 | 68 | 106% | N/A |
| 3Q21 | 63 | -38% | -7.4% |
| 4Q21 | 131 | 115% | 107.9% |
| 1Q22 | 117 | 134% | -10.7% |
| 2Q22 | 92 | 35% | -21.4% |
| 3Q22 | 84 | 33% | -8.7% |

291.    During the Company's earnings call for 4Q 2021, on March 14, 2022, an analyst from J.P. Morgan inquired about the change in the definition of Initial Studio Openings. The exchange follows below:

> **John William Ivankoe**
> *JPMorgan Chase & Co, Research Division*
> In the press release, there was a mention of a change of the definition
> of franchise open. I think it was as of October 1, 2021. Could you

elaborate -- and I'm sorry if I missed this. Could you elaborate specifically how the definition changed.

**Christopher E. Payne**
*CFO, Treasurer & Director*
I can take that one. John, the change related to -- it was an operational change in that we can now rely on our CRM to appropriately tag open date. So it was a system efficiency that we've been able to realize. So now we're actually tagging the actual open date and it's exactly the date that the studio opens its stores for operation.

**John William Ivankoe**
*JPMorgan Chase & Co, Research Division*
Okay. So in other words, it is open and it's receiving customers that just before it was only if it was, I guess, booking $4,500 of revenue a month, now you're recognizing it basically on its grand opening, correct?

**Christopher E. Payne**
*CFO, Treasurer & Director*
Correct.

292.     In other words, Defendant Payne confirmed that an Initial Studio Opening would be recording when a studio "opens its stores for operation[,]" regardless of whether the studio is generating a revenue minimum.

293.     This change benefited F45 because it allowed the Company to record Initial Studio Openings sooner (*i.e.*, when they open) and increased its reportable studio openings by expanding the definition to include unprofitable studios (*i.e.*, studios that could not generate monthly revenue of at least $4,500).

##### 5.     F45 Obtains Additional Financing Facilities and Hosts "All Star" Event In Las Vegas to Squeeze Contingent Multi-Unit Franchise "Deals" Out of Current Franchisees

294.     After Defendants released F45's aggressive guidance, on March 14, 2022, to obtain 1,000 New Franchises Sold and 1,000 Initial Studio Openings in 2022, they began scrambling to find new and/or existing multi-unit franchisees that could purchase a ton of franchises.

295.    In doing so, Defendants recognized that they could sign more franchisees if they were offered financing solutions—something that F45 could not afford on its own.  Behind the scenes, Defendants were able to collaborate with an investment group called Fortress Credit Corporation ("Fortress"), who would agree to provide new and existing F45 franchisees with loan financing.

296.    In addition, Defendants hosted an event in Las Vegas for F45's top 100 operators[21] and offered them incentives to "purchase" multi-unit franchises.

297.    According to CW-4, a Franchise Sales Executive at F45 from November 2021 to August 2022, F45 held an "All-Star Event" for its top 100 franchise operators in February 2022 in Las Vegas, Nevada.  CW-4 recalled that someone from Club Sports Group was present at this event.  CW-4 explained that he and approximately four other sales representatives were set to present F45's new "All-Star Project" to the group, but even that morning, they still were not made aware of the promotion F45 was offering.  CW-4 explained that then-CEO Gilchrist did not inform the sales representatives of the promotion until the "last minute" and then informed them that the promotion was that any franchise operator who agreed to open 20 studios only had to put $10,000 down. According to CW-4, franchisees had to sign letters of intent, and between him and another sales representative, they got "commitments" for approximately 600 studios.  CW-4 confirmed that this promotion was offered "just so we [F45] could count the [new studios]."

298.    CW-4 confirmed that financing from Fortress Corp. was a part of the multi-unit purchase promotion offered at the All-Star event.  According to CW-4, the sales team was under the impression that the Fortress deal was finalized at the time of the All-Star Event and the team

---

[21] When asked about the All-Star event in Vegas in the beginning of 2022, CW-6 recalled that Rammy Harwood and other CSG executives attended.

later found out that it had not been.  CW-4 added that it was his understanding that Fortress was mentioned in the pitch to franchisees and, following the collapse of the deal, F45 considered funding the deals themselves before deciding to look for a new partner.  CW-4 recalled that the initial agreements sent to franchisees from the All-Star Event mentioned Fortress and that two or three different versions were sent because previous versions had to be voided.

299.    CW-4 explained that the All-Star Event was the first time that F45 hosted a franchisee event of this nature.  CW-4 added that F45's "goal" was to have another similar event given the success of the initial All-Star Event.  According to CW-4, the All-Star weekend in Vegas changed his perception of the Company and he "really saw who Adam [Gilchrist] really was." CW-4 explained that he knew if Gilchrist remained the leader of F45 that his franchisees were "screwed."

300.    CW-5, a member of the sales team, recalled that following the July 2021 IPO, there was "more pressure" on the sales team to make sure they "hit" their numbers, and that there was general pressure on the Company to continue to grow.  According to CW-5, the Company's financing agreement with Fortress Credit Corp. was going to help F45 open additional franchises with "proven operators."

301.    CW-5 stated that the Company held an "All-Star" event in Las Vegas, Nevada in February 2022 for their top operators.  According to CW-5, during the All-Star event, F45 received commitments from operators who were incentivized through the Company's deal with Fortress. CW-5 added that franchise agreements were signed in relation to the deals.  CW-5 recalled that CEO Gilchrist did not provide details of what the sales representatives were able to offer operators until the "11th hour" of the All-Star event.  According to CW-5, the Company reported the commitments received during the All-Star event as new sales in Q1 2022.

302.    F45 did not actually enter into an official credit agreement with Fortress until May 13, 2022.  Notably, Section 7.1(u) of the credit agreement stated that the breach of a minimum market capitalization would constitute an event of default.  Specifically, F45 was required to maintain an average Market Capitalization of no less than $350,000,000 "as of the end of any twelve (12) consecutive trading days[.]"

303.    Ultimately, Defendants' all-out effort to inflate F45's New Franchise Sales metric was successful.  On May 16, 2022, F45 released what appeared to be impressive growth in the Company's New Franchises Sales and Initial Studio Openings for its first quarter 2022 fiscal year financial results.  Specifically, F45 reported **706** New Franchise Sales, representing a ***23,433%*** year-over-year increase, and **117** Initial Studio Openings, representing a ***134%*** year-over-year increase.

304.    Below is a table that demonstrates the artificially inflated growth metrics for Net New Franchises (purportedly) "Sold" in Q2 2022.  The only comparable quarter was Q2 2021, when F45 sold hundreds of franchises to three large multi-unit franchisees in order to inflate F45's "New Franchises Sold" metric right before the Company's IPO.   But, as alleged herein, this "hockey stick" effect was only achieved through artificial means and empty promises at the All-Star event F45 held in Las Vegas in February 2022, which was designed specifically to goose F45's franchise numbers with the purposed "sale" of multi-unit franchises to existing franchise owners – almost all of which never materialized.

| F45 NET NEW FRANCHISES SOLD | | | |
|---|---|---|---|
| Quarter | Number of New Franchises Sold | YoY Quarter Comparison | % Difference Prior Quarter |
| 2Q21 | 554 | 454% | N/A |
| 3Q21 | 210 | 35% | -62.1% |
| 4Q21 | 290 | 867% | 38.1% |
| 1Q22 | 706 | 23,433% | 143.4% |
| 2Q22 | (173) | -131% | -124.5% |
| 3Q22 | (152) | -172% | -12.1% |

305. Indeed, at least one F45 insider who spoke to Plaintiffs balked at CEO Gilchrist's misrepresentation and omissions on the Company's Q1 2022 earnings call during which Payne and Gilchrist failed to disclose the lengths to which the Company went to create the appearance that the 700 plus quarterly "sales" were real deals where studios would eventually open and F45 ultimately would receive franchise fees and other revenue streams from those deals.

306. For example, CW-5 was critical of Company's Q1 2022 earning's call. CW-5 recalled that during that earnings call, Gilchrist was asked what contributed to an increase of approximately 700 franchise sales and Gilchrist attributed to the growth to the "franchise effect." CW-5 said he had wished Gilchrist had just said that F45 had held a large event that drove commitments from their top operators, instead of suggesting the growth was organic. CW-5 recalled that this omission made him "uncomfortable."

### 6. Fortress Financing Is Pulled and Multi-Unit "Deals" Made at All-Star Event Ultimately Evaporate

307. On July 26, 2022, F45 issued a "Strategic Update" to investors disclosing, *inter alia*, that the financing facility with Fortress was no longer available. Specifically, the July 26, 2022 Strategic Update stated that "the $250 million[22] of growth capital provided by two previously

---

[22] The financing facility with Fortress provided a $150 million commitment of debt financing. In addition, F45 had arranged $100 million in debt financing by way of newly committed third party capital for the debut of the F45 Armed Forces to Entrepreneur ("F45 After") program. The July 26, 2022 Strategic Update announced that both financing facilities were no longer available.

announced franchise financing facilities, which F45 had arranged for franchisees to open additional studios, will not be available despite strong demand from franchisees."

308.    CW-4 stated that when the Fortress financing agreement fell through, F45 employees were told not to inform those who had signed on for the deal and the Company was purposely very vague.  CW-4 recalled "frustration" with the lack of transparency by the Company about the Fortress deal.  CW-4 explained that frustration existed both amongst the sales team and the franchisees who had signed letters of intent.  CW-4 added that military agreements also started falling through around this time.

309.    CW-5 confirmed that because "covenants [were] tripped up," by the decline in the Company's stock price, the deal with Fortress "went on ice."  CW-5 recalled that he and everyone else on his sales team were surprised when it was announced that the Company's agreement with Fortress was voided.

310.    According to CW-5, he was not privy to the fallout with Fortress before it was announced to the market, but explained that upper management at the Company would have known about it prior to the public.  CW-5 explained that "a lot" of the commitments from the All-Star event "fell through" after the Company's deal with Fortress was voided.  CW-5 explained that the veteran's initiative the Company had proposed also was "put on ice" and that both announcements occurred in July 2022 when they layoffs were announced as a part of the Company's "Strategic Update."

## X.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

311.    Plaintiffs allege that the statements in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein,

such statements artificially inflated or artificially maintained the price of F45 common stock and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired those shares during the Class Period. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information. As described below, Defendants created an impression of a state of affairs at F45 that differed in a material way from the one that actually existed. As previously noted, the Class Period begins on July 15, 2021 with F45's IPO, and ends on July 26, 2022, when F45 issued its Strategic Update.

**A.    July 2021 Statements in the IPO Materials**

**1.    Misstatements and Omissions About F45's Unit-Economic Model**

312.    The IPO Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

313.    Specifically, the IPO Registration Statement and Prospectus included the following false and misleading statements about F45's unit-economic model.

> We operate a nearly 100% franchise model that offers compelling economics to us and our franchisees. ***We believe our franchisees generally benefit from a relatively low initial investment and low four-wall operating expenses, which in turn can generate strong returns on franchisee investments.*** The optimized box layout of our studios, which requires as little as approximately 1,600 square feet of training area, contributes to the relatively low initial investment and operating costs of our franchisees, and allows our studios to be located in a wide array of attractive prospective retail locations. ***We believe this flexibility will enable us to capitalize on our estimated long-term global opportunity of over 23,000 studios.*** Based on the Franchise Survey conducted prior to the COVID-19 pandemic, ***we estimate that a typical F45 Training franchise in a normalized operating environment requires an aggregate initial investment of approximately $315,000 and, in its third year of operation can produce average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%***.

*We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation*, and has helped to facilitate our rapid growth and strong financial performance prior to the COVID-19 pandemic . . . which we believe underscores the resilience of our business model. Between 2018 and 2020 we grew our Total Franchises Sold at the annual rate of 33% and our Total Studios at the rate of 34%. *From June 30, 2020 to June 30, 2021, our Total Franchises Sold increased by 36% and our Total Studios increased by 22%.*

314.    The IPO Prospectus also stated:

*Compelling Franchisee Studio Economics*

*We believe we offer a compelling business opportunity for franchisees to generate strong returns driven by a relatively low initial investment combined with healthy AUV and low four-wall operating expenses.* Prior to the COVID-19 pandemic and based on data collected through our booking systems and the Franchise Survey, *we estimate that in a normalized operating environment, a typical F45 Training franchise requires an aggregate initial investment of approximately $315,000 and, in its third year of operation can produce an AUV of approximately $354,000, average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%.*

Across the F45 network, we believe that many studios that have re-opened following the onset of the COVID-19 pandemic have demonstrated the ability to ramp up AUV levels. Further, we believe that many studios that have re-opened following the onset of COVID-19 have been able to return to or lower their pre COVID-19 operating costs. During the six months ended June 30, 2021, studios that were open for the full period experienced an AUV increase of approximately 27% compared to the same period in 2020.

315.    Moreover, the IPO Registration Statement and Prospectus stated:

*Attractive Franchisee Return Profile*

*Our franchise model has the potential to generate strong returns for franchisees as a result of a relatively low initial investment and favorable operating cost structure driven by our purpose-built studio design and proprietary technology-enabled ecosystem.* We believe that our scale provides us with cost advantages that allow us to offer our equipment to our franchisees for a significantly lower cost than if they were to acquire it on their own ... *We believe the*

*modest initial investment, combined with limited staffing needs, creates the potential for strong financial performance and expands the universe of potential franchisees.*

Prior to the COVID-19 pandemic and based on data collected through our booking systems and the Franchise Survey, *we estimate that in a normalized operating environment, a typical F45 Training franchise requires an aggregate initial investment of approximately $315,000, which includes all of the required studio equipment contained in the World Pack, and, in its third year of operation can produce an AUV of approximately $354,000, average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%.*

316.  The IPO Registration Statement and Prospectus also stated, *"Our platform enables the rapid scalability of our model and helps to promote the success of our franchisees."*

317.  Further, the IPO Registration Statement and Prospectus stated, *"We have created a highly efficient franchisee development platform that leverages strong consumer demand for our fitness concept and the potential for attractive returns for new franchisees."*

318.  The IPO Registration Statement and Prospectus stated:

We believe the upfront and ongoing support that we offer to our franchisees is a key differentiator in our value proposition and has been a critical contributor to our success. Our new franchisees undergo a comprehensive and multi-day training program that covers membership marketing and day-to-day operations prior to opening the studio to ensure the F45 Training experience is standardized across our global footprint. All head trainers must pass a standardized fitness test and undergo a two-day training program to better understand our functional training programs, so that they are able to correct our members' movements and foster a collaborative and welcoming environment.

*We maintain a robust ongoing support program for our franchisees, with dedicated performance managers overseeing the health of the franchisee network within their designated geographies.* Performance managers are directly focused on driving strategies to support the performance of studios in their portfolio. Our studio support program is vital to maintaining the overall health and quality of our franchisee network.

319.    The statements set forth in ¶¶ 313-318 were materially false and misleading because Defendants failed to disclose that F45's business model and the Company's substantial growth was a result of undisclosed and unsustainable practices that the Company followed simply to maximize the number of Total Franchises Sold (as opposed to profitable studios operating), including:

(a)    misleading potential franchisees with respect to certain key profitability metrics in order to convince them to purchase a franchise license so F45 could record the deal in its closely watched metric "Total Franchises Sold;"

(b)    failing to conduct proper due diligence on potential franchisees to ascertain whether they were credit-worthy enough to purchase, open, and maintain one or more F45 franchises;

(c)    failing to provide franchisees with proper training and/or guidance once they opened a studio to assure a better likelihood of studio success (meaning increased royalties and other fees for F45);

(d)    failing to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth;

(e)    failing to disclose that a significant number of its franchisees' studios were in financial distress and were not profitable – certainly not within the time frame represented by the Company;

(f)    providing to certain preferred franchisees undisclosed modified payment terms and failing to properly account for those modified terms. This ultimately resulted in, among

other problems, ballooning account receivables for F45 and delayed cash inflows for the Company's growth initiatives;

(g)    "selling" exclusive franchise rights to multi-unit franchisees without regard to whether those franchisees could financially or would ultimately open those franchisees and in doing so, the Company artificially inflated the number of reported "Total Franchises Sold," a key metric followed closely by analysts and investors. Indeed, much of the committed franchise store development was conditional on near-100% external financing of this growth which included the Company's guarantee to support novel financing arrangements that ultimately fell through; and

(h)    failing to adequately remediate identified material weaknesses in internal controls over financial reporting.

320.    Several different sources provided information demonstrating the falsity of the statements in the IPO Materials.  For example, in one of the many lawsuits filed against F45, plaintiff Functional HIIT Fitness, LLC (a franchisee that owns and operates three F45 studios) asserted that the Company misrepresented: (i) estimated "break-even points" and earnings for newly opened studios; (ii) estimated costs relating to leasehold improvements per studio; and (iii) the exclusivity of a franchisee's territory—as the Company claimed that franchisees cannot solicit customers from each other's territory, yet mandated that franchisees advertise to customers in neighboring territories.

321.    Additional franchise owners confirmed that the Company misrepresented the profitability of F45 studios.

322.    For example, CW-2, an Owner and Operator of an F45 franchise in the UK from before the F45 IPO through June 2022, confirmed that F45 told him that he would be cash flow positive within nine months of opening his studio, which was not true and his actuals were not

close to that.  Specifically, CW-2 recalled that he spoke to current F45 Chief Revenue Officer Luke Armstrong directly and that Armstrong promised CW-2 that he would be profitable within nine months of opening his F45 studio.  CW-2 added that Armstrong said he owned his own F45 studio in Sydney, Australia that was "managing itself," which appealed to CW-2 because he purchased an F45 franchise an as investment and was not looking to actively manage it.  According to CW-2, his communications with Armstrong were mainly by phone, but they met in person in London in 2017.

323.    CW-2 recalled that his F45 franchise was barely breaking even before COVID and it closed in June 2022.  CW-2 stated that he never received any brand support from F45 and that there was no promotion or brand awareness for the F45 brand outside of London.  CW-2 explained that F45 does not provide support for studios located in "bad" markets and is only looking to make sales.  CW-2 suggested that "standalone" F45 studios were never going to be successful.  CW-2 added that after he signed his franchise agreement, he only communicated with F45 about compliance issues and the Company never provided him with business advice.

324.    CW-2 confirmed that F45 does not conduct due diligence for potential studio locations prior to opening in a new territory.  CW-2 suggested that F45 should have done due diligence before opening franchises in certain markets because franchisees were "relying on their expertise."  According to CW-2, it was his opinion that F45 sold franchises in territories that had no chance to succeed in the UK because the Company was only "looking to make sales."  CW-2 added that F45 had no "idea what the market was like outside of London" and never tested the price point in the territory they sold him.  CW-2 explained that most F45 studios outside of London, including F45 franchises in Manchester, Bristol, Reading and Bath have closed.

