**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| *In re F45 Training Holdings, Inc. Securities Litigation* | § § § § § § | CASE NO. 1:22-CV-01291-DAE<br><br>CLASS ACTION |

**DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................5

I. F45's Franchise Model ....................................................................................5

II. F45's Minority Investors and Directors ..........................................................6

III. COVID-19 Delays F45's IPO ........................................................................7

IV. F45's Post-IPO Growth ...................................................................................8

V. The July 26, 2022 Strategic Update ...............................................................9

VI. Procedural History ..........................................................................................9

ARGUMENT ......................................................................................................10

I. Plaintiff Detroit Should Be Dismissed for Lack of Standing ........................12

II. Plaintiffs Fail to State a Claim Under Section 11 of the Securities Act (Count I – Corporate, Minority Director, and Underwriter Defendants). .........................13

A. Statements About F45's Projections Are Predictive Statements Accompanied by Cautionary Language Protected Under the Bespeaks Caution Doctrine. ..............13

B. Statements Reflecting Opinions Are Inactionable. ......................................17

C. Statements Expressing Corporate Optimism Are Inactionable Puffery. ...................19

D. The Remaining Challenged Statements in the IPO Documents Were Not False When Made. ........................................................................................20

III. Plaintiffs Fail to State a Claim Under Section 12 of the Securities Act (Count II – Underwriter Defendants). ..........................................................................25

IV. Plaintiffs Fail to State a Claim Under the Exchange Act (Count IV – Corporate Defendants). ...............................................................................................26

A. Plaintiffs Fail to Allege Falsity. ...................................................................26

1. The IPO Documents Do Not Contain an Actionable Misstatement. ....................26

2. The Non-IPO Document Statements Are Not Actionable. ...............................27

a. Forward Looking Statements Are Protected by the PSLRA's Safe Harbor. ..........................................................................................27

b. Opinion Statements Are Inactionable .....................................................29

c. Statements Expressing Corporate Optimism Are Inactionable Puffery. .........30

d. The Remaining Statements Challenged Under the Exchange Act Were Not False When Made. ....31

B. Plaintiffs Fail to Plead Scienter as to Any Corporate Defendant....33

1. Plaintiffs Offer No Cogent Theory of Scienter. ....34

2. Defendants' Positions Are Insufficient to Plead Scienter. ....36

3. The Confidential Witnesses Add Nothing. ....38

4. Plaintiffs Do Not Allege Motive or Opportunity to Defraud. ....39

C. Plaintiffs Do Not Adequately Plead Loss Causation. ....40

V. Plaintiffs' Control Person Claims Likewise Fail (Counts III and V – Corporate Defendants, Minority Directors, KLIM and MWIG). ....42

A. MWIG and KLIM Did Not Possess "Control" Over F45 ....43

B. The Minority Directors Did Not Possess Control Over F45 ....43

CONCLUSION ....45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Equity Grp., Inc.*,
2 F.3d 613 (5th Cir. 1993) ....................42

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ....................36, 37

*Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*,
625 F.3d 185 (5th Cir. 2010) ....................10

*Akerman v. Oryx Commc'ns, Inc.*,
810 F.2d 336 (2d Cir. 1987)....................12

*In re Alamosa Holdings, Inc.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ....................23

*Alaska Elec. Pension Fund v. Asar*,
768 F. App'x 175 (5th Cir. 2019) ....................8, 36

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
915 F.3d 975 (5th Cir. 2019) ....................37

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)....................38, 41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................21

*In re Azurix Corp. Sec. Litig.*,
198 F. Supp. 2d 862 (S.D. Tex. 2002), *aff'd,* 332 F.3d 854 (5th Cir. 2003) ....................26

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................27

*Borderplex Inv. Partners v. Borderplex Realty Tr.*,
2017 WL 1738080 (W.D. Tex. Apr. 5, 2017)....................33

*In re BP p.l.c. Sec. Litig.*,
2016 WL 3090779 (S.D. Text. May 31, 2016)....................17, 29

*In re BP p.l.c. Sec. Litig.*,
852 F. Supp. 2d 767 (S.D. Tex. 2012) ....................19, 30

*Braun v. Eagle Rock Energy Partners, L.P.*,
223 F. Supp. 3d 644 (S.D. Tex. 2016) ....................13, 16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Campton v. Ignite Restaurant Grp., Inc.*,
2013 WL 12140291 (S.D. Tex. Sept. 3, 2013) ....................10, 12, 13

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
504 F. Supp. 2d 151 (N.D. Tex. 2007) ....................25, 26

*Dawes v. Imperial Sugar Co.*,
975 F. Supp. 2d 666 (S.D. Tex. 2013) ....................40

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
620 F. Supp. 3d 603 (S.D. Tex. 2022) ....................17, 18, 29

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)....................40

*Dennis v. Gen. Imaging, Inc.*,
1990 WL 3901 (E.D. La. Jan. 12, 1990), *aff'd*, 918 F.2d 496 (5th Cir. 1990) ....................42, 43

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir. 1993) ....................13

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................40, 41

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ....................42, 43

*Fener v. Belo Corp.*,
425 F. Supp. 2d 788 (N.D. Tex. 2006) ....................33

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014)....................20

*Firefighters' Ret. Sys. v. Citco Grp. Ltd.*,
855 F. App'x 902 (5th Cir. 2021) ....................42, 43

*In re Glob. Crossing, Ltd. Sec. Litig.*,
2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005)....................44

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)....................25

*Heck v. Triche*,
775 F.3d 265 (5th Cir. 2014) ....................42

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ....................11, 33, 35, 36, 39

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................12, 13

*Kapps v. Torch Offshore, Inc.*,
379 F.3d 207 (5th Cir. 2004) ....................13, 20, 21

*In re Key Energy Servs., Inc. Sec. Litig.*,
166 F. Supp. 3d 822 (S.D. Tex. 2016) ....................37, 38

*In re Kosmos Energy Ltd. Sec. Litig.*,
955 F. Supp. 2d 658 (N.D. Tex. 2013) ....................13

*Krim v. BancTexas Grp., Inc.*,
989 F.2d 1435 (5th Cir. 1993) ....................10, 25

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
810 F.3d 951 (5th Cir. 2016) ....................33, 37

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ....................8

*Masel v. Villarreal*,
924 F.3d 734 (5th Cir. 2019), *as revised* (June 6, 2019) ....................10, 12

*McCloskey v. Match Grp., Inc.*,
2018 WL 4053362 (N.D. Tex. Aug. 24, 2018)....................42

*McNulty v. Kanode*,
2013 WL 12077503 (W.D. Tex. Nov. 6, 2013)....................29

*Melder v. Morris*,
27 F.3d 1097 (5th Cir. 1994) ....................11

*Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*,
935 F.3d 424 (5th Cir. 2019) ....................38, 39

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) ....................37, 39

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)....................17, 18

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015)....................39

*Pierce v. Morris*,
2006 WL 2370343 (N.D. Tex. Aug. 16, 2006)....................12

*Plaisance v. Schiller*,
2019 WL 1205628 (S.D. Tex. Mar. 14, 2019)....................17, 18

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
777 F. App'x 726 (5th Cir. 2019)....................11, 19, 20, 30

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005)....................39

*Ret. Sys. of the City of Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023)....................24, 25

*Rosenzweig v. Azurix Corporation*,
332 F.3d 854 (5th Cir. 2003)....................16, 19, 30

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994)....................13

*Sec. & Exch. Com'n v. Rio Tinto plc*,
41 F.4th 47, 54 (2d Cir. 2022)....................10

*Silverstrand Inv. V. AMAG Pharm., Inc.*,
707 F.3d 95 (1st Cir. 2013)....................25

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004)....................10, 11, 33, 41, 42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................4, 8, 11, 33

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021)....................11

*Williams v. WMX Techs., Inc.*,
112 F.3d 175 (5th Cir. 1997)....................11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ....................28

*In re Worlds of Wonder Secs. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ....................13

*Yang v. Nobilis Health Corp.*,
2021 WL 3619863 (5th Cir. Aug. 13, 2021)....................38

*Yoshikawa v. Exxon Mobil Corp.*,
2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)....................28

**Statutes**

15 U.S.C. § 77o....................10

15 U.S.C. § 78t....................10

15 U.S.C. § 78u-4(b)....................11, 33

15 U.S.C. § 78u-5(i)(1) ....................27

15 U.S.C. § 78u-5(c)(1)(A)(i)-(B)(i)....................28, 29

**Rules**

Fed. R. Civ. P. 9(b) ....................1, 11, 16, 25, 26

Fed. R. Civ. P. 12(b)(6)....................1, 10

Fed. R. Evid. 201 ....................8

**Regulations**

17 C.F.R. § 229.105(a)....................24

17 C.F.R. § 229.3030(b)(2)(ii)....................24

17 C.F.R. § 230.405(f) ....................42

Under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), defendants F45 Training Holdings, Inc. ("F45" or the "Company"), Adam Gilchrist, Christopher Payne, Michael Raymond, Darren Richman, Mark Wahlberg, MWIG LLC ("MWIG"), Kennedy Lewis Management LLC ("KLIM"), and the "Underwriters"—Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Robert W. Baird & Co. Incorporated, Cowen and Company, LLC, Guggenheim Securities, LLC, Macquarie Capital (USA) Inc., MUFG Securities Americas Inc., and Roth Capital Partners, LLC—move to dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint").

## INTRODUCTION

This complaint is a classic example of fraud by hindsight. F45 is a franchiser of fitness studios offering 45-minute high-intensity workouts. In its early years, the Company experienced tremendous growth. Following that success, the Company and its officers made optimistic projections for continued growth in anticipation of an initial public offering ("IPO") in early 2020. The COVID-19 pandemic then wreaked havoc on the in-person fitness market and F45 delayed its IPO. As consumers began to resume some normal activities, the Company restarted preparations for an IPO, which it completed in July 2021. The materials accompanying the IPO (the "IPO Documents") reflected the positive trajectory F45 and its officers anticipated, tempered with extensive cautionary statements about the unpredictable nature of F45's business, particularly in the midst of a global pandemic. Over the next several months, F45's key franchisees continued to demonstrate increasing interest in further expansion. Unfortunately, repeated waves of COVID-19 variants, along with other challenges, prevented F45 from realizing its projected growth, and in July 2022, the Company reduced its projections.

Ignoring the unprecedented pandemic conditions and the IPO Documents' warnings, Plaintiffs seek compensation because their mid-pandemic investment in F45 was not profitable.

But both the Complaint and the documents it incorporates show that during and after the IPO, the Company warned investors of challenges to its business model, pre-existing material weaknesses in its internal controls, and projections that were transparently based on a "normalized environment" that did not exist at the time. Plaintiffs argue that they were duped, but the reasons their investments faltered were unsurprising: several of the Company's *disclosed* risks came to fruition, and F45 encountered *disclosed* challenges as it continued to expand.

Plaintiffs' hindsight approach seizes on the Company's reduced projections a year after the IPO to claim that F45's statements about the Company's prospects were misleading all along. Plaintiffs allege that F45 and certain of its officers, directors, minority investors, and underwriters violated Sections 11, 12, and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10 and 20 of the Exchange Act of 1934 ("Exchange Act"). Plaintiffs' 189-page, 564-paragraph Complaint tries to make up with length what it lacks in merit. Their kitchen-sink approach—naming an array of defendants and asserting a panoply of securities laws provisions—is an unsuccessful attempt to mask the absence of any viable claim.

