**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| IN RE F45 TRAINING HOLDINGS, INC. SECURITIES LITIGATION | Case No. 1:22-CV-01291-DAE <br><br> <u>CLASS ACTION</u> |

**PLAINTIFFS' BRIEF IN OPPOSITION**
**TO DEFENDANTS' OMNIBUS MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     FACTS .................................................................................................................. 4

        A.      F45 Background ......................................................................................... 4

        B.      F45 Goes Public on July 15, 2021 Projecting a Substantial Growth Rate.............. 4

                1.      The Other Players in F45's IPO ................................................... 6

                        a.      Director Defendants ........................................................... 6

                        b.      Controlling Entity Defendants ......................................... 6

                        c.      The Underwriter Defendants............................................. 7

        C.      Defendants Attempt to Show Substantial Growth at F45 Through Any Means Possible ......................................................................................................... 7

                1.      F45 Prioritized Multi-Unit Franchise Agreements ..................................... 7

                2.      Unbeknownst to Investors, F45 Did Little or No Due Diligence on Franchisees........................................................................................... 8

                3.      Defendants Redefine Key Metric Regarding New Studio Openings After the IPO........................................................................................ 8

                4.      F45 Hosts Franchisee Event in February 2022 and Receives "Commitments" for the Opening of Hundreds of Additional Multi-Unit Franchises Conditioned on Full Financing ................................................ 8

                5.      F45 Issues Unreasonably Aggressive Guidance on March 14, 2022.......... 9

                6.      F45 Announces 1Q 2022 Results and Reaffirms Guidance on May 16, 2022................................................................................................ 9

                7.      At the Time of the IPO and Throughout the Class Period, F45 Failed to Maintain an Effective Internal Controls Environment............................. 10

        D.      The Truth About the Company Is Revealed on July 26, 2022............................. 11

        E.      Post-Class Period, F45's Financial Condition Continues to Atrophy .................. 11

III.    ARGUMENT...................................................................................................... 12

A.    THE COMPLAINT ADEQUATELY ALLEGES SECTION 10(b) CLAIMS UNDER THE EXCHANGE ACT ............................................................ 12

    1.    The Complaint Adequately Alleges False and Misleading Statements and Omissions ................................................................................ 12

        a.    Plaintiffs Identify Many Categories of False and Misleading Statements ................................................................ 13

        b.    The Statements Defendants Challenge as Forward-Looking Are Historical Statements or Mixed Statements and Are Not Accompanied by Meaningful Cautionary Language ................... 15

            (1)    Neither the PSLRA's Safe Harbor nor the Bespeaks Caution Doctrine Immunize Defendants': (i) Statements of Present or Historical Fact; or (ii) Mixed Statements. ... 16

            (2)    The Challenged Statements Lacked Meaningful Cautionary Language ........................................................ 19

        c.    No Statement Is an Inactionable Opinion .................................... 22

        d.    The Complaint Does Not Allege as False and Misleading Generic Statements of Corporate Optimism ................................ 26

        e.    The Corporate Defendants Repeatedly Assured the Market F45 Had Emerged From the Pandemic Stronger and That It Was Growing at "Breakneck Speed" ................................................... 27

        f.    The CW Accounts Support the Falsity of Defendants' Statements ................................................................................. 28

    2.    The Complaint Adequately Alleges Scienter ........................................... 30

        a.    Defendants Gilchrist and Payne Had Access to Crucial Information, Controlled F45's Messaging and Misstatements, and Signed the Company's SEC Filings .................................... 30

        b.    F45's Ability to Maintain Substantial Growth by Selling New Franchises Was the Company's "Lifeblood" ............................... 32

        c.    Defendants Gilchrist and Payne Closely Monitored Franchise Sales, Studio Openings, and Performance of Opened Studios ..... 33

        d.    Defendants Gilchrist and Payne Spoke Repeatedly About F45's Business Model and Ability to Maintain Substantial Growth ...... 36

        e.    The CW Allegations Contribute to An Inference of Scienter ....... 37

f.      The Individual Defendants' Departures Support Scienter ............ 39

g.      Defendants Have Not Proffered a More Compelling Inference of Scienter, and Their Additional Arguments Fail........................ 39

3.      The Complaint Sufficiently Alleges Violations of Items 303 and 105 of Regulation S-K................................................................................. 41

4.      Loss Causation Is Adequately Pled............................................................ 42

B.      THE COMPLAINT ADEQUATELY ALLEGES STRICT LIABILITY CLAIMS UNDER THE SECURITIES ACT ........................................................ 44

1.      Plaintiffs Adequately Allege Standing for the Securities Act Claims ...... 44

a.      Plaintiffs Have Standing Under Section 11 ................................... 44

b.      Plaintiffs Have Standing Under Section 12(a)(2) ......................... 46

2.      Plaintiffs Adequately Allege Section 11 and Section 12(a)(2) Claims..... 47

a.      Plaintiffs' Securities Act Claims Are Subject to Rule 8 Notice Pleading........................................................................................ 48

b.      The Complaint Adequately Alleges Materially False and Misleading Statements and Omissions ......................................... 49

C.      THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY UNDER BOTH SECTION 11 OF THE SECURITES ACT AND SECTION 20(a) OF THE EXCHANGE ACT ....................................................... 49

IV.      CONCLUSION.......................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987)........................................................................................46

*Alaska Elec. Pension Fund v. Asar*,
  768 F. App'x 175 (5th Cir. 2019) ...............................................................................32

*Allison v. Oak Street Health, Inc.*,
  No. 22 C 149, 2023 WL 1928119 (N.D. Ill. Feb. 10, 2023).......................................41

*In re Apache Corp.*,
  No. 4:21-cv-00575, 2022 WL 4277350 (S.D. Tex. Sept. 15, 2022)...........................21

*In re Apple Inc. Sec. Litig.*,
  No. 19-cv-02033-YGR, 2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ......................39

*Asher v. Baxter Int'l Inc.*,
  377 F.3d 727 (7th Cir. 2004) ......................................................................................22

*Aubrey v. Barlin*,
  No. A-10-CA-076-SS, 2010 WL 3909332 (W.D. Tex. Sept. 29, 2010)......................44

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir. 2005) ......................................................................................12

*Bond v. Clover Health Invs., Corp.*,
  587 F. Supp. 3d 641 (M.D. Tenn. 2022)......................................................................41

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) .........................................................................36

*In re BP p.l.c. Sec. Litig.*,
  852 F. Supp. 2d 767 (S.D. Tex. 2012) .........................................................................27

*In re Broderbund/Learning Co. Sec. Litig.*,
  294 F.3d 1201 (9th Cir. 2002) ....................................................................................47

*Brody v. Zix Corp.*,
  No. 3:04-cv-1931-K, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)...............12, 28

*Budde v. Glob. Power Equip. Grp., Inc.*,
  No. 3:15-cv-1679-M, 2018 WL 4623108 (N.D. Tex. Sept. 26, 2018) .......................38

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
   No. 4:19-cv-957, 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021)..............................................29

*Campton v. Ignite Rest. Grp., Inc.*,
   No. 4:12-2196, 2013 WL 12140291 (S.D. Tex. Sept. 3, 2013)...............................................46

*Carlton v. Cannon*,
   184 F. Supp. 3d 428 (S.D. Tex. 2016*), amended on denial of reconsideration*,
   No. H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016) ...........................................18, 19

*In re Cassava Scis., Inc. Sec. Litig*,
   No. 1:21-cv-751-DAE, 2023 WL 3442087
   (W.D. Tex. May 11, 2023) (Ezra, J) ................................................................................ 42-43

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
   403 F. Supp. 3d 712 (D. Minn. 2019)....................................................................................42

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................................................36

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   No. H-14-3428, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016)....................................29, 43, 49

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
   22 F.4th 1 (1st Cir. 2021)........................................................................................................23

*Correa v. Liberty Oilfield Servs., Inc.*,
   548 F. Supp. 3d 1069 (D. Colo. 2021)....................................................................................41

*In re Deutsche Bank AG Sec. Litig.*,
   No. 09 CV 1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25, 2016)...........................46, 47

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................................................................42

*In re Dynegy, Inc. Sec. Litig.*,
   339 F. Supp. 2d 804 (S.D. Tex. 2004) ..............................................................................45, 46

*Edwards v. McDermott Int'l, Inc.*,
   No. 4:18-cv-4330, 2021 WL 1421609 (S.D. Tex. Apr. 13, 2021).........................................29

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
   MDL-1530, 2004 WL 5278716 (E.D. Tex. June 16, 2004)........................................... *passim*

*In re Franklin Bank Corp. Sec. Litig.*,
   782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A
   DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012)..................................................48

*Fresno Cnty. Emps.' Ret. Ass'n  v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................20

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
   514 F. Supp. 3d 942 (S.D. Tex. 2021) ................................................12, 20, 21

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 665 (2d Cir. 2009)......................48

*Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*,
   825 F. Supp. 2d 1082 (D.N.M. 2011) ................................................................44

*Hall v. Rent-A-Ctr., Inc.*,
   No. 4:16-cv-978, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017)....................21, 39

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) ....................................................................... 21-22

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)..........................................................................................44

*Holzwasser v. Staktek Holdings, Inc.*,
   No. A-05-CA-239-LY, 2006 WL 897746 (W.D. Tex. Mar. 30, 2006) .............33, 35

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
   236 F. Supp. 3d 824 (S.D.N.Y. 2017)................................................................47

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)................................................................46

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..............................................................................37

*In re Intuitive Surg. Sec. Litig.*,
   No. 5:13-cv-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017)...............25

*KB Partners I, L.P. v. Barbier*,
   907 F. Supp. 2d 826 (W.D. Tex. 2012)......................................................... 37-38

*Kurtzman v. Compaq Comput. Corp.*,
   No. Civ.A.H-99-799, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)..................27

*In re Landry's Seafood Rest., Inc.*,
   No. Civ.A. H-99-1948, 2001 WL 34115784 (S.D. Tex. Feb. 20, 2001) ...............34

*Lone Star Ladies Inv. Club v. Schlotzky's Inc.*,
   238 F.3d 363 (5th Cir. 2001) .............................................................................48

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................................... *passim*

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ....................................................................................... 39-40

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
333 F. Supp. 3d 1315 (N.D. Ga. 2018) ...........................................................................31

*N. Port Firefighters' Pension-Loc. Option Plan v. Temple-Inland, Inc.*,
936 F. Supp. 2d 722 (N.D. Tex. 2013) .............................................................................39

*In re NetSolve, Inc. Sec. Litig.*,
185 F. Supp. 2d 684 (W.D. Tex. 2001) ..................................................................... 32-33

*Nykredit Portefølje Admin. A/S v. Propetro Holding Corp.*,
No. MO:19-CV-217-CD, 2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) ................. 20, 43-44

*In re OCA, Inc. Sec. & Derivative Litig.*,
No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ......................................................32

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ................................................................................42

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ............................................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ................................................................................22, 23, 25

*One Longhorn Land I, L.P. v. FF Arabian, LLC*,
No. 4:15-cv-2023-RC-CMC, 2015 WL 7432360 (E.D. Tex. Nov. 23, 2015) ........................49

*Pierce v. Morris*,
No. 4:03-cv-026-Y, 2006 WL 2370343 (N.D. Tex. Aug. 16, 2006) ....................................46

*Police & Fire Ret. Sys.of City of Detroit v. Plains All Am. Pipeline, L.P.*,
777 F. App'x 726 (5th Cir. 2019) ...................................................................................27

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ...................................................................................42, 43, 44

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) ...............................................................16, 31, 37, 41

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ...................................................................................27

*Rougier v. Applied Optoelectronics, Inc.*,
No. 4:17-cv-2399, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) .............................. 18-19, 28

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009)...............................................................34

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010).................................................................................22

*In re SolarWinds Corp. Sec. Litig.*,
595 F. Supp. 3d 573 (W.D. Tex. 2022)..................................................27, 43, 49, 50

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ...............................................................................26

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ...................................................................... *passim*

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)...............................................................18, 27

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)............................................................................... 30, 40-41

*In re TETRA Techs., Inc. Sec. Litig.*,
No. 4:08-cv-0965, 2009 WL 6325540 (S.D. Tex. July 9, 2009) .............................42

*In re TETRA Techs., Inc. Sec. Litig.*,
No. 4:08-cv-0965, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009).........................50

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) ......................................................... 18-19, 49

*In re WRT Energy Sec. Litig.*,
No. 96 Civ. 3610(JFK), 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005)..................45

**Statutes & Rules**

Exchange Act of 1934 Section 10(b), 15 U.S.C. § 78j(b) ..................................... *passim*

Exchange Act of 1934 Section 20(a), 15 U.S.C. § 78t ...................................................49

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5(c)(1)(A)(i).......................19

Securities Act of 1933 Section 11, 15 U.S.C. § 77k............................................. *passim*

Securities Act of 1933 Section 12, 15 U.S.C. § 77l............................................. *passim*

Securities Act of 1933 Section 15, 15 U.S.C. § 77o.................................................49

Fed. R. Civ. P. 8 .................................................................................................... *passim*

Fed. R. Civ. P. 9(b) .............................................................................................48, 49

Fed. R. Civ. P. 12(b)(6)...................................................................................12, 45, 46

Fed. R. Civ. P. 15(a) ................................................................................................50

Lead Plaintiff Pledge Capital LLC ("Pledge Capital") and additional Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit P&F," together with Lead Plaintiff, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Omnibus Motion to Dismiss ("DB" or "Motion") (ECF No. 81) the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 59).[1]

## I.    INTRODUCTION

F45 is a fitness franchisor that licenses the F45 Training brand in over 70 countries. The Company offers a 45-minute high-intensity workout distributed primarily through its technology-enabled platform. Fueled by an intense rise in popularity—due in part to endorsements and partnerships with the likes of Greg Norman, Cindy Crawford, and David Beckham—F45 initially sought to go public in 2020, though the COVID-19 pandemic delayed F45's initial public offering ("IPO") until July 2021. In connection with the July 2021 IPO, and throughout the Class Period (July 15, 2021 through July 26, 2022, inclusive), Defendants assured investors that F45's business model and the Company's substantial growth were the result of a strong pipeline of current and future franchisees and that its growth would continue unabated following its IPO.[2]

The Complaint alleges that Defendants made false and misleading statements and omitted to disclose material facts concerning the sustainability of F45's business model, F45's ability to sustain its rapid growth, and the state of F45's internal controls. Despite the myriad problems

---

[1] Capitalized terms not defined herein are used as defined in the Complaint. Unless otherwise noted, all emphasis in quotations is added and all citations and internal quotations are omitted. All standalone "¶" or "¶¶" references are to the Complaint.