325. F45 also sought to sell additional studios to franchisees whose studios were not doing well. According to CW-2, F45 offered to discount either franchisee fees or setup fees by 50% to franchise owners who opened a second studio. According to CW-2, when F45 approached him about opening a second franchise during COVID, he asked why he should open a second studio when his current franchise was struggling. CW-2 recalled that F45 then blamed him for his franchise failing and told him that he was not marketing correctly. When CW-2 inquired about which territory he should open a second studio in, the Company did not provide any guidance and instructed him to conduct his own due diligence.

326. CW-2 stated that F45 was not setting up franchisees to succeed and that the Company blamed franchise owners when their studios failed. CW-2 noted that F45's culture was that "they were great, and everyone was shit." CW-2 added that he spoke to other franchisees who told him that F45 had also blamed them when their studios failed.

### 2. Misstatements and Omissions Related to the Increasing Percentage of Multi-Unit Franchisee Systems Being Sold

327. The IPO Materials also included false and misleading statements and omissions related to the increasing percentage of multi-unit franchisee systems being sold.

328. For example, the IPO Registration Statement and Prospectus stated:

> The majority of our franchisees today consist of owner-operators that manage single locations. ***Going forward, we intend to seek opportunities to develop multi-unit franchise systems with select financial partners. As of March 31, 2021, approximately 51% of our franchises sold were owned by multi-unit franchisees, up from approximately 41% as of December 31, 2019, which highlights the strong market demand for multi-unit franchise opportunities.***
>
> ***We recently entered into long-term multi-unit studio development agreements with three financial partners, including an affiliate of Kennedy Lewis Management, or KLIM, one of our principal stockholders. Pursuant to each such agreement, we have granted to the financial sponsor the right to develop, and the financial sponsor has agreed to develop, an agreed number of studios within***

*certain territories in the United States*, with one sponsor agreeing to develop at least 70 studios over a 7 year period, another to at least 87 studios over 6 years *and the sponsor affiliated with KLIM agreeing to at least 300 studios over 36 months*. In certain cases, we have also agreed to a right of first refusal in favor of the financial sponsor developer within their territories with respect to any new concepts developed by us.

329. Likewise, the IPO Prospectus stated:

**Franchising Strategy**

We utilize an attractive franchise model that has allowed us to scale our business rapidly. As of June 30, 2021, we had a global network of 2,801 Total Franchises Sold, including 1,555 Total Studios, of which 1,415 had re-opened following one or more temporary COVID-related closures. Approximately 49% of Total Franchises Sold are owned by single-unit franchisee owners, with the other 51% owned by multi-unit franchisees. As of March 31, 2021, our largest franchisee owns 24 franchises, representing approximately 1% of our Total Franchises Sold. *As we pursue opportunities to develop multi-unit franchise systems with financial partners, we expect the percentage of multi-unit franchisees to increase over time*.

330. The IPO Prospectus also stated:

During 2019, we sold a net average of 52 new franchises per month. . . . In addition, *300 of the net franchises sold during the 18 months ended June 30, 2021 were sold pursuant to pursuant to [sic] a long-term multi-unit studio development agreement with Club Franchise Group LLC*.

331. Similarly, the IPO Registration Statement and Prospectus stated:

**Franchise Agreement**

*For each franchise license, we enter into an agreement with the franchisee covering standard terms and conditions*. We grant our franchisees an exclusive area or territory under the franchise agreement, and territories are determined as agreed with us using our internal analysis, after taking into account population density and demographics.

332.    The IPO Registration Statement and Prospectus also stated:

**Equipment and merchandise revenue**

***We require our franchisees to purchase fitness and technology equipment directly from us and payment is required to be made prior to the placement of the franchisees' orders.*** Revenue is recognized upon transfer of control of ordered items, generally upon delivery to the franchisee, which is when the franchisee obtains physical possession of the goods, legal title has transferred, and the franchisee has all risks and rewards of ownership. The franchisees are charged for all freight costs incurred for the delivery of equipment. Freight revenue is recorded within equipment and merchandise revenue and freight costs are recorded within cost of equipment and merchandise revenue.

333.    The statements set forth in ¶¶ 328-332 were materially false and misleading for the reasons explained in ¶¶ 319(d),(f)-(g).

334.    Several former F45 employees have provided information that gives further context and corroboration for the fact that the Company provided preferential terms to certain franchisees.

335.    For example, CW-1 recalled that he heard of F45 waiving franchisee fees for owners who were "doing better than others."

336.    CW-5 also confirmed that the Company always offered incentives to investors during his tenure at F45, especially to larger investors and developers.  CW-5 confirmed that, for example, F45 would waive the franchise fee to investors who purchased the Company's equipment pack.

### 3.    Misstatements and Omissions About F45's Potential for Growth in the U.S.

337.    The IPO Registration Statement and Prospectus stated, ***"We believe there are several attractive opportunities to continue to drive the long-term growth of our business."***

338.    Similarly, the IPO Prospectus stated, "***We believe there is a significant opportunity to meaningfully expand our franchise studio footprint in the United States***. . .  Based on current

franchises sold in Australia per capita as of June 30, 2021, *we believe there is long-term studio potential for us to open over 7,000 studios in the United States*."

339.    Moreover, the IPO Registration Statement and Prospectus stated: *"Our opportunities to drive the long-term growth of our business include: [. . .] expanding our studio footprint in the United States[.]"*

340.    The IPO Registration Statement and Prospectus also stated:

> Our long-term growth will depend in part on our continued ability to sell new franchises. *We are still in the early stages of growth and expansion, particularly in the United States and ROW, and we believe we can significantly grow our franchisee base.*

341.    Further, the IPO Registration Statement and Prospectus also stated:

> Our long-term growth will depend in part on our continued ability to open new studios. *We believe that we will experience continued expansion of new studio openings in the United States and ROW*. However, if delays or difficulties are encountered and new studio openings do not occur as quickly as we would like, our operating results may be adversely affected.

342.    Moreover, the IPO Registration Statement and Prospectus stated, *"We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation*, and has helped to facilitate our rapid growth and strong financial performance prior to the COVID-19 pandemic."

343.    The IPO Registration Statement and Prospectus also stated:

> **Predictable, Asset-Light Model Driving Rapid Growth**
>
> As a franchisor, *we have employed an economic model that*, other than due to the unprecedented global shutdown of our network due to the COVID-19 pandemic, *has been predictable, asset light and cash flow generative and has enabled us to open new studios at an accelerated pace versus the owner-operator model that is common in the studio fitness landscape*. For the majority of franchises that we sell, we receive an upfront payment from the franchisee, which varies by geography. Once a new studio has opened, we receive contractual, recurring franchise fee revenue streams that provide us

with a high degree of revenue visibility. During the most challenging months of the COVID-19 pandemic, we offered franchisees temporary relief from contractual franchise fees. ***As our network of total studios grows, we expect recurring revenue as a percentage of total revenue to increase.***

344.    The statements set forth in ¶¶ 337-343 were false and misleading for the reasons explained in ¶¶ 319(a),(c)-(g) and because the IPO Registration Statement and Prospectus failed to disclose that F45's existing multiunit franchisees, such as Club Sports Group, had already been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth.

345.    Several former F45 employees have provided information that gives further context and corroboration for the alleged falsity of these statements. For example:

346.    CW-1 recalled that F45 was at its peak in the first half of 2021. CW-1 stated that he noticed a decline in new F45 studio openings in mid-2021 which he attributed to F45 headquarters "not protecting the franchisees."

347.    CW-1 explained that F45 allowed multiple studios to open in the same vicinity and to charge different membership fees to customers, which forced some F45 studios to close. CW-1 stated that if you do not put the F45 franchisees first "things crumble."

348.    Indeed, only a small percentage of the Club Sports Group F45 studios have opened to date.

### 4.    Misstatements and Omissions About the Quality of F45's Franchisees

349.    The IPO Registration Statement and Prospectus stated:

**Highly Engaged Franchise Community**

***We believe that F45 Training franchisees are highly motivated business owners who are financially, and often personally, invested in improving the wellbeing of their members.*** Franchisees typically fall into two categories: "owner-operators" and "investors." Owner-operator franchisees are individuals who

usually serve as the lead in-studio trainer and handle day-to-day management of the studio. These franchisees include former personal trainers or fitness enthusiasts who previously developed a strong connection with F45 Training as members before becoming franchisees. Investor franchisees generally hire outside staff to lead workouts and handle day-to-day management of the studio.

While the majority of our franchisees today consist of owner-operators that manage single locations, in the coming years we expect the number of investor franchisees to accelerate.

350.   The IPO Registration Statement and Prospectus also stated:

*When evaluating potential new franchisee partners, we generally look for the following criteria:*

- strong commitment to health and fitness;

- personal accountability for the success of a business;

- ability to work in a standardized operational environment;

- passion for delivering high quality service;

- ability to attract and develop talented people; and

- willingness to make a minimum commitment of five years.

We divide the franchisee selection process into four distinct phases:

- Prospects phase: *Our sales team identifies and contacts "marketing qualified leads" to discuss fit and interest*, as well as to determine suitability and optimal territory for a potential studio.

- Reservations phase: A potential franchisee reserves a territory, after which they complete an online interview, file disclosure documents, review the business model and review the terms of our franchise agreement.

- Contract sent phase: A contract is sent to potential franchisees. During this time, the sales team further educates the potential franchisee about the opportunity to become a franchisee. The majority of deals that reach this phase become F45 Training franchisees.

- Contract sold phase: The closing of the franchise sale typically occurs within six months of initial contact.

351.    The statements set forth in ¶¶ 349-350 were materially false and misleading because for the reasons explained in ¶¶ 319(b),(e).  Moreover, several former F45 employees have provided information that gives further context and corroboration for the alleged falsity of these statements.

352.    For example, CW-2 recalled that when he purchased his F45 franchise, the Company did not conduct any financial due diligence on him and other franchisees besides telling franchisees how to borrow money.  CW-2 recalled that F45 did not run a credit check on him prior to his F45 studio acquisition.  However, CW-2 recalled negotiating the parameters for his F45 studio location.  CW-2 stated that F45 would have sold his UK franchise "to anyone."

353.    According to CW-3, it was his perception that "over 50 percent" of F45 franchises were delinquent and "few gyms" paid their franchise and equipment fees on time.  CW-3 recalled that the delinquent F45 franchises' debt ranged from $100,000 to $500,000.  CW-3 stated that the West Coast F45 franchises were the most delinquent because of state COVID regulations and that franchises in major cities like New York City had "pretty extensive expenses."  CW-3 recalled that market saturation also caused F45 franchises to struggle.  CW-3 added that some F45 studios were not operating before COVID due to market saturation.

354.    CW-3 recalled that collecting fees from delinquent F45 franchises was a "balancing act" for the Company because they were "not trying to make much noise due to the IPO."

355.    According to CW-3, F45 accepted payment plans on debt owed starting in around March 2021 and April 2021 because studios were struggling to pay their fees all at once. CW-3 recalled that management pitted him against his co-worker to see who collected more fees every month from delinquent F45 franchises.  CW-3 explained that F45 tracked how close it was to collecting all outstanding fees and that he had a quota he had to collect each month. CW-3 departed F45 because he did not like "their approach" and the Company's "practices stood out" to him.

5.    **Misstatements and Omissions About F45's Deficient Internal Controls Over Financial Reporting**

356.    While the IPO Registration Statement and Prospectus did disclose that the Company had identified a material weakness in internal controls over financial reporting, it falsely stated that: ***"We believe we have taken the necessary actions to substantially address each of the material weaknesses discussed above, and we plan to take additional steps to improve our accounting function***."

357.    In the section entitled, "Internal Control Over Financial Reporting," the IPO Registration Statement and Prospectus addressed purported steps the Company had taken to address the material weakness in internal controls over financial reporting.   Specifically, the Company reported the following:

> In order to remediate these material weaknesses, we have taken and plan to continue to take the following actions:
>
> - we have hired additional accounting personnel to implement more robust internal controls and enhanced reporting, including a Chief Financial Officer in June 2018, a Financial Analyst in December 2018, a VP FP&A in June 2019, a Staff Accountant (Australia/ROW) in April 2020, a Chief Accounting Officer in November 2020, a Financial Controller (US) in January 2021, a Financial Controller (Australia/ROW) in March 2021, a Director of Revenue Accounting and SEC Reporting in March 2021, and a Senior Accountant (Australia/ROW) in March 2021. As we build out our team, we will continue to supplement our internal resources with third-party consultants;
>
> - we are maintaining sufficient accounting personnel so that journal entries and account reconciliations are reviewed by someone other than the preparer, including retaining evidence of the reviews performed by management; and
>
> - we are implementing a more robust enterprise resource planning, or ERP, system than the one we have previously employed. This ERP implementation process initiated in 2020 and is still in progress; we experienced delays with the implementation process because of COVD-19. This ERP

system will assist with the monthly close process, segregation of duties and the timely review and recording of financial transactions.

We also plan to take additional steps to remediate the identified material weaknesses and improve our accounting function, including:

- adopting formal internal control processes and documentation related to controls that address the elements of the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control Framework; and

- restricting access to our financial systems to appropriate personnel and implementing proper segregation of duties within our finance and accounting processes.

358.    The statements set forth in ¶¶ 356-357 were materially false and misleading for the reasons explained in Section VI and ¶ 319(h).[23]

### 6.    The IPO Risk Warnings Were Inadequate and Contained Material Misstatements and Omissions

359.    The IPO Materials violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, the IPO Materials violated Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, to include "adequately describe[] the risk[s]" that make the "offering speculative or risky."

360.    Specifically, the failure of the IPO Materials to disclose that F45's businesses model was unsustainable and that the Company was unable to maintain substantial growth for the

---

[23] Notably, Deloitte & Touch LLP, who served as the independent auditor for F45's Registration Statement and Prospectus, explicitly stated in its "Basis for Opinion" that "[a]s part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion."

reasons explained in ¶ 319 violated 17 C.F.R. § 229.303(b)(2)(ii) because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  This failure also violated 17 C.F.R. § 229.105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in F45 shares speculative or risky.

361.    Further, F45 included certain "Risk Factors" in the IPO Materials that were materially false and misleading when made as the conditions described had already materialized at the time of the issuance of the IPO Registration Statement and Prospectus.

362.    For example, F45's IPO Registration Statement and Prospectus contain the following "Summary of Risk Factors":

- ***If we fail to identify, recruit and contract with qualified franchisees, our ability to open new franchised studios and increase our revenue could be materially adversely affected.***

- ***If we are unable to renew our franchise agreements with our existing franchisees, our business, results of operations and financial condition would be materially and adversely affected.***

- We have limited control with respect to ***the operations of our franchisees, which could have a negative impact on our business, and our franchisees are impacted by factors that are beyond our control***.

- ***If we fail to successfully implement our growth strategy, which includes new studio development by existing and new franchisees, our brand and ability to increase our revenue and operating profits could be materially and adversely affected.***

- ***If we and our franchisees are unable to identify and secure suitable sites for new franchise studios, our revenue growth rate and operating profits may be negatively impacted.***

363.    Likewise, the Company listed "Risks Related to Our Franchise Business Model and Strategy" in its IPO Registration Statement as follows:

Our financial results are affected by the number of franchises sold and studios we open and by the operating and financial results of such studios, which impact will become more significant as we continue to implement a variable franchise fee structure.

* * *

**_If our franchisees are not successful in operating their studios, they may not be able to pay required monthly franchise fees to us, which could harm our operating results through reduced franchise fee revenue._**

364.    Similarly, the IPO Registration Statement and Prospectus stated:

If we fail to identify, recruit and contract with qualified franchisees, our ability to open new franchised studios and increase our revenue could be materially and adversely affected.

**_The opening of additional franchised studios depends, in part, upon the availability of prospective franchisees who meet our criteria. We may not be able to identify, recruit or contract with suitable franchisees in our target markets on a timely basis or at all. Although we have developed criteria to evaluate and screen prospective franchisees_**, our franchisees may not ultimately have the business acumen or be able to access the financial or management resources that they need to open and successfully operate the studios contemplated by their franchise agreements with us.

* * *

**_Our business and operations may consume resources faster than we anticipate_**. In the future, we may need to raise additional funds through the issuance of new equity securities, debt or a combination of both. However, the lapse or waiver of the lock up restrictions discussed above or any sale or perception of a possible sale by our stockholders, and any related decline in the market price of our common stock, could impair our ability to raise capital.

* * *

**_Our planned growth could place strains on our management, employees, information systems and internal controls, which may materially and adversely impact our business._**

Over the past several years, we have experienced significant growth in our business activities and operations, including an increase in the number of system-wide studios. **_Our past expansion has placed,_**

*and our planned future expansion may place, significant demands on our administrative, operational, financial and other resources. Any failure to manage growth effectively could seriously harm our business*. To be successful, we will need to continue to implement and improve our management information systems and our operating, administrative, financial and accounting systems and controls. We will also need to train new employees and maintain close coordination among our executive, accounting, finance, legal, human resources, risk management, marketing, technology, sales and operations functions. These processes are time-consuming and expensive, increase management responsibilities and divert management attention, and we may not realize a return on our investment. In addition, we believe the culture we foster at our studios is an important contributor to our success. However, as we expand, we may have difficulty maintaining our culture or adapting it sufficiently to meet the needs of our expanded operations. These risks may be heightened as our business continues to scale. Our failure to successfully keep pace with our planned expansion of studios could materially and adversely impact our business.

365.    The statements set forth in ¶¶ 362-364 were materially false and misleading for the reasons explained in ¶ 319 and Section VI.

366.    As a result of Defendants' misrepresentations and omissions, F45's stock price was artificially inflated and/or artificially maintained.

**B.    July 2021 Interviews**

367.    On July 15, 2021, during the Company's IPO, Defendant Gilchrist was interviewed by multiple news networks in his capacity as the CEO of F45.

368.    For example, Stuart Varney from Fox Business interviewed Defendant Gilchrist and inquired about F45 and its business. During the interview, Gilchrist stated, "I'm really excited about where we're headed because *we've never had a healthier pipeline of franchisers inquiring to buy our franchises*."

369.    The same day, Defendant Gilchrist was also interviewed by a representative from Yahoo Finance. During this interview, Gilchrist was asked about the Company's profitability and its outlook for the rest of the year. In response, Gilchrist stated, "Since 2013 we've never had an

unprofitable quarter. ***So there's not many companies that grow at the breakneck speed that we have and can boast that sort of fiscal responsibility***. . . . ***This year we've sold over 550 franchises already. So we're feeling extremely confident about the future***. How we see the future is obviously based on the health of our pipeline. And as we sit here today, ***we've never had a healthier pipeline with respect to potential franchisees buying in***."

370.    Also on the same day, Defendant Gilchrist was interviewed by TD Ameritrade. During the interview, Gilchrist touted the F45's unit-economic model, stating:

> It's a great question. ***A franchisee has to invest only $315,000 to buy a franchise. Our average cash on cash returns is over 33%, which is the strongest in the industry. When you look at the average number of members we have per studio, it's over 175 members, which isn't many***. So we're a really small, tight-knit community when they actually open up. What's really interesting is ***the number of members you need to break even, which is only 75***. So each day a franchisee typically conducts between eight and ten classes per day, where we train between 26 and 36 people per class. It is a 45-minute workout. It's a high intensity interval based modality, like you mentioned. But what we love about this is we choreograph all the workouts with [our] athletics department. ***So a franchisee really just has to be trained up, pass our certification, and they have to then build that community and deliver the workout***.