One fundamental defect is that Plaintiffs fail to plead that the statements they challenge were materially false or misleading when made. The vast majority of the challenged statements are not even statements of fact. Instead, they are (i) expectations for future results accompanied by dozens of pages of disclaimers explaining the risks that could (and in some cases did) cause actual results to differ, or (ii) statements of opinion that Plaintiffs all but concede were genuinely held. Many are also generic statements of optimism that are immaterial as a matter of law. The few factual statements that remain are not plausibly alleged to have been false or misleading when made. Plaintiffs make bold assertions like F45's business model was "unsustainable," but they do not provide any *factual* allegations to support these assertions. Instead, they offer anecdotes from

a handful of failed franchisees, and they ignore key aspects of F45's business model that were explained in the very documents Plaintiffs claim were misleading. Most importantly, Plaintiffs ignore F45's repeated emphasis on the scalability of its product, designed to enable success in a variety of geographic areas from major cities to rural regions. Plaintiffs' last resort is to challenge disclosures of material weaknesses and the risk factors themselves as misleading, but they fail to explain how these express disclosures of risks and flaws could mislead investors.

Furthermore, Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit") lacks standing to assert *any* of the Complaint's claims because it did not suffer harm as a result of any of the alleged misleading statements. Rather, it affirmatively pleaded it was not harmed by certifying that it sold all of its F45 stock before the supposed harm occurred. And Lead Plaintiff lacks standing to pursue a Securities Act Section 12(a)(2) claim because it did not purchase F45 shares in the IPO.

Plaintiffs' claims under the Exchange Act fail for two additional reasons. First, Plaintiffs fall well short of plausibly pleading scienter. Plaintiffs fail to allege particularized facts showing that F45 or its officers deliberately (or with severe recklessness) deceived the Company's investors. Plaintiffs *never* allege that Mr. Gilchrist or Mr. Payne, the only individual defendants named in this Count, were *actually aware* of a fact that put them on notice that any statement was false or misleading. Instead, Plaintiffs offer their own (incorrect) conclusions—i.e., that F45's business model was unsustainable, that exclusive rights to all "key" territories had already been granted, and that "sold" franchises would "never" open. Yet Plaintiffs do not allege Mr. Gilchrist or Mr. Payne knew of such "facts." Similarly, none of Plaintiffs' confidential witnesses alleges that they interacted with Mr. Gilchrist or Mr. Payne, and no confidential witness alleges that she—let alone Mr. Gilchrist or Mr. Payne—was aware of a fact undermining a challenged statement.

Further undermining the lack of plausible scienter is Plaintiffs' failure to allege that Mr. Gilchrist or Mr. Payne had a motive to defraud.

Ultimately, Plaintiffs' scienter theory boils down to bald assertions that, because Mr. Gilchrist and Mr. Payne held important positions at F45 and made the challenged statements, they must have known the statements were false or misleading. But this circular logic comes nowhere close to pleading an inference of *fraudulent intent* that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Instead, the only cogent inference is that the Defendants thought their product and business model were poised to continue their pre-pandemic trajectory, but the market created more obstacles than they anticipated.

Yet another flaw is Plaintiffs' failure to plead they suffered any loss as a result of the alleged fraud. Plaintiff Detroit sold its shares before the correction of any challenged statements supposedly caused F45's stock price to drop, so it did not suffer any harm. And Lead Plaintiff fails to allege that the supposed "harm" (*i.e.*, a stock price drop following F45's strategic update) was due to the revelation that the challenged statements were false, as opposed to reduced projections.

Further, Plaintiffs' control person claims must be dismissed because they fail to plead a primary violation. The control person claims against Mr. Raymond, Mr. Wahlberg, and Mr. Richman (the "Minority Directors"), MWIG and KLIM, fail for the additional reason that the status-based allegations on their face illustrate that those five defendants—two unaffiliated minority investors and three minority directors who are not alleged to have had any control over the challenged conduct—are *not* control persons.

The Court should dismiss the Complaint in full.

## BACKGROUND[1]

### I. F45's Franchise Model

F45 is a franchiser of fitness studios that offer 45-minute high-intensity workouts. ¶ 45. The Company uses its technology-enabled platform to support a global network of studios by offering the same daily workout to all F45 members around the globe. ¶ 48. Founded in 2013 in Sydney, Australia, the Company quickly grew by selling franchises with a replicable model whereby all F45 studios use the same equipment purchased from the Company in the same general studio layout. ¶¶ 48-49. The studios were designed to allow for relatively low overhead costs for opening and running a studio so that major metropolitan areas, other cities, suburbs, and rural areas alike would be prime locations for profitable franchises. ¶¶ 416, 420.

F45 sells two types of franchises. Under a traditional franchise agreement, the franchisee pays an initial establishment fee and agrees to standard terms and conditions, including an agreement to purchase equipment packs from F45. ¶ 50(a). The franchisee is then granted exclusive rights to operate within a specified territory. *Id.* Franchisees typically own between one and five franchises. *Id.* In addition to these traditional franchise agreements, F45 sells multi-unit development agreements, under which the franchisee purchases the right to develop multiple franchises in a specified area, usually for a period of three to five years. ¶ 50(b). Multi-unit development agreements require the franchisee to make significant upfront payments to F45. *Id.*

F45 grew rapidly, expanding outside of Australia to almost 70 countries, including the United States, United Kingdom, and New Zealand. ¶¶ 49, 402. When the IPO occurred, F45 had sold more than 2,800 franchises worldwide. ¶ 49. F45 reported its growth through various metrics,

[1] By summarizing Plaintiffs' allegations, Defendants do not concede the allegations are true. Citations in the form of "¶ __" or "¶¶ __" refer to the paragraphs of the Complaint. Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

including "Total Franchises Sold" and "New Franchises Sold," which respectively measured the total and new franchise agreements and studios committed under multi-unit agreements. ¶ 53. F45 also reported "Initial Studio Openings," "Total Studios," and "Open Studios," which measured the new and total studios opened during a specified period. *Id.*

## II. F45's Minority Investors and Directors

MWIG is a private investor that invested in F45, acquiring approximately 38.3% of the Company's outstanding shares pre-IPO and 28.6% post-IPO. ¶ 234. KLIM is a credit manager of private funds that also invested in F45, acquiring approximately 14.4% of the Company's outstanding shares pre-IPO and 11.4% post-IPO. *Id.* ¶ 235. Both MWIG and KLIM have held a minority interest in F45, both in terms of economic control and voting power. No senior member of F45 is affiliated with MWIG or KLIM, and under the stockholders' agreement, each was entitled to nominate one director to the board. *Id.* ¶¶ 234-235. Plaintiffs do not allege that MWIG and KLIM are affiliated in a way that would allow them to aggregate votes or make joint decisions.

Michael Raymond and Mark Wahlberg have served as members of the F45 board of directors (the "Board") since March 2019. ¶¶ 30, 32. Mr. Raymond is the Manager of FOD Capital LLC, which co-owns MWIG with Mr. Wahlberg. *Id.* ¶ 239. Darren Richman served as a member of the Board from October 2020 until October 2022. *Id.* ¶ 31. Mr. Richman is co-founder, co-Portfolio Manager, and co-Managing Member of KLIM. *Id.*

Plaintiffs' 189-page complaint makes only limited references to MWIG or KLIM. *See* ¶¶ 30, 32, 34, 68, 69, 137, 138, 234, 239, 240, 555, 560 and 561 (referencing MWIG in 13 of 563 paragraphs, identifying it as a defendant, identifying its relationship to Defendants Raymond and Wahlberg, describing its holdings in F45, and citing to the Registration Statement's description of it as a "Principal Stockholder" with a right to appoint a board member to F45's board); *id.* ¶¶ 7, 31, 35, 66, 80, 155, 234, 235. 239, 240, 276, 283, 328, 556, 560, 561 (mentioning KLIM in 16 of

563 paragraphs, for the same reasons as MWIG, and noting that KLIM is an affiliate of Club Franchise Group, LLC, which had a development agreement with F45); *id.* ¶¶ 30, 68, 137, 238-240, 559-561 (referencing Mr. Raymond in 9 of 563 paragraphs, and in each instance only to identify him as a defendant, state that he is a member of the board of directors, state that he signed the Registration Statement and Prospectus for the IPO, identify his shareholdings in F45, and identify his role with MWIG); *id.* ¶¶ 30, 32, 34, 47, 68, 84, 137, 239, 240, 560, 561 (mentioning Mr. Wahlberg in 11 of 563 paragraphs, for the same reasons as Mr. Raymond, with the additional allegations simply stating that Mr. Wahlberg has a "promotional agreement" with F45 and currently serves as F45's "Chief Brand Officer"); *id.* ¶¶ 31, 68, 80, 137, 238-240, 559-561 (mentioning Mr. Richman in only 10 of 563 paragraphs, for the same reasons as Mr. Raymond, with the sole addition being that he is alleged to have resigned from F45's board).

**III. COVID-19 Delays F45's IPO**

F45 initially filed for a U.S. IPO in January 2020. ¶ 61. But starting in March 2020, public health orders related to the COVID-19 pandemic forced many of F45's studios to close in the United States and Australia—the Company's largest markets, ¶ 62-63, and F45 delayed its IPO, ¶ 64. While some studios began to reopen during the summer of 2020, spikes in COVID-19 cases related to various variants forced additional closures through 2021, further delaying F45's IPO. ¶ 62.

As COVID-19 restrictions began to ease, F45's studios were quickly able to build up revenue. ¶ 63. F45 then resumed its IPO efforts, filing its Registration Statement with the SEC on June 21, 2021, and conducting the IPO on July 15, 2021, at $16.00 per share. ¶¶ 66-67, 77. The Registration Statement reported on F45's franchise sales and studio openings and disclosed various multi-unit agreements, including a June 15, 2021 agreement with Club Franchise Group LLC to open 300 studios in the United States over three years. ¶ 66. The Registration Statement

also acknowledged that the Company had material weaknesses in its internal controls for financial reporting. ¶ 93.

## IV. F45's Post-IPO Growth

Over the next several quarters, F45, its CEO Adam Gilchrist, and CFO Christopher Payne (the "Corporate Defendants") updated investors regarding its continued growth. For example, in August 2021—about a month after the IPO—F45 reported that it had sold 554 new franchises the prior quarter and was aiming to open more than 7,000 studios in the United States in the long term. ¶¶ 378, 384. Similarly, in November 2021, the Company reported that it had sold another 540 franchises in the prior quarter and was increasing its anticipated new net franchises sold for 2021 from a range of 800-50 to 830-50. ¶¶ 401, 409. The Company made similar reports and projections in March and May 2022 for subsequent quarters. *See* ¶¶ 427, 446-47.