[2] The claims are alleged against: (i) F45, former CEO Adam Gilchrist, former CFO Christopher Payne (together "the Corporate Defendants"), (ii) the Controlling Entity Defendants (defined below), (iii) the Underwriters Defendants (defined below) who took F45 public in July 2021, and (iv) the Director Defendants (defined below), including well-known actor and F45's Chief Brand Officer, Mark Wahlberg, who signed the IPO Registration Statement and the Company's Annual Report for 2021.

percolating at F45, Defendant Gilchrist insisted that F45 would become "***bigger than Starbucks . . . bigger than McDonald's***" and Defendants manipulated F45's Total Franchises Sold metric in order to artificially inflate the number of franchises the market thought the Company had sold.

But Defendants failed to disclose to investors that F45's business model and the Company's purported substantial growth were possible only with help from undisclosed and unsustainable business practices that Defendants used to maximize certain key metrics followed closely by market analysts. In order to create the appearance of rapid growth at F45, before and after the IPO, Defendants: (a) manipulated certain key profitability metrics in order to convince franchisees to purchase a franchise license so that F45 could record the deal in its closely watched metric, "Total Franchises Sold;" (b) failed to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth; (c) conducted little or no due diligence on potential franchisees, including multi-unit franchisees, to ascertain if they could afford to open and operate one or more F45 franchises, again to juice the number of reported "Total Franchises Sold;" (d) failed to disclose to the market that most of the committed franchise store development was conditional on near-100% external financing, which included F45's guarantee to support novel financing arrangements that ultimately fell through; and (e) failed to properly disclose and account for modified payment terms provided to certain preferential franchisees, resulting in ballooning account receivables for F45 and delayed cash inflows for the Company. In addition, at the time of the IPO, the Company claimed to have a plan to address rampant problems with its internal controls over financial reporting ("ICFR"), though the material weaknesses in ICFR were never adequately addressed and corrected. These and other undisclosed issues are described in great detail in the Complaint by Confidential Witnesses ("CWs")—former F45 employees and franchise owners.

The harsh reality that Defendants concealed came to light in a stunning announcement (the so-called "Strategic Update") on July 26, 2022, when the Company announced a 70% cut in the number of new franchises the Company would sell in 2022, a drastic 60% cut in the number of new studio openings in 2022, a 45% reduction in the Company's workforce, the departure of Defendant CEO Adam Gilchrist days earlier, and the appointment of a board member as Interim CEO of the Company. In addition, the Company revealed that the $250 million of previously announced franchise financing would not be available to franchisees after all. On this news, F45's common stock plunged more than 60% to close at $1.35 per share on July 27, 2022. This represented more than a 91.5% decline from F45's IPO price of $16.00 per share on July 16, 2021.

Trying to minimize the extent of their false and misleading statements to the market, Defendants characterize their statements as overly optimistic projections, opinions, and corporate optimism that were, unfortunately for investors, negatively impacted by the COVID-19 pandemic—which started 15 months before Defendants even began issuing their false and misleading statements, and long before F45 went public. But these arguments are belied by the facts pled in the Complaint. Defendants also argue that the Class Period-ending "Strategic Update" did not correct any false statements but simply "disclosed risks that came to fruition," and, in a conclusory manner, Defendants assert that the Complaint amounts to fraud-by-hindsight. Again, these assertions ring hollow. Finally, as to scienter for Plaintiffs' claims under the Exchange Act, Defendants boldly claim that they "thought their product and business model were poised to continue their pre-pandemic trajectory," but they encountered "more obstacles than they anticipated." DB at 4. The Court should reject Defendants' disingenuous counter-narrative and deny the motion to dismiss, which given the well-pled allegations in the Complaint, should not be a heavy lift.

II.    FACTS

A.    F45 Background

F45 and its subsidiaries franchise and license the F45 Training brand, which includes a 45-minute high-intensity workout distributed primarily through the Company's technology-enabled platform, in over 70 countries. F45 claimed that its franchise model was extremely scalable due to its innovative concept, which could purportedly be replicated quickly and easily, as all F45 studios are required to have the same equipment and general layout. The first F45 franchise was sold in 2013, in Sydney, and the Company began its franchise roll-out in 2014. Franchises were then sold in New Zealand, the U.S., and the U.K. Under the aggressive leadership of Defendant Gilchrist, F45 sought to be the "*world's biggest franchise system*" (¶407), and "*bigger than Starbucks . . . bigger than McDonald's*." ¶382. F45's revenue and profits are primarily derived from fees charged to its franchisees, including upfront establishment fees and monthly recurring franchise fees—the Company's most important source of revenue. Thus, prior to the IPO and throughout the Class Period, F45's business model was centered around rapid growth through the franchising of single and multi-unit fitness studios with low overhead. In turn, this growth would purportedly enable F45 to scale its operations, decrease its costs, and increase its recurring fees from franchisees.[3]

B.    F45 Goes Public on July 15, 2021 Projecting a Substantial Growth Rate

F45 confidentially filed for an IPO in January 2020. ¶61. As a result of the COVID-19 pandemic, F45 put its plans to go public on hold. More than a year and a half later, on June 21, 2021, when the Company determined the fitness market had recovered, F45 filed a registration statement on Form S-1 for its IPO which, after two amendments, was declared effective on July

---

[3] Notably, the Company has not recorded a profit since 2018 due to large expenses for the marketing and support of its franchisee base and limited sources of recurring revenue. ¶51.

14, 2021 (the "Registration Statement"). ¶65. In the Registration Statement, Defendants announced that the Company had entered into a long-term multi-unit studio agreement (defined below) with Club Sports Group LLC ("CSG"), an affiliate of Controlling Entity Defendant KLIM (defined below), to open 300 F45 studios over the course of three years.[4] F45 also announced two multi-unit deals with the Company's private equity sponsors each for more than 70 studios. ¶6.[5]

In its IPO Materials, F45 represented that if it could maintain its substantial rate of growth and scale its operations, the Company would report consistent profits. Indeed, F45's Registration Statement reported that the Company's "Total Franchises Sold" had grown from 84 franchises in 2014 to 2,801 franchises in 2021, as of June 30, 2021 (representing a *3,234% increase* in growth over the seven-year period), and from 2,244 franchises in 2020 to 2,801 franchises in 2021 (representing nearly a 25% increase in growth for the year at that point in time), and that growth would continue after the IPO. ¶71.

On July 15, 2021, F45 conducted the IPO pursuant to an IPO Registration Statement and Prospectus (¶67).[6] By means of the IPO Materials, F45 offered and sold 19,057,889 shares of common stock and Defendant MWIG (defined below) offered and sold 2,794,055 shares of F45 common stock at a public offering price of $16.00 per share for aggregate gross proceeds to F45 and MWIG of approximately $304.9 million and $44.7 million, respectively. ¶138.

---

[4] CSG was originally known as Club Franchise Group LLC until it changed its name on September 14, 2021. ¶66.

[5] F45 also represented to the market after the IPO that the Company had come out stronger after the COVID-19 pandemic. ¶¶377, 383, 390(b).

[6] F45's IPO Registration Statement and IPO Prospectuses are referred to in the Complaint and herein as the "IPO Materials." ¶133.

### 1.    The Other Players in F45's IPO

#### a.    Director Defendants

The Director Defendants (Mark Wahlberg, Michael Raymond, and Darren Richman) participated in F45's IPO and reviewed, approved, and signed the IPO Registration Statement and are liable for the false statements contained therein. ¶¶30-33, 68, 137. The Director Defendants also are liable as "control persons" of F45.[7]

#### b.    Controlling Entity Defendants

The Controlling Entity Defendants (Defendant MWIG LLC ("MWIG")[8] and Defendant Kennedy Lewis Management LLC ("KLIM"), along with its affiliated entities (the "KLIM Entities")[9]), private equity funds that invested in F45 before the IPO, controlled F45 through their share ownership, board directors, and agreements with the Company. Collectively, the Controlling Entity Defendants owned 52.7% of F45's outstanding shares prior to the IPO and 40% of the Company's outstanding shares after the IPO. ¶236. In addition, both MWIG and the KLIM Entities were controlled or beneficially owned by at least one of the Director Defendants and are liable as "control persons" of F45.[10]

---

[7] In addition to being a Director Defendant, Mark Wahlberg, a well-known actor who has a promotional agreement with F45, has served as F45's Chief Brand Officer since March 2023, and signed F45's 2021 10-K. ¶¶32, 47, 84.

[8] Defendant MWIG held 38.3% of F45's outstanding shares as of the IPO and 28.6% of the Company's outstanding shares after the IPO. ¶¶234, 239, 555.

[9] Defendant KLIM Entities held 14.4% of F45's outstanding shares as of the IPO and 11.4% of the Company's outstanding shares after the IPO. ¶¶235, 239, 556.

[10] MWIG was controlled by Director Defendants Wahlberg and Raymond (¶¶30, 32, 34, 239, 240, 560, 561), and the KLIM Entities were controlled by Director Defendant Richman. ¶¶31, 35, 239, 240, 560, 561.

c.      **The Underwriter Defendants[11]**

The Underwriter Defendants helped to draft and disseminate the IPO Materials and solicit investors to purchase F45 common stock in the IPO. The Underwriter Defendants sold millions of F45 shares and received millions in fees and commissions. ¶¶36-44.

C.      **Defendants Attempt to Show Substantial Growth at F45 Through Any Means Possible**

As part of its growth strategy, throughout the Class Period, F45 sought to significantly expand its franchise studio footprint in the United States.

1.      **F45 Prioritized Multi-Unit Franchise Agreements**

During the Class Period, a key aspect of F45's business and growth model was to focus on selling multi-unit franchises to new and existing franchisees. ¶267. The prioritization of multi-unit franchisees provided F45 with the opportunity to sell the right to develop multiple franchises over a set time frame in return for an upfront payment. ¶269. The multi-unit development agreements accounted for approximately 50% of the Company's total backlog as multi-unit franchisees had up to five years to open a studio. ¶267. Importantly, the multi-unit franchisee agreements allowed F45 to report a greater number of "New Franchises Sold"—a key growth metric used by analysts and the market to value the Company—regardless of whether these multi-unit franchisees ever opened any or all of the studios they contracted for. ¶268.

In addition, F45's prioritization of multi-unit franchisees involved preferential treatment for this group of potential franchisees, including the waiver of certain fees and undisclosed modified payment terms. ¶269. In fact, the multi-unit franchisees were able to contract for multiple franchises and reserve the right to operate studios in specific geographic locations without ever

---

[11] The "Underwriter Defendants" include: (i) Goldman Sachs & Co.; (ii) J.P. Morgan Secs.; (iii) Robert W. Baird & Co.; (iv) Cowen and Co., LLC; (v) Guggenheim Secs., LLC; (vi) Macquarie Capital (USA) Inc.; (vii) MUFG Secs.; and (viii) Roth Capital Partners, LLC. ¶¶36-44.

opening any of these studios. ¶270. The waiver of franchise fees and modified payment terms also helped induce franchisees into signing contracts for multiple franchises, but limited F45 revenue and constrained the cash inflows that could be used to support future growth. ¶271. As franchise fees were a substantial portion of F45's revenue, the waiver of franchise fees for preferred franchisees deprived F45 of revenue that should have been obtained in exchange for the rights to operate a studio in an exclusive location. Modified payment terms, such as the deferment of significant fees, also caused F45's accounts receivable to balloon and limited cash on hand. *Id.*

2.    **Unbeknownst to Investors, F45 Did Little or No Due Diligence on Franchisees**

As a part of F45's business model and aggressive growth strategy, F45 sought to sell as many franchises as possible with little to no due diligence for the potential franchisee's creditworthiness and/or ability to purchase, open, and successfully manage F45 studios. ¶264.