371.    Analysts credited Defendants' representations that F45 franchises were easily scalable, and that rapid growth was the key to value creation for shareholders:

372.    For example, in a report published on August 9, 2021 by Guggenheim Securities titled "FXLV - BUY - Rapidly Scaling a Differentiated, Global Specialty Fitness Brand—Initiating Coverage with a Buy Rating and a $19 PT," analysts at Guggenheim wrote:

> **Key Message**: We are initiating coverage of F45 Training Holdings, one of the leading global "experiential" specialty fitness brands, with a Buy rating and $19 PT. We believe the combination of (1) a favorable near-to-intermediate-term demand/supply backdrop, (2) a differentiated, macro influencer-embraced experience, (3) streamlined and centralized studio opening, programming, and

operating processes, (4) compelling studio-level economics, and (5) a quadrupling in annual unit openings should drive significant top and bottom-line growth and potentially meaningful multiple expansion over the next 3-5 years.

\* \* \*

**A $500K AUV, 40% Four-Wall EBITDA Margin, and 60% ROIC**. The unique studio experience and centralized franchisee support drive compelling unit-level economics. First, we expect AUV to double, to $500K, between years one and five. This is almost entirely driven by a significant increase in members per studio. Second, the average studio breaks even in year one, at 75 members, with the four-wall EBITDA margin reaching 30% in year three and 40% in year five. Third, with a capital outlay of $315,000, the cash-on-cash ROIC reaches 35% in year three and 60% in year five.

**A 4X Ramp in Studio Openings Holds the Key to Value Creation**. This attractive studio model has generated substantial franchisee interest, especially among larger strategic and financial groups, resulting in an ever-expanding pipeline. We expect a meaningful portion of this pipeline to come online in 2022-2023 as the annual opening cadence ramps 4X to more than 1,000. Given the fixed-fee nature of FXLV's revenue buckets, this ramp should drive a roughly 2.5X increase in total sales and adjusted EBITDA between 2021 and 2023 and holds the key to near-to-intermediate-term shareholder value creation.

\* \* \*

**A Quadrupling in Studio Openings Drives a Significant Step-Up in N-T Operating Momentum.** As has been clear during the IPO, the near-to-intermediate-term FXLV story is ALL about the steep trajectory in studio openings over the next 12-18 months. Simply put, if the planned quadrupling in the rate of expansion—to more than 1,000 new units annually—is successfully executed, the shares should meaningfully appreciate by the end of 2022. This reflects three principal realities: (1) given the largely fixed-fee nature of FXLV's numerous revenue lines, the simple process of getting these studios open should drive a significant top-line step-up, (2) in light of the franchised approach to expansion, this revenue ramp should carry high incremental EBITDA margins, and (3) since a successfully-executed acceleration in unit expansion should lend credence to the secular growth algo, we believe the multiple the market applies to this profitability likely will expand substantially, particularly from current levels. Because we have confidence in the

117

successful execution of this effort, we can envision the shares reaching the $19 level, or 17-18X 2022E EBITDA, 20% one-year appreciation.

373.    J.P. Morgan also initiated coverage of F45 on August 9, 2021, issuing a report titled, "F45 Training Holdings Inc., Believe US growth will prove aggressive despite dominance in home Australia market; Initiating N[eutral]," in which analyst John Ivankoe noted:

> **Forecasted US growth rate would be unprecedented, with our model estimating 600 net units added in F22 versus the 320 ending in F19 and 654 expected at end of F21, or opening almost as many units in a single year as Australia has opened since the brand's inception**. Franchises sold (but not opened) totaled 445 at the end of F20 and 823 at the end of 2Q21, after several large multi-unit transactions, which should give the company confidence in achieving unit growth goals. Controlling quality of studios while achieving this speed of growth will be essential to the brand's enduring consumer appeal, in our view, a difficult task over a much more geographically dispersed area versus Australia.

374.    As a result of Defendants' misrepresentations and omissions, F45's stock price was artificially inflated and/or artificially maintained.

375.    The statements set forth in ¶¶ 368-370 were materially false and misleading because they failed to disclose that F45's business model and the Company's substantial growth was a result of undisclosed and unsustainable practices that the Company followed simply to maximize the number of Total Franchises Sold (as opposed to profitable studios operating), including:

(a)    misleading potential franchisees with respect to certain key profitability metrics in order to convince them to purchase a franchise license so F45 could record the deal in its closely watched metric "Total Franchises Sold;"

(b)    failing to conduct proper due diligence on potential franchisees to ascertain whether they were credit-worthy enough to purchase, open, and maintain one or more F45 franchises;

(c)    failing to provide franchisees with proper training and/or guidance once they opened a studio to assure a better likelihood of studio success (meaning increased royalties and other fees for F45);

(d)    failing to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth;

(e)    failing to disclose that a significant number of its franchisees' studios were in financial distress and were not profitable – certainly not within the time frame represented by the Company;

(f)    providing to certain preferred franchisees undisclosed modified payment terms and failing to properly account for those modified terms. This ultimately resulted in, among other problems, ballooning account receivables for F45 and delayed cash inflows for the Company's growth initiatives;

(g)    "selling" exclusive franchise rights to multi-unit franchisees without regard to whether those franchisees could financially or would ultimately open those franchisees and in doing so, the Company artificially inflated the number of reported "Total Franchises Sold," a key metric followed closely by analysts and investors. Indeed, much of the committed franchise store development was conditional on near-100% external financing of this growth which included the Company's guarantee to support novel financing arrangements that ultimately fell through; and

(h)    failing to adequately remediate identified material weaknesses in internal controls over financial reporting.

C.   **2Q 2021 Results**

376.   On August 26, 2021, F45 issued a press release announcing second quarter 2021 ("2Q 2021") financial results.

377.   The same day, Defendants Gilchrist and Payne held a conference call to discuss the 2Q 2021 financial results (the "August 26, 2021 Earnings Call"), and made the following false and misleading statements. During the call, Defendant Gilchrist stated, "Despite challenges posed by the COVID-19 pandemic, we grew our footprint and experienced minimal permanent closures during 2020, which *really underscores the resilience of our business model*."

378.   Defendant Gilchrist also stated, "Now let's talk about growth. *We have a significant footprint expansion opportunity both in the United States* and across the rest of the world. *Starting with the U.S., we continue to believe that there is a significant long-term opportunity to meaningfully expand our franchise studio footprint.* As of June 30, 2021, we had 1,379 franchises sold and 556 open studios in the U.S. Based on our white space analysis, *we believe there is long-term studio potential for us to open over 7,000 studios in the U.S."*

379.   During the earnings call, Defendant Gilchrist represented, "Let me also take a moment to touch on a few of our growth drivers that we're really excited about. Multiunit franchise systems is the first that I'll touch on. The majority of our franchisees today consist of owner operators that manage single locations. *Going forward, we intend to seek further opportunities to develop multiunit franchise systems with select financial partners.* As of June 30, 2021, *approximately 51% of our franchises sold were owned by multiunit franchisees, up from approximately 40% as of the end of 2019, which really highlights the strong market demand for multiunit franchise opportunities and their ability to sell to existing franchisees*."

380. During the earnings call, Defendant Payne stated, in part:

> Regionally, our revenues have increased 84% in the United States, 68% in Australia and declined 2% in the Rest of World segment. We have a high level of visibility into our revenue streams as we operate nearly 100% franchise model. We charge new franchisees a onetime establishment fee of $50,000, which is amortized over 10 years; and monthly franchise fees, which are the greater of $2,500 a month or 7% of gross revenues.
>
> **Inclusive of the onetime establishment fee, franchisees are contractually required to purchase a World Pack**, which consists of all of the equipment, signage and technology they need to operate their studio. We believe our World Pack differentiate us as a franchisor. Nearly all necessary items a franchisee needs to operate their business gets delivered in a 40-foot shipping container. And our franchisees see a tremendous amount of value in the World Pack.
>
> **This onetime equipment sale of $125,000 is recognized at the time of delivery.**

381. During the Question and Answer ("Q&A") portion of the earnings call, an analyst asked about "the big opportunity for U.S. unit growth to 7,000 or more[.]" In response, Defendant Gilchrist stated:

> Well, that's a great question. Firstly, **we sort of look at the TAM being 7,000 because -- and admittedly, we can argue about what – it's more of an outcome**. But we looked at the Australian experience where we have 27 million people, a GDP that's 1/15 of the size of the U.S. So we extrapolate that number out and you arrive at a number that's actually closer to 9,000 studios in the U.S. **We give that a haircut, and we arrive at 7,000**. So that's the first part of the answer, and I hope like you can look at the Australian experience and think that it's very similar like with respect to culture.
>
> And you can also look at the CrossFit experience where they had somewhere in the range of 7,000 in the U.S. And **we think that, that's about the right number**.

382. Defendant Gilchrist also stated that "**we believe we can be bigger than Starbucks. We can be bigger than McDonald's.**"

383.    At the end of the earnings call, Defendant Gilchrist stated:

Thanks. Look, I just -- I have to say, as we sit here today, we've been impacted by COVID-19 over the last 18 months. And we've been a very fiscally conservative business since day 1. We've never had an unprofitable quarter. *So that's really important to think about because we've been growing at breakneck speed. And we're really excited during this IPO process to be able to relieve all of our debt. So we have a balance sheet that I would argue is the strongest in this space*.

384.    On August 27, 2021, Defendant Gilchrist was interviewed by TD Ameritrade regarding its 2Q 2021 earnings.  During the interview, Gilchrist touted F45's franchise sales, stating:

*What was fascinating about last quarter was the breakneck speed of our franchise sales growth. We recorded a total of 554 new franchises sold, which for us is an incredible achievement*. And although we were ranked number one in the world as the fastest growing fitness franchise in the world by Entrepreneur Magazine, *you know we are thinking that we'll be able to continue to accelerate to the point where we have all of next year's numbers fully contracted*. So you know we, the second part of your question is *we're looking at the future in a really positive way*.

385.    During the same interview, Defendant Gilchrist also touted the Company's unit-economic model and the success of its franchisees, stating:

(a)    "*The future of the business has never had a stronger sales funnel and the reason for that is because a lot of our franchisees that are inquiring are continuing to see, you know, what a robust investment this business is with a typical franchise only costing $300,000 to open up with cash-on-cash returns over 35%*."

(b)    "And what we, you really, really *shine a spotlight on the fact that it only takes 70 members to break even with this particular business in comparison to some of our peers where they need anywhere in excess of thousands of members if it's a big box gym, it's a really digestible number for these young entrepreneurs*, you know, to be able to come to grips with the

fact that they have to build the community of 70. ***Our average studios obviously can get up to 300-400 members*. . . .**"

(c)    "[F]ortunately we've been able to actually attract some of these professional athletes to become franchisees. Some great examples across Australia include ***one particular franchisee that owns 9 franchises and is currently earning three times the amount of money as what he did when he was a professional rugby player***."

386.    Analysts credited Defendants' representations that F45 was poised for unprecedented growth.

387.    For example, in a report published on August 27, 2021 by Roth Capital Partners titled "*FXLV: Quarter Should Ease COVID Concerns; Reiterate Buy and $21 Price Target,*" Roth reported:

> FXLV reported a strong quarter, especially considering the impact of COVID in Australia, where F45 has a large presence. Following the quarter our thesis is unchanged. We remain upbeat on the stock and see material upside as management executes against its new unit targets in the coming years.
>
> **Quarterly overview:** F45 Training reported 2Q21 results on 8/26/21 that exceeded our estimates. Revenue/EBITDA of $26.8mn/$10.7mn compared to our estimates of $24.0mn/$10.4mn, respectively. Important to note, revenue was aided by a franchise-related accounting adjustment that benefited 2Q21 and go-forward quarterly revenue by $3.0mn and approximately $1.5mn, respectively.
>
> **Key metrics:** FXLV sold over 550 franchises in the quarter, aided by three large multi-unit agreements. In Australia, where F45 Training has the deepest penetration, FXLV sold 109 new franchises, 2/3 of which are FXLV's new brand FS8. FS8 has ramped quickly to >110 units sold.
>
> **Guidance and estimate changes:** Management provided 2021 guidance, calling for $132mn-$137mn in revenue and $50mn-$52mn in EBITDA. We raise our estimates accordingly. Management models for Australian locations to fully reopen by mid-Q4. FS8 and other new modalities are not baked into guidance,

beyond what has already sold. Also in 2021, FXLV expects to sell 800-850 new franchises and open 220-260, the midpoint of both is slightly below our prior estimates. The military is becoming an increasingly important channel for new unit sales.

**Implied 2H21 ramp:** Management's guidance implies a material ramp in 2H21 revenue and profitability, driven largely from equipment placements to (1) large multi-unit operators, and (2) "stimulus" deals, done during 2020 to spur new unit development, which are contractually obligated to take equipment in 4Q21.

388.    Guggenheim Securities also reiterated its BUY rating for F45 in a September 6, 2021 reported titled, "*FXLV - The Studio Opening Ramp Is Coming And The Shares Are 10% Below The IPO—We Reiterate Our BUY Rating And $19 PT.*" In the report, John Heinbockel wrote:

**Key Message:** We reiterate our BUY rating and $19 PT in the aftermath of solid 2Q results. Bottom line, we are rapidly approaching our modeled expected ramp in studio openings—which is the linchpin for a sharp acceleration in operating momentum—and the shares continue to trade ~11% below the IPO price, largely, we believe, on Delta variant concerns…

\* \* \*

2Q operating results were noisy, especially (and surprisingly) at the top line, while confirming the secular growth thesis....

\* \* \*

**The Powerful 2022-2023 Ramp In Openings Should Drive Shareholder Value.** From a big picture perspective, the robust directional ramp in studio openings during 2022-2023 should create meaningful shareholder value, particularly from current levels...As we discussed in our initiation report, FXLV's P&L is more directly linked to actual studio openings than any other franchise model we know given its largely fixed-fee structure. As a result, as the number of annual openings quadruples, to 1,000 plus over the next two years, total revenue should surpass $300 million in 2023, with adjusted EBITDA approximating $130 million, a 40% margin. Our current PT would correlate to a seemingly modest 11-12x 2023 EBITDA multiple. Moreover, if the company can demonstrate an ability to effectively manage 1,000 openings annually, confidence

in a 20-25% secular algo would be bolstered, supporting out-year multiple expansion and upside beyond our PT.

389.    On August 30, 2021, F45 filed with the SEC its quarterly report on Form 10-Q for 2Q 2021, which was subsequently amended by the filings of a Form 10-Q/A on September 17, 2021 (together with the August 30, 2021 Form 10-Q, the "2Q21 10-Qs"). The 2Q21 10-Qs were signed by Defendant Payne and certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Gilchrist and Payne.

390.    The 2Q21 10-Qs contained the following false and misleading statements <u>related to F45's unit-economic model and the success of its existing franchisees</u>:

(a)    "***Our platform enables the rapid scalability of our model and helps to promote the success of our franchisees***."

(b)    "We operate a nearly 100% franchise model. ***We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation, and has helped to facilitate our rapid growth and strong financial performance*** prior to the COVID-19 pandemic. Despite challenges posed by the COVID-19 pandemic, we grew our footprint and experienced minimal permanent closures during 2020, which ***we believe underscores the resilience of our business model***."

391.    The 2Q21 10-Qs also contained the following false and misleading statements <u>related to F45's business model and ability to maintain substantial growth within the United States</u>:

(a)    "***Our opportunities to drive the long-term growth of our business include . . . expanding our studio footprint in the United States***[.]"

(b)    "Our long-term growth will depend in part on our continued ability to sell new franchises. ***We are still in the early stages of growth and expansion, particularly in the United States and ROW, and we believe we can significantly grow our franchisee base***. If we

cannot sell new franchises as quickly as we would like in these geographies, our operating results may be adversely affected."

    (c)  "Our long-term growth will depend in part on our continued ability to open new studios. ***We believe that we will experience continued expansion of new studio openings in the United States and ROW***. However, if delays or difficulties are encountered and new studio openings do not occur as quickly as we would like, our operating results may be adversely affected."

  392.  The 2Q21 10-Qs contained the following false and misleading statement related to <u>franchisee payments for World Pack fees</u>:

> ***Typically, a portion of the World Pack fee is required to be paid upon the execution of a franchise agreement, with the balance due upon the earlier of: (i) the date the franchisee orders the World Pack; or (ii) eight months from the effective date of the franchise agreement. The franchise agreement mandates all franchisees to order and update new equipment on an annual basis.***

  393.  The 2Q21 10-Qs contained the following false and misleading statement <u>related to the Company's internal controls</u>:

    (a)  "***We maintain disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) that are designed to ensure that information required to be disclosed in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to the officers who certify the Company's financial reports and to other members of senior management and the Board of Directors as appropriate to allow, to allow for timely decisions regarding disclosure***."

394.    The 2Q21 10-Qs noted that "the effectiveness of the Company's disclosure controls and procedures" was "evaluated, under the supervision of and with the participation of senior management," including F45's CEO (Gilchrist) and CFO (Payne), pursuant to Rule 13a-15(b) of the Exchange Act.

395.    In addition, the 2Q21 10-Q acknowledges that F45 had identified certain material weaknesses in the Company's internal control over financial reporting in the IPO Registration Statement and Prospectus filed with the SEC in July 2021, stating:

*Material Weakness in Internal Control Over Financial Reporting*

The material weaknesses related to a failure to properly staff and design our financial closing and reporting team and processes, a lack of segregation of duties in certain key financial reporting processes and a lack of formal documentation of policies and internal controls being followed by us, including, but not limited to, controls involving risk assessment procedures, tools to prevent a cybersecurity breach and controls designed to prevent or detect fraud.

*Remediation Measures*

**To address the material weakness described above, the Company continues to take the following steps including**:

- adopt formal internal control processes and documentation related to controls that address the elements of the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control Framework;

- hired additional accounting personnel to implement more robust internal controls and enhanced financial reporting;

- maintain sufficient accounting personnel so that journal entries and account reconciliations are reviewed by someone other than the preparer, including retaining evidence of the reviews performed by management;

- implemented a more robust enterprise resource planning, or ERP, system to assist with the monthly close process, segregation of duties and the timely review and recording of financial transactions; and

- restrict access to our financial systems to appropriate personnel and implementing segregation of duties within our finance and accounting processes.

***We believe the actions described above will be sufficient to remediate the identified material weakness and strengthen our internal control over financial reporting.*** However, the steps taken to address the material weakness have not operated for a sufficient amount of time to conclude that the material weakness has been remediated. We will continue to monitor the effectiveness of these controls and will make further changes management determines appropriate.

396.    As a result of Defendants' misrepresentations and omissions, F45's stock price was artificially inflated and/or artificially maintained.