In early 2022, interest from F45's most important franchisees indicated that momentum in F45's business was about to pick up. Ex. 1 at 5 (May 16, 2022 Earnings Call) ("The vast majority of these studios sold but not yet open are attributed to our most experienced multiunit franchise partner.").[2] These franchisees were experienced and had a track record of successfully starting and running franchises. *Id.* To prepare for this anticipated inflection point, F45 made significant investments. It pre-purchased approximately 1,200 World Packs, lined up franchisee financing, and worked with a partner to optimize real estate strategies to drive new studio openings. Ex. 2,

---

[2] Citations to "Ex. __" refer to the exhibits to the Declaration of Lissa Percopo, filed concurrently herewith in Defendants' Appendix. Defendants respectfully request that the Court consider the exhibits in connection with the Motion to Dismiss. When ruling on a motion to dismiss in a securities class action, "courts must consider the complaint in its entirety, . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. Each exhibit is incorporated into the Complaint, publicly available, and properly the subject of judicial notice. *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 181-82 (5th Cir. 2019); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009); Fed. R. Evid. 201.

at 1 (Mar. 14, 2022 8-K Press Release).

During this time, the Company continued disclosing its unresolved material weaknesses in internal controls. ¶¶ 395, 439, 441.

### V. The July 26, 2022 Strategic Update

On July 26, 2022, F45 filed a Form 8-K with the SEC announcing a strategic update, adjusting its projections downward, and explaining that these changes were "[d]ue to market conditions." ¶ 76; Ex. 3 at 1-2 (July 26 Update). The expected number of new studios opening in 2022 was reduced from 1,000 to a range of 350 to 450, and the expected number of new franchises was reduced from 1,500 to a range of 350 to 450. *Id.* F45 also announced cuts to its workforce and that Mr. Gilchrist was departing as CEO. *Id.* at 2-3. The next day, F45's stock price closed at $1.35, down from $3.51 the day before. ¶ 77.

### VI. Procedural History

Kenzie Goer filed this action in December 2022 alleging claims under Securities Act Sections 11 and 15 based on allegedly misleading statements in the IPO Documents. ECF No. 1. This Court later granted Pledge Capital LLC's lead-plaintiff motion. ECF No. 26. Pledge Capital LLC ("Lead Plaintiff") then filed the operative amended class action complaint on behalf of itself and additional named plaintiff Detroit (together with Lead Plaintiff, "Plaintiffs"). ECF No. 59.

In addition to the original claims, Plaintiffs' 189-page, 564-paragraph Complaint added claims (i) under Securities Act Section 12 against the IPO underwriters, and (ii) for securities fraud under Exchange Act Sections 10 and 20 based on the IPO Documents and subsequent statements. ECF No. 59. The Complaint also added as defendants KLIM and MWIG LLC, asserting that those minority stockholders and investors are liable as persons controlling the Company. The Complaint also attached a certification and chart showing Detroit's ownership of F45's stock from July 15, 2021 to May 20, 2022. *Id.* at Ex. 1.

**ARGUMENT**

The Complaint should be dismissed for failure to state a claim under Rule 12(b)(6). Plaintiffs fail to sufficiently allege various elements of their claims under Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 10(b)[3] and 20(a) of the Exchange Act. ¶¶ 203-42, 537-563. "The elements of a securities fraud claim under §§ 11 and 12 of the [Securities] Act are: (1) an omission or misrepresentation, (2) of a material fact required to be stated or necessary to make other statements made not misleading." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993). In addition, a plaintiff must have been "harmed by the omission or misrepresentation." *Campton v. Ignite Restaurant Grp., Inc.*, 2013 WL 12140291, at *4 (S.D. Tex. Sept. 3, 2013) (collecting cases). In turn, the elements of Section 10(b) claim are "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Masel v. Villarreal*, 924 F.3d 734, 743 (5th Cir. 2019), *as revised* (June 6, 2019) (quoting *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 192 (5th Cir. 2010)). Section 15 of the Securities Act and Section 20(a) of the Exchange Act extend liability to individuals who "contro[l] any person liable" for a primary violation. 15 U.S.C. §§ 77o, 78t; *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004).

Because Plaintiffs allege that Defendants engaged in "fraudulent wrongdoing" in making

[3] Plaintiffs bring their Section 10(b) claims under Rule 10b-5, without specifying a subsection. Even though Plaintiffs use the word "scheme" in their allegations, *see, e.g.*, ¶ 523 (Defendants "engaged in a scheme to defraud investors"); *see also* ¶¶ 539-42, Plaintiffs have not asserted a claim for scheme liability under Rule 10b-5(a) or (c), but instead have asserted only misstatements under Rule 10b-5(b), ¶ 538. *See Sec. & Exch. Com'n v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022) ("[M]isstatements and omissions alone are not enough for scheme liability"; rather, a plaintiff must allege "*something extra* that makes a violation a scheme.").

the challenged statements, their claims are all subject to heightened pleading requirements. Exchange Act claims are always subject to the exacting pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Under the PSLRA, Plaintiffs must "'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *Southland Sec. Corp.*, 365 F.3d at 364 (quoting 15 U.S.C. § 78u-4(b)). Statements are misleading only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008) (internal quotation marks and citation omitted). Plaintiffs also must plead a strong inference of fraudulent intent. *Tellabs*, 551 U.S. at 319.

While Securities Act claims generally are subject only to the pleading requirements of Rule 8, where, as here, Plaintiffs challenge statements in a company's registration statement under both the Securities Act and the Exchange Act, *compare* ¶¶ 139-193, *with* ¶¶ 312-366, all of Plaintiffs' claims are subject to elevated pleading standards. *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019). Plaintiffs' "[b]oilerplate disavowal of an intent to plead fraudulent conduct is unpersuasive" when they "support both their [Securities Act] claims and their Exchange Act claims with the same IPO . . . materials." *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 669 (S.D. Tex. 2021); *see* ¶ 132 (blanketly "disavow[ing] and disclaim[ing] any allegations of fraud"). Plaintiffs' entire complaint therefore sounds in fraud and must satisfy Rule 9(b)'s particularized pleading requirements. This requires particularized allegations not only of the "who, what, when, and where," but also specific factual allegations that "explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997); *see also Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) (holding Rule 9(b) requires plaintiffs to "set forth specific facts supporting an inference of fraud"

(emphasis omitted) (citation omitted)).

As explained below, Plaintiffs fail to plead the elements of any of their claims with the required particularity, and therefore the Complaint should be dismissed.

## I. Plaintiff Detroit Should Be Dismissed for Lack of Standing

As an initial matter, additional named plaintiff Detroit should be dismissed for lack of standing. A plaintiff does not have standing to maintain a claim under either the Securities Act or the Exchange Act if it has not suffered any damages. *See supra* at 10. Economic loss is a recognized element of a claim under Section 10(b). *Masel*, 924 F.3d at 743 (internal quotation marks and citation omitted). Similarly, Securities Act claims "must be dismissed if [the plaintiff] has no conceivable damages." *Campton*, 2013 WL 12140291, at *4 (citation *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347 & n.76 (S.D.N.Y. 2003)); *see also Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336 (2d Cir. 1987) (affirming dismissal of Section 11 claim where plaintiffs could not establish losses on account of the alleged misstatements, reasoning that "[t]he price decline before disclosure [of misstatements] may not be charged to defendants"); *Pierce v. Morris*, 2006 WL 2370343, at *4 (N.D. Tex. Aug. 16, 2006) (dismissing where plaintiff had no conceivable damages).

The damages requirement leads to an easy dismissal of Detroit because Plaintiffs' own allegations confirm that it sustained no cognizable injury. The only injury Plaintiffs claim is an alleged drop in the market price for F45 stock on July 26, 2022. ¶¶ 11-12, 76-77, 194-95, 467-69, 524. But Detroit had sold the last of its F45 shares two months earlier on May 20, 2022. Compl. Ex.1, at Ex. A. Thus, even if Plaintiffs were correct that F45's stock price was improperly inflated before July 26, 2022, Detroit could not have been injured from the disclosure on that date; to the contrary, Detroit would have *benefited* from selling at an inflated price. Detroit has therefore suffered "no conceivable damages," and it should be dismissed from the case. *Campton*, 2013 WL

12140291, at *4 (quoting *In re Initial Pub. Offering*, 241 F. Supp. 2d at 347 & n.76).

## II. Plaintiffs Fail to State a Claim Under Section 11 of the Securities Act (Count I – Corporate, Minority Director, and Underwriter Defendants).

Plaintiffs' Securities Act claims fail to allege an actionable misstatement. The challenged statements were (1) predictive statements protected under the bespeaks caution doctrine, (2) inactionable opinion statements, (3) inactionable puffery, or (4) not false when made.

### A. Statements About F45's Projections Are Predictive Statements Accompanied by Cautionary Language Protected Under the Bespeaks Caution Doctrine.

Under the "bespeaks caution doctrine," predictive statements accompanied by cautionary language cannot be "materially misleading" as a matter of law and, therefore, should be dismissed on the pleadings. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 214-16 & n.11 (5th Cir. 2004) (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993)) (collecting cases); *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994) ("To put it another way, the 'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context."). The doctrine "applies when (1) forward-looking statements, such as financial projections, are (2) accompanied by meaningful cautionary language, which would alert the reasonable investor to consider those statements with healthy skepticism." *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 653 (S.D. Tex. 2016). While the bespeaks doctrine is not a "per se" bar to liability, *Rubinstein*, 20 F.3d at 168, it "allows court[s] to dismiss claims" involving predictive statements rendered immaterial by cautionary language, *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 664 (N.D. Tex. 2013) (citing *In re Worlds of Wonder Secs. Litig.,* 35 F.3d 1407, 1414 (9th Cir. 1994)); *see Braun*, 223 F. Supp. 3d at 654-55 (dismissing Section 11 claim under the bespeaks caution doctrine).

The Complaint challenges several categories of predictive statements in the IPO Documents, including F45's growth and revenue projections, ¶¶ 140, 155-56, 164-68, 170,

financial projections for typical franchises, ¶¶ 140-42, and plans to improve its internal controls over financial reporting, ¶¶ 184-85. In addition to the IPO Documents' general qualifications about the use of forward-looking statements, Ex. 4, at 65-66 (Prospectus), Ex. 5 at 65-66 (Registration Statement), each category of predictive statement was accompanied by meaningful cautionary language. That language, labeled "risk factors," made up ***forty pages*** of the very same documents containing the challenged statements and provided specific, detailed cautionary information regarding every statement about which Plaintiffs complain. *See* Ex. 4, at 24-64 (Prospectus); *see also* Ex. 5 at 24-64 (Registration Statement). The Court should therefore dismiss Plaintiffs' claims as to these statements under the bespeaks caution doctrine.

*First*, Plaintiffs challenge statements in the IPO Documents about F45's growth and revenue projections despite on-point cautionary language. For example, the Complaint challenges statements that the Company hoped "to capitalize on our estimated long-term global opportunity of over 23,000 studios," ¶ 140, and that F45 "believe[d] there is significant opportunity to meaningfully expand our franchise studio footprint in the United States," including "a long-term studio potential for us to open over 7,000 studios in the United States," ¶ 165; *see also* ¶¶ 164, 166-68. Plaintiffs further challenge statements regarding F45's intentions to seek multi-unit franchise agreements, ¶¶ 155-56. Ultimately, Plaintiffs challenge the related projection that "[a]s our network of total studios grows, we expect recurring revenue as a percentage of total revenue to increase." ¶ 170. The problem for Plaintiffs is that these statements were accompanied by meaningful cautionary language, including that "[o]ur financial results are affected by the number of franchises sold and studios we open" and that "[o]ur ability to open new franchised studios and increase our revenue could be materially and adversely affected" if the Company could not "recruit . . . qualified franchisees" or was "unable to renew our franchise agreements." Ex. 4, at 28-30

(Prospectus); *see also id.* at 31-33; Ex. 5 at 28-33 (Registration Statement). And the IPO Documents specifically cautioned that "the number of new franchised studios that actually open in the future may differ materially from the number of signed commitments we currently have or anticipate from existing and new franchises," and that the Company may "fail to successfully implement our growth strategy, which includes new studio development by existing and new franchisees." Ex. 4 at 30-31 (Prospectus); *see also* Ex. 5 at 30-31 (Registration Statement).