3.    **Defendants Redefine Key Metric Regarding New Studio Openings After the IPO**

On October 1, 2021, F45 changed the definition of "Initial Studio Openings" from "the first month in which the studio first generates monthly revenue of at least $4,500" to "the month in which we record the initial studio opening in our internal systems," regardless of whether the studio is generating any revenue. ¶¶289-92. This change was not disclosed to investors until March 14, 2022, and was an attempt to artificially inflate a key growth metric used by analysts and the market to value the Company. ¶¶290-93.

4.    **F45 Hosts Franchisee Event in February 2022 and Receives "Commitments" for the Opening of Hundreds of Additional Multi-Unit Franchises Conditioned on Full Financing**

Defendants recognized that they could sign more franchisees if they were offered financing solutions—something that F45 could not afford on its own. Thus, Defendants collaborated with an investment group called Fortress Credit Corporation ("Fortress") which agreed, under certain

circumstances, to provide new and existing F45 franchisees with loan financing. ¶295. In order to promote the Fortress financing agreement, F45 held an "All-Star Event" for its top 100 franchise operators in February 2022 in Las Vegas, Nevada and offered them incentives to "purchase" multi-unit franchises. Those incentives included the offer of financing from Fortress even though F45 didn't officially enter into a credit agreement with Fortress until three months later, on May 13, 2022. At the All-Star event in February 2022, any franchise operator who agreed to open 20 studios only had to put $10,000 down. Thus, F45 was able to get "commitments" for approximately 600 additional studios. Defendants' all-out effort to "sell" additional studios with the promise of almost complete financing was successful. ¶297. On May 16, 2022, F45 reported 706 New Franchise Sales, representing a 23,433% year-over-year increase, and 117 Initial Studio Openings, representing a 134% year-over-year increase. ¶303.

### 5.    F45 Issues Unreasonably Aggressive Guidance on March 14, 2022

On March 14, 2022, F45 announced its 4Q and full-year fiscal 2021 financial results and touted F45's business model and the Company's ability to maintain substantial growth. F45 reemphasized the Company's intent on targeting multi-unit franchisees and announced guidance that included 1,000 New Franchises Sold and 1,000 Initial Studio Openings in 2022. ¶¶294, 424-30. Analysts credited the representations that F45 remained poised for swift growth. ¶¶431-35.

### 6.    F45 Announces 1Q 2022 Results and Reaffirms Guidance on May 16, 2022

On May 16, 2022, F45 announced its first quarter 2022 ("1Q22") financial results and cited "unprecedented demand" from franchise partners. ¶445-46. Defendants touted the Company's ability to "sell" over 700 franchises that year, stating, "And *you can just look at the numbers and they're mind-blowing to sell over 700 full fee-paying franchises this year.* And secondly, *with our visibility on openings, which we haven't changed our guidance for 1,000*[.]" ¶454.

9

Defendants also reaffirmed studio openings guidance ("1,000 openings this year" (¶459)) and represented that F45 would execute on its growth plans, stating, "In closing, *we remain bullish as ever about the future of this business. I have no doubt that we have the right team and strategic initiatives in place to execute on our growth plans*." ¶452.

### 7. At the Time of the IPO and Throughout the Class Period, F45 Failed to Maintain an Effective Internal Controls Environment

In its IPO Materials, throughout the Class Period, and through at least May 2023, F45 reported a material weakness in ICFR. ¶93. The material weaknesses identified in the IPO Registration Statement and Prospectus specifically related to: (i) a failure to properly design financial closing and reporting process to record, review and monitor compliance with generally accepted accounting principles for transactions on a timely basis; (ii) a lack of segregation of duties existing in certain key financial reporting processes; and (iii) a lack of formal documentation of policies and internal controls, including entity-level controls involving risk assessment procedures and conclusions. ¶¶94-99, 126.

Despite disclosing this material weakness in the IPO Materials, the Company represented that it had taken (and would continue to take) comprehensive steps to ameliorate the material weakness in every respect. ¶¶98, 439. Despite the purported efforts to address the material weaknesses in ICFR over the course of more than 20 months, from before the IPO in July 2021 to May 16, 2023, the material weaknesses remained uncorrected. ¶99. Indeed, nearly one year later, on March 16, 2023, F45 disclosed that the Company's 2022 10-K would not be timely filed, but that the Company expected to report a material weakness similar to the material weakness reported in its 2021 10-K. ¶100.

**D.      The Truth About the Company Is Revealed on July 26, 2022**

On July 26, 2022, only two months after Defendants' extremely bullish representations made in connection with F45's 1Q22 financial results, F45 issued a "Strategic Update" to investors disclosing, inter alia, that the $250 million financing facility with Fortress was no longer available. ¶194. The Company also announced: (a) a dramatic cut in the number of new studios the Company would open in 2022—down approximately 60% from 1,000 studios to a range of 350 to 450 new studios; (b) an extraordinary cut in the number of new franchises that the Company would sell in 2022—down approximately 70% from 1,500 to 350 to 450 new franchises; (c) a significant reduction in the Company's financial guidance for full-year revenue from a range of $255 to $275 million to a range of $120 to $130 million; (d) the reduction of approximately 45% of F45's workforce; (e) the departure of CEO Adam Gilchrist that was effective July 24, 2022; (f) the appointment of Board Member Ben Coates as Interim CEO; and (g) the payment of a $2.4 million retention bonus to CFO Payne to ensure he would stay on as CFO until at least October 15, 2022 (10 additional weeks). ¶194. F45's common stock plunged more than 60% to close at $1.35 per share on July 27, 2022. ¶195.

**E.      Post-Class Period, F45's Financial Condition Continues to Atrophy**

On August 15, 2022, F45 released its 2Q22 financial results and disclosed that: (i) total franchises sold declined by 175 in the region; (ii) gross profit decreased 9.1% from the prior period; (iii) gross profit margin fell to 65.5% from 80.6% for the prior year period; and (iv) franchise gross profit declined 8.9% to $17.4 million compared to $19.1 million in 2Q21. ¶473. Additionally, F45 confirmed that 307 franchises were terminated, and another 300 franchises were still in question as F45 was unable to provide financing after the termination of the Fortress financial deal. ¶¶474-75. Thus, almost all of the 706 franchises announced as "sold" in 1Q22 were conditional agreements that contained significant financing contingencies. ¶475. After the release of F45's

11

2Q22 financial results, credit and cash flow conditions at the Company materially worsened. ¶481. By May 18, 2023, F45's stock was trading at less than $1.00 per share, down from its July 15, 2021 IPO price of $16.00 per share. ¶17. On August 14, 2023, F45 delisted from the NYSE and announced its intention to deregister its common stock and suspend its reporting obligations.[12]

## III.   ARGUMENT

### A.    THE COMPLAINT ADEQUATELY ALLEGES SECTION 10(b) CLAIMS UNDER THE EXCHANGE ACT

"When faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). Motions to dismiss in securities actions are "viewed with disfavor and are rarely granted[,]" and courts "must also draw all reasonable inferences in the plaintiff's favor." *Id.* "[I]n the context of securities fraud, a dismissal pursuant to Rule 12(b)(6) is difficult to obtain since such a claim revolves around fact-specific inquiries." *Brody v. Zix Corp.*, 2006 WL 2739352, at *2 (N.D. Tex. Sept. 26, 2006). "The sole issue before the Court at this time is whether the claims in Plaintiff[s'] Complaint are adequately *alleged*, not whether the claims are likely to survive a motion for summary judgment following discovery." *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 957 (S.D. Tex. 2021) (emphasis in original).

### 1.    The Complaint Adequately Alleges False and Misleading Statements and Omissions

To allege falsity, Plaintiffs need only "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 256 (5th Cir. 2005).

---

[12] F45 Training Holdings Inc., Current Report (Form 8-K) (Aug. 14, 2023).

"Whether or not any of these allegations can be proven during later stages of this litigation" is not relevant to the inquiry. *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014). Plaintiffs have amply satisfied the pleading requirements here.

### a. Plaintiffs Identify Many Categories of False and Misleading Statements

As detailed in the Complaint, Plaintiffs allege that statements in the IPO Materials and throughout the Class Period were materially false and misleading when made. For ease of reference, the Complaint divides the allegedly false statements into several categories. These include statements about: ***F45's growth*** (¶¶164-70 [337-43][13], 368-69, 377-78, 381-84, 390(a), 391, 400, 402, 404, 407, 409, 416, 425, 427, 429, 437(c)-(f), 447, 451, 452, 455, 458-59); ***F45's unit-economic model*** (¶¶140-45 [313-18], 370, 385, 390(b), 417, 420, 437(a)-(b)), 455; ***increasing percentage of multi-unit franchisee systems being sold*** (¶¶155-59 [328-32], 379, 403, 419, 426, 430, 456); ***F45's internal controls and remediation of material weakness in internal controls*** (¶¶184-85 [356-57], 393, 395, 440-41); ***risk warnings*** (¶¶190-92 [362-64], 438(a)-(b); ***quality & credit-worthiness of F45 franchisees*** (¶¶176-77 [349-50], 405-06, 428, 438(a)-(b)); ***F45's franchise equipment fee*** (¶¶380, 392, 418); ***the "franchise effect"*** (¶¶453, 457); ***guidance and franchisee pipeline*** (¶¶401, 447, 449); ***700 net new franchise "sales"*** (¶¶446, 450, 454); and ***F45's Fortress financing facility*** (¶448).

The Complaint alleges these core representations were false and misleading when made. In reality, and unbeknownst to investors, F45's whole business model and the Company's substantial growth was entirely reliant on undisclosed and unsustainable practices that the Company followed simply to maximize the number of Total Franchises Sold (as opposed to

---

[13] Statements in the IPO Materials are alleged to be false and misleading under both Section 11 and Section 10(b). Those statements are repeated in both the Securities Act and Exchange Act sections of the Complaint and are cross-referenced in this list through the use of brackets [x].

profitable studios operating), including: (a) misleading potential franchisees with respect to certain key profitability metrics in order to convince them to purchase a franchise license so that F45 could record the deal in its closely watched metric, "Total Franchises Sold;" (b) failing to conduct due diligence on potential franchisees to ascertain whether they were credit-worthy enough to purchase, open, and maintain F45 studios; (c) failing to provide franchisees with proper training and/or guidance once they opened a studio to assure a better likelihood of studio success (meaning increased royalties and other fees for F45); (d) failing to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S. considered a good fit for an F45 studio, leaving little room for additional growth; (e) failing to disclose that a significant number of its franchisees' studios were in financial distress and were not profitable— at least not within the time frame represented by the Company; (f) providing to certain preferred franchisees undisclosed modified payment terms and failing to properly account for those modified terms—this ultimately resulted in ballooning account receivables for F45 and delayed cash inflows for the Company's growth initiatives; (g) "selling" exclusive franchise rights to multi-unit franchisees without regard to whether those franchisees could financially or would ultimately open those franchisees—indeed, much of the committed franchise store development was conditional on near-100% external financing of this growth, which included the Company's guarantee to support novel financing arrangements that ultimately fell through; and (h) failing to adequately remediate identified material weaknesses in ICFR. ¶8.

In response to the Complaint's well-pled allegations, Defendants make a host of arguments challenging falsity, including that certain statements are: (i) forward-looking statements protected by the bespeaks caution doctrine or the PSLRA's safe harbor; (ii) inactionable statements of

14

opinion; (iii) inactionable corporate optimism/puffery; and (iv) not particularized enough for investors to rely on.[14] Each of these arguments fails.

### b. The Statements Defendants Challenge as Forward-Looking Are Historical Statements or Mixed Statements and Are Not Accompanied by Meaningful Cautionary Language

The Safe Harbor under the Private Securities Litigation Reform Act ("PSLRA") can render a statement inactionable when it is a "forward-looking" statement that is "identified as . . . forward-looking" and is: (i) "accompanied by meaningful cautionary statements"; or (ii) "the plaintiff fails to [plead] that the forward-looking statement . . . was made with actual knowledge [and] that it was false or misleading." *Lormand*, 565 F.3d at 243 (citing 15 U.S.C. § 78u-5(c)(1)(A-B)). Defendants cannot satisfy any element of this analysis, as they fail to identify any forward-looking statements or any sufficient cautionary language, and the Complaint adequately pleads that Defendants knew their statements were false or misleading when made.