397.    The statements set forth in ¶¶ 377-385, 390-393, 395 were materially false and misleading because Defendants failed to disclose that F45's business model and the Company's purported growth were a result of undisclosed and unsustainable business practices that the Company followed simply to maximize the number of Total Franchises Sold (as opposed to profitable studios operating).

398.    Specifically:

(a)    The "growth statements" in ¶¶ 377-378, 381-384, 390-391 were materially false and misleading for the reasons explained in ¶¶ 375(a),(c)-(g);

(b)    The "unit-economic model" statements in ¶ 385 were materially false and misleading for the reasons explained in ¶¶ 375(a),(e).

(c)    The "increase in percentage of multi-unit franchisees" statements in ¶ 379 were materially false and misleading for the reasons explained in ¶¶ 375(d),(f)-(g);

(d)    The "equipment fee" statements in ¶¶ 380, 392 were materially false and misleading for the reasons explained in ¶¶ 375(f); and

(e)    The "internal controls" statements in ¶¶ 393, 395 were materially false and misleading for the reasons explained in Section VI and ¶ 375(h).

**D.    3Q 2021 Results**

399.    On November 12, 2021, F45 issued a press release announcing third quarter 2021 ("3Q21") financial results.

400.    On the same day, F45 held a conference call to discuss the 3Q21 results (the "November 12, 2021 Earnings Call"). During the November 12, 2021 Earnings Call, Defendant Gilchrist touted F45's business model and the Company's ability to maintain substantial growth, stating:

> We are very pleased to report strong third quarter results. Notably, *we continue to execute on our growth strategy, demonstrated by strong new franchise sales, including additional multiunit deals and continued strength in new studio openings*. Additionally, we saw encouraging sequential improvements in studio performance with visitation and average unit volumes exceeding pre-pandemic levels in *the U.S., which is our most significant growth market*.
>
> *    *    *
>
> In the third quarter, we sold 210 net new franchises and ended the quarter with 3,011 franchises sold. We also opened 63 net new studios globally and ended the quarter with 1,618 total studios, an 18% increase versus the prior year. W*e are well on our way to achieving over 4 new goals of franchises sold and studio openings, demonstrating the strong continued interest from franchisees to open new F45 studios*. Moreover, we are encouraged by the strong franchise pipeline of approximately 1,400 sold but not yet opened studios. As I've said before, *a significant portion of these sold but unopened studios are comprised [sic] a very experienced, well-capitalized multiunit franchisees*.

401.    Defendant Payne stated:

> Now moving on to guidance. *With the pace of franchise sales and studio openings tracking ahead of our prior outlook, we're raising the low end of our guidance ranges for franchise sales and studio openings*. We now expect full year new net franchises sold of 830 to 850 compared to our prior range of 800 to 850. Full year net studio

openings at 240 to 260 compared to prior range of 220 to 260. As we've discussed in the past, we continue have very good visibility into our studio opening pipeline for the next few years. *We are very pleased with the pace and visibility of our franchisee pipeline with over 3,000 franchises sold to date, approximately half of which are open studios. The other half represents more than 1,400 sold but not yet opened studios, a significant portion of which are part of multiunit deals with well-capitalized franchisee groups.*

*These studios are contractually obligated to open, and we continue to have high confidence in our partners' ability to do so in a timely manner.* While there remains considerable uncertainty regarding the global supply chain backdrop and delays at major shipping ports, the company maintains its financial outlook for the year.

402.   Defendant Gilchrist then followed up Payne's statements, stating:

*Based on our white space analysis and our internal estimates, we continue to believe there is long-term studio potential for us to open over 7,000 studios in the U.S.* This does not include the meaningful long-term white space potential related to either our other F45 verticals such as corporate, college and military studios or other fitness modalities such as FS8, Malibu Crew, Avalon House and Vive Active, which I'll discuss in more detail in a few moments. Outside our core markets of the U.S. and Australia, we have already demonstrated the portability of our brand and franchise model in almost 70 countries. *We've designed our studios to be easily deployed in both developed and emerging markets and to drive continued growth in both underpenetrated existing markets and new markets.*

*Based on our global white space analysis, we continue to see long-term potential for approximately 16,000 studios outside the U.S.* Now what gives us our confidence in these long-term targets? We have 3 significant drivers that will enable us to achieve our ambitious goals: one, multiunit franchises; two, expansion into institutional channels; and three, new concepts targeting additional demographics. Starting with multiunit franchises. *We continue to see strong market demand for multiunit franchise opportunities. our [sic] multiunit operator partners range from existing franchise partners who are looking to expand their studio footprint to well-capitalized institutional partners.* Currently, most of our franchisees are independent owner-operators who manage a single location. *Going forward, we will continue to drive new franchise sales and new studio openings with larger well-capitalized multiunit franchise groups.*

403.    During the Q&A, an analyst asked about the "larger or maybe chunkier deals that

we shouldn't expect to continue[.]"  In response, Defendant Payne stated:

> *In regards to our multiunit deals, yes, we have a very strong pipeline of these sophisticated investors, larger groups that are looking to take out portfolios of F45. We do also have a very healthy pipeline of our regular way single to 5-unit, multi-unit deals. So we're expecting that in the fullness of time that we will be closing a mix of both multiunit larger deal and also continuing our regular way sales.*

404.    Defendant Gilchrist responded:

> Yes. If I can just also add 1 point on to that, Chris. We have been not inundated, but we've had probably somewhere between 40 and 60 inquiries from PE firms. And because of the large amount of inquiry, we've actually outsourced the negotiations and created a process with an investment bank, and we mentioned those folks on our last call, to assist us in going through and channeling these great sophisticated investors into the F45 network. *So we're feeling really good about the fact that there is an extremely large pipeline. And as we continue to mature with the rest of the franchise community, we believe that, that space will continue to grow over the next 2 to 3 years*.

405.    Defendant Payne then discussed studio openings, stating, in part:

> Yes. Just to reiterate a couple of points there, John. We have a high degree of visibility over our backlog as Adam has clearly articulated. And the other important point there in regards to the backlog is that *over half of the backlog of these large multi-unit operators with contractual opening dates and terms, they're very well capitalized. And from what we're seeing, they're moving ahead, ahead of pace. So we've got a high degree of confidence*.

406.    To that, Defendant Gilchrist added:

> And look, just on that last point, *we have over 600 franchises in our backlog that are highly sophisticated private equity folks or family offices with incredible balance sheets and great operators. So these are folks that are on the ground now with CBRE executing letters of intent and leases. So we're feeling really good about Q1 and Q2*.

407.    At the end of the earnings call, Defendant Gilchrist stated:

> So it's been a great period being a public company. We get excited about having the visibility on our backlog. We've got lots of folks in PE that are contacting us that we're working through now to join our family. And like we've said, all along, *we believe that we can be the world's biggest franchise system in the future*.

> Secondly, we believe that we're delivering the most important franchise service in the world, which is getting people fit and healthy. Thirdly, we want to do it in a fiscally responsible way, where both – we're a very strong business from a balance sheet and cash flow standpoint, *but also making sure that our franchisees have got incredible margins*.

408.    Two days later, on November 15, 2021, F45 filed with the SEC its quarterly report on Form 10-Q for 3Q21 ("3Q21 10-Q"). The 3Q21 10-Q was signed by Defendant Payne and certified pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Gilchrist and Payne. The 3Q21 10-Q contained the same misstatements as the 2Q21 10-Qs (¶¶ 390-393), except for the "participation of senior management" statement (¶ 394).

409.    The next day, on November 16, 2021, Defendant Gilchrist was interviewed by CNBC regarding F45's 3Q 2021 earnings. During the interview, Gilchrist was asked what was driving the Company's growth. In response, Gilchrist stated:

> *[W]hat's fueling our growth is the incredible returns for our franchisees. Our business only costs $300,000 to open up a franchise, and we have over 35% cash on cash returns for those folks across our 2,800 locations* – which, you know, is expanding dramatically. And I think a better soundbite than our 126% same store sales growth, was the fact that *we sold 540 franchises last quarter – which is just an incredible effort from what we've seen in comparison to our peers*.

410.    Analysts credited Defendants' representations that F45 remained poised for unprecedented growth.

411.    For example, in a report published on November 15, 2021 by J.P. Morgan titled, "Analysts credited Defendants' representations that F45 was poised for unprecedented growth," John Ivankoe wrote:

> The company discussed ~33% system wide sales growth (including ~20% increase in operating weeks) which included 17% y/y increases in visitation. Australia is ~34% of system sales and with 60%. . . .
>
> *  *  *
>
> Now it is the Company's challenge to achieve never-done-before unit development targets of over 600 in the US alone in F22 vs an ending 631 F21 base and compared to the 633 units in Australia which took over 8 years to build. The improving economics in the US to $306k estimated F21 AUV is vs $319k in F19 and supports store growth of this well-branded, effective, and high-variety fitness model. We model 750 units to grow in F23 as well to end with an at-scale 2,000+ units in F23. . . Much is made around large private equity franchisees to propel near-term unit growth, but we are sensitive towards the balanced locally managed units that create the 1x1 connection and community so essential in boutique fitness.

412.    In a November 15, 2021 report from Cowen & Co titled "Strong U.S. Fitness Recovery, But Challenging Environment Pressures Results," Max Rakhlenko, wrote:

> (2) Impressive Studio Level Momentum In U.S: Comps increased +67% in the U.S., and we now estimate comps have returned to pre-pandemic levels as overall visits have increased +115% Y/Y. Likewise, AUVs are now above pre-pandemic levels, and momentum has continued into 4Q. We are also encouraged visitation increased to more than 2.7x per week, above pre-pandemic levels, along with lower churn rates. In our view this is important as F45 transitions to a variable royalty stream of greater of 7% AUVs or $2.5k/month, and our industry checks suggest F45 has further room to increase weekly visitation.
>
> (3) Good Progress With Multi-Unit Franchisees: We are encouraged by progress F45 is making partnering with bigger multi-unit franchisees, as we see this as the path forward for the company. In 3Q, F45 added 155 multi-unit franchises across three groups, and as of 3Q-end 65% of total franchises sold were owned by multi-unit franchisees vs. 40% at FY19-end, and we expect mix to continue to trend higher over the longer-term. Management called out a group

in Europe that will open 75 studios, and another one that will open 15 in Australia and the U.K (on top of 30 already open).

We maintain our Outperform rating as we believe F45's differentiated features create a powerful moat (link, link), but lower our PT to $17 on 15x our FY22 $98mm EBITDA as we think shares may remain range-bound in the near-term while investors assess visibility into the U.S. franchise pipeline, supply chain challenges, and other factors.

413.    As a result of Defendants' misrepresentations and omissions, F45's stock price was artificially inflated and/or artificially maintained.

414.    The statements set forth in ¶¶ 400-409 were materially false and misleading when made for the reasons described in ¶¶ 375.  Specifically:

(a)    The "growth" statements in ¶¶ 400, 402, 407, 409 were materially false and misleading for the reasons explained in ¶¶ 375(a),(c)-(g).

(b)    The "guidance and franchisee pipeline" statements in ¶ 401 were materially false and misleading for the reasons explained in ¶¶ 375(a),(c)-(g).

(c)    The "increase in multi-unit franchisee" statements in ¶¶ 403 were materially false and misleading for the reasons explained in ¶¶ 375(d), (f)-(g).

(d)    The "quality and credit of franchisees" statement in in ¶¶ 405-406 was materially false and misleading for the reasons explained in ¶¶ 375(b),(e),(g).

415.    Additionally, the statements set forth in ¶¶ 400-401 were materially false and misleading when made because Defendants failed to disclose that F45 had changed the definition of what constituted an open studio in early October 2021 which was not disclosed to the market until March 2022.

### E.    ICR Conference: January 10, 2022

416.    On January 10, 2022, F45 presented at the ICR Conference.  During the ICR Conference, Defendant Gilchrist touted F45's business model and the Company's ability to

maintain substantial growth, stating "***if you look at key markets for us in terms of growth, being the likes of Texas, Florida, we really are flourishing, not just from a franchise sales perspective***, but also from a visitation and member growth standpoint."

417.    Defendant Gilchrist also made the following false and misleading statements regarding F45's unit-economic model and the success of its franchisees' studios:

(a)    When asked about "the health of your franchisees" Defendant Gilchrist stated, "***I mean we have a business that pre-COVID was generating cash-on-cash returns of over 35% per franchisee. So what that enabled our franchisees to do was to have a fair amount of compression with their revenue and still remain profitable***."

(b)    Defendant Gilchrist also stated, "***We would argue on the data that we've seen, we're the most profitable fitness franchise in the world***."

418.    During the conference, Defendant Payne made the following false and misleading statements regarding franchisee payments terms for World Pack fees:

> So as Adam quite rightly pointed out, as soon as we became a public company in July, ***we moved from that pay-as-you-go method, as it relates to franchisees ordering equipment from us, to pulling the inventory forward and delivering it and storing it in our warehouses and delivering it to our franchisees in accordance with the terms of their franchise agreements***.
>
> So we shifted back to that methodology. So from July, we started ordering all of our equipment volumes a couple of quarters in advance. But as we've stated previously, that onetime shift it took until Q4 for our factories to ramp up that production to get that stock. And as we've demonstrated clearly here, we've been able to get that quantity of deliveries done in Q4. And that was a onetime issue for us. Now we have the stock moving forward in plenty of time to meet the contracted demand, if that makes sense.

419.    When an analyst asked whether any of the "previously guided at least 1,000 openings" for 2022 were "pulled forward" into the fourth quarter of 2021.  In response, Defendant Payne stated:

> We've got this higher degree of visibility over the backlog. And *a significant percentage of our backlog is made up of these high-quality, multiunit franchise groups. They're executing ahead of their plans*. And there's just this high degree of visibility around the backlog. *So we can actually see how many of those, 1,300 in that number, you've got to imagine, would be higher now given the sales pace and the opening pace, you can figure out that math*. But we have a high degree of visibility about how many of those franchisees are progressing to executing leases, to selecting sites. *And we feel very confident in our ability, and we have the backlog there to achieve that 1,000 openings that you've referred to. So we feel really good about our position*. And we don't believe that we've pulled forward any openings into Q4 that we're anticipating in Q1.

420.    During the conference, an analyst also asked about the importance of the U.S. as a growth market and how different returns are for net units across the United States.  In response, Defendants Gilchrist and Payne stated:

> **Adam James Gilchrist**
> *Founder, President, CEO & Chairman of Board*
>
> Yes. I mean Chris can dive in after I briefly answer. *There's not a huge, but there is a wide variance across the U.S. with respect to what the AUVs are*. And a good example would be our top studios in California do over $100,000 a month. *But obviously, the average studios can run at $25,000 to $30,000 a month and be profitable and have that 35% cash-on-cash return*. So really, that's how we see it. And I'll sort of pause there for Chris to dive in.
>
> **Christopher E. Payne**
> *CFO, Treasurer & Director*
>
> Yes. *I think the important thing here, John, is just acknowledging that this product is highly portable*. And as we've always said, it just works in a range of markets, countries, transcends cultures, languages. But specifically, as it relates to the U.S., whether it be a major metro market, which, yes, might have higher revenues like in

New York, but in New York it will have higher rent and higher cost of labor, but that return profile is exceptional.

*If you go to a more urban or suburban market or even a rural market, where rents are lower, the cost of employment is lower, but it still generates a meaningful return*. I think this product has proven to work across that diverse range of markets and cultures and countries. *But it's also really important to note that, that return profile and that breakeven point of 75 members, you don't need thousands of members to breakeven*. And the goal really is to get to that 200 to 300 members in a catchment of territory, which is typically around a population of 20,000 people. So that's one of the key reasons why the success of the portability of this product.

421.   As a result of Defendants' misrepresentations and omissions, F45's stock price was artificially inflated and/or artificially maintained.

422.   The statements set forth in ¶¶ 416-420 were materially false and misleading when made for the reasons described in ¶¶ 375.  Specifically:

(a)   The "growth" statements in ¶ 416 were materially false and misleading for the reasons explained in ¶¶ 375(a),(c)-(g).

(b)   The "unit-economic model" statements in ¶¶ 417, 420 were materially false and misleading for the reasons explained in ¶¶ 375(a),(e).

(c)   The "multi-unit franchisee" statements in ¶ 419 were materially false and misleading for the reasons explained in ¶¶ 375(d), (f)-(g).

(d)   The "equipment fee" statements in in ¶ 418 was materially false and misleading for the reasons explained in ¶¶ 375(f).

423.   Additionally, the statements set forth in ¶ 419 were materially false and misleading when made because Defendants failed to disclose that F45 had changed the definition of what constituted an open studio in early October 2021 which was not disclosed to the market until March 2022.

F.      **4Q and Full Year 2022 Results**

424.    On March 14, 2022, F45 issued a press release announcing fourth quarter ("4Q22") and full-year fiscal 2021 financial results.

425.    On the same day, Defendants Gilchrist and Payne held a conference call to discuss the fourth quarter and full-year fiscal year 2021 results (the "March 14, 2022 Earnings Call"). During the March 14, 2022 Earnings Call, Defendant Gilchrist touted the F45's business model and the Company's ability to maintain substantial growth, stating:

> Moving on to the fourth quarter results. For both the fourth quarter and the full year, ***we continue to execute on our business and growth strategies that have enabled F45 to become the fastest-growing fitness franchisor in the world*** as well as the #1 ranked boutique fitness brand according to Entrepreneur magazine.
>
> During the fourth quarter, ***we continued to demonstrate strong franchise sales, including additional multiunit deals and continued strength in new studio openings and equipment pack deliveries.***
>
> \*   \*   \*
>
> In addition, ***we continue to be encouraged by the strong franchise pipeline of over 1,500 sold franchises as at 12/31, 2021, but not yet open. As I've said before, a significant portion of these sold, but unopened studios, are comprised of very experienced and well-capitalized multi-unit franchisees***, which I'll talk about further.
>
> As we have discussed in the past, we have taken and will continue to take strategic proactive measures with respect to our supply chain. To that end, we recently announced that we have secured 1,200 equipment packs for delivery in 2022. As a result, ***we remain confident in our ability to satisfy the robust demand from franchisees for new F45 studios***.

426.    During the earnings call, Defendant Payne discussed franchises sold and reemphasized the Company's intent on targeting multi-unit franchisees, stating:

> As of December 31, 2021, we had 1,552 franchises sold, but not yet open, with the highest concentration with over 1,000 in the U.S. market. ***The majority of these sold but not yet open studios are***

*attributed to our well-capitalized multi-unit franchise partners*. For additional context, the global average net franchises sold per month increased to 88, well ahead of the 2020 average of 29 per month.

In the U.S., the average net franchises sold per month increased to 65, ahead of the 2020 average of 10 per month. *In addition, approximately 65% of our franchises sold were owned by multi-unit franchisees, up from approximately 52% as of December 31, 2020, and 40% as of December 31, 2019, which highlights the strong market demand for multi-unit franchise opportunities*.