*Second*, Plaintiffs' challenge to F45's financial projections for typical franchises—namely, that a new franchise "in a normalized operating environment" would require an "initial investment of approximately $315,000," and that in its "third year of operation," the franchise could expect "average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%"—again run into express cautionary language. ¶¶ 140-42. The IPO Documents specifically warned that "our franchisees are impacted by factors that are beyond our control," such as "the COVID-19 pandemic," "capital requirements," and "negative economic conditions," as well as "rising costs related to construction of new studios." Ex. 4, at 30, 33 (Prospectus); *see also* Ex. 5 at 30, 33 (Registration Statement). The IPO Documents further cautioned that "[o]pening new studios in close proximity may negatively impact our existing studios' revenue and profitability." Ex. 4 at 32 (Prospectus); *see also* Ex. 5 at 32 (Registration Statement).

*Third*, Plaintiffs challenge statements about the Company's efforts to improve internal controls over financial reporting, including that "we plan to take additional steps to improve our accounting function." ¶¶ 184-85. The IPO Documents identify risks with these remediation efforts, including that "if our remediation of such material weaknesses is not effective, or if we fail to develop and maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with

applicable laws and regulations could be impaired." Ex. 4, at 58, 64 (Prospectus); *see also* Ex. 5 at 58, 64 (Registration Statement).

These predictive statements are all "forward-looking." *Braun*, 223 F. Supp. 3d at 653. And the cautionary language in the IPO Documents is precisely the sort warranting application of the bespeaks caution doctrine. For example, in *Rosenzweig v. Azurix Corporation*, the Fifth Circuit affirmed dismissal of a Section 11 claim based on "risk warnings," including that the expenditure projections were accompanied by the cautionary language that "[t]here can be no assurances that we will be successful in securing any financing arrangements." 332 F.3d 854, 869 (5th Cir. 2003) (internal quotation marks omitted). Applying *Rosenzweig*, the court in *Braun*, similarly dismissed challenges to statements under the bespeaks caution doctrine because the financial projections were accompanied by "generalized warnings" as well as additional cautionary language that "there can be no assurance that the prospective results will be realized or that actual results will not be significantly higher or lower than estimated." 223 F. Supp. 3d at 654. Here, the IPO Documents similarly contain "generalized warnings," Ex. 4, at 65-66 (Prospectus), Ex. 5 at 65-66 (Registration Statement), as well as the detailed risk disclosures discussed above regarding the specific statements that Plaintiffs challenge. Thus, a reasonable investor would review the challenged statements and cautionary language together, rendering the predictive statements "immaterial as a matter of law" and "not false or misleading." *Braun*, 223 F. Supp. 3d at 654-55.[4]

In sum, the cautionary language in F45's risk disclosures put investors on notice of the precise risks about which Plaintiffs complain. As a result, the Company's predictive statements

---

[4] As a fall back, Plaintiffs challenge the cautionary statements in F45's risk disclosures as themselves misleading. ¶¶ 187-93. But, as discussed below, *see infra* Section II.A, D., Plaintiffs fall far short of pleading that these risk disclosures were misleading with the specificity required by Rule 9(b).

are protected by the bespeaks caution doctrine.

**B. Statements Reflecting Opinions Are Inactionable.**

As a general rule, "a sincere statement of pure opinion is not an 'untrue statement of material fact'" giving rise to liability under the Securities Act, even if "an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Opinion statements are actionable only if "the speaker did not sincerely hold that opinion, or if the plaintiffs allege that '(i) the speaker omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and (ii) those facts conflict with what a reasonable investor would take from the statement itself.'" *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 623 (S.D. Tex. 2022) (quoting *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *9 (S.D. Text. May 31, 2016)). "That is no small task for an investor," who cannot simply allege "that an opinion was wrong" or that "the issuer failed to reveal its basis." *Omnicare*, 575 U.S. at 189, 194. And because "'[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,'" a plaintiff cannot "circumvent the particularity and materiality requirements of a fraud claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose 'some fact cutting the other way.'" *Plaisance v. Schiller*, 2019 WL 1205628, at *10 (S.D. Tex. Mar. 14, 2019) (quoting *Omnicare*, 575 U.S. at 189).

Many of the statements Plaintiffs challenge are opinion statements qualified by the term "believe"—"a quintessential opinion word." *Del. Cnty. Emps. Ret. Sys.*, 620 F. Supp. 3d at 623; *see* ¶¶ 140-42, 164-65, 167-70, 176, 184. These include the Company's ***beliefs*** regarding the benefits of F45's business model—that it involves "a relatively low initial investment and low four-wall operating expenses" and offers the "potential for asset-light growth, strong profitability and robust cash flow generation," ¶¶ 140-42, 169—the quality of F45 franchisees, ¶ 176, the

sufficiency of the Company's efforts to improve its financial reporting controls, ¶ 184, and projections about the Company's and franchises' growth and revenue, ¶¶ 140-42, 164-65, 167-68, 170. Thus, for these statements, Plaintiffs must plead particularized facts showing (i) that these opinions were not "sincerely h[e]ld" or (ii) undisclosed information concerning the speaker's "inquiry" or "knowledge" that contradicts the opinion. *Del. Cnty. Emps. Ret. Sys.*, 620 F. Supp. 3d at 623 (internal quotation marks and citation omitted); *see also Omnicare*, 575 U.S. at 186.

Here, Plaintiffs fail to plead Defendants' state of mind with any particularity for these opinion statements. *See infra* Section IV.B. In fact, for the defendants named solely in the Securities Act claims, the Complaint makes no effort to plead their knowledge and "disavow[s] any allegations of . . . intentional conduct." ¶ 132. Because there is no allegation that Defendants did not sincerely hold these opinions, "Plaintiffs must allege, with particularity, facts capable of establishing that [Defendants] knew, but omitted to include in [the IPO Documents], material facts that contradict its opinion statements." *Plaisance*, 2019 WL 1205628, at *11. Plaintiffs fail to satisfy that burden as well. In some cases, Plaintiffs simply claim that the opinion "turned out to be wrong," which does not render the opinion statements misleading. *Omnicare*, 575 U.S. at 186; *see, e.g.*, ¶¶ 146(h), 186 (adequacy of efforts to remediate material weakness in financial reporting). And in others, Plaintiffs fail to plead specific facts undercutting the stated opinion. For example, Plaintiffs challenge the statement that F45, "believe[d] that F45 Training franchisees are highly motivated business owners who are financially, and often personally, invested in improving the wellbeing of their members." ¶ 176. But the reasons they offer for why that stated opinion was false—anecdotal evidence that some franchisees struggled financially, ¶¶ 180-83—do not undermine the belief that the franchisees were generally "motivated" or "invested" in their franchises. Similarly, Plaintiffs allege no particularized facts rendering misleading F45's opinion

that its model provided "relatively" low-cost franchises with the "potential" for "strong profitability." *See* ¶¶ 140-42, 169. These generic optimistic opinions are inactionable.

**C. Statements Expressing Corporate Optimism Are Inactionable Puffery.**

Other challenged statements are categorically immaterial because they constitute inactionable puffery. "'Allegations that amount to little more than corporate 'cheerleading' are puffery'" and as a result "'are not actionable under federal securities law because no reasonable investor would consider such statements material.'" *Police & Fire Ret. Sys.*, 777 F. App'x at 730 (quoting *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 789 (S.D. Tex. 2012)). "'[I]nvestors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts.'" *Id.* (quoting *In re BP*, 852 F. Supp. 2d at 789). Allegations based on "mer[e] expressions of corporate optimism" are subject to dismissal. *Rosenzweig*, 332 F.3d at 874.

Several categories of statements plaintiffs challenge are paradigmatic examples of puffery. Plaintiffs challenge, for example, several statements about F45's franchise model, including that it is "attractive," ¶¶ 140, 169, that the model "has the potential to generate strong returns for franchisees," ¶ 142, and that the model "has been predictable, asset light and cash flow generative," ¶ 170. Similarly, several statements express general optimism about F45's "platform," including that it "enables . . . rapid scalability" and "helps promote the success of our franchisees," ¶ 143, that it is "highly efficient" and creates "the potential for attractive returns," ¶ 144, and that it includes a "robust ongoing support program for our franchisees," ¶ 145. Finally, Plaintiffs challenge F45's statement that there is "strong market demand for multi-unit franchise opportunities." ¶ 155. These statements are classic puffery, no different from statements like "[o]ur fundamentals are strong," that the "pipeline" of corporate opportunities "remains strong," or that a company is "making steady progress"—all of which have been found to be inactionable. *Rosenzweig*, 332 F.3d at 869-70.

Additionally, "aspirational statements" including expressions of the company's "commitment to" certain "goals it was seeking to reach" "fall under the category of corporate cheerleading." *Police & Fire Ret. Sys.*, 777 F. App'x at 731. Such statements are inactionable even if the company failed to achieve its goals, because they are "generalized positive goals rather than specific promises." *Id.* That holding squarely covers F45's statement that it seeks to maintain a "robust ongoing support program for our franchisees." ¶ 145. Even if Plaintiffs were to allege facts showing that F45's program was less "robust," the generalized commitment expressed in the IPO Documents would still be inactionable puffery.

**D. The Remaining Challenged Statements in the IPO Documents Were Not False When Made.**

Plaintiffs fail to allege that the remaining statements were false or otherwise misleading when made. Plaintiffs' allegations amount to criticism of F45's optimism in light of later developments. That is insufficient. "To be actionable, a statement or omission must be misleading at the time it was made," and "attempts to plead fraud by hindsight are impermissible and devoid of plausibility." *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 897 (E.D. La. 2014). Plaintiffs point to isolated anecdotes that they argue should have also been disclosed, but there is "no duty to disclose in the prospectus all information material to the offering." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 212 n.6 (5th Cir. 2004) (citation omitted). Rather, there is a duty to disclose "only that material information necessary to make the statements in the prospectus not misleading and that material information specifically required by the securities laws to be included." *Id.* (citation omitted). "[O]missions that create a misleading impression—particularly one that is misleading only in hindsight—are not sufficient to constitute the basis of a securities action under section 11 or section 12(2)." *Bulmahn*, 53 F. Supp. 3d at 897 (alteration in original) (internal quotation marks and citation omitted).

Plaintiffs fail to plead that any statement was false when made.