Defendants broadly contend that "[m]any of the statements Plaintiffs challenge under Section 10(b) constitute forward-looking statements" (DB at 27), but Defendants fail to adequately support this position. Rather, with perfunctory references to their similarly weak "bespeaks caution doctrine" arguments with respect to Plaintiffs' Section 11 claims (DB at 13-17), Defendants challenge statements regarding: (i) F45's growth (¶¶378, 381, 384, 391, 400, 402, 404, 406, 408, 427-28, 437(b)-(d), 447, 451-53, 455, 457-60); (ii) F45's unit-economic model (¶¶437(b)); (iii) multi-unit franchises (¶¶379, 403, 430); (iv) internal control weaknesses and purported remediation (¶¶395, 439); (v) purported risk factors in IPO Materials (¶¶362-64); and (vi) guidance

---

[14] The statements Defendants challenge as not particularized enough include statements at ¶¶157, 177, 369, 370, 379, 380, 384, 385, 392, 393, 395, 400-01, 405, 408, 409, 417, 419, 420, 425-28, 437(a)), 438, 440-41, 446-48, 450, 454, 456, 460. DB at 31-33.

and franchisee pipeline (¶¶401, 454). DB at 27.[15] In support of this argument, Defendants cite to a laundry list of Complaint paragraphs without: (i) identifying what statement or portion of a statement is forward-looking; nor (ii) explaining what purported cautionary language applies to any specific statement. This gambit fails.[16]

(1)     Neither the PSLRA's Safe Harbor nor the Bespeaks Caution Doctrine Immunize Defendants': (i) Statements of Present or Historical Fact; or (ii) Mixed Statements.

Defendants' argument that many of the cited statements are forward-looking fails, as several of the statements Defendants identify are statements of historical or present fact that are not forward-looking statements at all or mixed statements of present and future fact. For example, the Safe Harbor provides no refuge for the following statements:

- ¶¶140-42, [313-15], 437(a) ("**[W]e estimate that in a normalized operating environment, a typical F45 Training franchise . . . in its third year of operation can produce an AUV of approximately $354,000, average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%**.");

- ¶¶165 [338] ("Based on current franchises sold in Australia per capita as of June 30, 2021, **we believe there is a long-term studio potential for us to open over 7,000 studios in the United States**.");

- ¶¶170 [343] and 437(b) ("**[W]e have employed an economic model that . . . has been predictable, asset light and cash flow generative and has enabled us to open new studios at an accelerated pace versus the owner-operator model that is common in the studio fitness landscape**.");

---

[15] Defendants also argue the following statements in the IPO Materials are protected by the bespeaks caution doctrine: (i) growth statements (¶¶140, 155-56, 164-68, 170); (ii) F45's unit-economic model (¶¶140-42), (iii) internal control weaknesses and purported remediation (¶¶184-85); and (iv) purported risk factors in IPO Materials (¶¶190-92). DB at 13-14.

[16] *See, e.g.*, *Lormand*, 565 F.3d at 245 (district court "erroneously neglected to address how each . . . statement (or portions of those statements) is specifically and meaningfully protected by the safe harbor" because "[e]ach statement that benefits from the safe harbor must be addressed individually"); *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 850 (N.D. Tex. 2018) ("Courts cannot apply a blanket safe harbor for all forward-looking statements but must determine how a statement is specifically and meaningfully protected by the safe harbor.").

16

- ¶¶184 [356] ("*We believe we have taken the necessary actions to substantially address each of the material weaknesses discussed above, and we plan to take additional steps to improve our accounting function*.");

- ¶185 [357] ("*In order to remediate these material weaknesses, we have taken and plan to continue to take the following actions . . . . We also plan to take additional steps to remediate the identified material weaknesses and improve our accounting function . . . .*");

- ¶379 ("As of June 30, 2021, *approximately 51% of our franchises were owned by multiunit franchisees, up from approximately 40% as of the end of 2019, which really highlights the strong market demand for multiunit franchise opportunities and their ability to sell to existing franchisees*.");

- ¶384 ("*What was fascinating about last quarter was the breakneck speed of our franchise sales growth[,] . . . you know we are thinking that we'll be able to continue to accelerate to the point where we have all of next year's numbers fully contracted*.");

- ¶400 ("*[W]e continue to execute on our growth strategy, demonstrated by strong new franchise sales, including additional multiunit deals and continued strength in new studio openings*. Additionally, we saw encouraging sequential improvements in studio performance with visitation and average unit volumes exceeding pre-pandemic levels in *the U.S., which is our most significant growth market. . . . We are well on our way to achieving over 4 new goals of franchises sold and studio openings, demonstrating the strong continued interest from franchisees to open new F45 studios*.")*'*

- ¶402 ("*Based on our global white space analysis, we continue to see long-term potential for approximately 16,000 studios outside the U.S. . . . We continue to see strong market demand for multiunit franchise opportunities*.");

- ¶403 ("*In regards to our multiunit deals, yes, we have a very strong pipeline of these sophisticated investors, larger groups that are looking to take out portfolios of F45. We do also have a very healthy pipeline of our regular way single to 5-unit, multi-unit deals. So we're expecting that in the fullness of time that we will be closing a mix of both multiunit larger deal and also continuing our regular way sales*.");

- ¶406 ("*[W]e have over 600 franchises in our backlog that are highly sophisticated private equity folks or family offices with incredible balance sheets and great operators. So these are folks that are on the ground now with CBRE executing letters of intent and leases. So we're feeling really good about Q1 and Q2*.");

- ¶427 ("*We continue to see strong market demand from both existing and new multi-unit franchisees*.");

17

- ¶430 ("*We have over 20 discussions and term sheets being negotiated at this moment.*");

- ¶452 ("*[W]e remain bullish as ever about the future of this business. I have no doubt that we have the right team and strategic initiatives in place to execute on our growth plans.*");

- ¶453 ("*We are continuing to grow our business by leveraging incredible influencers, such as David Beckham. But what we have found in the past is what we sort of term as the franchise effect.*"); and

- ¶459 ("*We sit here today with absolute visibility on being able to open 1,000 franchises this year.*").

These and other misstatements of present and/or historical fact are not forward-looking and therefore do not qualify for Safe Harbor protection. *See, e.g.*, *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 597 (W.D. Tex. 2014) ("statements about the present strength of the company and of its product" are not forward-looking); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 467–68 (S.D. Tex. 2016*), amended on denial of reconsideration*, 2016 WL 3959164 (S.D. Tex. July 22, 2016) (statements were not forward-looking as they "referred to then-present factual conditions").

Even if some of these and other misstatements Defendants challenge do contain forward-looking elements, many of them also incorporated present factual assertions, rendering the PSLRA Safe Harbor inapplicable. *See Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023) ("Although the deadline is a future projection, the crux of Plaintiff's fraud claim is that Defendants misled investors about the Company's present construction progress. This is a mixed present/future statement ineligible for safe harbor protection."); *Spitzberg*, 758 F.3d at 691 ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."); *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 657-58 (S.D. Tex. 2021) (finding statements about timeline not solely forward-looking and contained actionably false or historical aspects that lacked sufficient cautionary

18

language); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) ("A forward-looking statement, for instance, whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision.").

(2)    <u>The Challenged Statements Lacked Meaningful Cautionary Language</u>

The statements Defendants challenge as forward-looking also are not entitled to Safe Harbor protection because none of the putative warnings upon which Defendants rely (DB at 13-17, 27-29) included "meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). Defendants claim that the "Corporate Defendants' statements" (without identifying any) are protected because "[t]he SEC filings all contained general cautionary language regarding forward-looking statements and incorporated the relevant risk factors from the IPO Documents or included similar risk factors." DB at 28-29. Such imprecise disclaimers—which Defendants concede were "general"—amount to meaningless boilerplate. *See Lormand*, 565 F.3d at 244-45 (warning factors that "could cause actual results to be materially different" is "boilerplate and not meaningfully cautionary"); *Carlton*, 184 F. Supp. 3d at 454 ("The case law is clear that . . . boilerplate warnings won't do; cautions must be tailored to the risks that accompany the particular projections[.]").

*First*, for a cautionary statement to be meaningful, it must provide a "substantive company-specific warning[] based on a realistic description of the risks applicable to the particular circumstances" addressed in the statement. *Lormand*, 565 F.3d at 245; *see also id.* at 247-48 (cautionary statements not meaningful where they were not "specific, concrete explanations that clearly identified and quantified" the risks). Attempting to satisfy this requirement, Defendants point to the following purported warnings:

- "Our financial results are affected by the number of franchises sold and studios open." DB at 14.

19

- "'Our ability to open new franchised studios and increase our revenue could be materially and adversely affected' if the Company could not 'recruit . . . qualified franchisees' or was 'unable to renew our franchise agreements.'" DB at 14.

- "[T]he number of new franchised studios that actually open in the future may differ materially from the number of signed commitments we currently have or anticipate from existing and new franchises[.]" DB at 15.

- "[T]he Company may 'fail to successfully implement our growth strategy, which includes new studio development by existing and new franchisees.'" DB at 15.

- "'[O]ur franchisees are impacted by factors that are beyond our control,' such as 'the COVID-19 pandemic,' 'capital requirements,' and 'negative economic conditions,' as well as 'rising costs related to construction of new studios.'" DB at 15.

- "Opening new studios in close proximity may negatively impact our existing studios' revenue and profitability." DB at 15.

But these boilerplate statements are hardly warnings at all; they are merely vague truisms about the franchise business, applicable to any franchisor. They are certainly not meaningful cautions tailored to "the particular circumstances" facing F45. *See Lormand*, 565 F.3d at 245; *see also Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) ("[T]he relevant cautionary language must be prominent and specific, and must directly address exactly the risk that . . . was not disclosed.").[17]

*Second*, "[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Anadarko*, 514 F. Supp. 3d at 953. *See also Nykredit Portefølje Admin. A/S v. Propetro Holding Corp.*, 2021 WL 9037758, at *17 (W.D. Tex. Sept. 13, 2021) (finding warnings about adequacy of internal controls misleading

---

[17] Defendants' purported warnings regarding its internal controls fare no better. F45's statement that it "plan[s] to take additional steps to improve [its] accounting function" is not a warning at all (DB at 15), nor is it a sufficient to state that F45's "ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired" "if [F45's] remediation of such material weaknesses is not effective, or if [it] fail[s] to develop and maintain an effective system of disclosure controls and internal control over financial reporting[.]" *Id.* at 15-16. This statement is merely a tautology masquerading as a warning.

because "risk warned of had already come to pass"). Thus, because F45's substantial growth was the result of undisclosed and unsustainable practices even before the IPO—and these risks were clear to Defendants Gilchrist and Payne—F45's putative "warnings" are insufficient. *See, e.g.,* ¶146; *infra*, § III.A.2. Warning about risks that are already emerging provides an independent basis to conclude that Defendants' purported cautions were not meaningful. *See Lormand*, 565 F.3d at 247 (warnings not meaningful in light of "clearly present danger that was materializing"); *In re Apache Corp. Sec. Litig.*, 2022 WL 4277350, at *5 (S.D. Tex. Sept. 15, 2022), *R&R adopted*, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022) (cautionary language inadequate when warned-of risk arisen); *Anadarko*, 514 F. Supp. 3d at 953 ("When cautionary language is glossed over as a future risk rather than the certain dangers that had already begun to materialize then the warnings are no longer meaningful.").

*Third*, Defendants' purported warnings pertaining to F45's franchise model and growth were not meaningful given Defendants' Class Period statements denying that such risks existed. *See, e.g.,* ¶451 ("***We expect full year net franchises sold of approximately 1,500 compared to our prior guidance of 1,000***[.]"); ¶452 ("**[*W*]*e remain bullish as ever about the future of this business. I have no doubt that we have the right team and strategic initiatives in place to execute on our growth plans*.**"); ¶459 ("***We sit here today with absolute visibility on being able to open 1,000 franchises this year*.**"). Cautionary language is not meaningful where, as here, Defendants make repeated and specific statements denying the risks referenced in the warning. *See Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *19 (E.D. Tex. Oct. 19, 2017), *R. & R. adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017).

*Fourth*, Defendants' putative cautionary statements were not meaningful because they "remained unchanged despite a significant change in circumstances of material importance to an

21

investor." *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107 (D.C. Cir. 2015) (collecting cases); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("The consistency of defendants' language over time despite [changing circumstances] belies any contention that the cautionary language was tailored."). By Defendants' own admission, F45's SEC filings "all contained general cautionary language . . . and incorporated the relevant risk factors from the IPO Documents or included similar risk factors[,]" and that "in the relevant earnings calls, Corporate Defendants referenced the cautionary language contained in F45's SEC filings[.]" DB at 28-29. Thus, Defendants admit that they merely repeated the "warnings" from F45's IPO documents throughout the Class Period with minimal changes, if any. These stale warnings became more and more meaningless with every repetition as F45's condition deteriorated further. *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (putative cautionary language inadequate, in part, because it "remained fixed even as the risks changed").[18]

### c.    No Statement Is an Inactionable Opinion

Opinion statements are actionable when plaintiffs "call into question the issuer's basis for offering the opinion." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Under *Omnicare*, "whether a statement is misleading depends on the perspective of a reasonable investor" (*id.* at 186), who "expects" that an expressed opinion "fairly aligns with the information in the issuer's possession at the time." *Id.* at 188-89. "[I]f the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at 188.

---

[18] The statements at ¶¶140-41, 155-56, 166-68, 190-92, 362-64, 378, 381, 391, 395, 401, 404, 408, 428, 437(b)-(d), 439, 447, 451, 454-55, 457-58, 460 also incorporated present factual or historical assertions and/or lacked meaningful cautionary language, but due to space constraints, Plaintiffs have limited discussion within this section to the enumerated examples. Additionally, Defendants challenge some of the statements highlighted herein as inactionable statements of opinion, and those statements are addressed below.