427. Defendant Gilchrist also reaffirmed the long-term growth potential for F45 in the United States, stating:

As Chris already mentioned, as of December 31, 2021, we had 1,130 franchises sold, with 654 total studios in the United States. Based on our white space analysis, and our internal estimates, *we continue to believe there is long-term studio potential for there to be over 7,000 F45 studios in the U.S.*

\* \* \*

*Since day 1, our franchise model was purpose-built around scalability*. What exactly does this mean? It was very simple. We make our studios simple to open and simple to operate. *This allows franchisees to spend more of their time growing their business by opening potentially more studios.*

Looking ahead, we intend to continue to grow our footprint with existing as well as new franchisees in both developed and emerging markets. Turning to demand for new franchises. *We continue to see strong market demand from both existing and new multi-unit franchisees*. Our multi-unit franchise partners range from existing franchisees who are looking to expand their studio footprint to well-capitalized institutional partners seeking to build studio footprints of scale.

*During the fourth quarter, we added 160 multi-unit owner-operator franchises across 3 multi-unit franchise groups*. As of December 31, 2021, approximately 65% of our franchises sold were owned by multi-unit franchisees, which is up from approximately 40% as of the end of 2019. *Going forward, we will continue to drive new franchise sales and new studio openings with larger, well-capitalized multi-unit franchise groups.*

428.    During the Q&A, an analyst asked Defendants to provide additional details "around the large multi-unit deals" signed in the fourth quarter.  In response, Defendant Gilchrist stated:

> Yes, I think that's a good question. ***We see the business accelerating with highly sophisticated, well capitalized investors***. That's my first point. The second point that I'll make is it's actually easier to operate a portfolio of F45 that's greater than 10. And by that, I mean, you can actually establish a small head office, you can have efficiencies with membership sales, marketing. So really, what we're trying to do is to continue to assist smaller franchisees.
>
> When I say smaller franchisees, I mean, with few up multiunit numbers in that portfolio with an exit. So we're seeing a potential portfolio of roll-ups over the next 24 months. ***And I would expect this year that we will continue to accelerate forward with larger portfolio owners that acquire somewhere between 20 and 100 franchises each. If you look at Q4, again, the major transaction that we completed last year was with Club Franchising Group. That was completed prior to Q4, and that was for a portfolio of 350 locations in Q4***, we had no major transactions with regard to portfolio acquisitions of over 50 franchises. The way I would look forward though is I think the average franchisee across the group will own 20 franchises. That's sort of the ZIP code that I anticipate and I'll pause there and let Chris add any additional color if he has some as well. But I -- again, I hope that goes a long way to answering your question.

429.    During the Q&A, when an analyst asked how F45 was scaling its business, Defendant Gilchrist responded:

> Yes. I think -- I mean we're seeing – ***we're not announcing Q1's sales, but we're being blown over with the level of interest that we have***. And I suppose we believe internally that the high level of confidence is coming off the back of the IPO because ***we would argue that we would have the strongest balance sheet in this fitness ecosystem in comparison to our peers***. As Chris mentioned, we had 0 debt at the end of Q4. We have kept our revolver, however, to acquire equipment, so that's just a timing question.
>
> So there's a tremendous amount of confidence coming from private equity, family office and sophisticated entrepreneurs buying into our network, and they're seeing that ***we've operated a fiscally-conservative business by also balancing this breakneck speed growth***. So the answer to your question is ***we have unprecedented amounts of franchisee inquiry***.

140

430.    Also, during the Q&A, an analyst asked about F45's potential to make "large institutional unit sales, 100 units plus[.]" In response, Defendant Gilchrist stated:

> *I anticipate F45 probably completing and closing on 2 major portfolios this year that are greater than 100. We have over 20 discussions and term sheets being negotiated at the moment.* So we're being very cautious because we believe that the right ZIP code is in that sort of 20 range. *And we want highly -- really competitive, sophisticated yet experienced operators only. So in some cases, you can get well capitalized, sophisticated investors in to buy $100 million worth of these studios. However, they may not have a tremendous amount of experience. So really, it's a balancing act between those 3 criteria.* And what we're seeing at the moment is a tremendous amount of inquiry from our existing network of extremely successful franchisees, wishing to increase the number of units that they currently own. So moving forward, I think there's probably 3 parts to this answer. It will only really bring in another 2, maybe maximum 3 major portfolio owners to run parallel with Club Franchising Group that owns around 50.
>
> Number two, I suspect we will see a tremendous amount of growth internally from our current network to increase their multiunit ownership. And then lastly, as I mentioned, *demand is -- has never been greater in this business than before*. So there's probably the 3 key takeaways, and I hope that answers your question, Paul. takeaways, and I hope that answers your question, Paul.

431.    Analysts credited Defendants' representations that F45 remained poised for unprecedented growth.

432.    For example, in a report published on March 14, 2022 Guggenheim Securities titled, "*FXLV - Equipment Rebate/Investment and Studio Opening Cadence "Noise" Spur Weakness—Reiterate BUY and $19 PT*," John Heinbockel wrote:

> **Key Message**: "Noise" surrounding several issues, most notably the equipment channel's impact on the P&L and cash flows and the cadence of the tripling in studio openings, overshadowed an in-line, robust full-year top and bottom-line guide. . .

*   *   *

**Gaining Clarity Into The Critical 2022 Outlook—The Guide Brackets The Street.** We have consistently said that the shares will work as long as 2022 studio openings approach the planned 1,000. Today's guide reaffirming this target, along with total revenue and EBITDA guidance bracketing the Street and implying a near-100% YOY growth rate, is a positive. However, this is tempered by a more backend-loaded expansion cadence than we had expected. This is laid out in Exhibit 4. We now model less than 200 openings in the 1Q, despite the 4Q equipment deliveries, a function of omicron-oriented delays. As a result, investors may be more confident at the midpoint, with total revenue of $265 million and adjusted EBITDA of $95 million—we maintain our full-year estimates but lower the 1Q and raise the 2H—see Exhibit 5. Our optimism stems from the healthy, MUD-focused pipeline, the 1,500 locations already identified by CBRE, and the commitment to 1,200 World Packs this year.

433. On March 14, 2022, Jefferies also issued a report on F45 titled, "*F45 Training Strong Finish to F'21 + Momentum in F'22; Massive Expansion Underway; PT to $25*," in which Randal J. Konik reported:

**Key Takeaway**: 4Q results came in above consensus estimates and within the guidance announced in January. We are encouraged by the studio growth in F'21 and the strong outlook for F'22. There is clearly a ton of interest from franchisees as the company sold 1,057 net new franchises in F'21 (vs. 352 in F'20). We believe F45 will continue to grow its studio count and drive SSS through its tech-enabled platform, expansion into new channels, and unique workouts. PT to $25.

Investment Thesis: We believe F45 Training's differentiated, technology-enabled platform, strong global presence, and rapidly growing studio footprint are likely to further solidify FXLV's competitive positioning in the global fitness industry. Additionally, F45 has experienced leading foot traffic trends in the boutique fitness industry, and we believe there is meaningful opportunity for the company to gain market share as it continues growing its global studio footprint.

**What We LIKED In the Quarter**

1) **F'21 Revenue Was In-Line With Guidance**. 4Q21 revenue of ~$62M was slightly above consensus estimate of ~$61M, and F'21 revenue was $134M, which was within the guidance range announced in January ($133M-$136M). We are encouraged by the

continued growth of revenue as the company looks on track to generate significant growth in the coming years.

2) **Studio Count Growth in the U.S. Remains a Priority**. In F'21, FXLV opened 312 new studios, net. Out of the 312, ~54% were opened in the U.S., further emphasizing the company's commitment to expanding in the U.S. Additionally, the company sold 1,057 new franchises, net. Out of the 1,057, ~74% were sold in the U.S.

3) **Robust F'22 Guidance.** F45 provided F'22 guidance that included net new franchises sold of ~1,000 and net initial studio openings of ~1,000 (expected to be 2H weighted). Additionally, the company expects revenue to be $255M-$275M and adj. EBITDA to be $90M-$100M. We believe the 1,000 studio openings could be conservative as the company has already secured 1,200 equipment packs to meet franchisee demand.

\* \* \*

**Massive Studio Growth Ahead.** FXLV has a long-term target of 23,000+ studios across the globe (~7,000 studios in the U.S.). The company had 1,749 total studios open as of 4Q21. We anticipate significant growth will occur in the U.S., Europe, and other international regions.

434.    Cowen & Co also issued a report on F45's results on March 14, 2022 titled,

*"Boutique Leader Poised to Accelerate Growth Ahead*," in which Max Rakhlenko reported:

**Key Thoughts Following FXLV's 4Q21 EPS:**

**(1) Strong Initial Guidance:** We are constructive on initial FY22 guide including 1,000 franchise sales and studio openings, and EBITDA dollars to hit $90mm to $100mm. F45 exited 4Q21 with momentum, and should have sufficient World Packs to support growth. That said, we do think meeting 1Q bogeys will be critical for shares to work. In our followup, management sounded very confident and appears poised to at-least reach studio sales and opening targets. With franchise sales and openings above expectations, our sense is revenue guidance is likely conservative. Cadence of franchise sales should be relatively even, and will lean heavily to U.S. Openings will increase sequentially throughout FY22, with a large step-up in 3Q, as multi-unit developers will need to open material number studios by then (are on track). The backlog is 1,552 at 4Q-end.

**(2) Institutional Franchise Mix Taking Shape**: Franchise sales to multi-unit groups reached 65% of mix in 2021 driven by several large deals, increasing from 52% in 2020, and 40% in 2019. In 4Q, three groups purchased 160 units, and management is very focused on growing the brand through large institutional partners…F45 anticipates to add several 100+ studio portfolios in 2022, and is actively negotiating 20+ term sheets.

435.    Roth Capital Partners raised their revenue outlook for F45 on March 23, 2022, noting:  "We are changing our estimates only modestly in 2022 and 2023. Revenue increases slightly in both years to account for improved franchise revenue and generally consistent openings. EBITDA dips slightly in 2022 and stays flat in 2023. Our 2022 estimates are back-half weighted due to equipment shipment timing."

436.    On March 23, 2022, F45 filed with the SEC its annual report on Form 10-K for full year 2021 ("2021 10-K").  The 2021 10-K was signed by Defendants Gilchrist, Payne, and each of the Director Defendants, and certified pursuant to the Sarbanes-Oxley Act of 2022 by Defendants Gilchrist and Payne.  The 2021 10-K contained the same false and misleading statements as the 2Q21 10-Qs (¶¶ 390-393), except for the "participation of senior management" statement (¶ 394), the "material weakness in ICFR" statement (¶ 395).

437.    The 2021 10-K also contained additional false and misleading statements, including:

(a)    "*We believe we offer a compelling business opportunity for franchisees to generate strong returns driven by a relatively low initial investment combined with attractive AUVs and low four-wall operating expenses. Prior to the COVID-19 pandemic and based on data collected through our booking systems and the Franchise Survey, we estimate that in a normalized operating environment, a typical F45 Training franchise requires an aggregate initial investment of approximately $315,000 and, in its third year of operation can produce an*

144

*AUV of approximately $354,000, average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%.*"

(b)    "As a franchisor, *we have employed an economic model that*, other than due to the unprecedented global shutdown of our network due to the COVID-19 pandemic, *has been predictable, asset light and cash flow generative and has enabled us to open new studios at an accelerated pace compared to an owner-operator model*."

(c)    "*We believe there is a significant opportunity to meaningfully expand our franchise studio footprint in the United States*.   As of December 31, 2021, we had 1,710 Franchises Sold and 654 Total Studios in the United States. . . . *We believe there is long-term studio potential for over 7,000 F45 Training studios in the United States*."

(d)    "*we believe there is a long-term global opportunity for over 23,000 studios, with a potential for approximately 16,000 studios outside of the U.S. market*."

(e)    "*We utilize an attractive franchise model that has allowed us to scale our business rapidly*."

(f)    "*We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation, and has helped to facilitate our rapid growth and strong financial performance prior to the COVID-19 pandemic*."

438.    The 2021 10-K contained the following false and misleading statements in its "Risk Disclosures":

(a)    "*Although we have developed criteria to evaluate and screen prospective franchisees, our franchisees may not ultimately have the business acumen or be able to access the financial or management resources that they need to open and successfully operate the studios contemplated by their franchise agreements with us*."

145

(b)    "we have begun entering into long-term multi-unit studio agreements with individual parties. These agreements provide for a large number of studios to be open on a set schedule and be operated by a single party. *If that party does not perform or is unable to open and operate the studios as anticipated, it could materially and adversely affect our planned openings of new studios and expected revenue from the studios*."

(c)    "*A portion of our Franchises Sold may not ultimately open as new franchised studios*."

439.    The 2021 10-K contained the following statements related to the Company's material weakness in ICFR:

> As previously described in the Company's Final Prospectus, dated July 14, 2021, filed in connection with our IPO, for the year ended December 31, 2020, management had identified a material weakness in our internal controls over financial reporting related to the financial close process.
>
> As the result of management's internal control design and operational assessments as of December 31, 2021, management noted that the Company had identified control deficiencies within the financial close processes as the Company has not properly designed or maintained effective controls over our financial closing and reporting process to record, review and monitor compliance with generally accepted accounting principles for transactions on a timely basis. This includes an inadequate level of precision in management's reviews of accounting documentation and journal entries, including a lack of evidence to support that a review had been performed.
>
> As of December 31, 2021, management evaluated the design and operational effectiveness of our internal controls and has concluded that the previously reported material weakness remains unremediated related to our financial closing and reporting process.
>
> Based on deficiencies identified above, the Company has identified and implemented additional processes, procedures and controls as noted below to improve the effectiveness of our internal control over financial reporting and disclosure controls and procedures in this

area. The Company initiated and implemented the following corrective actions:

• developed, formalized and implemented additional management review controls across the organization in order to add more comprehensive levels of review and approval for significant transactions;

• enhanced and refined our quarterly and annual financial analysis and procedures to allow for more timely and substantive review of financial results before the filing of the quarterly reports of Form 10-Q and Annual Report on Form 10-K;

• commenced the implementation of certain modules within our accounting system to automate and provide better tracking and more timely reporting of certain processes; and

• retained an outside consultant to assist the Company in refining and testing the internal controls over financial reporting that are in place at the Company, including within the financial close process.

***The Company believes the actions described above will be sufficient to remediate the identified material weakness and strengthen our internal control over financial reporting***. However, the steps taken to address the material weakness have not operated for a sufficient amount of time to conclude that the material weakness has been remediated. The Company will continue to monitor the effectiveness of these controls and will make further changes management determines appropriate.

440.   Further, the 2021 10-K stated that "the Company has identified ***and implemented additional processes, procedures and controls to improve the effectiveness of our internal control over financial reporting and disclosure controls and procedures***. The Company regularly reviewed our progress toward remediating these material weaknesses with our audit committee during 2021."

441.   With respect to the Company's purported remediation of material weaknesses with respect to the Company's "lack of segregation of duties" and "inadequate documents of accounting policies and internal controls[,]" the 2021 10-K stated:

*Segregation of Duties*

As previously report[ed] in our prospectus filed in July 2021, a lack of segregation of duties existed in certain key financial reporting processes, including a lack of separation between the preparer and reviewer of journal entries; individual users with administrative access to the general ledger, billing and payroll systems also having access to post journal entries; and insufficient implementation of the automated approval hierarchy for invoices in our billing system to ensure reviews were being performed by the appropriate personnel.

***In an effort to remediate the identified material weakness, the Company initiated and implemented the following corrective actions***:

- hired additional accounting personnel to implement more robust internal controls and enhanced financial reporting;

- maintain sufficient accounting personnel so that journal entries and account reconciliations are reviewed by someone other than the preparer, including retaining evidence of the reviews performed by management;

- implemented a more robust enterprise resource planning, or ERP, system to assist with the monthly close process, segregation of duties and the timely review and recording of financial transactions; and

- restrict access to our financial systems to appropriate personnel and implementing segregation of duties within our finance and accounting processes.

*Inadequate documentation of accounting policies and internal controls*

As previously report[ed] in our prospectus filed in July 2021, a lack of formal documentation of policies and internal controls being followed by us existed, including, but not limited to, entity-level controls involving risk assessment procedures and conclusions, tools to prevent a cybersecurity breach and controls designed to prevent or detect fraud.

***In an effort to remediate the identified material weakness, we initiated and implemented the following corrective actions***:

• adopted formal internal control processes and documentation related to controls that address the elements of the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control Framework; and

• documented key accounting policies and established a process for their periodic updates as well as a review and approval process over each policy. Protocols were established for the maintenance and availability of such policies to accounting personnel.

***Implementation of management's remediation plans described above have strengthened our internal control over financial reporting and addressed the material weaknesses identified above. Based on its assessment, management concluded that these material weaknesses have been remediated as of December 31, 2021.***

442.    On March 30, 2022, Jefferies issued a report on F45 reflecting a meeting with F45 management wherein management made clear that the Company's growth pathways, including opening 1,000 new studios in F'22 was "achievable." Jefferies wrote:

> **Tone Upbeat.** We found mgmt's tone to be upbeat in our meetings. The company is clearly excited about its position in the fitness industry and its near- and long-term growth opportunities... Lastly, mgmt is confident about its goals for studio openings as the company has secured more than enough wellpacks to open its target studio count.
>
> **Growth Pathways Clear**... Mgmt made clear that its growth pathways are achievable. Between expanding its channels and demographics through nascent concepts and targeting 1,000 new studios in F'22, mgmt is confident that it can become a boutique fitness powerhouse over time. FXLV is prioritizing the U.S. for new studio openings as the real estate dynamic is favorable and a renewed focus on health and wellness is prominent.

443.    As a result of Defendants' misrepresentations and omissions, F45's stock price was artificially inflated and/or artificially maintained.

444.    The statements set forth in ¶¶ 425-430, 436-441 were materially false and misleading when made for the reasons described in ¶¶ 375. Specifically:

(a)      The "growth" statements in ¶¶ 425, 427, 429, 437(c)-(f) were materially false and misleading for the reasons explained in ¶¶ 375(a),(c)-(g).

(b)      The "increase in percentage of multi-unit franchisees" statements in ¶¶ 426, 430 were materially false and misleading for the reasons explained in ¶¶ 375(d), (f)-(g).

(c)      The "quality and credit of franchisees" statements in ¶¶ 428, 438(a)-(b) were materially false and misleading for the reasons explained in ¶¶ 375(b),(e),(g).

(d)      The "unit-economic model" statements in ¶¶ 437(a)-(b) were materially false and misleading for the reasons explained in ¶¶ 375(a),(e).