***F45's Results.*** Plaintiffs challenge statements reporting the Company's results, including that "[f]rom June 30, 2020 to June 30, 2021, our Total Franchises Sold increased by 36% and our Total Studios increased by 22%," ¶ 140, and that the Company had recently entered a multi-unit agreement with Club Franchise Group LLC, ¶¶ 155, 157. Plaintiffs do not plead that these reported results were false. Instead, Plaintiffs claim that the statements were misleading because F45 did not also disclose that its "substantial growth was a result of undisclosed and unsustainable practices." ¶ 146. But rather than identify these supposed practices and explain how they contradicted the statements, Plaintiffs offer two conclusory assertions: that F45 (1) "granted exclusive rights to most of the key territories in the U.S.," which Plaintiffs conclude "le[ft] little room for additional growth"; and (2) supposedly sold multi-unit franchises "without regard to whether those franchisees . . . would ultimately open those franchisees, " ¶ 146 (d), (g).[5] But Plaintiffs do not plead any facts showing that it was understood when the IPO occurred that there was limited room for growth. Plaintiffs do not even identify the "key territories." In fact, they allege both that "metro areas" were "most desirable" and that areas like New York City faced particular challenges. *See, e.g.*, ¶¶ 6, 353. Plaintiffs also repeatedly ignore F45's own statements—reflected in the Complaint—regarding the business strategy of supporting franchises in major metropolitan areas and rural areas alike. ¶¶ 416, 420; *see also* Ex. 5 at 113-14

[5] Plaintiffs make several allegations regarding representations to potential franchisees, the sufficiency of training offered to franchisees, and the profitability of certain individual franchises, ¶ 146(a), (c), (e), but it is unclear how those allegations relate to F45's reporting on its actual results. The only connection between these criticisms and the challenged statements are—again—Plaintiffs' own unsupported conclusions, which are insufficient to state a claim and can be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even if they were somehow "material to the offering," those statements would not render the results F45 reported misleading. *Kapps*, 379 F.3d at 212 n.6 (internal citation omitted).

(Registration Statement). Further, Plaintiffs fail to plead any facts establishing that F45 would not expect multi-unit franchisees like Club Franchise Group LLC to open the franchises they purchased. As Plaintiffs acknowledge, the sale of multi-unit franchises involved an upfront payment, ¶ 50(b), and franchisees were typically required to make monthly payments even if they did not open the agreed upon studios, Ex. 5, at 84 (Registration Statement). Plaintiffs identify no reason why multi-unit franchisees would make these payments without planning to open the agreed-upon studios when entering into the agreement with F45.

While Plaintiffs now claim that F45's growth was unsustainable, they fail to offer any factual allegations (as opposed to hindsight-driven conclusions) that would make the statements false when made.

***Franchisees.*** Plaintiffs' challenges to F45's statements regarding its franchisees are similarly without merit. Plaintiffs challenge statements that F45 typically used some "standard terms and conditions" in its franchise agreements, ¶ 158, and that the Company "require[d] our franchisees to purchase fitness and technology equipment" from F45 with payment "required to be made prior to the placement of the franchisees' orders," ¶ 159. Plaintiffs claim these statements were false because F45 entered into "modified payment terms" with "certain preferred franchisees." ¶ 146(f). But F45 fully disclosed in the IPO documents that it entered into modified payment terms, including that it "may from time to time negotiate terms of our franchise agreements with individual franchisees or groups of franchisees." Ex. 5, at 36 (Registration Statement). In particular, F45 disclosed that it had made "limited-time promotional offer[s]" to certain existing franchisees with "reduced dollar establishment fee and no franchise fee payments" as part of an effort to "stimulate sales in response to the COVID-19 pandemic." *Id.* at 120.

Even setting aside these express disclosures, Plaintiffs fail to plead when F45 entered into those modified payment agreements about which they complain, whether F45 had entered into those agreements at the time of the IPO, or how those agreements rendered the statements false or misleading. *See* ¶ 146(f). This is true even of Plaintiffs' allegations that certain confidential witnesses recalled hearing of fee discounts and incentives at unspecified times. ¶¶ 272-75. Indeed, CW-4 and CW-7 did not hold positions at F45 until *months after* the July 2021 IPO. *See* ¶¶ 89, 92. *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 851 (N.D. Tex. 2005) ("Plaintiffs must allege sufficient particulars to show the probability that the confidential sources actually possess the information pleaded."). Plaintiffs therefore fail to plead facts showing that the statements in the IPO were false when made.

Plaintiffs also challenge statements that the Company looked for certain criteria in potential franchisees. ¶ 177. According to Plaintiffs, the Company "fail[ed] to conduct proper due diligence on potential franchisees." ¶ 146(b). Plaintiffs' sole basis for this allegation is the statements of CW-2, a single franchisee in the United Kingdom. ¶ 151. But other than the conclusory allegation that "F45 does not conduct due diligence for potential studio locations prior to opening in a new territory," CW-2 offered no details as to F45's process for identifying and selecting potential franchisees. *Id.* Plaintiffs therefore fail to plead that F45's statements about its criteria for potential franchisees were misleading.

***Disclosed Material Weaknesses***. Plaintiffs also challenge F45's statement that it has "taken and plan[s] to continue to take" certain identified actions "to remediate . . . material weaknesses" in the Company's internal controls. ¶ 185. Plaintiffs claim this statement was misleading because F45 "fail[ed] to adequately remediate" those material weaknesses. ¶¶ 146(h), 186. That kind of bootstrapping is impermissible fraud by hindsight and fails to contradict the

statement that F45 took the described actions. It therefore fails to plead an actionable misstatement.

***Risk Disclosures***. Plaintiffs claim that the F45's risk disclosures were misleading because "the conditions described had already materialized at the time of the issuance of the IPO Registration Statement and Prospectus." ¶ 189. But while Plaintiffs list a series of disclosed risks, the Complaint fails to identify which, if any, of the listed risks materialized or how or when they materialized. ¶¶ 190-93.

***Items 303 & 105***. Nor is there any merit to Plaintiffs' claim that F45's risk disclosures violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), or Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105") because the IPO Documents did not disclose that "F45's busines[s] model was unsustainable." ¶ 188. *See Rosenzweig*, 332 F. 3d at 869 ("[Defendant] was under no duty to cast its business in a pejorative, rather than a positive, light."). Item 303 required F45 to disclose "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.3030(b)(2)(ii). But the Complaint fails to identify any trends or uncertainties that F45 allegedly omitted, much less the more exacting requirement that F45 *knew* of those trends. *See* ¶¶ 187-93; *see also infra* Section IV.B (discussing Plaintiffs' failure to plead Defendants' state of mind with the requisite particularity). Moreover, while Item 105 required F45 to "adequately describe[]" factors that "make an investment in the registrant or offering speculative or risky," 17 C.F.R. § 229.105(a), Plaintiffs fail to offer any specific reasons why the dozens of pages of relevant risk disclosures in the IPO Documents were inadequate. *See* ¶¶ 187-93. As detailed above, F45's disclosures went far beyond "generic or boilerplate discussions" of risks that are inadequate under Item 105. *Emps.' Ret. Sys. of the City*

*of Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 393 (4th Cir. 2023) (internal quotations and citation omitted); *accord Silverstrand Inv. V. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) (internal quotation marks and citation omitted). As relevant here, the IPO Documents expressly identified the relevant material weaknesses, ¶ 126, and identified the risk that F45's remediation efforts may not be sufficient, Ex. 4, at 30, 33 (Prospectus). The other risk disclosures similarly detailed the relevant risks and uncertainties F45 faced related to opening and retaining franchises and sustaining the Company's growth. *See supra* at 23; *see also* ¶¶ 190-92 (listing uncertainties disclosed in the risk disclosures).

* * *

Plaintiffs have failed even *plausibly* to allege a materially false or misleading statement in the IPO, and certainly have not done so with the particularity Rule 9(b) requires. The Court should therefore dismiss Plaintiffs' Section 11 claims for failure to state a claim.

## III. Plaintiffs Fail to State a Claim Under Section 12 of the Securities Act (Count II – Underwriter Defendants).

Like Section 11, Securities Act Section 12 requires that the complaint plead a materially false or misleading statement or omission. *See Krim*, 989 F.2d at 1445. Thus, for the same reasons that the Complaint fails to state a Section 11 claim, it also fails to state a Section 12(a)(2) claim.

The Section 12(a)(2) claim also fails because Plaintiffs lack standing. To have Section 12 standing, a plaintiff must have purchased shares in the offering itself; secondary-market purchases cannot give rise to Section 12 claims. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995) (limiting Section 12 claims to those who purchased in the offering); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 159 (N.D. Tex. 2007) ("[S]ection 12(a)(2) standing is more narrow than section 11 standing in that it is limited to shareholders who acquired securities directly in the initial offering; it is not sufficient to allege that the shares can be 'traced back' to

the offering."); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 893 (S.D. Tex. 2002) (dismissing Section 12 claim for lack of standing "because it is undisputed that plaintiffs did not purchase their shares . . . pursuant to the company's initial public offering"), *aff'd,* 332 F.3d 854 (5th Cir. 2003). Here, only plaintiff Detroit asserts that it purchased shares in the offering. *See* Compl., Ex. 1. But as shown above, Detroit lacks standing to sue because it did not suffer any cognizable harm. *See supra* Section I. Lead Plaintiff Pledge Capital, in contrast, only claims to have purchased shares "traceable" to the IPO or during the Class Period, which is insufficient to plead standing for a Section 12(a)(2) claim. *Congregation of Ezra Sholom*, 504 F. Supp. 2d at 159. Thus, the Section 12(a)(2) claim should be dismissed for the additional reason that no named plaintiff has standing to assert that claim.

## IV. Plaintiffs Fail to State a Claim Under the Exchange Act (Count IV – Corporate Defendants).

Plaintiffs also allege that the same statements discussed above violate the Exchange Act, along with some additional statements made between July 15, 2021, and May 16, 2022. The Exchange Act requires Plaintiffs to plead (1) a false or misleading statement with particularity under the PSLRA and Rule 9(b), (2) fraudulent intent with particularity, and (3) loss causation. Plaintiff has failed to plead any of these elements, warranting dismissal of the Exchange Act claims as well.

### A. Plaintiffs Fail to Allege Falsity.

Plaintiffs fail to plead the required particularized facts that *any* statement made either in the IPO Documents or after the IPO was false or misleading at the time it was made.

#### 1. The IPO Documents Do Not Contain an Actionable Misstatement.

Plaintiffs challenge the exact same statements under Section 10(b) of the Exchange Act as they do under their Securities Act claims. *Compare* ¶¶ 139-193, *with* ¶¶ 312-366. For the reasons

stated above, the challenged statements in the IPO Documents were not materially misleading because they were protected forward-looking statements, inactionable opinion statements or puffery, or were not false when made.[6] *See supra* Section II. Accordingly, Plaintiffs also fail to allege a materially misleading statement in the IPO Documents in support of their Exchange Act claim, and their claims based on those statements should be dismissed.