With scant argument or support, Defendants suggest that "several statements expressing . . . opinions on various aspects of the Company, including many 'believe' statements" are inactionable "opinion statements." DB at 29. Defendants only refer to a string cite of paragraph numbers from the Complaint, without indicating which statement (or portion thereof) Defendants contend is an opinion.[19] These generalized arguments are meritless.

Each of the statements Defendants challenge as an inactionable opinion were "determinat[ive], verifiable statement[s]" of material fact without any qualifying language. *See Omnicare*, 575 U.S. at 184; *see also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 7 (1st Cir. 2021) (claims that product "improves our performance" and "makes us really competitive" are actionable fact statements).

Even assuming, *arguendo*, that the Court finds certain of the statements contain opinion language, the Complaint alleges that the speaker: (i) "omit[ted] material facts about the [Defendants'] inquiry into or knowledge concerning a statement of opinion"; and (ii) the omitted facts "conflict[ed] with what a reasonable investor would take from the statement." *Omnicare,* 575 U.S. at 189. *Omnicare* makes clear that "[a] fact is a thing done or existing or an actual happening." *Id.* at 183. Notably, "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192.

Thus, the Court need not review the statements Defendants challenge as opinions under *Omnicare* because each statement is based upon Defendants' knowing misrepresentation or omission of the contemporaneous adverse facts discussed above. For example:

- ¶142 ("***Our franchise model has the potential to generate strong returns for franchisees as a result of a relatively low initial investment and favorable***

---

[19] Defendants challenge the following statements as inactionable opinion statements: ¶¶140-42, 164-65, 167-70, 169, 176, 184, 378, 382, 390-91, 395, 402, 404, 407-08, 427, 437(a), (c)-(d), (f), 439, 447, 453, 459-60. DB at 17-18, 29-30.

*operating cost structure driven by our purpose-built studio design and proprietary technology-enabled ecosystem*.”);

- ¶165 (“Based on current franchises sold in Australia per capita as of June 30, 2021, *we believe there is a long-term studio potential for us to open over 7,000 studios in the United States*.”);

- ¶167 (“*We are still in the early stages of growth and expansion, particularly in the United States and ROW, and we believe we can significantly grow our franchisee base*.”);

- ¶170 (“As a franchisor, *we have employed an economic model that . . . has been predictable, asset light and cash flow generative and has enabled us to open new studios at an accelerated pace versus the owner-operator model that is common in the studio fitness landscape*.”);

- ¶378 (“*We have a significant footprint expansion opportunity both in the United States* and across the rest of the world.”)

- ¶¶143, 316, 390(a) (“*Our platform enables the rapid scalability of our model and helps to promote the success of our franchisees*.”);

- ¶391(b) (“*We are still in the early stages of growth and expansion, particularly in the United States and* [*rest of world*.]”);

- ¶395 (“*We believe the actions described above will be sufficient to remediate the identified material weakness and strengthen our internal controls over financial reporting*.”);

- ¶402 (“*We continue to see strong market demand for multiunit franchise opportunities*.”);

- ¶404 (“*So we're feeling really good about the fact that there is an extremely large pipeline*.”);

- ¶407 (“[W]e're . . . *also making sure that our franchisees have got incredible margins*.”);

- ¶427 (“*Since day 1, our franchise model was purpose-built around scalability. . . . This allows our franchisees to spend more of their time growing their business by opening potentially more studios*.”);

- ¶437(a) (“[*W*]*e estimate that in a normalized operating environment, a typical F45 Training franchise requires an aggregate initial investment of approximately $315,000 and, in its third year of operation can produce an AUV*

24

*of approximately $354,000, average EBITDA in excess of 30% and average cash-on-cash returns in excess of 33%.*”);

- ¶437(f) (“*We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation, and has helped to facilitate our rapid growth and strong financial performance prior to the COVID-19 pandemic.*”);

- ¶447 (“*And on the demand side, we have approximately 1,100 franchisees that have a contractual obligation to pay for and receive equipment packs by the end of '22 . . . .*”);

- ¶453 (“*We are continuing to grow our business by leveraging incredible influencers, such as David Beckham. But what we have found in the past is what we sort of term as the franchise effect.*”); and

- ¶459 (“*We sit here today with absolute visibility on being able to open 1,000 franchises this year.*”).

Moreover, Defendants' conclusory position that attaching the word “believe” or “think” to a statement renders it an inactionable opinion statement (DB at 29) is contrary to the law, including *Omnicare*. *See* 575 U.S. at 193 (“‘[W]e believe’ or ‘we think[]’ . . . can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors.”). Unsurprisingly, courts frequently hold that “we think” or “we believe” statements are actionable. *See, e.g.*, *In re Intuitive Surg. Sec. Litig.*, 2017 WL 4355072, at \*2-3 (N.D. Cal. Sept. 29, 2017) (statements prefaced with “[w]e believe” actionable based upon material omissions). Defendants fail to demonstrate how any statement with “believe” attached to it is not actionable.

   **d.**  **The Complaint Does Not Allege as False and Misleading Generic Statements of Corporate Optimism**

Defendants challenge certain statements repeated throughout the Class Period as inactionable puffery.[20] A statement is "puffery" when it is "of the vague and optimistic type . . . contain[ing] *no concrete factual or material misrepresentation*." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). When a statement, however, is "too specific to categorize as general corporate optimism[,]" it is not inactionable puffery. *See Six Flags*, 58 F.4th at 220. Despite Defendants' conclusory assertion that "[n]one of these statements contains 'specific facts' that 'investors and analysts' would 'rely on'" (DB at 30), the Complaint pleads that Defendants did more than provide "generalized statements about the Company's performance." DB at 30.[21] Defendants' misstatements repeatedly hinged on concrete factual statements that Defendants selectively omit from their quotations of these statements. DB at 18-19, 30.[22] These

---

[20] These statements include: "*we remain bullish as ever about the future of this business*[,]" ¶452; *accord* ¶459; "*we believe we can be bigger than Starbucks . . .* [and] *bigger than McDonald's*[,]" ¶382; *accord* ¶¶407, 417(b); "*we're feeling really good about Q1 and Q2*[,]" ¶406; *see also* ¶¶368, 383-84, 416, 425, 429, 446, that the Company has "*never had a healthier pipeline of franchisers*," ¶368; *see also* ¶¶369, 403-04, 430, 449, and that F45's business model is "*attractive*," "*resilien[t]*," "*strong*," and "*enables the rapid scalability of our model*," ¶390; *see also* ¶¶377, 408, 427, 437(d)-(e), 450, 460; DB at 30. Defendants also challenge statements in the IPO Materials as puffery. DB at 19 (¶¶140-45, 155, 169, 170).

[21] Defendants curiously challenge Defendant Gilchrist and Defendant Payne's signed SOX Certifications in F45's 3Q21 10-Q (¶408) and 1Q22 10-Q (¶460) with a quadfecta of challenges: (i) forward-looking statement; (ii) statement of opinion; (iii) puffery; and (iv) statement not particularized enough for investors to rely on. DB at 27-32.

[22] For example, Defendants represented that F45's business model was "*attractive*," in part, because "*[f]rom June 30, 2020 to June 30, 2021, our Total Franchises Sold increased by 36% and our Total Studios increased by 22%*" (¶140); F45's model "*has the potential to generate strong returns for franchisees*," in part, because "*a typical F45 Training franchise requires an aggregate initial investment of approximately $315,000 . . . and, in its third year of operation can produce an AUV of approximately $354,000, average EBITDA margins in excess of 30% and average cash-on-cash returns in excess of 33%*" (¶142); the "*strong market demand for multi-unit franchise opportunities*" was evident because "*[a]s of March 31, 2021, approximately 51% of our franchises sold were owned by multi-unit franchisees, up from approximately 41% as of December 31, 2019*" (¶155); Defendants were "*feeling really good about Q1 and Q2*," in

26

patently untrue statements about the specific advantages of F45's business model and its purported

continued success are concrete and material. *See Lormand*, 565 F.3d at 249 n.14 (rejecting puffery

argument because complaint "alleges concrete factual and material misrepresentations and

omissions concerning statements that discuss the very specific benefits of" the programs and

affiliations); *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022); *Stone*,

26 F. Supp. 3d at 599 (material "representations about the strength of [a] company and of its

product" are not "mere corporate puffery"); *Kurtzman v. Compaq Comput. Corp.*, 2000 WL

34292632, at *36-37 (S.D. Tex. Dec. 12, 2000) (statements like "[w]e continue to see strong

demand . . . and the opportunity for continued market share gains and revenue growths" go

"beyond merely generally rosy predictions, especially where those predictions go to the heart of

the plaintiffs' complaint"). Thus, they are not inactionable puffery.[23]

> **e.      The Corporate Defendants Repeatedly Assured the Market F45 Had Emerged From the Pandemic Stronger and That It Was Growing at "Breakneck Speed"**

At the time of the IPO and during the Class Period, the Corporate Defendants repeatedly

touted F45's "***breakneck speed***" growth (¶¶369, 383, 384, 429), and represented to the market that

the Company had come out of the pandemic even stronger. *See, e.g.,* ¶¶377, 390(b) ("Despite

---

part, because "***we have over 600 franchises in our backlog that are highly sophisticated private equity folks or family offices with incredible balance sheets and great operators***" (¶406); and F45 "***never had a healthier pipeline***," in part, because "***[t]his year we've sold over 550 franchises already***." ¶369.

[23] The cases that Defendants cite to support their puffery argument provide them with no support. DB at 19-20, 30. Defendants' misstatements are not articulations of "aspirational . . . generalized positive goals" like those found inactionable in *Police & Fire Retirement System of City of Detroit v. Plains All American Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019). Nor are Defendants' misstatements analogous to BP's puffery that it "could 'keep up momentum' while simultaneously focusing on safe operations, 'take on and manage risk,' and, with the Board of Directors at the helm, 'set expectations of how risk is managed.'" *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 807 (S.D. Tex. 2012). And Defendants' specific, fact-based misstatements are a far cry from vague proclamations that a company's "fundamentals" or "pipeline" are "strong," which were found inactionable in *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869-70 (5th Cir. 2003).

challenges posed by the COVID-19 pandemic, we grew our footprint and experienced minimal permanent closures during 2020, which *we believe underscores the resilience of our business model*."); ¶383 ("*[W]e've been growing at breakneck speed. And we're really excited during this IPO process . . . we have a balance sheet that I would argue is the strongest in this space.*"); ¶416 ("*[I]f you look at key markets for us in terms of growth . . . we really are flourishing, not just from a franchise sales perspective*, but also from a visitation and member growth standpoint."); ¶429 ("[C]oming off the back of the IPO . . . *we would argue that we would have the strongest balance sheet in this fitness ecosystem in comparison to our peers*."); ¶446 ("*I am pleased to report that our business is firing on all cylinders. Our key performance metrics are trending at or above pre-pandemic levels, and we are encouraged by the unprecedented demand from our franchise partners and members around the world*."). Thus, the Court should reject Defendants' attempt to blame the pandemic for why their false statements ultimately came to light.

### f.      The CW Accounts Support the Falsity of Defendants' Statements

Plaintiffs' allegations are based upon the detailed and consistent facts that the CWs furnished, which reliably and amply support the falsity of the above-identified statements. The Complaint describes each CW with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded." *Rougier*, 2019 WL 6111516, at *11. More specifically, the Complaint pleads each of the following details for each CW, enabling the Court to accord maximum weight to the facts each CW provided: (i) the CW's job description; (ii) the CW's responsibilities; (iii) the CW's employment dates; and (iv) how the CW learned the information alleged. *See Brody*, 2006 WL 2739352, at *5 (the foregoing details adequately demonstrate that CWs "would possess the information pleaded").

Courts in this Circuit routinely credit CW-based allegations when, as here, such details about the basis for the CW's knowledge are pled. *See Spitzberg*, 758 F.3d at 691 (allegations based on CW's report reliable and provided an adequate factual basis to support claims); *see also Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at *12 (S.D. Tex. Apr. 14, 2021) (denying motion to dismiss after crediting CW allegations); *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609, at *9 (S.D. Tex. Apr. 13, 2021) (same). As in the foregoing cases, Plaintiffs here provide sufficient details for the Court to reach the same conclusion. ¶¶86-92.

In light of the Complaint's thoroughly detailed descriptions of the CWs, there is no basis for the Court to discount the facts that they provide. *See Camelot*, 2021 WL 1416025, at *7 (relying, in part, on facts CWs provided to deny motion to dismiss); *Edwards*, 2021 WL 1421609, at *5-6 (referencing facts provided by certain CWs in denying motion to dismiss); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *3 (S.D. Tex. Jan. 19, 2016) (because "basis for [CWs'] knowledge is set forth in the [c]omplaint[,]" the allegations "based on knowledge obtained from these witnesses ***will not be discounted***").