**G.     1Q 2022 Results**

445.     On May 16, 2022, F45 issued a press release announcing first quarter 2022 ("1Q22") financial results.

446.     On May 16, 2022, after the market closed, F45 held a conference call to discuss the 1Q22 results (the "May 16, 2022 Earnings Call") in which Defendants Gilchrist and Payne participated. Defendant Gilchrist opened the call by touting F45's business model and the "unprecedented demand" from franchise partners, stating:

> *I am pleased to report that our business is firing on all cylinders. Our key performance metrics are trending at or above pre-pandemic levels, and we are encouraged by the unprecedented demand from our franchise partners and members around the world. Overall, our momentum remains strong across our performance metrics.*
>
> *During the first quarter, we sold a record 706 net new franchises, which brought the total number of sold but not yet open studios to over 2,200. This is an incredible accomplishment, particularly given the fact that all 706 of these new franchises are full fee-paying contracts.*

447.     Defendant Gilchrist also reaffirmed studio openings guidance, stating:

> *For 2022, we are not changing our openings guidance, and we believe in our ability to deliver the 1,000 openings this year as we*

*have both the equipment packs now available and the contracted franchises moving through the opening process to achieve this target.* On the supply side, as previously discussed, we have already secured 1,200 equipment world packs for delivery this year. *And on the demand side, we have approximately 1,100 franchisees that have a contractual obligation to pay for and receive equipment packs by the end of '22 as well as nearly 900 contracted franchises that are in advanced process of securing financing and/or finalizing a lease so they can commence their opening process.*

448.    During the May 16, 2022 Earnings Call, Defendant Gilchrist also boasted about the

Company's newly acquired franchise funding from Fortress, and the Company's Veteran's

program, both to be used to accelerate growth, stating:

> Now I would like to provide an update on our strategic growth initiatives, starting with franchise financing. First, we announced a $150 million facility with affiliates of Fortress Investment Group, which has the potential to expand to $300 million. *This facility will principally be used to help our existing franchisees secure growth capital to fund new studio development on a more timely basis and at more attractive terms than is otherwise available.*
>
> *Second, we announced a $100 million facility to support our AFTER program*, which stands for Armed Forces to Entrepreneurship. AFTER is an exciting new chapter in the relationship we have established with the U.S. military and the veteran community in the United States. And through this innovative program, we will have the opportunity to empower many of the 200,000 service members who leave the U.S. military each year to pursue an exciting entrepreneurial opportunity that may otherwise not be possible due to financial constraints. We are grateful for their service, and we look forward to the opportunity to serve them as new F45 business partners.
>
> *Even before marketing the new financing, we have already received over 2,500 inquiries from interested prospects who want to become F45 franchise owners. By establishing new bespoke financing solutions tailored to the specific needs of our franchisees, we have taken proactive measures to assist our franchisees in executing on their growth ambition. In particular, we are securing the pathway to 1,000 new openings this year, and we are creating a playbook for establishing financing solution to support our expansion in 2023.*

To that end, we have launched a new process to establish a third financing vehicle to fund growth outside the U.S. I'm excited to share developments on this front in the coming months as that process unfolds. ***Because these facilities will be funded by third parties and be treated as off-balance sheet from F45's perspective, we are able to maintain the compelling economics of our typical franchise agreement and our asset-light economic model***.

449.    During May 16, 2022 Earnings Call, Defendants Gilchrist stated, ***"Our business is extremely well positioned with a new studio pipeline that has never been stronger and strategic initiatives in place to streamline the path of opening new studios."***

450.    Defendant Payne also touted the strength of the F45's business model and the Company's ability to maintain substantial growth, stating:

> As Adam mentioned, ***our first quarter results were strong and above our expectations. Despite increased geopolitical and macro volatility, our teams delivered record results and continue to drive the financial success of the business. This quarter was another strong demonstration of our stability of our revenue stream, returns on investment and our strength of our business model***.
>
> *  *  *
>
> First quarter total revenues increased 175% to $50 million from $18.1 million, which was driven by a significant increase in both franchise and equipment and merchandise revenues. First quarter franchise revenues increased 51% to $19.9 million from $13.2 million. ***The increase was due to the growth in our global studio base of franchises sold, which increased by 1,760 units or 78% from 2,247 total franchises sold as of March 31, 2021 to 4,007 total franchises sold as of March 31, 2022. This represents a record 706 net new franchises sold during Q1 2022, which was an increase of 703 net new franchises sold versus Q1 2021***. In addition, franchise revenues were supported by global same-store sales of 6.2%.
>
> *  *  *
>
> In the case of our monthly franchise fee, our agreements typically ensure we receive a minimum fee with a variable component that allows us to capture upside from studios as they reach run rate levels of productivity. These reoccurring contracted revenue streams are driven by our existing global franchise footprint and increase with every additional franchise sale we make. ***This reoccurring revenue,***

> *paired with our asset-light business model, result in strong profitability and cash flow generation*.
>
> \* \* \*
>
> During the quarter, *we sold 706 franchises* and opened 117 studios on a net basis. *As of March 31, 2022, we had over 2,200 franchises sold but not yet open with the highest concentration in the U.S. with over 1,700 backlog studios. The vast majority of these studios sold but not yet open are attributed to our most experienced multiunit franchise partner. As of March 31, 2022, approximately 71% of our franchises sold were owned by multiunit franchisees, up from approximately 65% as of December 31, '21. This highlights the strong market demand for multiunit franchise opportunities.*

451.    During the May 16, 2022 Earnings Call, Defendant Payne provided updated guidance for key growth metrics for fiscal year 2022, stating:

> Now moving on to guidance. We are providing guidance based on the visibility that we have today, and we're assuming no significant worsening of the pandemic or increased risks related to geopolitical uncertainties that may materially impact performance. *We expect full year net franchises sold of approximately 1,500 compared to our prior guidance of 1,000; full year net initial studio openings of approximately 1,000, and we expect the cadence of those openings to be weighted towards the back half of the year; full year revenue between $255 million and $275 million; full year adjusted EBITDA between $90 million and $100 million; and full year free cash flow between $50 million and $60 million*. As a reminder, a reconciliation of the non-GAAP measures to the most comparable GAAP measures and definitions of these indicators are included in our quarterly report form of our 10-K and in our earnings release.

452.    Defendant Gilchrist affirmed that F45 would execute on its growth plans, stating, "In closing, *we remain bullish as ever about the future of this business. I have no doubt that we have the right team and strategic initiatives in place to execute on our growth plans.*"

453.    During the Q&A, an analyst asked about the "huge spike" in franchises sold and whether the newly announced financing would speed up the number of studio openings moving forward.  In response, Defendant Gilchrist stated:

Yes. Thanks, Randy. The first part, the answer is, we've never seen this amount of demand from franchisees. ***We are continuing to grow our business by leveraging incredible influencers, such as David Beckham. But what we have found in the past is what we sort of term as the franchise effect.*** So as more franchises open up, that generates more awareness to both investors and members. And typically, when we open up a franchise, we see somewhere between 5 and 15 very solid inquiries from members of that studio. So there is a flywheel effect as we continue to roll out the franchise network, and we do continue to see this huge upward trend of interested parties wanting to invest. We have increased guidance from 1,000 sales to 1,500. However, ***if I was looking into the future, I'd certainly not speculate that, that may go up again closer to 2,000 before the end of the year***.

The second part to your question, yes, definitely. ***With regard to franchise, bespoke franchise finance, we believe that will assist in speeding up the backlog openings***. During COVID, we had very choppy periods with respect to openings. Pre-COVID, a typical franchisee would take 9 months to open their studio. That 9-month period was broken up typically into 3 parts: number one, finding a location which typically took 3 months; secondly, getting permits, which pre-COVID took 3 months; and then the third part was obviously the build-out. So we're hoping that we can get back to pre-pandemic backlog periods in openings. But with this finance and secondly, with our CB Richard Ellis relationship, we think that, that could come down to as close as 6 months with regard to backlog periods from signing a contract to openings.

454.    Defendant Gilchrist then touted the Company's ability to sell over 700 franchises that year, stating, "And ***you can just look at the numbers and they're mind-blowing to sell over 700 full fee-paying franchises this year***. And secondly, ***with our visibility on openings, which we haven't changed our guidance for 1,000. . . .***"

455.    With respect to how the multiunit franchisees broke down, Defendant Gilchrist stated, "***The average number of franchises that our investors purchased in Q1 was 20 franchises per franchisee. So some purchased 5, 10; some purchased 30, 40. That's the first part… But with regard to the Q1 sales, we would anticipate all of those opening up before the end of 2023***."

456. During the Q&A, an analyst from J.P. Morgan inquired about why F45's accounts receivable has ballooned to $40 million on franchise revenue of only $50 million.

**Christopher E. Payne**
*CFO, Treasurer & Director*

Yes. Thanks, John, and good morning or good afternoon wherever you are. You're quite right. Typically, a world pack is payable on delivery. ***Obviously, when we're entering into these large multiunit deals, we do enter into slightly modified payment terms. So some of that accounts receivable increase is attributed to world packs that we've delivered to our larger multiunit partners, and that's probably equated to the lion's share of the increase on Q4.***

As it relates to franchise revenue ... In terms of what the payment terms actually are, a franchisee is paying their franchise fees in each month. So a franchisees' franchise fee for the month of March, for example, are payable on the 15th of March. I hope that addresses your AR

**John William Ivankoe**
*JPMorgan Chase & Co, Research Division*

It does, but it doesn't change the fact that AR does look very elevated relative to revenue. Would you expect that ratio to improve in coming quarters or they're just based on how the payment timing is with some of your larger operators to stay elevated?

**Christopher E. Payne**
*CFO, Treasurer & Director*

Yes. It definitely will. So that money is going to return to us in the very near future. So we gave a runway of around 3 to 6 months in some cases to pay off the full balance of the equipment. Obviously, they wanted to secure the equipment because these developers have very aggressive opening time lines that they're really sticking to, and that gets us really excited. So we wanted to help facilitate that. ***Obviously, that backlog is 2,200. That's made up of 1,700 of those are those larger multiunit or top-tier multiunit. There are 45 franchisees that we're really excited to support and continue to grow this network.***

457. During the Q&A, when an analyst asked why F45's revenue outlook did not increase in light of the substantial increase in guidance for units sold, Defendant Payne stated:

Jon, *I think the best way to answer that is that this will be back half-weighted*. So we haven't, at this stage, taken the opportunity to increase revenue guidance, but that will be something that we continue to assess in subsequent quarters. We're not changing the terms of our franchise agreements. They will always be the same. We're selling off rate card in all of our major geographies. *So no, there's no change in our franchise model, but there are some complexities with development deals and when revenue recognition commences*. So we have decided not to increase revenue guidance at this stage.

458.    When asked about the timing of the 1,000 new studio openings, Defendant Gilchrist noted: "*I'll just dive in and just say that we do anticipate the bulk of the 1,000 openings being weighted in Q3, Q4. If you were to sort of model out a number that's going to be closer to sort of 200 to 250 for this quarter, that would be in the range that we're currently expecting*."

459.    Before concluding the earnings call, Defendant Gilchrist's closing remarks further affirmed F45's ability to achieve its strategic goals, stating:

Moving forward as a very simple business, we're all about execution. 100% of our focus is about execution. *We sit here today with absolute visibility on being able to open 1,000 franchises this year. When we achieve that milestone, we will have set another record for this company to be the only franchisor in history to open 1,000 franchises.* If you look at the financing for our franchisees, that was a key bridge that we had to build to enable us to get to that 1,000 openings this year with absolute confidence.

\* \* \*

Obviously, we're extremely passionate about our business. But more importantly, *we have 100% belief that we can achieve our goals this year*. We haven't changed guidance on openings for a specific reason, being we have a visibility on our backlog. And more importantly, *this cash-rich business, which is asset-light, is incredible for investors*, in our opinion. *I'm the largest individual shareholder of this business, and I've never been more bullish*. . .

460.    On May 16, 2022, F45 also filed with the SEC its quarterly report on Form 10-Q for 1Q22 ("1Q22 10-Q"). The 1Q22 10-Q was signed by Defendant Payne and contained the same false and misleading statements as the 2Q21 10-Qs (¶¶ 390-393).

461.    Analysts credited Defendants' representations that F45 remained poised for unprecedented growth.

462.    On May 17, 2022, Jefferies issued a report on F45 titled, "*F45 Training - 5x EV/EBITDA + Early Stage Growth = >300% Upside*," in which Randal J. Konik reported:

> **Key Takeaway**
>
> 1Q results were slightly ahead of consensus expectations, and FXLV reiterated its F'22 outlook. We continue to be encouraged by the strong studio growth as the company opened 117 studios in 1Q (vs. 50 in 1Q21). Additionally, franchisee interest remains high as the company sold 706 net new franchises in 1Q (~3x our estimate). We remain confident in F45's ability to open ~1,000 studios in F'22 and believe shares are attractive at ~5x F'23 EBITDA. Reit Buy.
>
> \* \* \*
>
> 2) Studio Count Grows Nicely Again. In 1Q22, FXLV opened 117 net new studios. Out of the 117, ~62% were opened in the U.S. The U.S. continues to be a priority as the company grows its global presence. Additionally, ~98% of the 706 net new franchises sold were in the U.S., and this shows that franchisee interest has remained strong in the U.S.
>
> 3) Reiterated Guidance, But Raised Full Year New Franchises Sold. F45 raised its net new franchises sold guidance to ~1,500 from ~1,000 and reiterated the rest of its F'22 guidance. The guidance includes ~1,000 net initial studio openings (2H weighted), revenue of $255M-$275M, and adj. EBITDA of $90M-$100M. Given the company has already secured 1,200 equipment packs, we are confident in the company's ability to open ~1,000 studios this year.

463.    Cowen & Co also issued a report on May 17, 2022 titled, "Explosive Unit Sales Demonstrate F45's Attractiveness: Now Waiting For Studio Openings," which stated:

> **Impressive Franchise Sales**, But Now Need To Convert To Openings...Solid First Step: F45 sold 706 franchises, and raised full-year guide by +50% to 1,500. That said, U.S. backlog increased to 70%, and management expects openings will lean to 2H. Valuation is attractive at 4x EBITDA as shares trade well below fitness peers, but openings will need to accelerate for sentiment to improve.

157

**Top Takeaways:** (1) F45 sold 706 franchises in 1Q, including 692 in the U.S., well above our expectations, and also raised full-year guidance by +500 to 1,500. We maintain our 2Q-4Q estimates and model 1,497 openings for the year. (2) Management remains very confident in its ability to reach its 1,000 openings in FY22, but openings will be back-half weighted. In the meantime, the backlog percentage in the U.S. increased to 70%, but should modestly decline throughout the year. F45 looks to open 200-250 units in 2Q, but investors may be inclined to wait another quarter to get better visibility into 2H opening cadence. (3) Despite raising franchise sales guidance by +50%, management reiterated full-year revenue guidance of $255mm to $275mm, suggesting a likely raise in the coming quarters. Further, we see upside to EBITDA margin guidance on stronger equipment margins. (4) We are encouraged mix of franchises sold to multi-unit franchisees increased to 71% from 65% last quarter, and anticipate trends will continue to increase over the medium-term.

464. As a result of Defendants' misrepresentations and omissions, F45's stock price was artificially inflated and/or artificially maintained.

465. The statements set forth in ¶¶ 446-460 were materially false and misleading when made for the reasons described in ¶ 375. Specifically:

(a) The "growth" statements in ¶¶ 447, 452, 455, 458-459 were materially false and misleading for the reasons explained in ¶¶ 375(a),(c)-(g).

(b) The "700 net new franchise sales" statements in ¶¶ 446, 450, 451, 454 were materially false and misleading for the reasons explained in ¶¶ 375(a),(c)-(g), including that much, if not all, of the committed franchise store development agreed to at the All-Star event in Las Vegas, was conditional on near-100% external financing of this growth which included the Company's guarantee to support novel financing arrangements that ultimately fell through.

(c) The "financing facility" statements in ¶ 448 were materially false and misleading for the reasons explained in ¶¶ 375(e)(g), 465(b).

(d) The "franchisee pipeline" statements in ¶ 449 were materially false and misleading for the reasons explained in ¶¶ 465(b).

(e)    The "franchise effect" statements in ¶ 453 were materially false and misleading for the reasons explained in ¶¶ 465(b).

466.    Additionally, the statements set forth in ¶¶ 446-455, 458-459 were materially false and misleading when made because Defendants failed to disclose that:

(a)    F45's one-time All-Star event in Las Vegas was designed specifically to offer special a special promotion to its top 100 franchisees in an effort to artificially inflate key financial metrics such as New Franchises Sold (¶¶ 294-306); and

(b)    F45's credit agreement with Fortress was contingent on the Company's ability to maintain its artificially inflated share price (¶ 302).

## XI.    THE TRUTH IS DISCLOSED

467.    On July 26, 2022, the truth concerning F45's unsustainable business model and inability to maintain substantial growth was revealed.  Specifically, on July 26, 2022, after market close, F45 issued a "Strategic Update" to inform investors about "strategic updates to align the Company more closely with macroeconomic conditions and current business trends and **prepare for the next phase of studio and membership growth**."

468.    F45 shocked investors by announcing:

(a)    a dramatic cut in the number of new studios the Company would open in 2022 - down approximately 60% from 1,000 studios to a range of 350 to 450 new studios;

(b)    an extraordinary cut in the number of new franchises that the Company would sell in 2022 – down approximately 70% from 1,500 to 350 to 450 new franchises;

(c)    a significant reduction in the Company's financial guidance for full-year revenue from a range of $255 to $275 million to a range of $120 to $130 million

(d)    the immediate termination of a $250 million credit line for franchisee studio acquisitions;

159

(e)      the reduction of approximately 45% of F45's workforce;

(f)      the departure of CEO Adam Gilchrist two days earlier;[24]

(g)      the appointment of Board Member Ben Coates as Interim CEO;[25] and

(h)      the payment of a $2.4 million retention bonus to CFO Payne to ensure he would stay on as CFO until at least October 15, 2022.

469.    F45's stock plunged *__more than 60%__* in direct response to these revelations, from $3.51, on the close trading day on July 26, 2022, to close at $1.35 on July 27, 2022 on extremely heavy trading volume.

470.    Analysts were shocked by the disclosure.  For example,

(a)      On July 27, 2022, Roth Capital Partners withdrew its estimates and prior Neutral rating on F45 until it had "more clarity on the company's strategy and financial model."

(b)      Guggenheim Securities issued a report on July 28, 2022 noting: "We have always regarded FXLV's growth targets as ambitious but were surprised by the magnitude of the recent revisions.,, . At less than 6x 2022 EBITDA, shares are likely bottoming but clarity on the 2023 outlook and the CEO transition will be needed to restore investor confidence."

---

[24] The Company disclosed that on July 24, 2022, it had entered into a Separation Agreement with Gilchrist. Under the terms of the Separation Agreement, Gilchrist was eligible to receive payments and benefits including, but not limited to: (i) cash payments of at least $5.8 million; (ii) payment by F45 of a one year lease on Gilchrist's residence in Gulfstream, Florida with an annual cap of $1.2 million, or $100,000 per month; (iii) reimbursement of legal fees; and (iv) $850,000 in forgiveness of outstanding receivables owed to the Company.

[25] On July 26, 2022, the Company filed with the NYSE a Section 303A Interim Written Affirmation notifying the NYSE that, due to the appointment of Mr. Coates as Interim Chief Executive Officer, the Company had five independent directors and six non-independent directors and, accordingly, did not have a majority of independent directors pursuant to Section 303A.01 of the NYSE Listed Company Manual which requires publicly listed companies to have a majority of independent directors.