**2. The Non-IPO Document Statements Are Not Actionable.**

**a. Forward Looking Statements Are Protected by the PSLRA's Safe Harbor.**

Much like the bespeaks caution doctrine, the PSLRA provides a safe harbor for forward-looking statements, such as "projection[s] of revenues," statements "of the plans and objectives of management for future operations," and statements "of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)-(D). Many of the statements Plaintiffs challenge under Section 10(b) constitute forward-looking statements and are therefore protected by the PSLRA's safe harbor. These include some of the same types of forward-looking statements that appeared in the IPO Documents, including growth and revenue projections (¶¶ 378, 381, 384, 391, 400, 402, 404, 406, 408, 427-28, 437(c)-(d), 451-53, 455, 457-60), projections for franchisees (¶¶ 437(b)), plans regarding multi-unit franchises (¶¶ 379, 403, 430), and F45's efforts to remediate material weaknesses in its internal controls for financial reporting (¶¶ 395, 439). These statements qualify as forward-looking. *See* 15 U.S.C. § 78u-5(i)(1). In addition, Plaintiffs challenge several statements where Corporate Defendants maintained or made adjustments to prior objectives and projections. *See, e.g.*, ¶¶ 401, 447, 454. To the extent that these statements "'merely declar[e] or

[6] Like in their Securities Act claims, Plaintiffs purport to bring an omission claim, but other than their patently insufficient attempt to invoke Items 303 and 105, they fail even to identify an affirmative duty to disclose. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

reaffirm[] the objective itself,'" they are "forward-looking." *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *11 (N.D. Tex. Sept. 29, 2022) (quoting *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021)).[7]

Forward-looking statements cannot serve as a basis for Section 10(b) liability unless Plaintiffs can show *both* that Corporate Defendants made the statements with "actual knowledge" that they were false, *and* that the statements were not "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i)-(B)(i). Although Plaintiffs assert in conclusory fashion that Corporate Defendants "knew the statement[s were] false or misleading" and that the statements "were not accompanied by any meaningful cautionary language," ¶¶ 526-27, Plaintiffs fail to make either showing with the requisite particularity.

*First*, as explained below, Plaintiffs fail to allege particularized facts establishing a strong inference of scienter. *See infra* Section IV.B. As a result, Plaintiffs necessarily have failed to plead that Corporate Defendants acted with *actual knowledge* that any forward-looking statement (in the IPO Documents or after) was false. *Id.* Other than their conclusory disclaimer regarding the PSLRA's safe harbor and insufficient scienter allegations, Plaintiffs fail to plead any facts supporting their assertion that Corporate Defendants knew the forward-looking statements they made were false.

*Second*, Corporate Defendants' statements were identified as forward-looking and accompanied by meaningful cautionary language. Plaintiffs challenge forward-looking statements in F45's SEC filings and related earnings calls. The SEC filings all contained general cautionary

---

[7] Statements of "past or present circumstances" accompanying such forward-looking statements are not subject to the safe harbor. *Yoshikawa*, 2022 WL 4677621, at *11. But to the extent these statements contain assertions of past or present circumstances, they were not false or misleading for the reasons stated *infra* at 29-32.

language regarding forward-looking statements and incorporated the relevant risk factors from the IPO Documents or included similar risk factors. *See* Ex. 6, at iv-v, 61 (Aug. 31, 2021 10-Q); Ex. 7, at 1-2, 61 (Sept. 17, 2021 Amended 10-Q); Ex. 8, at ii-iii, 59 (Nov. 15, 2021 10-Q); Ex. 9, at iv-v, 17-54 (Mar. 23, 2022 10-K); Ex. 10, at iii-iv, 62 (May 16, 2022 10-Q). As explained above, that cautionary language was sufficient to render the accompanying forward-looking statements inactionable. *See supra* at 15-16. Similarly, in the relevant earnings calls, Corporate Defendants referenced the cautionary language contained in F45's SEC filings, which is sufficient to bring the oral forward-looking statements within the PSLRA's safe harbor. *McNulty v. Kanode*, 2013 WL 12077503, at *9 (W.D. Tex. Nov. 6, 2013) (citing 15 U.S.C. § 78u-5(c)(2)(B)); *see* Ex. 11, at 2 (Aug. 26, 2021 Earnings Call Transcript); Ex. 12, at 2 (Nov. 12, 2021 Earnings Call Transript); Ex. 13, at 2 (Mar. 14, 2022 Earnings Call Transcript); Ex. 1, at 2 (May 16, 2022 Earnings Call).

Plaintiffs therefore fail to plead either of the two requirements to remove forward-looking statements from the PSLRA's safe harbor. The statements are therefore inactionable.

**b. Opinion Statements Are Inactionable**

As with the IPO Documents, Plaintiffs challenge several statements expressing Corporate Defendants' opinions on various aspects of the Company, including many "believe" statements. *See* ¶¶ 378, 382, 390-91, 395, 402, 404, 407-08, 427, 437(a), (c)-(d), (f), 439, 447, 453, 459-60; *see also* ¶¶ 402, 437(a) ("estimate"). Like the similar statements in the IPO Documents, Corporate Defendants' opinion statements are generally inactionable under *Omnicare*, unless Plaintiffs can show that "the speaker did not sincerely hold that opinion" or if Plaintiffs allege that the speaker omitted material facts about his inquiry into or knowledge about the opinion that conflict with the statement itself. *Del. Cnty. Emps. Ret. Sys.*, 620 F. Supp. 3d at 623 (quoting *In re BP p.l.c.*, 2016 WL 3090779, at *9); *see also supra* at 16-18.

The additional opinion statements Plaintiffs challenge under the Exchange Act fall into the

same categories as those challenged under the Securities Act: opinions about the benefits of F45's business model, ¶ 437(a), (f), the sufficiency of the Company's efforts to improve its financial reporting controls, ¶¶ 395, 439, and projections about the Company's and franchises' growth and revenue, ¶¶ 378, 382, 390, 402, 404, 407-08, 427, 437(c)-(d), 447, 453, 459-60. These opinion statements are inactionable. Plaintiffs make no effort to plead that the Corporate Defendants did not sincerely hold these opinions, and the only allegations they offer to contradict them are Plaintiffs' own conclusory assertions about the viability of F45's business model. *See supra* at 17-18.

**c. Statements Expressing Corporate Optimism Are Inactionable Puffery.**

Plaintiffs again challenge statements of corporate optimism that are immaterial as a matter of law, such as "we remain bullish as ever about the future of this business," ¶ 452; *accord* ¶ 459, "we believe we can be bigger than Starbucks . . . [and] McDonald's," ¶ 382; *accord* ¶¶ 407, 417(b), "we're feeling really good about Q1 and Q2," ¶ 406; *see also* ¶¶ 368, 383-84, 416, 425, 429, 446, that the Company has "never had a healthier pipeline of franchisers," ¶ 368; *see also* ¶¶ 369, 403-04, 430, 449, and that F45's business model is "attractive," "resilien[t]," "str[o]n[g]," and "enables the rapid scalability of our model." ¶ 390; *see also* ¶¶ 377, 408, 427, 437(d)-(e), 450, 460.

None of these statements contains "'specific facts'" that "investors and analysts" would "rely on." *Police & Fire Ret. Sys.*, 777 F. App'x at 730 (quoting *In re BP p.l.c.*, 852 F. Supp. 2d at 789). To the contrary, these sorts of generalized statements about the Company's performance—that it has "strong" performance and "pipeline"—are "obviously immaterial puffery." *Rosenzweig*, 332 F.3d at 869. For the same reasons as stated above, *supra* at 18-19, these statements should be dismissed.

**d. The Remaining Statements Challenged Under the Exchange Act Were Not False When Made.**

Plaintiffs fail to plead particularized facts showing that the remaining challenged statements were false when made or were otherwise misleading.

As with the IPO statements, Plaintiffs challenge several statements reporting F45's results, including franchise sales, franchise pipeline, and the number of multi-unit franchises sold. *See, e.g.*, ¶ 369 ("This year we've sold over 550 franchises already."); ¶ 379 ("As of June 30, 2021, approximately 51% of our franchises sold were owned by multiunit franchisees, up from approximately 40% as of the end of 2019 . . ."); *see also* ¶¶ 384, 400-01, 405, 409, 417, 419, 425-28, 446-47, 450, 454, 456. Once again, Plaintiffs offer no factual allegations showing that these statements were false when made. Instead, Plaintiffs rely on unsupported conclusory assertions that (1) F45 could not continue to grow in "key territories" and (2) multi-unit franchisees would not open all of the franchises they purchased. ¶¶ 375(d), (g), 398(a), (c), 414(a)-(c), 422(a), (c), 444(a), 465(a)-(b), (d); *see supra* at 20-21. Plaintiffs also attempt to challenge F45's reported pipeline metrics because a significant portion of the "committed franchise store development was conditional" on "financing arrangements that ultimately fell through." ¶ 375(g); *see also* ¶¶ 448, 465(c), 466 (challenging statements regarding the financing facility). But these allegations constitute facially improper fraud-by-hindsight pleading. Plaintiffs also challenge the reported metrics because "F45 had changed the definition of what constituted an open studio in early October 2021." ¶¶ 415, 423. But Plaintiffs' own pleadings illustrate that statement was *not* materially misleading; the Complaint does not allege that this was a corrective disclosure or that

any investor otherwise reacted to the news. *See* ¶¶ 53 n.10, 289-93.[8] Plaintiffs have therefore failed to plead with particularity that F45's reported results were false or misleading when made.

Next, Plaintiffs challenge several statements describing average franchise performance metrics, including initial start-up costs, membership, and revenue. ¶¶ 370, 385, 409, 420, 437(a)). Plaintiffs allege that these statements were misleading because a supposedly "significant number" of franchises "were in financial distress and were not profitable." ¶ 375(e). But that assertion does not render F45's reports regarding *average* or *typical* franchise performance misleading. Indeed, the Company's risk disclosures specifically warned that certain franchises may "not perform" or be "unable to open and operate the studios as anticipated." ¶ 438. Plaintiffs fall far short of pleading with particularity that F45's statements about average franchise performance were misleading in context.

Plaintiffs also again challenge statements regarding franchise and equipment fees that franchisees paid to F45. ¶¶ 380, 392, 408, 460. As explained above, Plaintiffs fail to plead particularized facts establishing how and when the Company employed modified payment terms. *Supra* at 22. That failure is critical because F45 disclosed to investors that it was making adjustments in its equipment ordering process, ¶ 418, and explained that it did in fact offer modified payment terms to multi-unit franchisees, ¶ 456. Plaintiffs' general allegations of unidentified modified payment terms therefore fail to establish that Corporate Defendants made any false or misleading statements regarding franchise or equipment fees.

Finally, as with the IPO Documents, Plaintiffs challenge several statements regarding F45's efforts to remediate material weaknesses in its internal controls. ¶¶ 393, 395, 408, 440-41,

---

[8] The only evidence Plaintiffs cite is a J.P. Morgan analyst report issued more than six months after F45 announced its revised metric, ¶ 480, which hardly suggests investors contemporaneously viewed the metric as misleading.

460. Plaintiffs expressly rely on hindsight—that the efforts ultimately were not effective—to allege that these statements were misleading. *See supra* at 23. Accordingly, Plaintiffs fail to establish that these statements were false when made.

* * *

In sum, Plaintiffs fail to plead particularized facts alleging an actionable misstatement under the Exchange Act. Plaintiffs' Exchange Act claims should therefore be dismissed on that basis alone.