Moreover, the CW accounts support the falsity of Defendants' statements. For example: ***F45's growth*** (CW-1 (¶¶173-74 [346-47], 250); CW-4 (¶¶286, 297-99); CW-6 (¶288)); ***F45's unit-economic model*** (CW-2 (¶¶149-50 [322-23], 245-46); CW-6 (¶¶256-58, 259-60)); ***Increasing percentage of multi-unit franchisee systems being sold*** (CW-1 (¶¶162 [335], 272, 335); CW-2 (¶273); CW-4 (¶274); CW-5 (¶¶163, [336]); CW-6 (¶¶270(a), 277-82, 288); CW-7 (¶275)); ***Quality & credit-worthiness of F45 franchisees*** (CW-2 (¶¶151-53 [324-26], 180 [352], 247-49, 265); CW-3 (¶181-83 [353-55], 251-53); CW-6 (¶¶254-55, 259, 266); CW-7 (¶262-63)); ***F45's franchise equipment fee*** (CW-7 (¶¶261, 263)); ***700 net new franchise "sales"*** (CW-4

29

(¶¶297-99); CW-5 (¶¶300-01, 306)); *F45's financing facility* (CW-4 (¶308); CW-5 (¶¶300-01, 306, 309-10)).

## 2.    The Complaint Adequately Alleges Scienter

A complaint adequately pleads scienter by alleging facts that support the defendant acted with an "intent to deceive, manipulate, or defraud or severe recklessness." *Six Flags*, 58 F.4th at 214 (quoting *Lormand*, 565 F.3d at 251). An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences[.]'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Rather, a complaint's scienter allegations suffice even when reasonable, non-culpable inferences exist, and without allegations of motive. *Id*. at 325. In assessing scienter, the "inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand*, 565 F.3d at 251. A complaint cannot be dismissed if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Stated differently, "a tie favors the plaintiff." *Spitzberg*, 758 F.3d at 686. Severe recklessness does *not* require that Defendants know that their statements are false. *Id*. As the Fifth Circuit has explained, whether "[defendants] actually believed [their statements to be true] *is irrelevant* to whether [defendants] were severely reckless." *Id*.

### a.    Defendants Gilchrist and Payne Had Access to Crucial Information, Controlled F45's Messaging and Misstatements, and Signed the Company's SEC Filings

Defendants Gilchrist and Payne's senior positions, access to key metrics about the Company, control of F45's statements, and their critical involvement with F45's SEC filings support an inference that they were either duly informed of the true facts of F45's unsustainable business model and the Company's inability to maintain growth or were reckless in not knowing

30

of these facts. *See Ramirez*, 334 F. Supp. 3d at 854 (scienter supported, in part, by the roles of CEO and Principal Financial Officer, who sat on the defendant-company's Management Committee, and their execution of defendant-company's SEC filings); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 333 F. Supp. 3d 1315, 1325 (N.D. Ga. 2018) ("allegations concerning positions, responsibilities, and access to information[,]" contributed to an inference of scienter).

In their respective roles as CEO and CFO, Gilchrist and Payne determined F45's strategies, decisions, and messaging to the investing public. ¶489. They were also members of F45's Chief Operating Decision Maker Group, which reviewed operating results, including revenue and gross profit for each of the Company's reportable segments, in order to assess performance and allocation of resources. ¶490. As the Company's most senior executives, Gilchrist and Payne were privy to confidential information concerning F45's franchisees, studios, operations, and growth. ¶494. Similarly, Gilchrist and Payne (i) had access to internal corporate documents, conversations with corporate officers, and employees; (ii) attended management and Board meetings and committees; and (iii) reviewed reports and other information provided to them pursuant to their roles. *Id.*; *see also In re Fleming Cos. Inc. Sec. & Derivative Litig.,* 2004 WL 5278716, at \*11 (E.D. Tex. June 16, 2004) ("strong inference of fraud may be established where" defendants "knew facts or had access to information suggesting that their public statements were not accurate").

Gilchrist and Payne participated in the drafting, preparation, and/or approval of F45's filings with the SEC. ¶492. They were provided with copies of the SEC filings at issue prior to or shortly after their issuance and had the opportunity to prevent their issuance or cause them to be corrected. *Id.* Thus, Gilchrist and Payne were responsible for ensuring the accuracy of these statements, for verifying the facts that supported these statements, and that there were no material

omissions (*id.*)—a responsibility they failed to fulfill. *Fleming*, 2004 WL 5278716, at \*11 ("strong inference of fraud" where defendants "failed to check information they had a duty to monitor").

Both Gilchrist and Payne also signed and certified F45's IPO Registration Statements and Prospectuses, as well as the Company's Form 10-K for the year ended December 31, 2021, and Payne was the sole signatory of F45's quarterly reports filed with the SEC during the Class Period. ¶491. Further, Gilchrist and Payne certified F45's Forms 10-Q for the second and third quarters of 2021 (¶¶389, 408) and the Company's 2021 10-K (¶436). *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 187 (5th Cir. 2019) (SOX certifications are "probative of scienter" if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.). Similarly, Gilchrist and Payne spoke repeatedly to analysts on quarterly earnings calls and were the only employees that answered analyst questions on behalf of the Company during such calls. ¶493. Taken together, these facts support a strong inference of scienter for Defendants Gilchrist and Payne.

### b. F45's Ability to Maintain Substantial Growth by Selling New Franchises Was the Company's "Lifeblood"

A strong inference of scienter is further supported by the fact that F45's ability to maintain substantial growth by selling franchises and opening new studios was critical to F45's core operations. "The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false." *In re OCA, Inc. Sec. & Derivative Litig.*, 2006 WL 3747560, at \*18 (E.D. La. Dec. 14, 2006). Thus, as here, where the material misstatements or omissions concern the "lifeblood of the company," the information contradicting Gilchrist's and Payne's rosy and materially misleading public statements "would have been so obvious that the [Individual Defendants] must have been aware

of it." *In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001); *see also Holzwasser v. Staktek Holdings, Inc.*, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006) (misstatements that "pertained to [company's] core business" supported scienter).

It is undisputed that F45's ability to maintain substantial growth by selling franchises and opening new studios was critical to the Company's core business. Indeed, in the years ended December 31, 2020 and 2021, F45 derived 63.8% and 55.0% of its revenue, respectively, from franchise revenue. ¶496. This included franchise establishment fees—which, when combined with World Pack fees, constituted F45's largest source of cash inflows throughout the Class Period. *Id*. As an analyst covering F45 put it, the "fundamental FXLV growth story" was "tied to one basic premise—can the company effectively expand a franchised brand with a differentiated experience and compelling studio-level returns at a consistently-healthy pace." ¶500.

The Fifth Circuit has held that "core operations" allegations support a strong inference of scienter under circumstances involving operations far less important to a company than exist here. For example, in *Six Flags*, 58 F.4th at 219, the Fifth Circuit held that "core operations" allegations contributed to a strong inference of scienter where the misstatements at issue related to aspects of Six Flags' business that were "an important aspect of future growth prospects and EBITDA" even though they were "***not critical*** to Six Flag's survival[.]" Here, F45's ability to maintain substantial growth by selling franchises and opening new studios was not merely "important," it was critical to F45's ability to survive. It strains credulity to believe—as Defendants ask the Court—that Gilchrist and Payne were in the dark on matters of utmost importance to F45.

c.    **Defendants Gilchrist and Payne Closely Monitored Franchise Sales, Studio Openings, and Performance of Opened Studios**

The fact that Defendants Gilchrist and Payne closely monitored F45's core metrics regarding the Company's ability to maintain substantial growth, including franchise sales, studio

33

openings, and performance of open studios (¶¶502-15) supports a strong inference of scienter. *See In re Landry's Seafood Rest., Inc.*, 2001 WL 34115784, at \*22 (S.D. Tex. Feb. 20, 2001) ("monitor[ing] the business continuously and closely . . . support[s] a strong inference of recklessness, if not conscious behavior"); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1261 (W.D. Wash. 2009) (scienter alleged where CFO "repeatedly represented to the investing public that he was informed," including by assuring the public that "[w]e continue to actively monitor and collectively manage" risk). Gilchrist and Payne's monitoring of these metrics is evidenced by numerous facts set forth in the Complaint.

*First*, as the Company's most senior executives, Gilchrist and Payne were required to keep themselves and F45's non-management directors informed of the Company's day-to-day operations. ¶502.

*Second*, monitoring and maximizing franchise sales and new studio openings were critical to the Company's core operations. ¶¶495-501.

*Third*, as numerous CWs attest, Gilchrist and Payne had access to F45's internal systems used to track the financial success of F45's franchises. These included the Company's Customer Relationship Management system, which tracked "Key Performance Indicators" of open studios (¶505); Oracle NetSuite, which tracked delinquent franchises (¶506); and a database (likely Oracle NetSuite) that compiled information including franchisees' payments, contracts, equipment fees, location, and the status of a franchise's takeover (¶507). *See Fleming*, 2004 WL 5278716, at \*11 (scienter may be pled where defendants "knew facts or had access to information suggesting that their public statements were not accurate"). Defendants argue that Plaintiffs did not "allege that some problematic information that undermined a challenged statement necessarily would have

34

been discovered" by using these systems. DB at 36. But this argument ignores that these systems tracked the health of F45's franchises, which goes to the core of Defendants' misstatements.

*Fourth*, Gilchrist and Payne made it clear to the public that they were, in fact, monitoring franchise sales, new studio openings, and F45's revenue streams from its franchise model. Specifically, the Individual Defendants consistently expressed to analysts during earnings calls that they were monitoring these metrics, repeatedly stating that "we" (*i.e.*, Gilchrist and Payne) had significant "visibility" into, *inter alia*, F45's revenue streams, studio openings and F45's franchise pipeline, and anticipated number of franchises to be opened by the end of 2022. ¶¶401, 405, 407, 419, 454, 459, 508, 510-13. Gilchrist and Payne characterized their level of "visibility" into these metrics as, *inter alia*, "high level," "exceptional," and even "absolute." ¶¶508-09, 513. Indeed, in one earnings call Gilchrist claimed that "**nearly on a daily basis, we're aware of where these folks [i.e., franchisees] are up to** . . . ." ¶510.

In response to these well-pled allegations, Defendants argue that when Gilchrist and Payne repeatedly assured analysts that they had significant "visibility" into F45's core metrics that the Individual Defendants actually meant that the *Company* had such visibility, rather than themselves. DB at 36. But concluding definitively that Gilchrist and Payne were *not* speaking about themselves—as Defendants ask this Court to do—would be a factual determination not appropriate at this stage of the litigation. *Holzwasser*, 2006 WL 897746, at \*4 ("[T]he strong inference pleading standard does not license the Court to resolve disputed facts at this stage of the case."). Even so, the context of the Individual Defendants' statements makes clear the strong plausibility that they were attesting to their own personal knowledge. For example, Gilchrist touted his and Payne's "visibility" into studio openings in response to an analyst's question specifically inquiring about the Individual Defendants' personal knowledge: "So *Adam and Chris*, maybe start with --

35

given the importance of opening studios, *your* visibility . . . how do *you guys* go about [understanding the health of F45's franchises?]" ¶510. And in response, Gilchrist specified that Payne—rather than F45 in general—possessed "visibility" into the metrics underpinning F45's earnings: ". . . I think what we've identified is the fact that the ***visibility*** is crucial because that ***enables Chris and his finance team to have such confidence*** with all of the earnings, but not just this year but going into next year." *Id.*

### d.      Defendants Gilchrist and Payne Spoke Repeatedly About F45's Business Model and Ability to Maintain Substantial Growth

Defendant Gilchrist and Payne's repeated public statements about the sustainability of F45's business model and the Company's ability to maintain substantial and rapid growth (¶¶516-18) also contribute to a strong inference of scienter. *See In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 784 (S.D. Tex. 2012) (defendants' "numerous and frequent statements about" BP's safety progress and oil spill estimates supported scienter). Further, their public statements featured a level of specificity that serves as "strong circumstantial evidence that [Gilchrist and Payne] were receiving some form of specific information" on these matters. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). For example: (i) Gilchrist gave interviews in July, August, and November 2021 where he recounted, *inter alia*, the exact number of franchises sold, the dollar amount of investment required by franchisees to buy a franchise, the average percentage cash-on-cash returns for franchisees, the average number of members per studio, and the number of classes and attendees per class at such studios (¶¶369-70, 384-85, 409); (ii) Gilchrist and Payne spoke at the ICR Conference in January 2022, where they discussed, *inter alia*, F45's key markets, the cash-on-cash returns per franchisee, franchisee payment terms for World Pack fees, the "breakeven point" of franchisees, and Gilchrist's assertion that F45 was, in his and Payne's view, "the most profitable fitness franchise in the world" (¶¶416-

36

20); and (iii) Gilchrist and Payne held at least four conference calls with analysts between August 2021 and May 2022 to discuss the Company's quarterly and year-end financial results, where they described, *inter alia*, the exact number of franchises sold and studios opened over a given timeframe, the cost of an average franchise to "open up with cash-on-cash returns over 35%," the number of franchises in F45's backlog, the amount of franchises sold but not yet open, the percentage of franchises owned by multi-unit operators, and the number of franchises that were on full fee-paying contracts (¶¶376-83, 399-407, 424-30, 445-59).