(c)    Evercore, in a report issued on August 11, 2022, noted that it was "staying on the sidelines here" and was encourage investors to take a closer look at an F45 competitor.

471.    Investors also were shocked by the strategic update. For example, Great Ocean Advisors (GORA) delivered a letter to F45's Board of Directors on July 27, 2022, stating, in part:

> **Strategic update provided by management**
>
> On July 26th, 2022, FXLV management shared a 'Strategic Update' with the investment community that introduced a significant likelihood of the company becoming insolvent. The update relative to prior communicated expectations for the 2022 year included:
>
> - A 73% reduction in studios sold
>
> - A 60% reduction in studios opened
>
> - A 52% reduction in revenue and,
>
> - A 71% reduction in EBITDA
>
> As a result of the update, FXLV's share price declined 70% on July 27th, 2022, bringing its year-to-date share price decline to more than 90%. **This destruction in shareholder value reflects the true reality of FXLV's business following a 12-month period since IPO in which management have made a series of claims about the business upon which investors relied, which now appear likely to have been false**.

472.    As alleged in greater detail *infra*, Defendants' materially false and misleading statements and omissions alleged herein artificially inflated the price of F45's common stock. The decline in F45's stock price was a direct and proximate result of the truth being revealed to investors and to the market.

## XII.    SUBSEQUENT EVENTS

473.    On August 15, 2022, F45 issued a release announcing second quarter ("2Q22") financial results. On the same day, F45 held a conference call to discuss the second quarter 2022 results (the "August 15, 2022 Earnings Call"). During August 15, 2022 Earnings Call, F45

disclosed that during the quarter: (i) total franchises sold declined by 175 in the region; (ii) gross profit decreased 9.1% from the prior period; (iii) gross profit margin fell to 65.5% from 80.6% during the prior year period; (iv) franchise gross profit declined 8.9% to $17.4 million compared to $19.1 million in the 2Q21.

474.    CFO Payne confirmed: "The franchises sold in the U.S. were comprised of a [sic] 132 gross franchise sales, less 307 terminations during the quarter."  The (at least) 307 franchises that terminated during 2Q22 did so purportedly because of an "inability of franchisees to access the financing facilities we announced at the end of Q1 2022."

475.    In addition, to the 307 franchises that terminated, another 300 franchises were still in question as F45 "continue[d] to explore financing options for our franchise partners," Thus, almost all of the 706 franchises announced as "sold" in 1Q22 were not real franchise agreements, but were conditional agreements that contained significant financing contingencies.  Defendant Payne admitted as much in stating: "Going forward, we will provide updates regarding when a multiunit development agreement converts into a franchise agreement."

476.    On this point, CFO Payne clarified:

> We have two categories of franchise sales, franchise agreements and multiunit development agreements. With regard to the franchise agreements, these are with single and multi-unit owners who signed standard franchise agreements. These agreements generally apply to franchisees that own between 1 to 5 franchises. Under these agreements, franchisees pay an initial establishment fee for each agreement and agreed to standard terms such as fee start date and equipment ordering date. We generally begin to charge monthly royalties in month 9 of the agreement and recognized revenue beginning 1 month after the franchisee signs the franchise agreements. This type of agreement accounts for approximately 95% of our total studio footprint and 55% of our total backlog.
>
> The second type is a multiunit development agreement where franchisees have granted the right to develop multiple territories within an area defined by that development agreement over a certain period of time, usually 3 to 5 years. These deals typically require an

upfront payment as part of the development agreement, the development partner enters into a single franchise agreement for each territory when development commences. Finally, earlier this year, in connection with the previously announced financing facility, we entered into multiunit development agreements to select existing franchisees that contemplated access to new financing facilities, the company had arranged. As we touched on earlier, the negative net franchises sold during the second quarter was related to the termination of a number of these commitments by our franchise partners. As of today, we have approximately 300 remaining multiunit development agreements that contemplate access to these financing facilities. However, I do want to note that, one, we continue to explore financing options for our franchise partners. And two, a number of these franchise partners are working with unaffiliated third-party lenders to secure our financing to support their development plans. As a result, we do not currently believe that the entire remaining balance of these commitments will be terminated.

477.    Director and Interim CEO Ben Coates also confirmed the Company was on the

precipice of a liquidity crisis:

As you are aware, we had negative free cash flow during the first half of the year. The primary reason for the negative free cash flow during this period was due to significant investments in inventories and global head count to support our previous new initial studio opening strategy, where we connected our best franchisees with readily accessible capital and real estate. Our decision to make these investments was partially due to the $250 million of committed capital from 2 financing facilities we announced earlier this year. However, recent market conditions and share price performance meant that we could not make this facility available to our franchises. As a result, we have made the decision to terminate the $150 million financing facility, which we announced in an 8-K filed today. Underpinning our immediate focus on liquidity and cash flow generation is a focus on cost reduction in our core business. As we announced 3 weeks ago, we have made significant reductions to global headcount to align our cost structure to a more conservative growth outlook.

In addition, we have made the strategic decision to reduce or defer investments in noncore channels as well as our more nation concepts in order to concentrate our resources on our core F45 business. Although we continue to have confidence in the long-term opportunity to deepen penetration of F45 across adjacent channels as well as expand the footprint of other concepts, we have chosen to

delay these investments until we demonstrate the core pillars of our financial model, sustainable growth, profitability and cash flow generation.

478.    In terms of resetting F45's growth outlook, Payne noted:

We are maintaining the guidance provided with our pre-announcement that was released in July. We continue to expect full year net franchises sold between 350 and 450, full year net initial studio openings between 350 and 450, full year revenues between a $120 million and a $130 million.[26] full year adjusted EBITDA between $25 million and $30 million. . . In conclusion, we have reset our growth outlook and rightsized our cost structure. As discussed, we believe these decisions will allow us to prioritize profitability and free cash flow generation. We also believe that these changes will help position the company for long-term sustainable success.

479.    With respect to the status of the Club Sports Group agreement to open 300 franchises over 36 months, Payne revealed that CSG was focusing not on opening new franchises, but on acquiring existing franchises from selling franchisees.

480.    On August 19, 2022, Cowen formally announced that it was discontinuing its coverage of F45, stating, "We are discontinuing coverage of F45 Training Holdings (FXLV) in light of continued uncertainty around the company's outlook following its strategic re-alignment and termination of its credit facility for franchisees. Our previous investment rating, price target, and earnings estimates are no longer in effect and should not be relied upon." On October 4, 2022, J.P. Morgan issued an analyst report that expressed frustration as a result of the omitted information, stating:

Leveraging a highly scalable fitness model, the brand pursued an unprecedented rate of growth in the US, trying to duplicate its success in Australia into what was a much more competitive market for this new-to-the-US brand. We upgraded the stock on December 17, 2021, relying on information available on the Company's website that showed much higher than expected rate of 4Q21 unit openings and what we understood to be a very strong pipeline of

---

[26] During the Q&A, Payne clarified that the 350 to 450 guidance assumed all of the remining 300 multi-unit "commitments" from 1Q22 would cancel.

available equipment – and franchise demand - for 2022 openings. What we did not know at the time is that the Company changed its definition of what constituted an open store on October 1, 2021, a fact not disclosed until 4Q21 earnings were reported in March 2022. Nor did we understand that much of the committed franchise store development was conditional on near-100% external financing of this growth, which included the Company's guarantees given to support a novel Fortress financing arrangement that was announced on May 16, 2022 with 1Q22 results. Even comments made on the May 16th 1Q22 earnings call for expected 2Q22 openings was far off; the company guided to 200-250 for 2Q and the actual was 92.

As concerns over credibility in the strategy turned into outright doubt, CEO Adam Gilchrist left his seat on July 26, and is replaced with an interim CEO as the search for a permanent replacement is now underway. Over that time, credit and cash flow conditions worsened materially.

481.    Subsequent to the August 15, 2022 Earnings Call, credit and cash flow conditions at F45 materially worsened.  At the end of 2Q22, ending net cash was $11 million including more than $40 million of accounts receivable (which are mostly royalties).  Net cash slipped from $42 million in 4Q21 and tripped to net debt of approximately $18 million at the end of 1Q22 and greater than $50 million net debt/$60 million gross debt at end of 2Q22 out of a total $90 million revolver facility.  Royalties (Accounts Receivable) jumped from $28 million in 4Q21 to $45 million at the end of 1Q22 to greater than $40 million at end of 2Q22.  Inventories of equipment packages available for sale to franchisees expanded from approximately $17 million at the end of 3Q21 to more than $36 million at end of 2Q22. The state of cash flows and available liquidity is at emergency conditions, and the Company must do what it can to collect on its owed receivables.[27]

482.    On March 16, 2023, F45 announced its Report on Form 10-K for the year ended December 31, 2022 would not be timely filed because "the Company expects to report a material weakness similar to the material weakness reported in its Annual Report on Form 10-K for the

---

[27] J.P Morgan, Rahul Krotthapalli, F45 Training Holdings, Inc., *Breakneck Growth Led to Cash Flow and Now Balance Sheet Stress*, Oct. 4, 2022.

fiscal year ended December 31, 2021, filed with the U.S. Securities and Exchange Commission on March 23, 2022, related to the proper design of the Company's financial closing and reporting processes, and appropriate processes to monitor, review, and record transactions in compliance with generally accepted accounting principles."

483.    On May 10, 2023, F45 filed with the SEC, a Report on Form 12b-25 (Notification of Late Filing of Form 10-Q) detailing that the Company Report on 10-Q for the first quarter ended March 31, 2023 also would not be timely filed.

484.    As of May 19, 2023, F45's stock trades at less than one dollar per share, down from its IPO price of $16.00 per share.

## XIII.    ADDITIONAL ALLEGATIONS OF SCIENTER

485.    As alleged herein, Defendants acted with scienter throughout the Class Period, in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt or access to information reflecting the true facts regarding F45's unsustainable business model and the Company's inability to maintain substantial growth.

486.    Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent conduct described in this Section could not have been perpetrated during the Class Period without the knowledge and complicity, or at least, the reckless disregard, of F45 executives at the highest levels of the Company.

487. Defendants Gilchrist, Payne, and the Director Defendants permitted F45 to release these false and misleading statements and failed to file the necessary disclosures which artificially inflated or artificially maintained the price of the Company's common stock.

488. The following allegations all support a strong inference of scienter:

(a) Defendants Gilchrist and Payne controlled the Company's messaging to the public;

(b) Defendants Gilchrist and Payne spoke repeatedly to investors about the sustainability of the F45's business model and the Company's ability to maintain substantial and rapid growth;

(c) Defendants' ability to maintain exponential growth by selling and opening new franchises was critical to the Company's core operations;

(d) Defendants Gilchrist and Payne closely monitored franchise sales, studio openings, and the financial health of F45's studios; and

(e) The departures of Gilchrist and Payne support a strong inference of scienter.

## A. Defendants Gilchrist and Payne Controlled the Company's Messaging to the Investing Public

489. Defendants Gilchrist and Payne had determined the F45's strategies, decisions, and messaging to the investing public. Gilchrist co-founded the Company and served as Co-Chief Executive Officer from 2014 until July 2022 and a member of the Company's Board of Directors since 2017. Payne served as the CFO of F45 from 2018 until November 2022.

490. In their respective roles as CEO and CFO, and as members of F45's Chief Operating Decision Maker ("CODM") group, which reviewed the operating results, including revenue and gross profit for each of the Company's reportable segments, in order to assess performance and allocation of resources, Defendants Gilchrist and Payne were able to, and did,

determine the content of the various SEC filings and other public statements pertaining to F45 during the Class Period.

491.    Defendants Gilchrist and Payne signed and certified F45's IPO Registration Statements and Prospectuses, as well as the Company's annual report on Form 10-K for the year ended December 31, 2021 filed with the SEC in March 2022.  Payne was also the sole signatory that certified F45's quarterly reports filed with the SEC.

492.    Further, Defendants Gilchrist and Payne participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, Gilchrist and Payne were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions. They are therefore liable for the misrepresentations and omissions therein.

493.    In addition, Gilchrist and Payne attended conference calls and spoke on behalf of the Company throughout the Class Period.  Since going public in July 2021, and until the end of the Class Period, Gilchrist and Payne were the only F45 employees to have signed and/or certified every annual and quarterly report filed with the SEC.  Gilchrist and Payne were also the only F45 employees that answered analyst questions on behalf of the Company during quarterly earnings calls.

494.    As the most senior executive officers of F45, Defendants Gilchrist and Payne were privy to confidential and proprietary information concerning F45, its franchisees and studios, its results of operations, and its ability to maintain substantial growth.  Each of them also: (i) had access to, *inter alia*, internal corporate documents, conversations with corporate officers, and

employees; (ii) attended management and Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith.  Because of their possession of such information, Gilchrist and Payne knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**B.    Defendants' Ability to Maintain Substantial Growth by Selling Franchises and Opening New Studios Was Critical to the Company's Core Operations**

495.    Defendants Gilchrist's and Payne's knowledge of F45's unsustainable business model and inability to maintain substantial growth can be inferred because these facts were critical to the Company's core operations.

496.    In particular, a substantial portion of F45's revenue comes from franchisee revenue, including establishment fees, and monthly franchise and related fees throughout the term of the franchise agreement.  In years ended December 31, 2020 and 2021, F45 derived 63.8% and 55.0% of its revenue, respectively, from franchise revenue.  Moreover, F45's filings with the SEC throughout the Class Period continuously maintained that "[i]n all periods presented, our largest source of cash inflow stemmed from our collections of establishment and World Pack fees from our franchisees."

497.    Moreover, F45 stood to benefit from the success of its franchisees' studios because the monthly franchise fees were based on the greater of (i) a fixed month franchise fee, or (ii) a percentage of gross monthly studio revenue.  Accordingly, the success and financial wellbeing of the franchisees' studios was also critical to the Company's operations and growth.

498.    Further, in light of the fact that F45 was not profitable (¶ 51), the sustainability of the F45's business model and the Company's ability to maintain substantial growth were particularly crucial to the Company's continued financial success.

499.    As Defendant Gilchrist explained during the November 12, 2021 Earnings Call, the Company's growth strategy could be "demonstrated by strong new franchise sales, including additional multiunit deals and continued strength in new studio openings." In other words, selling new franchises and opening new studios were critical operations of F45's growth because they could meaningfully increase the Company's revenue and profit base.

500.    Analysts following F45 also understood that substantial, sustainable growth was critical to the Company's financial success. For example, a Guggenheim analyst report dated August 9, 2021 listed the "failure to grow studios in the near term" and the "failure to execute on long term growth plans, inclusive of international expansion" as "primary risks" for an investment in F45. Likewise, analysts understood that strong franchise sales and new studio openings were crucial to F45's growth strategy. For example, the same Guggenheim analyst report stated, "Bottom line, the fundamental FXLV growth story, at least over the next five years, appears promising and simply tied to one basic premise—can the company effectively expand a franchised brand with a differentiated experience and compelling studio-level returns at a consistently-healthy pace."

501.    Given the critical importance of selling franchises and opening new studios to F45's business model and the Company's ability to maintain substantial growth, knowledge of the undisclosed information, including that existing franchisees had already been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, can therefore be imputed to Defendants.

**C.    F45, Gilchrist, and Payne Closely Monitored Franchise Sales, Studio Openings, and the Performance of Opened Studios**

502.    In their roles as CEO and CFO, Defendants Gilchrist and Payne were required to not only keep themselves informed of the Company's day-to-day business and operations, but to

also keep F45's non-management directors apprised of the state of the Company's business, operations, and trends.

503.   As discussed above, monitoring and maximizing F45's franchise sales and new studio openings were critical to the Company's operations and growth because it enabled F45 to meaningfully increase its revenue and profit base.  Another critical component of F45's revenue and profit base is the financial success of its franchisees' studios, which offered a means to increase F45's recurring franchise fees.

504.   Defendant Gilchrist admitted this much during an interview with TD Ameritrade on July 15, 2021 (the day of the IPO), stating that "the health of our network is paramount." Similarly, during a separate interview with TD Ameritrade on August 27, 2021, Gilchrist stated that "franchises have to be in a really healthy financial state because the health of our network really is you know the clutch to us."

505.   In order to monitor these critical growth metrics, F45 used a Customer Relationship Management (CRM) software.   According to CW-4, F45 had a Customer Relationship Management (CRM) system that F45's leadership had access to.  CW-4 added that it was his understanding that officers in F45's C-Suite would have access to the CRM system.  CW-4 confirmed that there were F45 staff who monitored return on investment for the studios, including tracking Key Performance Indicators (KPIs) after studio openings.  CW-4 explained that this was monitored by the Performance Team on a studio level and team members had a certain number of studios assigned to them and they were responsible for tracking their KPIs.  CW-4 added that this was done to monitor their profitability and they would intervene in instances where franchises were performing poorly.

506.    According to CW-3, F45 tracked delinquent franchises in Oracle NetSuite.  CW-3 explained that he was able to see all delinquent F45 franchises in Oracle NetSuite and not just franchises located in the territories he was assigned.  CW-3 suggested that F45 management had access to Oracle NetSuite as well because it was a companywide database.

507.    CW-7 recalled that F45 maintained a database, likely Oracle NetSuite, that compiled information including franchisees' payments, contracts, equipment fees, location, and the status of a franchise's takeover.  CW-7 explained that this database had a front end, which all franchisees could access as it did not maintain sensitive information, and a backend which included the aforementioned information.  CW-7 confirmed that this database provided a "high level view" of the Company, including if certain franchises were delinquent on franchise and equipment fees.  According to CW-7, all F45 employees had access to this database including senior management.

508.    Further, Defendants Gilchrist and Payne made clear that they were, in fact, monitoring franchise sales, new studio openings, and F45's revenue streams from its franchise model.  For example, during the August 26, 2021 Earnings Call, Defendant Payne stated:

> **We have a high level of visibility into our revenue streams as we operate [a] nearly 100% franchise model**.  We charge new franchisees a onetime establishment fee of $50,000, which is amortized over 10 years; and monthly franchise fees, which are the greater of $2,500 a month or 7% of gross revenues.

509.    During the same call, Defendant Payne stated, "We have exceptional visibility as to the health of our onboarding pipeline."