### B. Plaintiffs Fail to Plead Scienter as to Any Corporate Defendant.

Plaintiffs' Exchange Act claims should be dismissed for the independent reason that Plaintiffs fail to plead scienter. To meet the PSLRA's demanding standard for pleading scienter, Plaintiffs must allege particularized facts creating a strong inference the Corporate Defendants acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted); *see also Shaw*, 537 F.3d at 533 (citation omitted); 15 U.S.C. § 78u-4(b)(2)(A). To be "strong," the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

That strong inference must be pleaded "*with respect to each individual defendant.*" *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 801 (N.D. Tex. 2006) (emphasis added) (citation omitted). Here, that means Plaintiffs must plead a strong inference that Mr. Gilchrist and Mr. Payne made each statement with fraudulent intent. *See INSpire*, 365 F.3d at 366 (confirming plaintiffs can only plead scienter as to a company by pleading the scienter of an "individual corporate official or officials"). Scienter cannot be pleaded through so-called "group pleading," which has been rejected by the Fifth Circuit. *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) (rejecting group pleading because the Fifth Circuit "focuses

on the state of mind of the corporate officials who make, issue, or approve the statement" (citation omitted)). For that reason, Plaintiffs' generic allegations regarding what "Defendants" did or knew, *see, e.g.*, ¶¶ 311, 319, are categorically insufficient to plead scienter and should be "discarded." *Borderplex Inv. Partners v. Borderplex Realty Tr.*, 2017 WL 1738080, at *13 (W.D. Tex. Apr. 5, 2017).

Plaintiffs come nowhere close to pleading that Mr. Gilchrist or Mr. Payne purposefully misled investors by making the challenged statements. Plaintiffs cannot point to a single fact that Mr. Gilchrist or Mr. Payne was aware of that would have put them on notice that a challenged statement was false. Instead, Plaintiffs offer their own conclusions (i.e., that "key" territories were already taken, *see* ¶¶ 344, 501, or even that "sold" franchises would "never" open, *see* ¶¶ 6, 270, 285), but never allege that Mr. Gilchrist or Mr. Payne *actually knew* such "facts." Rather, Plaintiffs allege that they must have known about the purportedly bad facts by virtue of their positions, but such circumstantial pleading is not allowed outside of very rare circumstances not present here.

**1. Plaintiffs Offer No Cogent Theory of Scienter.**

Plaintiffs fail to allege any facts showing conscious or severely reckless behavior by Mr. Gilchrist or Mr. Payne. Despite the Complaint's thematic criticism of the Defendants' optimism and discussion of a handful of anecdotes blaming the Company for the failure of individual franchises, *see* ¶¶ 245–48, 322–25, the only cogent and compelling theory of scienter is non-fraudulent. In the first half of 2021, with the COVID vaccine available and gyms reopening, the Company regained some optimism and moved forward with its IPO. *See* ¶¶ 276, 283 & n.19. Throughout the alleged Class Period, the Company continued seeing increased interest from more sophisticated franchisees and investors.[9] *See* ¶ 301. F45 worked to obtain financial support to

---

[9] Plaintiffs' entire theory necessarily hinges on third parties acting against their own best interests and paying for franchises that they never intended to open. Plaintiffs offer no factual support for

encourage these sales, *see* ¶ 295, and was receiving commitments at a faster pace. *See* ¶¶ 297, 301. By late 2021, only about half of the sold units were actually open, but F45 disclosed that fact and analysts included those numbers in their reports. *See* ¶¶ 400–01; *see also* ¶¶ 373, 433-34, 463. Perhaps Mr. Gilchrist and Mr. Payne would have been less optimistic with the benefit of hindsight, but that is a far cry from a compelling theory of intentional or even severely reckless deception.

In fact, the publicly available documents on which Plaintiffs rely actually *undercut* an inference of scienter. In late 2021 and early 2022, interest in franchise expansion increased from F45's key customers: experienced, multi-unit franchisees who had already successfully started franchises. Ex. 1, at 5 (May 16, 2022 Earnings Call Transcript) ("The vast majority of these studios sold but not yet open are attributed to our most experienced multiunit franchise partner."). To accommodate that interest and streamline franchise openings, F45 pre-purchased approximately 1,200 World Packs, lined up financing, and worked with a partner to secure real estate in multiple regions. Ex. 2, at 1 (Mar. 14, 2022 8-k Press Release). F45 was optimistic that after COVID-related stalls, momentum was about to pick up and took affirmative steps to plan for it. These were not the actions of a company or individuals that knew the business was all smoke and mirrors and the bottom was about to fall out, as Plaintiffs (wrongly) claim. Rather, the *only* plausible inference is that F45, Mr. Gilchrist, and Mr. Payne believed a big break was coming. And they wanted to be ready.

Without a cogent and compelling theory or particularized factual allegations to back it up, Plaintiffs instead rely on impermissible conclusory assertions that "Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be

---

this assertion and certainly do not offer any factual support for the argument that Mr. Gilchrist and Mr. Payne knew these third parties would act against their own interests.

disseminated to the investing public." ¶ 486; *see also* ¶¶ 485, 494, 518. These types of "general allegations and conclusory statements . . . do not contribute to a strong inference of scienter." *Shaw*, 537 F.3d at 538–39 (internal quotation marks and citation omitted).

Plaintiffs allege that "F45, Gilchrist, and Payne Closely Monitored Franchise Sales, Studio Openings, and the Performance of Opened Studios." Section XIII.C. To support this conclusion, they point only to (1) allegations that Mr. Gilchrist and Mr. Payne would have had access to internal monitoring software and (2) generalized comments by Mr. Gilchrist and Mr. Payne that there was "visibility" into the Company's revenue stream and pipeline for franchise and studio openings. See ¶¶ 502-15. Nowhere do Plaintiffs allege that some problematic information that undermined a challenged statement necessarily would have been discovered as part of this diligence. In any event, generalized statements using "we" and "us" to describe what the Company was tracking generally, *see* ¶¶ 508–13, do ***not*** allege what Mr. Gilchrist or Mr. Payne were aware of individually. *See Asar*, 768 F. App'x at 188 (rejecting "we are monitoring" allegations because they could "merely mean that [the company] monitored the [numbers]"). Plaintiffs similarly claim "[Corporate] Defendants' repeated statements [to investors] support an inference that . . . they were actively monitoring and had access to . . . facts that rendered their statements false and misleading." ¶ 518; *see also* ¶¶ 516-17. The argument that they knew statements were fraudulent because they made them is nonsensical.

Plaintiffs' allegations "lack specificity about what [Mr. Gilchrist or Mr. Payne] may have known or, for that matter, w[ere] reckless not to have known." *Shaw*, 537 F.3d at 535. These flaws warrant dismissal.

### 2. Defendants' Positions Are Insufficient to Plead Scienter.

Lacking direct allegations that Mr. Gilchrist or Mr. Payne knew any statement was false when made, Plaintiffs resort to arguing that they must have had fraudulent intent because of their

positions. *See* ¶¶ 494, 502. Such allegations are categorically insufficient. "A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). The exception to this rule is rare and only applies in "special circumstances" not present here.

Courts consider a series of factors when weighing whether special circumstances exist. Those factors are: (1) the company's size; (2) whether the transaction at issue was critical to the company's continued vitality; (3) whether the misrepresented information would have been readily apparent to the speaker; and (4) whether the defendant's statements were internally inconsistent with one another. *See Diodes*, 810 F.3d at 959. As an initial matter, F45 is larger than the companies for which special circumstances generally apply. *See Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (calling a company with 60 employees "approximately twice as large" as companies where the Fifth Circuit allowed a "special circumstances" exception); Ex. 4 at 128 (Prospectus) (confirming F45 had more than 120 employees at the time of the IPO). Plaintiffs do not attempt to identify internally inconsistent statements, nor do they identify any fact that would have been "readily apparent" to Mr. Gilchrist or Mr. Payne. *See Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982-86 (5th Cir. 2019) (rejecting "special circumstances" allegations that certain information was "readily apparent" where the complaint did not offer factual allegations in support). Instead, Plaintiffs reiterate their unsupported conclusion that F45's business model was unsustainable and offer the circular logic that because the business model was important, the CEO and CFO must have known it was unsustainable. *See* ¶¶ 495–501. Plaintiffs have failed to plead scienter for Mr. Gilchrist or Mr. Payne and cannot compensate for that failing by pointing to their titles. *Abrams*, 292 F.3d at 432.

### 3. The Confidential Witnesses Add Nothing.

The Complaint identifies seven confidential witnesses, but none supports any allegation that either Mr. Gilchrist or Mr. Payne deliberately made any false or misleading statement. For a confidential witness to add to an inference of scienter, Plaintiffs must plead (1) that the confidential witness had information that contradicted a challenged statement and (2) how the individual defendant became aware of what the confidential witness knew. *See, e.g.*, *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 862 (S.D. Tex. 2016); *Yang v. Nobilis Health Corp.*, 2021 WL 3619863, at *2 (5th Cir. Aug. 13, 2021); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 720 (W.D. Tex. 2010).

Here, Plaintiffs never even allege that any confidential witness had contact or otherwise interacted with either Mr. Gilchrist or Mr. Payne. That alone is a basis to discount the confidential witness allegations. *See Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 434 (5th Cir. 2019) ("[T]hese statements are all from confidential witnesses who do not relate any interaction with [the individual defendants], so we must discount them.").

While every confidential witness shares unfounded, critical opinions (extending beyond the witness's personal knowledge base) of how the Company was run, *see* ¶¶ 150, 247, 251, 252, 254, 259, 270(a), 275, 299, 300, 310, not one offers a factual allegation that undermines any challenged statement. For example, CW-2, an individual franchisee, gripes about the lack of support the Company provided him, without making any connection to a challenged statement. *See* ¶¶ 245–46. CWs 1, 6, and 7 similarly complain about a perceived lack of support for individual franchisees. *See* ¶¶ 173, 254–55, 275. Other confidential witnesses, including CWs 4 and 5, share their unsupported personal opinions about management's performance or what management should have known, but provide no concrete allegation indicating what management actually knew. *See* ¶¶ 299, 310. And CWs 3, 4, and 7 claim the Company used Oracle NetSuite and a

Customer Relationship Management software "that F45's leadership had access to." ¶¶ 505-07. But Plaintiffs never claim Mr. Gilchrist or Mr. Payne actually used the software, what data the software would have provided them, or how that data would have contradicted their public comments. *See ArthroCare*, 726 F. Supp. 2d at 733 ("It it [sic] is well established that merely pleading access to a company's private records, without more, does not adequately allege scienter."); *see also Neiman*, 854 F.3d at 748.

Those confidential witness statements actually made with personal knowledge generally involve anecdotes about isolated problems at franchises that do not render statements about the company as a whole misleading or put Mr. Gilchrist or Mr. Payne on notice of anything. *See, e.g.*, ¶¶ 149–150 (CW-2). But ground-floor-level allegations about individual franchises' performance "does not necessarily lead to the conclusion" the Company intentionally concealed that its business model was unsustainable and it was unable to maintain substantial growth. *Shaw*, 537 F.3d at 537. In other words, Plaintiffs "fail to tie these statements to the alleged fraud," which is also fatal to their scienter allegations. *Pier 1*, 935 F.3d at 434 (citation and internal quotation marks omitted).