Additionally, during the Company's quarterly conference calls, Defendants Gilchrist and Payne did not merely *speak to* analysts, they engaged in detailed and substantive *exchanges with* analysts, further contributing to a strong inference of scienter. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) ("Given the specificity and repetition of the analysts' questions, McGuire's position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that McGuire's behavior reached this threshold of recklessness"); *Ramirez*, 334 F. Supp. 3d at 856 ("in-depth discussions in analyst meetings" contribute to strong inference of scienter).

It is undisputed that the Individual Defendants made statements about the sustainability of F45's business model and the Company's ability to maintain growth, repeatedly, and in detail. For example: On August 26, 2021, Gilchrist described the methodology behind F45's estimate that it could open over 7,000 U.S. studios in response to an analyst's question about "the big opportunity for U.S. unit growth to 7,000 or more." ¶381. *See also* ¶¶291, 306, 403-07, 428, 430, 453, 456. These public statements contribute to a strong inference of scienter.

e.       **The CW Allegations Contribute to An Inference of Scienter**

Corroborating allegations from numerous CWs further strengthen the inference of scienter. *KB Partners I, L.P. v. Barbier*, 907 F. Supp. 2d 826, 831 (W.D. Tex. 2012) ("[C]orroborating

37

allegations [from CWs] . . . make the inference of scienter in this case more compelling."). For example, CW-2 confirmed that F45 did not conduct due diligence on studio locations prior to opening in a new territory, and CW-3 recounted his understanding that during his tenure at F45, "over 50 percent" of franchises were delinquent. ¶¶151, 181. These allegations speak to F45's core operations, supporting an inference of scienter. Multiple CWs also speak to Gilchrist's personal involvement: CW-4 explained that promotions to increase franchise numbers "all came down from Adam [Gilchrist]," and both CW-4 and CW-5 recounted that Gilchrist communicated the specific promotion to be offered at the All-Star Event. ¶274, 297, 301. The Complaint describes the CWs in sufficient detail to show they "were in [] position[s] to know at first hand the facts" to which they attest, and the Complaint includes "convincing detail to the information they provide"—thus rendering their allegations credible. *Six Flags*, 58 F.4th at 208.

Defendants argue that the CWs "[a]dd [n]othing" because Plaintiffs do not allege that any of the CWs interacted directly with the Individual Defendants and no CW "offers a factual allegation that undermines any challenged statements." DB at 38-39. It is well-established, however, that CWs need not have direct communication with defendants to be credited. *See Budde v. Glob. Power Equip. Grp., Inc.*, 2018 WL 4623108, at \*4 (N.D. Tex. Sept. 26, 2018) ("CWs are often reporting hearsay, but that does not automatically disqualify [their] statement from consideration in the scienter calculus . . . because the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."). Further the CWs' allegations undermine the challenged statements. For example, CW-2 and CW-3's allegations that F45 conducted no due diligence on studio locations and that over half of F45's franchises were delinquent are at odds with Gilchrist's and Payne's sunny statements about the health of F45's franchise model and ability to maintain growth. Thus, the CW allegations further contribute to the inference of scienter.

38

###### f.    The Individual Defendants' Departures Support Scienter

The abrupt departure of Gilchrist and Payne near the end of the Class Period also supports a strong inference of scienter. ¶¶519-22; *see Hall*, 2017 WL 6398742, at *34 (noting sudden departures of CEO and CFO "are circumstantial evidence" that "support[s] a strong inference of scienter"); *N. Port Firefighters' Pension-Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 754 (N.D. Tex. 2013) ("[R]esignation of high level officials may contribute to an inference of scienter."). This is particularly true of Gilchrist whose resignation was announced the same day the Company released its "Strategic Update"—indicating a pressing need to remove Gilchrist from the Company's helm. ¶¶78, 194.

###### g.    Defendants Have Not Proffered a More Compelling Inference of Scienter, and Their Additional Arguments Fail

Defendants suggest a sole competing inference of non-fraudulent intent, arguing that in hindsight Gilchrist and Payne were just overly "optimistic" about F45—that they "believed a big break was coming. And they wanted to be ready." DB at 35. But "hope . . . does not justify misleading investors." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 (N.D. Cal. Nov. 4, 2020). As detailed herein, the Complaint adequately alleges that Gilchrist and Payne repeatedly made representations to the public about F45—including relating to F45's economic model and potential for growth, the percentage of multi-unit franchisee systems being sold, and the quality of F45's franchisees—that were materially misleading, and, as CEO and CFO, they were integral in the issuance of F45's materially misleading SEC filings.

Defendants argue that Gilchrist and Payne would have been acting irrationally by fraudulently touting F45 if they "knew the business was all smoke and mirrors and the bottom was about to fall out." DB at 35. But this argument "confuses expected with realized benefits[,]" as the Individual Defendants "may have thought that there was a chance that the situation . . . would right

39

itself." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). The "fact that [the Individual Defendants'] gamble . . . fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Six Flags*, 58 F.4th at 215.

Defendants make two additional arguments attacking Plaintiffs' allegations, which both miss the mark. *First,* Defendants argue that Gilchrist's and Payne's positions are "insufficient" to plead scienter. DB at 36-37. But Plaintiffs do not allege that the Individual Defendants' roles alone are *sufficient* to support a strong inference of scienter. Rather, Gilchrist's and Payne's positions as F45's most senior executives constitute only one of the *many* factors that, taken collectively*,* contribute to a strong inference of scienter. Defendants try to distract from the strawman they have constructed by arguing that "special circumstances" are not present to support an inference of scienter based solely on the Individual Defendants' positions because F45 is "larger than the companies for which special circumstances generally apply" and Defendants did not make any "internally inconsistent statements." DB at 37. But Defendants conveniently ignore recent Fifth Circuit precedent under *Six Flags*, where the Fifth Circuit held that "special circumstances" contributed to an inference of scienter because, as here, the misstatements involved "core operations" and because the executive-officer defendants made comments to analysts "implying they knew details of the" company's core operations—even though Six Flags is a significantly larger company than F45. *Six Flags*, 58 F.4th at 219. Even if Defendants' "special circumstances" argument was persuasive (it is not), it would not detract from the legion of other allegations that support a strong inference of scienter.

*Second*, Defendants argue that Plaintiffs have not established a strong inference of scienter because Plaintiffs did not allege a motive to defraud. DB at 39-40. Yet, it is well-established that alleging motive is not necessary to establish a strong inference of scienter. *See Tellabs*, 551 U.S.

40

at 325 ("absence of a motive allegation is not fatal"); *see also Spitzberg*, 758 F.3d at 685 ("Even if Defendants[] were unable to benefit financially from their alleged misrepresentations . . . , such misrepresentations would still be severely reckless and dangerous to investors.").

Considered holistically, Plaintiffs have adequately alleged a strong inference of scienter, and Defendants have failed to proffer a stronger non-fraudulent inference.

### 3.    The Complaint Sufficiently Alleges Violations of Items 303 and 105 of Regulation S-K

In addition to making false and misleading statements, the Corporate Defendants failed to disclose the unsustainability of their franchising practices and their negative impact on growth as (i) an uncertainty or trend reasonably likely to have a negative impact on the Company's financials or operations, as required by Item 303 of Regulation S-K; or (ii) a significant fact making investment in F45 speculative and risky as required by Item 105 of Regulation S-K. ¶¶359-64. Though the Fifth Circuit has yet to opine on whether violations of Items 303 and 105 create a basis for liability under Section 10(b) (*see Ramirez*, 334 F. Supp. 3d at 849), permission from the Circuit is not a barrier in the absence of binding precedent. *See Allison v. Oak Street Health, Inc.*, 2023 WL 1928119, at *8-9 (N.D. Ill. Feb. 10, 2023) (noting that "[t]he Seventh Circuit has not yet decided whether Items 303 and 105 impose a duty to disclose" and finding plaintiffs "sufficiently alleged Items 303 and 105 violations, providing another basis for their section 10(b) claim").[24] Here, F45's failure to disclose that its business practices were unsustainable and that it was unable to maintain its growth were "significant factors" making F45 investments risky and were "reasonably likely to have a[n] . . . unfavorable impact" on the Company. *See* ¶¶359-64. Courts

---

[24] *See also Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 674 (M.D. Tenn. 2022). Failure to comply with Items 303 and 105 also triggers Section 11 liability. *See Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 3d 1069, 1081-82 (D. Colo. 2021) (finding omission of oversupply trend leading to price decreases was "likely to have material effects on the company's financial condition" misleading when left out of offering documents).

41

have upheld similar claims of unsustainable practices as threats to a company's core business and actionable under Items 303 and 105. *See In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 726 (D. Minn. 2019); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019).

Defendants rely exclusively on the purported effectiveness of their risk disclosures as preventing Plaintiffs from successfully claiming Defendants violated Items 303 and 105 by failing to disclose the known trends discussed above as making an investment in F45 risky. Yet, as detailed in § III.A.1.b.2, Defendants' risk disclosures were inadequate. Additionally, as explained *supra*, § III.A.2, Plaintiffs establish that Defendants knew about the trends threatening the sustainability of its business model and the threats to the Company's growth.

### 4.    Loss Causation Is Adequately Pled

Loss causation is the "causal connection between the material misrepresentation and the loss" suffered by Plaintiffs and the putative class. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). In the Fifth Circuit, loss causation allegations are subject to Rule 8's liberal pleading standards and need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *See Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). Plaintiffs must only "allege enough facts to give rise to reasonable hope or expectation that discovery will reveal a facially plausible causal relationship between the alleged fraudulent statements or omissions and plaintiff's economic loss, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock[.]" *In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at *9 (S.D. Tex. July 9, 2009).

As this Court has observed, "Plaintiffs must explicitly allege a corrective disclosure—i.e., a statement that corrects a previous misrepresentation or discloses a prior omission—that, when

42

disclosed, negatively affected the value of the security." *In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *11 (W.D. Tex. May 11, 2023) (Ezra, J.). Plaintiffs must establish at the pleading stage "that it is more probable than not that it was the corrective disclosure . . . that caused at least a substantial amount of price drop." *See Amedisys*, 769 F.3d at 320-21; *SolarWinds*, 595 F. Supp. 3d at 588; *see also Cobalt*, 2016 WL 215476, at *6 (loss causation pled when "factfinder could reasonably infer that it is more probable than not that the corrective disclosures caused at least a substantial portion of these episodes of price decline."). Plaintiffs easily meet this standard.

Contrary to Defendants' baseless recharacterization of Plaintiffs' allegations as "merely identifying a stock drop driven by some bad news" (DB at 40-41), the Complaint alleges in great detail that investors learned the truth through the Company's "Strategic Update" after trading hours on July 26, 2022, which revealed the truth concerning F45's unsustainable business model and inability to maintain substantial growth. ¶¶467-72. Specifically, F45 shocked the market by revealing several pieces of previously undisclosed information which revealed the falsity of Defendants' prior statements: (1) a 60% cut in the number of studios F45 would open in 2022 (from 1,000 to 350-450 studios); (2) a 70% cut in the number of franchises F45 would sell in 2022 (from 1,500 to 350-450 franchises); (3) a significant reduction in the Company's full-year guidance for 2022 from $255-$275 million to $120-$130 million; (4) the termination of a $250 million credit line for franchisee studio acquisitions; (5) a 45% reduction in F45's workforce; (6) Defendant Gilchrist's departure as CEO on July 24, 2022; (7) the appointment of F45 Board Member Ben Coates as interim CEO; and (8) a $2.4 million bonus paid to Defendant Payne to ensure he would stay at F45 until at least October 15, 2022. ¶468. As a result of these revelations, *F45's stock price fell 60%* on July 27, 2022. ¶469. These allegations are more than sufficient to

43

meet the liberal Rule 8(a) pleading requirement for proximate cause. *See Amedisys*, 769 F.3d at 326 (loss causation adequately pled); *Propetro*, 2021 WL 9037758, at *29 (same).[25]

**B.    THE COMPLAINT ADEQUATELY ALLEGES STRICT LIABILITY CLAIMS UNDER THE SECURITIES ACT**

**1.    Plaintiffs Adequately Allege Standing for the Securities Act Claims**

**a.    Plaintiffs Have Standing Under Section 11**

Defendants do not contest that Lead Plaintiff Pledge Capital has standing to pursue Section 11 claims on behalf of the class. However, Defendants argue that additional plaintiff Detroit P&F's claims under Section 11 should be dismissed for failure to plead standing. DB at 12-13. In doing so, Defendants' attempt to impose a higher pleading standard than is required, and improperly ask this Court to prematurely decide the merits of Detroit P&F's claims. Under Section 11, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Defendants do not challenge Detroit P&F's standing on the basis that it did not purchase a security issued pursuant to a registration statement—nor could they. Instead, Defendants contend that Detroit P&F lacks standing under Section 11 solely because it has failed to plead that it suffered any damages. But this argument overlooks that Detroit P&F must "plead only a ***decline in market value*** [of shares] to state an appropriate claim for damages." *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3,* 825 F. Supp. 2d 1082, 1148 (D.N.M. 2011). Plaintiffs clearly have satisfied this requirement, alleging "[t]he value of F45's

---

[25] Moreover, determining which parties' account of the facts of the case is accurate is an intensely factual inquiry inappropriate for determination at the pleadings stage, particularly when judged (as it must be) under the Rule 8(a) notice pleading standard. *See Aubrey v. Barlin*, 2010 WL 3909332, at *12 (W.D. Tex. Sept. 29, 2010) ("Lahr's arguments to the contrary are factual disputes over the 'actual' cause of the losses; thus, they are not appropriate in the context of a motion to dismiss, in which we must take all of Plaintiffs' well-pleaded facts as true.").

stock purchased or otherwise acquired pursuant and/or traceable to the materially false and misleading IPO Materials has declined substantially from the date[] of the IPO." ¶214.