510.    Similarly, during the November 12, 2021 Earnings Call, Defendant Payne confirmed that Defendants had visibility into F45's franchisee sales and studio openings stating, "we continue to have **very good visibility into our studio opening pipeline** for the next few years. We are very pleased with the pace and **visibility of our franchisee pipeline** with over 3,000 franchises sold to date. . . ."  During the same call, Defendant Gilchrist responded to a question

from John Edward Heinbockel, an analyst from Guggenheim Securities, LLC, regarding Defendants' visibility with respect to the Company's franchisees.  In doing so, Defendant Gilchrist confirmed that Defendants' visibility into studio openings was "excellent" and "crucial" for Defendant Payne and his finance team:

> **John Edward Heinbockel**
> *Guggenheim Securities, LLC, Research Division*
>
> So Adam and Chris, maybe start with -- given the importance of opening studios, your visibility because you talked about that and your ability to get your arms around what the franchisees are doing, what their plans are and timing is as you look out, I don't know, 3, 6, 9 months, how do you guys go about doing that and ensuring that they're on track and maybe the role that CBRE plays in that as well.
>
> **Adam James Gilchrist**
> *Founder, President, CEO & Chairman of Board*
>
> John, Adam Gilchrist here. Excellent question. Initially, when I was looking at obviously trying to create a platform of efficiency, what became very evident was the importance of being able to obviously follow people through, but more importantly, follow these folks through a journey where we can assist them in getting their studio open and obviously, trying to calibrate these folks into being great marketing operators.
>
> And so what we did is we created a technology platform called F45 playbook. This playbook is a process where the individual franchisee has to go through 50 different steps to be able to open up their franchise. Every step of the way they have to upload information to our playbook to then progress into the next phase of their opening process. So an excellent example would be if they enter into a letter of intent to lease a property, then that has to be uploaded to our playbook and our customer support team has to approve it. We look for critical metrics when people are going out looking for leases, including what the TI might be, what the period of the lease might be, if there's various demolition clauses.
>
> As we move through the process, **the visibility for us is excellent** because we: a, assist them with CBRE in going and sourcing your location; b, **we have visibility on their letter of intent with respect to leasing properties**; c, [sic] we get all of the leases sent to us and have to be approved by us. Then we go out with those folks and

provide third-party operators that also assisted in getting city approvals and then lastly, completing the construction phase.

**So what that really means is nearly on a daily basis, we're aware of where these folks are up to**. With regard to this great relationship we have with CBRE, what we're really trying to achieve is an ability to express or compress that time frame by providing a franchisee with an already approved location in their franchise territory. So how that would play out in the case study is, right now, we have CBRE looking and scouring over 2,000 locations that currently have a major multiunit owner that has got over 100 letters of intent that -- so we're really seeing that relationship enable us to bring forward that backlog period that, to be quite frank, has always been 9 months from the time somebody signs pre-pandemic to when they open.

And we're trying to achieve a period where someone walks in, they love the experience of an F45, enter into a franchise agreement with us, but we deliver them an already approved property. So it's a very important question you asked. But **I think what we've identified is the fact that the visibility is crucial because that enables Chris and his finance team to have such confidence with all of the earnings, but not just this year but going into next year**.

511.     Later, on the same call, Defendant Gilchrist and Payne both confirmed that Defendants have "a high degree of visibility" for the F45's backlog with respect to studio openings. Gilchrist also emphasized that Defendants had "great visibility across that F45 playbook platform."

512.     During the March 14, 2022 Earnings Call, Defendant Payne further emphasized the importance of the visibility and recurring nature of F45's revenue, stating "we believe that the highly visible and recurring nature of our revenue strength is an invaluable asset to our business model. These recurring contracted revenue streams are driven by our existing global franchise footprint and increase with every additional franchise sale we make."

513.     Finally, during the May 16, 2022 Earnings Call, Defendant Gilchrist reassured investors that F45 would be able to open 1,000 franchises for its 2022 fiscal year results, stating, "We sit here today with absolute visibility on being able to open 1,000 franchises this year."

514.    Moreover, CW-4 confirmed that there were F45 staff who monitored return on investment for the studios after studio openings including tracking Key Performance Indicators (KPIs).

515.    Defendants' admissions that they had visibility into F45's franchisee sales, studio openings, and the Company's revenue streams from its franchise model throughout the Class Period confirm that Defendants Gilchrist and Payne were monitoring these key growth metrics. These admissions support a strong inference that Defendants Gilchrist and Payne were fully aware that F45's business model was unsustainable and that the Company was unable to maintain substantial growth.

> **D.    Defendants Gilchrist And Payne Spoke Repeatedly To Investors About The Sustainability of F45's Business Model And The Company's Ability To Maintain Substantial And Rapid Growth**

516.    Throughout the Class Period, Defendants spoke repeatedly to investors about the sustainability of the F45's business model and the Company's ability to maintain substantial growth.  In particular, Defendants repeatedly assured investors that F45's business model was "attractive" because of the "highly visible and recurring nature of our revenue strength." Defendants reassured investors that the Company continued to "execute on our business and growth strategies" by demonstrating strong franchise sales, studio openings, and revenue strength.

517.    Moreover, during the May 16, 2022 Earnings Call, Defendant Gilchrist even stated that "we remain bullish as ever about the future of this business. I have no doubt that we have the right team and strategic initiatives in place to execute on our growth plans."

518.    Defendants' repeated statements support an inference that at the time they spoke they were actively monitoring and had access to, and knew or recklessly disregarded the facts that rendered their statements false and misleading.

E.    **The Departures of Defendants Gilchrist and Payne Support a Strong Inference of Scienter**

519.    The resignation of F45's CEO (Gilchrist) at a key point in the Class Period, and the subsequent resignation of the Company's CFO (Payne) after the Class Period, both of whom are senior executives primarily responsible for developing the Company's business model, maintaining the Company's substantial growth, and setting financial guidance, support a strong inference of scienter.

520.    Specifically, on July 26, 2022, F45 announced the departure of its President, CEO, and Chairman of the Board of Directors who was responsible for leading the Company for the last decade.  Defendant Gilchrist was instrumental in developing and implementing F45's franchise and business model.  Similarly, Gilchrist was also responsible for maintaining the Company's substantial growth in terms of franchises sold, studio openings, and revenue strength.  This announcement stated, "This transition will allow his successor to establish and execute new opportunities amid changing macroeconomic and business conditions."  Notably, F45 announced Gilchrist's departure from the Company in his capacity as an officer on the same day that it slashed guidance and released the July 26, 2022 Strategic Update.

521.    In addition, on November 21, 2022, F45 announced that the departure of its CFO, Defendant Payne.  As CFO, Payne had primary oversight over the Company's financial performance, including forecasting of franchise sales, studio openings, accounts receivable, revenue, billings growth, and other such metrics, and thus played a key role in the Company's decision to maintain its guidance for key growth metrics.

522.    The resignations of the two key executives responsible for the sustainability of F45's business model and the Company's ability to maintain substantial growth, who repeatedly assured investors that the F45 was executing its business and growth strategies, directly after the

Company announced that it was slashing its guidance for key growth metrics supports a strong inference of scienter.

## XIV.   LOSS CAUSATION

523.   Defendants' misstatements and omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Throughout the Class Period, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to defraud investors.  Defendants' misstatements and omissions artificially inflated the price of F45's common stock and operated as a fraud and deceit on the Class.  During the Class Period, Plaintiffs and the Class purchased F45 common stock, at artificially inflated prices and were damaged thereby when the price of F45 common stock declined when the truth was revealed.

524.   Specifically, Defendants' materially false and misleading statements mispresented F45's unsustainable business model and the Company's inability to maintain substantial growth. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of F45's common stock dropped significantly.  As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risk on July 26, 2022, after market close, F45 common stock tumbled ***more than 60%*** in direct response to the disclosure, plunging from $3.51 per share on the close of trading on July 26, 2022, to a close of $1.35 per share on July 27, 2022 on trading volume of 31.8 million shares -  more than 69 times F45's average trading daily volume. This drastic price drop represented more than a 91.5% decline from F45's offering price of $16.00 per share on July 16, 2021.  As a result, investors incurred hundreds of millions of dollars in losses.

525.   It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions would artificially inflate the price of F45 common stock.  It was also foreseeable to Defendants that the revelation of the truth about F45's unsustainable business model and the Company's inability to maintain substantial growth would cause the price of the

Company's common stock to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements.

## XV.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

526.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

527.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of F45 who knew that the statement was materially false or misleading when made.

528.    Additionally, the risk disclosures included in F45's public filings were inadequate, obfuscated the truth, and did not inform investors of the true facts and actual risks already occurring.

## XVI.    PRESUMPTION OF RELIANCE

529.    Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)   F45's common stock was actively traded in an efficient market on the NYSE;

(b)   F45's common stock traded at high weekly volumes;

(c)   As a regulated issuer, F45 filed periodic public reports with the SEC;

(d)   F45 regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e)   The market reacted promptly to public information disseminated by F45;

(f)   F45 common stock was covered by numerous securities analysts employed by major brokerage firms, including Cowen & Co., Guggenheim Securities, LLC, Evercore ISI, J.P. Morgan, Roth MKM, and Jefferies LLC, which wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(g)   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of F45 common stock; and

(h)   Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired F45's common stock between the time Defendants misrepresented or omitted material facts and the time the true facts were disclosed.

530.   Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omission of material fact that there was a duty to disclose.

531.    Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for F45's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XVII.  CLASS ACTION ALLEGATIONS

532.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of F45 during the Class Period (July 15, 2021 through July 26, 2022, inclusive), and were damaged thereby (the "Class"). Excluded from the Class are Defendants; F45's affiliates and subsidiaries; the officers, directors, and control persons of F45 and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; the legal representatives, heirs, successors, and assigns of any excluded person or entity, in their capacities as such; and any entity in which any excluded person has or had a controlling interest.

533.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, F45's common shares were actively traded on the New York Stock Exchange.  As of March 22, 2022, there were over 94 million shares of F45 common stock outstanding. Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by F45 or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

534.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

(a)     whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)     whether the Control Person Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(c)     whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(d)     whether the members of the Class have sustained damages, and the proper measure of damages.

535.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with the interests of the Class.

536.    A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVIII. CLAIMS FOR RELIEF

### COUNT IV
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Corporate Defendants

537.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

538.    This Count is asserted on behalf of all members of the Class against each of the Corporate Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

539.    During the Class Period, the Corporate Defendants disseminated, furnished information for inclusion in, or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

540.    During the Class Period, the Corporate Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase F45 common stock at artificially inflated prices.

541.    The Corporate Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for F45 common stock.

542.    The Corporate Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with severe recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of F45 common stock, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, F45's fraud; (b) artificially inflate and maintain the market price of F45 common stock; and (c) cause Plaintiffs and other members of the Class to purchase F45 common stock at artificially inflated prices and suffer losses when the true facts became known and/or the risks materialized.

543.    The Corporate Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

544.    As described above, the Corporate Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of F45 stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

545.    Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for F45's common stock, which inflation was removed from its price when the true facts became known.

546.     The Corporate Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Plaintiffs and other Class members.  Had the Corporate Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired F45 common stock or would not have purchased or otherwise acquired these shares at the artificially inflated prices that they paid.  It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of F45's common stock and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of F45's common stock to decline.

547.     Accordingly, as a result of their purchases of F45 common stock during the Class Period, Plaintiffs and the Class suffered economic loss and damages under the federal securities laws.

548.     By virtue of the foregoing, the Corporate Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

549.     This claim is brought within the applicable statute of limitations.

## COUNT V
### For Violation of Section 20(a) of the Exchange Act
### Against the Corporate Defendants, Director Defendants, and Controlling Entity Defendants

550.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

551.     As alleged above, the Corporate Defendants, the Director Defendants, and the Controlling Entity Defendants each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

552.    This count is asserted on behalf of all members of the Class against Defendants Gilchrist, Payne, the Director Defendants, and the Controlling Entity Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

553.    At all relevant times, Defendants Gilchrist, Payne, the Director Defendants, and the Controlling Entity Defendants were controlling persons of the Company within the meaning of Section 20 of the Exchange Act.

554.    Defendants Gilchrist and Payne were control persons of F45 by virtue of their positions as directors and/or as senior officers of the Company.  Gilchrist and Payne were control persons of F45 within the meaning of Section 20(a) of the Exchange Act by virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about F45.  Thus, Defendants Gilchrist and Payne had the power and ability to control the actions of F45 and its employees.  In fact, the Controlling Entity Defendants were considered "major stockholders" within the IPO Registration Statement and Prospectus, which stated that "[o]ur current major stockholders will continue to have significant control over us after this offering, which could limit your ability to influence the outcome of matters subject to stockholder approval, including a change of control."

555.    Each of the Controlling Entity Defendants controlled F45 by virtue of their share ownership, power to appoint directors, and agreements with the Company.  For example, the IPO Registration Statement characterized MWIG LLC as a "Principal Stockholder" that held 38.3% of F45's outstanding shares as of June 30, 2021, stating that after the IPO, MWIG LLC would continue to own 28.6% of the Company's outstanding shares.  Pursuant to a stockholders' agreement, MWIG LLC had the right to designate a nominee for F45's board of directors, prior to

the IPO, because it "beneficially own[ed] at least 30% of [the Company's] convertible preferred stock or 30% of the shares of common stock issued or issuable upon conversion of [the Company's] convertible preferred stock[.]"

556.    Similarly, the IPO Registration Statement characterized the KLIM Entities as a "Principal Stockholder" that held 14.4% of F45's outstanding shares as of June 30, 2021, stating that after the IPO, the KLIM Entities would continue to own 11.4% of the Company's outstanding shares.  Pursuant to a stockholders' agreement, the KLIM Entities were entitled to designate a nominee of F45's board of directors for as long as it "continue[d] to beneficially own 30% of the aggregate dollar amount of [F45's] convertible notes or equivalent number of shares of common stock issued or issuable upon conversion of [the Company's] convertible notes[.]"

557.    Collectively, the Controlling Entity Defendants constituted 52.7% of F45's outstanding shares prior to the IPO (as of June 30, 2021) and 40% of the Company's outstanding shares after the IPO.

558.    Accordingly, the Controlling Entity Defendants were, at the time of the wrongdoing alleged herein and as set forth herein, controlling persons of F45 within the meaning of Section 20(a) of the Exchange Act because they were majority (or near-majority) owners and controlled the Company before, during and after the IPO.  In addition to controlling a majority of F45's voting shares, the Controlling Entity Defendants also appointed and had significant influence over F45's management and members of its Board of Directors.

559.    Each of the Director Defendants were control persons by virtue of their positions as a director of the Company.  Defendants Raymond and Richman beneficially owned approximately 38.3% and 14.4% of F45's outstanding shares prior to the IPO (as of June 30, 2021), and 28.6 and 11.4% of F45's outstanding shares after the offering, respectively.

560.    Moreover, both MWIG LLC and the KLIM Entities were controlled or beneficially owned by at least one of the Director Defendants.  Specifically, FOD Capital LLC (an entity that is managed by Defendants Raymond)[28] and Defendant Wahlberg own approximately 65% and 26% of the membership interests in MWIG LLC, respectively.  And Defendant Richman is a managing member and control person of the KLIM Entities.

561.    Defendants Raymond and Wahlberg's control over and/or ownership of MWIG LLC, and Defendant Richman's control over and/or ownership of the KLIM Entities further demonstrates that the Director Defendants were control persons of F45 within the meaning of Section 20(a) of the Exchange Act.

562.    Defendants Gilchrist, Payne, the Director Defendants, and the Controlling Entity Defendants were culpable participants in the violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, as alleged in Counts Four and Five above, based on having signed the IPO Materials and/or having otherwise participated in the process that allowed the IPO to be completed successfully.  As a result of the foregoing, Plaintiffs and the other members of the Class within the scope of this Count have suffered damages.

563.    By reason of the aforementioned conduct, the Controlling Entity Defendants are liable under Section 20 of the Exchange Act jointly and severally with and to the same extent as the Corporate Defendants and the Director Defendants are liable under Section 10 of the Exchange Act to Plaintiffs and all members of the Class.

---

[28] According to F45's IPO Registration Statement and Prospectus, Defendant Raymond is the sole manager of FOD Capital LLC and "as such may be deemed to beneficially own the shares of [the Company's] common stock beneficially owned by MWIG.

## XIX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Plaintiffs as the Class Representatives and Labaton Sucharow LLP as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XX.    JURY DEMAND

564.    Plaintiffs demand a trial by jury.

Dated: May 19, 2023

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: /s/ Christine M. Fox_____
Christine M. Fox (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Guillaume Buell (TX Bar #24080813)
Charles J. Stiene (*pro hac vice*)
140 Broadway
New York, New York 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
cfox@labaton.com
dschwartz@labaton.com
gbuell@labaton.com
cstiene@labaton.com

*Lead Counsel for Lead Plaintiff Pledge Capital LLC, Additional Plaintiff Police and Fire Retirement System of the City of Detroit, and the Proposed Class*

Brian Schall (*pro hac vice*)
Rina Restaino (*pro hac vice*)
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Tel.: (310) 301-3335
brian@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Lead Plaintiff Pledge Capital LLC*

# Exhibit 1

## <u>CERTIFICATION</u>

I, David Cetlinski, as Executive Director of the Police and Fire Retirement System of the City of Detroit ("Detroit P&F"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Detroit P&F.  I have reviewed the complaint prepared against F45 Training Holdings, Inc. ("F45") alleging violations of the federal securities laws, and authorize the filing of an amended complaint;

2.      Detroit P&F did not purchase common stock of F45 at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Detroit P&F is willing to serve as additionally named plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Detroit P&F fully understands the duties and responsibilities of additionally named plaintiff including overseeing the prosecution of the action for the Class;

4.      Detroit P&F's transactions in F45 common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Detroit P&F sought to serve as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

*Vega v. Energy Transfer LP,* No. 1:22-cv-04614 (S.D.N.Y.)
*The Police & Fire Retirement System City of Detroit v. Argo Group International Holdings, Ltd..*
No. 1:22-cv-8971 (S.D.N.Y.)

6.      Beyond its pro rata share of any recovery, Detroit P&F will not accept payment for serving as an additionally named plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _11th_ day of May 2023.

_David Cetlinski_
Executive Director
Police and Fire Retirement System of the City of Detroit

**EXHIBIT A**

**TRANSACTIONS IN F45 TRAINING HOLDINGS, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 7/15/2021 | 20,447 | $16.00 | ($327,152.00) |
| Purchases | 7/15/2021 | 3,270 | $16.75 | ($54,772.50) |
| Sales | 9/22/2021 | -1,065 | $13.11 | $13,957.78 |
| Sales | 11/12/2021 | -4,630 | $13.68 | $63,357.85 |
| Sales | 11/12/2021 | -6,610 | $12.84 | $84,852.57 |
| Sales | 5/9/2022 | -418 | $7.08 | $2,958.81 |
| Sales | 5/10/2022 | -418 | $6.71 | $2,803.32 |
| Sales | 5/11/2022 | -418 | $6.49 | $2,712.78 |
| Sales | 5/12/2022 | -418 | $6.39 | $2,669.26 |
| Sales | 5/13/2022 | -418 | $6.60 | $2,756.96 |
| Sales | 5/16/2022 | -558 | $6.93 | $3,866.33 |
| Sales | 5/17/2022 | -3,062 | $7.00 | $21,422.36 |
| Sales | 5/18/2022 | -940 | $6.78 | $6,370.66 |
| Sales | 5/19/2022 | -2,886 | $5.87 | $16,943.13 |
| Sales | 5/20/2022 | -1,876 | $5.64 | $10,577.26 |