**4. Plaintiffs Do Not Allege Motive or Opportunity to Defraud.**

Plaintiffs do not allege that either Mr. Gilchrist or Mr. Payne had a motive to defraud investors. If, as Plaintiffs assert, the business model was unsustainable all along, and the bottom was about to fall out, what motive would Mr. Gilchrist and Mr. Payne have had to mislead investors? There is no allegation that they sold stock or obtained some other benefit while the stock price was inflated. "Where, as here, the plaintiff has not alleged a clear motive for the alleged misstatements or omissions, the strength of its circumstantial evidence of scienter must be correspondingly greater." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005); *see also Neiman*, 854 F.3d at 748. General corporate motives to improve the Company's stock price or raise capital are insufficient. *See Shaw*, 537 F.3d at 543 (holding motive requires pleading a

concrete benefit beyond a general corporate benefit); *see also Owens v. Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015) (rejecting allegations of motive shared by virtually all corporate insiders).

* * *

Plaintiffs have failed to allege particularized facts giving rise to the strong inference of scienter required by the PSLRA. Plaintiffs have therefore failed to state a claim under the Exchange Act for that independent reason.

### C. Plaintiffs Do Not Adequately Plead Loss Causation.

The Exchange Act claims should be dismissed for the independent reason that Plaintiffs fail to allege facts showing that Corporate Defendants' alleged misrepresentations "proximately caused the plaintiff's economic loss," also known as "loss causation." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). To plead loss causation, Plaintiffs must identify a so-called "corrective disclosure" that reveals the challenged statements were false and causes the stock price to drop. Merely identifying a stock drop driven by some bad news about the Company is not enough; a corrective disclosure must actually "reveal the falsity of [the defendant's] prior representations." *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 908-09 (W.D. Tex. 2008) (rejecting allegations that negative financial results and disclosure of an SEC investigation were a "corrective disclosure," because they did not "specifically disclose any fraud or wrongdoing").

Plaintiffs fail to plead a corrective disclosure. They identify one alleged decline in the trading price of F45's common stock, following the July 26, 2022 "Strategic Update" and Form 8-K (together, the "July 26 Update"), and argue that this is a "corrective disclosure." ¶ 524. Glaringly absent from the Complaint is any explanation of ***which*** prior statements (most of which were projections, opinions, or puffery) this disclosure allegedly corrected, and ***what*** "truth" about

those statements the disclosure allegedly revealed.[10] The July 26 Update was not a correction of prior statements and did not "reveal" any prior information as false. Rather, it provided "the Company's updated outlook and financial guidance"—updates that it expressly explained were "[d]ue to market conditions." Ex. 3 at 2 (July 26 Update). The revised outlook included disappointing adjustments to the Company's projections for where it anticipated being by the end of 2022. *See id.*; *see also id.* at 34. It provided a road map forward: after facing swift COVID-related headwinds and a rapidly deteriorating market, the Company would implement, among other things, cost-saving measures and a headcount reduction. *See* ¶¶ 76, 194, 467-68. These were "new . . . firm-specific facts," *Dura*, 544 U.S. at 343, ***not*** a corrective disclosure. *See ArthroCare*, 726 F. Supp. 2d at 726 (rejecting as insufficient allegations that "simply allege the misrepresentation 'touches upon' a later economic loss" (citation omitted)).

Plaintiffs do not try to explain how the July 26 Update "revealed" the alleged falsity of prior statements because they cannot; there is simply no "correction." Instead, Plaintiffs summarily claim "[Corporate] Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors," and "[a]s a result . . . F45 common stock tumbled."[11] ¶ 524. This is insufficient. *See Dura*, 544 U.S. at 343 (finding it "insufficient" to simply allege that a misrepresentation "'touches upon' a later economic loss" (citation omitted)). Because Plaintiffs have not identified a corrective disclosure revealing a relevant truth of an allegedly misleading statement, the Complaint should be dismissed.

---

[10] To the extent Plaintiffs pursue a materialization of the risk theory of loss causation, that theory fails in the Fifth Circuit. *See, e.g.*, *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 709 (S.D. Tex. 2013) ("The Fifth Circuit has not adopted the materialization-of-the-risk theory.").

[11] The Court should not accept these conclusory allegations as true. *See, e.g.*, *INSpire Ins*, 365 F.3d at 361 ("Nor do we accept conclusory allegations, unwarranted deductions, or legal conclusions.".

**V. Plaintiffs' Control Person Claims Likewise Fail (Counts III and V – Corporate Defendants, Minority Directors, KLIM and MWIG).**

As explained above, the Complaint fails to plead any actionable violation of Section 11, Section 12, or Section 10(b). In the absence of an underlying violation of the federal securities laws, Plaintiffs' Section 15 (Count III) and Section 20 (Count V) claims must be dismissed. *See McCloskey v. Match Grp., Inc.*, 2018 WL 4053362, at *7 (N.D. Tex. Aug. 24, 2018) (requiring primary violation under Section 15); *INSpire*, 365 F.3d at 383 (requiring primary violation under Section 20).

Plaintiffs have also failed to show that MWIG, KLIM, and the Minority Directors are control persons. To establish "control" under Section 15 and Section 20, plaintiffs must allege "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *See Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 619 n.15 (5th Cir. 1993) (quoting 17 C.F.R. § 230.405(f)) ("The control person sections of both acts are interpreted the same, at least with respect to the definition of 'controlling person.'" (citation omitted)); *see also Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) ("In determining who is a 'control person,' the Fifth Circuit similarly construes the control person provisions in Section 15 . . . and Section 20(a)." (citations omitted)). A plaintiff alleging a control person violation under either statute must "at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 855 F. App'x 902, 905 (5th Cir. 2021). To survive dismissal, a complaint must "allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person." *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004); *see also Dennis v. Gen. Imaging, Inc.*, 1990 WL 3901, at *9 (E.D. La. Jan. 12, 1990), *aff'd*, 918 F.2d 496 (5th Cir. 1990) (dismissing

control person claims against directors because "this status alone will not automatically cause him to be deemed a Section 15 or 20 controlling person"). Where, as here, the claimed primary violation is based on alleged material omissions or misstatements in certain public filings, the plaintiff must show "that [the alleged controller] had the ability to control the content" of the filing. *Citco*, 855 F. App'x at 905. The control person claims should be dismissed because the Complaint fails to allege a primary violation or control.

**A. MWIG and KLIM Did Not Possess "Control" Over F45**

The Complaint's only allegations of control against MWIG and KLIM are that they "controlled F45 by virtue of their share ownership, power to appoint directors, and agreements with the Company." ¶¶ 234, 555. But none of these allegations demonstrates that MWIG or KLIM had the power to control the contents of any challenged statement. The Complaint does not allege that MWIG or KLIM had had any right whatsoever to control the contents of the Registration Statement prior to filing. As the Complaint acknowledges, both MWIG and KLIM were *minority* shareholders at all times. ¶¶ 234-235, 555-556. Neither had the ability to direct the management or policies of the company solely by virtue of their ownership of voting securities. *See Dennis*, 1990 WL 3901, at *9 (granting summary judgment for control person claim against minority shareholder where plaintiff failed to allege that shareholder "had any influence at all over the corporate policies pursued by these firms").

And while MWIG or KLIM each individually had the power to nominate—not appoint—directors, that power alone does not translate into control for the same reasons that a person's status as a director alone does not automatically translate into control. ¶¶ 234-235.

**B. The Minority Directors Did Not Possess Control Over F45**

The Complaint offers a conclusory allegation in support of its control person claims against the directors: "Each of the Director Defendants were control persons by virtue of their positions

as a director of the company." ¶¶ 238, 559. But a defendant's status as a director alone does not suffice to show "actual power or control." *See In re Dynegy*, 339 F. Supp. 2d at 828. Far from alleging that any of the Minority Directors had the ability to control the contents of the Registration Statement or other public filings, the Complaint states only that the Minority Directors "participated in the preparation of the Registration Statement." ¶ 33. Nowhere does the Complaint allege that the Minority Directors—two MWIG-affiliated directors and one KLIM-affiliated director—had the power to dictate the contents of the Registration Statement or other public filings. They did not. Indeed, one of the basic functions of a multi-member board of directors is to leave no single director with such unilateral power. *See In re Glob. Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *13 (S.D.N.Y. Aug. 8, 2005) ("Allegations that a person was one of multiple directors of the primary violator does not raise an inference of control over that entity.") (citations omitted). None of the Minority Directors had such an ability to control the Company, and the Complaint does not allege otherwise.

* * *

In short, the Complaint is bereft of any allegations whatsoever that would support a control person claim against the Minority Directors, MWIG, or KLIM.[12] Plaintiffs instead rely only on insinuations that the status of a director or substantial shareholder alone is enough to show control. The law in the Fifth Circuit is clear that such statuses, standing alone, do not support a control person claim. The Complaint's control person claims against the Minority Directors and Entity Defendants should be dismissed.

---

[12] Additionally, Plaintiffs' claim for controlling person liability with respect to their Section 12(a)(2) claim against the Underwriter Defendants further fails because Plaintiffs do not allege that any of the individual defendants controlled the Underwriter Defendants. *See* ¶¶ 229-42 (alleging control of F45 but not of the Underwriter Defendants).

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Amended Class Action Complaint in its entirety.

Dated: August 7, 2023

/s/ Shahzeb Lari
**HUGHES HUBBARD & REED LLP**
Kevin T. Abikoff
Katherine Taylor (*pro hac vice*)
1775 I Street, N.W., Ste 6th Floor
Washington, DC 20006
Tel: (202) 741-4945
katherine.taylor@hugheshubbard.com
kevin.abikoff@hugheshubbard.com

Shahzeb Lari (*pro hac vice*)
Terence Healy (*pro hac vice*)
One Battery Park Plaza
New York, NY 10004
Tel: (212) 837-6267
shahzeb.lari@hugheshubbard.com
terence.healy@hugheshubbard.com

*Counsel for Defendant Adam Gilchrist*

/s/ Michelle A. Reed
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Michelle A. Reed
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Tel: (214) 969-2713
mreed@akingump.com

Stephen M. Baldini
One Bryant Park, 44th Floor
New York, NY 10036
Tel: (212) 872-1062
sbaldini@akingump.com

*Counsel for Defendants Darren Richman, Mark Wahlberg, Michael Raymond, MWIG LLC, and Kennedy Lewis Investment Management LLC*

Respectfully submitted,

/s/ Gregg J. Costa
**GIBSON, DUNN & CRUTCHER LLP**
Gregg J. Costa
811 Main Street Suite 3000
Houston, TX 77002
Tel: (346) 718-6600
Fax (346) 718-6620
gcosta@gibsondunn.com

Craig Varnen (*pro hac vice*)
333 South Grand Avenue, 46th Floor
Los Angeles, CA 90071
Tel: (213) 229-7922
Fax: (213) 229-6922
cvarnen@gibsondunn.com

Lissa Percopo (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 887-3770
Fax: (202) 530-9528
lpercopo@gibsondunn.com

*Counsel for Defendants F45 Training Holdings, Inc., and Chris Payne*

/s/ Danny S. Ashby
**O'MELVENY & MYERS LLP**
Danny S. Ashby
2501 North Harwood Street, Suite 1700
Dallas, TX 75201
Tel: (972) 360-1900
dashby@omm.com

Jonathan Rosenberg (*pro hac vice*)
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
jrosenberg@omm.com

*Counsel for the Underwriter Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2023, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

*/s/ Gregg J. Costa*
Gregg J. Costa

*Attorney for Defendants F45 Training Holdings, Inc., and Chris Payne*