While Defendants' Motion nominally challenges Detroit P&F's standing, what Defendants are in fact challenging is loss causation and/or damages. But Section 11 has well-established damages requirements that Detroit P&F satisfies because Detroit P&F sold its shares prior to the filing of its suit for less than the IPO price. 15 U.S.C. § 77k(e). More fundamentally, however, Defendants' damages- and causation-based arguments are premature at this stage in the litigation because a "stock's price decline remains a subject of factual inquiry, and because the price decline is presumed to have been caused by misrepresentations in the registration statement." *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 870 (S.D. Tex. 2004). Indeed, "negative causation" is an affirmative defense, and "Plaintiffs have no obligation to plead loss causation as part of their *prima facie* Section 11 claim." *In re WRT Energy Sec. Litig.,* 2005 WL 2088406, at *1, *2 (S.D.N.Y. Aug. 30, 2005). Dismissing Detroit P&F's Section 11 claim under Rule 12(b)(6) on "negative causation" grounds, therefore, would "place[] a burden of pleading loss causation on the [P]laintiffs, and remove[] the burden of establishing negative causation from the [D]efendants, where it properly lies." *Id.* at *2; s*ee also Dynegy*, 339 F. Supp. 2d at 869 (denying defendants' motion to dismiss on negative causation grounds, even where "plaintiff's losses were incurred before the alleged misrepresentations became public").

In the rare instances where courts *have* granted motions to dismiss Securities Act claims on negative causation grounds, they do so "***only when undisputed facts make clear that no relief could be granted under any set of facts*** that could be proved consistent with the allegations[,]" such as when plaintiffs sold their shares at a profit or above the IPO price. *Dynegy*, 339 F. Supp. 2d at 869. The cases Defendants cite on this point only prove the limited and inapplicable nature

45

of this exception. *See Campton v. Ignite Rest. Grp., Inc.*, 2013 WL 12140291, at \*4 (S.D. Tex. Sept. 3, 2013) (dismissing Section 11 claim where the value of plaintiff's stock as of the date of filing exceeded the amount plaintiffs paid for the security); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003) (dismissing Section 11 claims where plaintiffs sold their shares above the offering price); *Pierce v. Morris*, 2006 WL 2370343, at \*4 (N.D. Tex. Aug. 16, 2006) (dismissing Section 11 claims where the value of the plaintiff's shares in the defendant-entity *increased* in value).[26]

Here, Defendants do not claim—nor could they—that Detroit P&F sold its F45 stock above its IPO price of $16 a share or that the price of F45 common stock has risen above its IPO price. Defendants cannot deny that the value of Detroit P&F's shares in F45 "declined substantially from the date[] of the IPO." ¶214. Indeed, as of the date of filing this action, F45 stock traded at less than $1.00 per share. ¶18. Thus, Detroit P&F has sufficiently pled that it has standing under Section 11, and Defendants have failed to meet their heavy burden of proving a negative causation affirmative defense—especially at this early stage in the litigation.

**b.      Plaintiffs Have Standing Under Section 12(a)(2)**

Both Plaintiffs have standing to pursue Section 12(a)(2) claims on behalf of the Class. "Section 12(a)(2) provides similar redress" as Section 11 against statutory sellers "where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Deutsche Bank AG Sec. Litig.*, 2016 WL 4083429, at \*15

---

[26] Defendants also rely on *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336 (2d Cir. 1987), but such reliance is misplaced because "*Akerman* was not decided on a Rule 12(b)(6) motion to dismiss but on a Rule 56 motion for summary judgment" and "the *Akerman* court did not dismiss the plaintiffs' claim merely because the plaintiffs sought recovery of damages for a price decline that occurred before disclosure of the alleged misrepresentations[.]" *Dynegy*, 339 F. Supp. 2d at 871. Thus, this Court should "not [be] persuaded that *Akerman* supports the [D]efendants' argument that [Securities Act] claims for misrepresentations that were not disclosed until after the stock declined in price should be dismissed." *Id.*

(S.D.N.Y. July 25, 2016). Defendants do not contest that the securities at issue were sold using prospectuses. Rather, they argue that Detroit P&F did not plead that it suffered damages and Pledge Capital did not plead that it purchased shares in F45's IPO. DB at 25-26. Both arguments fail.

For the same reasons articulated above, *supra*, § III.B.1.a, Detroit P&F has clearly pled that it suffered damages, as it adequately alleged that its shares in F45 "declined substantially from the date[] of the IPO" (¶214), which entitles Detroit P&F to damages under Section 12(a)(2). *See In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1205 (9th Cir. 2002).

Defendants' argument that Pledge Capital lacks standing also fails. Defendants assert that Pledge Capital lacks standing because the Complaint "only claims [that Pledge Capital] purchased shares 'traceable' to the IPO or during the Class Period[.]" DB at 26. But to plead standing under Section 12(a)(2), the Complaint need only "allege that [Plaintiffs] purchased [shares] in connection with the [offerings]." *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 832 (S.D.N.Y. 2017); *see id.* ("Plaintiffs are not required to identify the specific defendant from whom they purchased the [shares.]"); *see also Deutsche Bank,* 2016 WL 4083429, at *35 (sustaining Section 12(a)(2) claims where securities were "acquired or purchased pursuant to the false and misleading Registration Statement and corresponding Prospectus for each Offering"). Here, the Complaint alleges what the law requires.[27] Taken together, Detroit P&F and Pledge Capital have adequately pled standing under Section 12(a)(2).

### 2. Plaintiffs Adequately Allege Section 11 and Section 12(a)(2) Claims

Section 11 of the Securities Act "imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required

---

[27] If the Court dismisses Detroit P&F's Section 12(a)(2) claim for lack of standing, Plaintiffs request leave to amend the Complaint to identify the underwriter from whom Detroit P&F purchased its shares in connection with the IPO, information which Plaintiffs confirmed following the Complaint's filing.

to be stated therein or necessary to make the statements therein not misleading." *Fleming*, 2004 WL 5278716, at \*46. Similarly, "Section 12(a)(2) imposes liability on a person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact." *Id.*

### a. Plaintiffs' Securities Act Claims Are Subject to Rule 8 Notice Pleading

Unlike claims arising under Section 10(b)(5) of the Exchange Act, claims under Sections 11 and 12(a)(2) of the Securities Act need only satisfy the general pleading standard of Rule 8. *Fleming*, 2004 WL 5278716, at \*46 ("[T]he pleadings [alleging a Section 12(a)(2) claim] need only satisfy the liberal pleading requirements of Rule 8."). Thus, Sections 11 and 12(a)(2) do not require a plaintiff to plead or prove scienter. *Fleming*, 2004 WL 5278716, at \*45-46.

Defendants argue that Plaintiffs' Section 11 and Section 12(a)(2) claims are subject to Rule 9(b)'s heightened standard for pleading fraud-based claims. DB at 11. However, Plaintiffs specifically alleged that their Securities Act claims do not sound in fraud. ¶¶131-32. This statement is "sufficient . . . to disavow a pleading of fraud for purposes of Rule 9(b)." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 403 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).[28]

---

[28] *See also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 665 (2d Cir. 2009) (applying Rule 8 pleading standards to Section 11 claims where plaintiffs specifically disclaimed reliance on fraud). Further, even if a complaint does not meet the heightened standard for fraud, a court should still analyze whether a non-fraudulent claim was stated. *See Lone Star Ladies Inv. Club v. Schlotzky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001) (finding complaint that expressly stated it did "not assert that defendants are liable for fraudulent or intentional conduct and disavow[ed] and disclaim[ed] any allegation of fraud" not subject to heightened pleading standards).

**b.      The Complaint Adequately Alleges Materially False and Misleading Statements and Omissions**

Defendants argue that Plaintiffs have failed to plead false and misleading statements with the particularity required under Rule 9(b). However, as set forth *supra,* § III.B.2.a, Plaintiffs' Securities Act claims need only satisfy Rule 8's liberal pleading standard—which Defendants do not dispute Plaintiffs have met. Even if Rule 9(b) did apply, the Complaint adequately alleges that F45's IPO Materials contained false and misleading statements, and violations of Items 105 and 303 of Regulation S-K. *See supra,* § III.A.3.

**C.      THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY UNDER BOTH SECTION 11 OF THE SECURITES ACT AND SECTION 20(a) OF THE EXCHANGE ACT**

The Complaint adequately states primary violations of Section 10(b) of the Exchange Act, as well as Sections 11 and 12(a)(2) of the Securities Act. The Fifth Circuit applies "a relaxed and lenient pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability." *See Cobalt*, 2016 WL 215476, at *11 (finding "persuasive the reasoning of district courts in the Fifth Circuit that apply a 'relaxed' and 'lenient' pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability" under Section 15); *One Longhorn Land I, L.P. v. FF Arabian, LLC*, 2015 WL 7432360, at *2 (E.D. Tex. Nov. 23, 2015) (same for Section 20(a)). "[P]laintiffs need not allege that the controlling person actually participated in the underlying primary violation to state a claim for control person liability." *SolarWinds*, 595 F. Supp. 3d at 593.

To state a control person claim, a plaintiff need only allege a primary violation—in this case of Sections 10(b), 11, or 12(a)(2)—and control of the primary violator. *Venator*, 547 F. Supp. 3d at 654. Plaintiffs have stated a primary violation under Section 10(b) against the Corporate Defendants and under Sections 11 and 12(a)(2) against the Corporate Defendants, the Director

49

Defendants, and the Underwriter Defendants. Accordingly, Plaintiffs need only plausibly allege under Rule 8(a) that the Corporate Defendants, Director Defendants, and Controlling Entity Defendants had "direct[] or indirect[] control[]" over F45. *See In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6326865, at *1 (S.D. Tex. Aug. 10, 2009). Plaintiffs easily meet this requirement.

Defendants offer perfunctory arguments that Defendants MWIG, the KLIM Entities, and Director Defendants Raymond, Richman, and Wahlberg "did not possess control over F45." DB at 43-44. Boldly, Defendants claim that "the Complaint states only that the [Raymond, Richman, and Wahlberg] 'participated in the preparation of the Registration Statement.'" DB at 44; ¶33. Yet, Defendants fail to acknowledge—from that very same paragraph of the Complaint—that Plaintiffs plead, "[e]ach of the Director Defendants participated in the preparation of the Registration Statement ***and in the making of the materially inaccurate, misleading, and incomplete statements alleged.***" ¶33 (emphasis added). Such allegations—showing how the shareholders worked together—are sufficient to plead control person liability. *See SolarWinds*, 595 F. Supp. 3d at 594 (finding allegations two minority shareholders "acted jointly to exercise control over" company "sufficient to survive a motion to dismiss").

## IV.    CONCLUSION

Defendants' motion to dismiss should be denied in its entirety. Should the motion be granted, in any part, Plaintiffs respectfully request leave to amend under Rule 15(a) to comply with the Court's ruling.

DATED: October 6, 2023

                                    LABATON SUCHAROW LLP


                                    By: /s/ Christine M. Fox
                                         Christine M. Fox (pro hac vice)
                                         David J. Schwartz (pro hac vice)
                                         Guillaume Buell (TX Bar #24080813)
                                         James M. Fee (pro hac vice)
                                         Matthew J. Grier (pro hac vice)
                                         140 Broadway
                                         New York, New York 10005
                                         Tel: (212) 907-0700
                                         Fax: (212) 818-0477
                                         cfox@labaton.com
                                         dschwartz@labaton.com
                                         gbuell@lbaton.com
                                         jfee@labaton.com
                                         mgrier@labaton.com

                                         *Lead Counsel for Lead Plaintiff Pledge
                                         Capital LLC, Additional Plaintiff Police and
                                         Fire Retirement System of the City of
                                         Detroit, and the Proposed Class*

                                         Brian Schall (pro hac vice)
                                         Rina Restaino (pro hac vice)
                                         THE SCHALL LAW FIRM
                                         2049 Century Park East, Suite 2460
                                         Los Angeles, California 90067
                                         Tel: (310) 301-3335
                                         brian@schallfirm.com
                                         rina@shallfirm.com

                                         *Additional Counsel for Lead Plaintiff Pledge
                                         Capital LLC*

51

**CERTIFICATE OF SERVICE**

I certify that on October 6, 2023, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

/s/ Christine M. Fox
Christine M. Fox

*Counsel for Lead Plaintiff Pledge Capital LLC and Additional Plaintiff Police and Fire Retirement System of the City of Detroit*