UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE F45 TRAINING HOLDINGS, INC. SECURITIES LITIGATION | § § § | No. 1:22-CV-01291-DAE |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Before the Court is a Motion to Dismiss filed on March 11, 2024, by Defendants F45 Training Holdings, Inc. ("F45" or the "Company"); Adam Gilchrist; Christopher Payne; Michael Raymond; Darren Richman; Mark Wahlberg; MWIG LLC ("MWIG"); Kennedy Lewis Management LLC ("KLIM"); and the "Underwriters"—Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Robert W. Baird & Co. Incorporated; Cowen and Company, LLC; Guggenheim Securities, LLC; Macquarie Capital (USA) Inc.; MUFG Securities Americas Inc.; and Roth Capital Partners, LLC— ("Defendants"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. # 101). On April 24, 2024, Plaintiffs filed a response to Defendants' Motion to Dismiss (Dkt. # 102). On May 24, 2024, Defendants replied. (Dkt. # 103). The Court finds this matter suitable for disposition without a hearing. After careful consideration of the memoranda filed in support of and against the motions, the Court **GRANTS IN PART AND**

**DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 101) for the following reasons.

BACKGROUND

F45 is a fitness franchisor that licenses the F45 Training brand in over 70 countries. (Dkt. # 98 at ¶ 3.) The Company offers a 45-minute high-intensity workout distributed primarily through its technology enabled platform. (Id.) F45 initially sought to go public in 2020, though the COVID-19 pandemic delayed F45's initial public offering ("IPO") until July 2021. (Id. at ¶¶ 66–70.)

F45's revenue and profits are allegedly primarily derived from fees charged to its franchisees, including upfront establishment fees and monthly recurring franchise fees. (Id. at ¶ 4.) Thus, prior to the IPO and throughout the Class Period, F45's business model was allegedly centered around rapid growth through the franchising of single and multi-unit fitness studios with low overhead. (Id. at ¶ 57.)

F45 sells two types of franchises. Under a traditional franchise agreement, the franchisee pays an initial establishment fee and agrees to standard terms and conditions, including an agreement to purchase equipment packs from F45 (Id. at ¶ 55(a).) The franchisee is then granted exclusive rights to operate within a specified territory. (Id.) In addition to these traditional franchise

agreements, F45 sells multi-unit development agreements, under which the franchisee purchases the right to develop multiple franchises in a specified area, usually for a period of three to five years. (Id. at ¶ 55(b)). Multi-unit development agreements allegedly require the franchisee to make upfront payments to F45. (Id.)

When the IPO occurred, F45 had sold more than 2,800 franchises worldwide. (Id. at ¶ 54.) F45 reported its growth through various metrics, including "Total Franchises Sold" and "New Franchises Sold," which respectively measured the total and new franchise agreements and studios committed under multi-unit agreements. (Id. at ¶ 58.) F45 also reported "Initial Studio Openings," "Total Studios," and "Open Studios," which measured the new and total studios opened during a specified period. (Id.)

F45 filed a registration statement on Form S-1 for its IPO which, after two amendments, was declared effective on July 14, 2021 (the "Registration Statement"). (Id. at ¶ 70.)

According to Lead Plaintiffs Pledge Capital, LLC ("Lead Plaintiff") and additional plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit P&F," together with Lead Plaintiff, "Plaintiffs"), they were misled by the Registration Statement. While Plaintiffs were told F45 could maintain a

substantial rate of growth and scale of operations, in reality, Plaintiffs claim that F45's business model was reliant on undisclosed and unsustainable practices. (Id. at 8(a)-(h).)

Plaintiffs say that Defendants painted an optimistic picture of the business that was in fact deeply problematic. Plaintiffs claim that a key growth metric, "New Franchises Sold," was defined to allow F45 to misleadingly overreport the number of multi-unit franchise agreements regardless of whether these multiunit franchisees ever opened. (Id. at ¶ 279.) Moreover, on October 1, 2021, F45 allegedly changed the definition of "Initial Studio Openings" from "the first month in which the studio first generates monthly revenue of at least $4,500" to "the month in which we record the initial studio opening in our internal systems," regardless of whether the studio is generating any revenue. (Id. at ¶¶ 300–03.) Plaintiffs say this was an attempt to artificially inflate a key growth metric used by analysts to value the Company. (Id. at ¶¶ 301–04.)

Plaintiffs also claim that F45 began waiving certain fees and issued undisclosed modified payment terms to potential franchisees. (Id. at ¶ 298.) Plaintiffs claim that Defendants failed to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S., leaving little room for additional growth. (Id. at ¶157(d).) Indeed, Plaintiffs claim F45 was "selling" exclusive franchise rights to multi-unit franchisees without

regard to whether those franchisees could financially open those franchises. (Id. at ¶ 157(g).)

Plaintiffs also claim that F45 created new loan financing options in collaboration with Fortress Credit. (Id. at ¶ 306.) At an event in Las Vegas, Nevada, F45 allegedly told potential franchisees that any franchise operator who agreed to open 20 studios only had to put down $10,000. (Id. at ¶ 308.) Thus, F45 allegedly received "commitments" for approximately 600 additional studios. (Id.) This allegedly led to minimal due diligence for the potential franchisee's creditworthiness or ability to purchase, open, and successfully manage F45 studios. (Id. at ¶ 275.)

On July 26, 2022, F45 issued a "Strategic Update" disclosing that the $250 million financing facility with Fortress was no longer available. (Id. at ¶ 318.) The Company also announced: (i) a cut in the number of new studios the Company would open in 2022—down approximately 60% from 1,000 studios to a range of 350 to 450 new studios; (ii) a cut in the number of new franchises that the Company would sell in 2022— down approximately 70% from 1,500 to 350 to 450 new franchises; (iii) a reduction in the Company's financial guidance for full-year revenue from a range of $255 to $275 million to a range of $120 to $130 million; (iv) the reduction of approximately 45% of F45's workforce; (v) the departure of CEO Adam Gilchrist; (vi) the appointment of an Interim CEO; and (vii) the

payment of a $2.4 million retention bonus to CFO Payne to ensure he would stay on as CFO for an additional 10 weeks. (Id. at ¶ 511.) On this news, F45's common stock fell more than 60% to close at $1.35 per share on July 27, 2022. (Id. at ¶ 512.)

On August 15, 2022, F45 released its 2Q22 financial results and disclosed that: (i) total franchises sold declined by 175 in the region; (ii) gross profit decreased 9.1% from the prior period; (iii) gross profit margin fell to 65.5% from 80.6% for the prior year period; and (iv) franchise gross profit declined 8.9% to $17.4 million compared to $19.1 million in 2Q21. (Id. at ¶ 516.) F45 also confirmed that 307 franchises were terminated, and another 300 franchises were still in question as F45 was unable to provide financing after the termination of the Fortress financial deal. (Id. at ¶¶ 517–18.) Thus, allegedly almost all the 706 franchises purportedly "sold" in 1Q22 were, in fact, conditional agreements that contained significant financing contingencies. (Id. at ¶ 518.) By May 18, 2023, F45's stock was trading at less than $1.00 per share, down from its IPO price of $16.00 per share. (Id. at ¶ 527.) On August 14, 2023, F45 delisted from the NYSE. (Id. at ¶ 18.)

On October 23, 2023, F45 issued its Form 10-K for fiscal 2022, which included a restatement of F45's financial statements for the year ending on December 31, 2021, and the first three quarters of 2022. (Id. at ¶¶ 107, 324–349.)

The Restatement allegedly revealed errors related to, among other things, premature revenue recognition on equipment and merchandise revenue, improperly recognized rebates, and other errors. (Id. at ¶ 20.)

Plaintiffs allege that statements in the IPO Materials and throughout the alleged Class Period were materially false and misleading when made. These include statements about: (1) F45's growth (Id. at ¶¶ 175-81 [376-82], 407-08, 416-17, 420-23, 429(a), 430, 439, 441, 443, 446, 448, 455, 464, 466, 468, 478(c)-(f), 489, 493-94, 497, 500-01); (2) F45's unit economic model (Id. at ¶¶ 151-56 [352-57], 409, 424, 429(b), 455-56, 459, 478(a)-(b)); (3) increasing percentage of multi-unit franchisee systems being sold (Id. at ¶¶ 165-171 [366-71], 418, 442, 458, 465, 469, 498); (4) F45's internal controls and remediation of material weakness in internal controls (Id. at ¶¶ 195-96 [395-96], 432, 434, 481-82); risk warnings (Id. at ¶¶ 201-03 [401-03], 479(a)-(b); (5) quality & credit-worthiness of F45 franchisees (¶¶ 187-88 [388-90], 444-45, 467, 479(a)-(b)); (6) F45's franchise equipment fee (Id. at ¶¶ 419, 431, 457); (7) the "franchise effect" (Id. at ¶¶ 495, 499); (8) guidance and franchisee pipeline (Id. at ¶¶ 440, 489, 491); (9) 700 net new franchise "sales" (Id. at ¶¶ 490, 492-93 496); and (10) F45's Fortress financing facility (Id. ¶ 490).

Based on these statements, Plaintiffs allege that F45 and certain of its officers, directors, minority investors, and underwriters violated Sections 11, 12,

and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10 and 20 of the Exchange Act of 1934 ("Exchange Act").

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Review is limited to the contents of the complaint and matters properly subject to judicial notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In analyzing a motion to dismiss for failure to state a claim, "[t]he [C]ourt accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss. See Twombly, 550 U.S. at 555–56. In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a

cause of action. See id. at 556–57. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (citation omitted). However, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissal with prejudice, "unless it is clear that the defects are incurable[.]" Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).

## DISCUSSION

### I. Exchange Act

The Exchange Act requires Plaintiffs to plead (1) a false or misleading statement with particularity under the PSLRA and Rule 9(b), (2) fraudulent intent

with particularity, and (3) loss causation. The Court will discuss each element in turn.

A. Falsity

"The test for whether a statement or omission is 'materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" In re Vivendi S.A. Sec. Litig., 838 F.3d 223, 250 (2d Cir. 2016) (quoting Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004). Moreover, under the federal securities laws, "literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 192 (2015). Companies have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. 240.10b-5(b)). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014).

Plaintiffs that bring claims pursuant to Section 10(b) and Rule 10b–5 of the Exchange act are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). See In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 262 (S.D.N.Y. 2010). "In order to satisfy Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. (internal quotation marks and citation omitted). The PSLRA "insists that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed, and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. (internal quotation marks, citation, and alterations omitted). "Whether or not any of these allegations can be proven during later stages of this litigation" is not relevant to the inquiry. Spitzberg v. Hous. Am. Energy Corp., 758 F.3d 676, 691 (5th Cir. 2014).

Defendants argue that the statements are not actionable misrepresentations because (1) they were protected forward-looking statements, (2) inactionable opinion statements or puffery, or (3) were not false when made.

i. Forward-Looking Statements

The PSLRA provides a safe harbor for forward looking statements, such as "projection[s] of revenues," statements "of the plans and objectives of management for future operations," and statements "of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)-(D).

Forward-looking statements cannot serve as a basis for Section 10(b) liability unless Plaintiffs can show *both* that Corporate Defendants made the statements with "actual knowledge" that they were false, *and* that the statements were not "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i)-(B)(i).

Defendants contend that growth and revenue projections, projections for franchisees, plans regarding multi-unit franchises, and F45's efforts to remediate material weaknesses in its internal controls for financial reporting, are not actionable. Moreover, Defendants assert that Plaintiffs have failed to plead that Corporate Defendants acted with actual knowledge that any forward-looking statement were false or that they were not accompanied by meaningful cautionary language.

Defendants have argued the following statements are inactionable because they are forward-looking: ¶¶ 417, 418, 420, 423, 430, 434, 439, 440, 441, 442, 443, 445, 447, 466-67, 469, 478(b)-(d), 480, 489, 493-96, 497, and 499-502.

Plaintiffs claim that the purported forward-looking statements contain statements about the present strength of the company. This could have the effect of making such statements actionable. See, e.g., Stone v. Life Partners Holdings, Inc., 26 F. Supp. 3d 575, 597 (W.D. Tex. 2014) ("statements about the present strength of the company and of its product" are not forward-looking); Carlton v. Cannon, 184 F. Supp. 3d 428, 467–68 (S.D. Tex. 2016), amended on denial of reconsideration, 2016 WL 3959164 (S.D. Tex. July 22, 2016) (statements were not forward-looking as they "referred to then-present factual conditions"); see also Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp., 58 F.4th 195, 211 (5th Cir. 2023) ("Although the deadline is a future projection, the crux of Plaintiff's fraud claim is that Defendants misled investors about the Company's present construction progress. This is a mixed present/future statement ineligible for safe harbor protection."); Spitzberg v. Hous. Am. Energy Corp., 758 F.3d 676, 691 (5th Cir. 2014) ("[A] 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'"); In re Venator Materials PLC Sec. Litig., 547 F. Supp. 3d 624, 657–58 (S.D. Tex. 2021) (finding statements about timeline not solely forward-looking and contained actionably false or historical aspects that lacked sufficient cautionary language); Rougier v. Applied Optoelectronics, Inc., No. 4:17-CV-2399, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) ("A forward-looking statement, for instance, whose falsity

consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision.")

For instance, the following statements contain elements of both the present status of the company as well as future financial protections: "Based on current franchises sold in Australia per capita as of June 30, 2021, we believe there is a long-term studio potential for us to open over 7,000 studios in the United States." (Dkt. # 98 at ¶¶ 176, 377.) The Complaint lists similar present/future statements such as "[b]ased on our global white space analysis, we continue to see long-term potential for approximately 16,000 studios outside the U.S." (Id. at ¶ 441.)

While the Court recognizes that these statements contain facts about the current status of the Company, when put into context, the purpose of *most* of the statements Defendants argue are forward-looking is to relay information about the future.

The "use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement." Slayton v. Am. Express Co., 604 F.3d 758, 769 (2d Cir. 2010) (citation and quotation marks omitted).

Moreover, "[a] statement may contain some elements that look forward and others that do not," and, where that is true, the "the forward-looking elements and the non-forward-looking are severable." In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) (quoting Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd., 620 F.3d 137, 144 (2d Cir. 2010)). "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." In re Supercom Inc. Sec. Litig., No. 15 Civ. 9650, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018); see also In re Adient plc Sec. Litig., No. 18-CV-9116, 2020 WL 1644018, at *19 (S.D.N.Y. Apr. 2, 2020); Gissin v. Endres, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'" (citation omitted)).

Based on the Complaint, it is not clear whether Plaintiffs are contesting the veracity of any present tense portion of Defendants' statements. Indeed, these statements refer to the present only as a means for gauging future

possibilities and, when read in context, cannot meaningfully be distinguished from the future projection of which they are a part. For example, "[b]ased on current franchises sold . . . we believe there is a long-term studio potential for us to open over 7,000 studios in the United States" is really intended to project an estimate of future earnings. (Dkt. # 98 at ¶¶ 176, 377.) In most of the challenged statements, Defendants were not making guarantees about the present; they were stating their educated guess about what the preceding financial data would mean for the Company's future. The Court finds that this type of statement is not actionable if accompanied by meaningful cautionary language or was not made with actual knowledge that it was false or misleading. "A determination of either in the affirmative is sufficient to confer safe harbor protection." In re Adient plc Sec. Litig., 2020 WL 1644018, at *20.

As detailed more fully in the scienter analysis below, Plaintiffs do not sufficiently allege that Defendants acted with recklessness, let alone actual knowledge. See Slayton v. American Exp. Co., 604 F.3d 758, 776 n.9 ("[e]ven if we were to conclude, based on the alleged facts, that [a certain issue was] 'so obvious that . . . defendant[s] must have been aware of it,' . . . this would not avail the plaintiffs." (citations omitted)). Plaintiffs argue that "Defendants had access to and obtained information that rendered their purported forward-looking statements false when made." This allegation is insufficient to establish that the Defendants

knew about the alleged unsustainable practices within the Company. Cf. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp., No. 19-CV-10825 (JPO), 2021 WL 212337, at *9 (S.D.N.Y. Jan. 21, 2021) (finding lack of scienter, in part, because "Plaintiffs have not alleged that the CPI scorecard or business review decks included any specific information detailing, for example, an unusually high number of customer complaints or an abnormally low number of claims payments").

Moreover, the forward-looking statements are also not actionable as they were accompanied by meaningful cautionary language. "A defendant who publishes a forward-looking statement is protected against liability in a private action under the federal securities laws if that statement is accompanied by 'meaningful cautionary language.'" Gray v. Wesco Aircraft Holdings, Inc., 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020) (quoting Slayton, 604 F.3d at 771). To be meaningful, the cautionary language need not directly precede or follow the forward-looking statement. See Slayton, 604 F.3d at 768–69 (noting that the cautionary language was several pages away). The language, however, cannot merely be boilerplate and must contain "important factors that could realistically cause results to differ materially." Slayton, 604 F.3d at 773. In other words, the language must be "extensive and specific," id. at 772 (quoting Inst. Investors Group v. Avaya, Inc., 564 F.3d 242, 256 (3d Cir. 2009)), and contain "substantive

company-specific warnings." Id. (quoting Southland Secs. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 372 (5th Cir. 2004)). "'The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business.'" Wesco Aircraft Holdings, Inc., 454 F. Supp. 3d at 392 (quoting Conference Report at 43, 1995 U.S.C.C.A.N. at 742).

The Court finds that the predictive statements were accompanied by meaningful cautionary language. Indeed, risk factors made up forty pages of detailed cautionary information in the Prospectus and the Registration Statement. For example, Defendants state that "[o]ur financial results are affected by the number of franchises sold and studios we open" and that "[o]ur ability to open new franchised studios and increase our revenue could be materially and adversely affected" if the Company could not "recruit . . . qualified franchisees" or was "unable to renew our franchise agreements." (Dkt. # 101 at Ex. 6, at 28-30 (Prospectus)). And the IPO Documents specifically cautioned that "the number of new franchised studios that actually open in the future may differ materially from the number of signed commitments we currently have or anticipate from existing and new franchises," and that the Company may "fail to successfully implement our growth strategy, which includes new studio development by existing and new

franchisees." (Dkt. # 101 at Ex. 6 at 30-31 (Prospectus); Ex. 7, at 30-31 (Registration Statement)). The IPO Documents specifically warned that "our franchisees are impacted by factors that are beyond our control," such as "the COVID-19 pandemic," "capital requirements," and "negative economic conditions," as well as "rising costs related to construction of new studios." (Dkt. # 101 at Ex. 6, at 30, 33 (Prospectus); Ex. 7, at 30, 33 (Registration Statement)). The IPO Documents further cautioned that "[o]pening new studios in close proximity may negatively impact our existing studios' revenue and profitability." (Dkt. # 101 at Ex. 6 at 32 (Prospectus); Ex. 7, at 32 (Registration Statement)). The IPO Documents identified risks with remediation efforts, including that "if our remediation of such material weaknesses is not effective, or if we fail to develop and maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired." (Dkt. # 101 at Ex. 6, at 58, 64 (Prospectus); Ex. 7, at 58, 64 (Registration Statement)).

Plaintiffs nonetheless argue that such risk disclosures are insufficient because the cautionary language was virtually unchanged despite a significant change in circumstances of material importance to an investor. In Slayton, the Second Circuit held that: "[t]he consistency of the defendants' [cautionary] language over time" "bolstered their conclusion that the cautionary language at

issue was not meaningful and entitled to protection under the PSLRA." 604 F.3d at 773.

However, in this case, Plaintiffs have not pointed to any changes that would have necessitated altering the cautionary language. While the cautionary statements remained largely unchanged over time, there were no major changes in the risks. This is a crucial distinction from Slayton where defendants had failed to update their cautionary language in spite of "the new information they received in early May 2001." Id. "[C]autionary language is not rendered insufficient merely because Defendants utilized similar language in their cautionary disclosures throughout the Class Period." In re Allied Nevada Gold Corp., No. 314CV00175LRHWGC, 2016 WL 4191017, at *10 (D. Nev. Aug. 8, 2016). In this case, Defendants' cautionary statements identified risks that were present throughout the class period and did not omit any major risk factors. Harrington v. Tetraphase Pharms. Inc., No. CV 16-10133-LTS, 2017 WL 1946305, at *10 (D. Mass. May 9, 2017).

Therefore, the Court finds that statements ¶¶ 417, 418, 420, 423, 430, 434, 441, 443, 447, 466-67, 469, 478(c)-(d), 480, 493-95, 497, 500-502 fall within the scope of safe harbor for forward-looking statements and are not actionable. However, as stated above, not all of the statements are solely forward looking. While almost all of the paragraphs that Defendants allege are forward looking are

not actionable, the Court finds that a few contain language rooted in present conduct. This has the effect of being actionable and not protected as forward-looking. For instance, Paragraph 439 is the type of statement that is not protected as forward-looking. That sentence states:

> We are very pleased to report strong third quarter results. Notably, ***we continue to execute on our growth strategy, demonstrated by strong new franchise sales, including additional multiunit deals and continued strength in new studio openings***. Additionally, we saw encouraging sequential improvements in studio performance with visitation and average unit volumes exceeding pre-pandemic levels in ***the U.S., which is our most significant growth market***.
>
> In the third quarter, we sold 210 net new franchises and ended the quarter with 3,011 franchises sold. We also opened 63 net new studios globally and ended the quarter with 1,618 total studios, an 18% increase versus the prior year. W***e are well on our way to achieving over 4 new goals of franchises sold and studio openings, demonstrating the strong continued interest from franchisees to open new F45 studios***. Moreover, we are encouraged by the strong franchise pipeline of approximately 1,400 sold but not yet opened studios. As I've said before, ***a significant portion of these sold but unopened studios are comprised [sic] a very experienced, well-capitalized multiunit franchisees***.

It is true that part of the statement is forward-looking. Indeed, it discusses that the company is "well on our way to achieving" its future goals. Moreover, the statement discusses the future pipeline of franchises that are yet to open. Nevertheless, unlike some of the other statements that merely forecast the future, this statement contains severable and actionable representations of the present. The statement notes that a portion of the unopened studios are comprised

of very experienced and well capitalized multi-unit franchisees. This is a representation about the present financial situation of the company. It is also a statement that goes to the core of Plaintiffs' theory that these franchisees were in fact not in a good position to open studios. Therefore, the Court finds that Paragraph 439 is actionable and not protected as forward-looking. Plaintiffs have also put forward a plausible reason as to why such a statement is misleading.

For the same reason, the Court finds that Paragraph 442 is a mixed statement of forward-looking and present comments that are actionable. Defendant Payne's comment about the future is directly tied to the "current pipeline" of sophisticated investors. Although Paragraph 442 states that the company is "expecting in the fullness of time that [it] will be closing" deals, Payne remarks that it is because of its current healthy pipeline. Plaintiffs say it was misleading to assert that the pipeline was healthy. The Court agrees that such a statement is plausibly misleading and not protected as forward-looking.

Lastly, the Court finds that Paragraphs 445, 478(b) and 499 are not protected as forward-looking. These statements are primarily focused on the economic model that the company employed. Plaintiffs allege that this economic model was unsustainable despite the fact that they were told it was predictable and allowed for accelerated expansion. Because the statements are more focused on

the present rather than the future, the Court finds them actionable and plausibly misleading.

To conclude this section of forward-looking statements, the Court finds that Plaintiffs failed to allege that ¶¶ 417, 418, 420, 423, 430, 434, 441, 443, 447, 466-67, 469, 478(c)-(d), 480, 493-95, 497, 500-502 are actionable. However, ¶¶ 439, 442, 445, 478(b), 499 are not protected and may be considered plausibly misleading.

ii. Opinion Statements

Opinion statements, such as those prefaced by "we believe" or "we think," may, or may not, be actionable. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 188 (2015).

Whether opinion statements are actionable depends on whether (1) "the speaker did not hold the belief she professed" and (2) "the supporting fact she supplied [was] untrue." Id. at 185–86. Whether omissions in an opinion statement are actionable depends on whether the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." Id. at 189.

Defendants allege that the following statements are inactionable opinions: ¶¶ 417, 421, 429-30, 434, 441, 443, 446-47, 466, 478(a), (c)-(d), (f), 480, 489, 495, 501-02.

First, the Court must decide whether the statements are protected as opinions and qualify as such under Omnicare or whether they are statements of fact.

The Supreme Court has explained that the most significant difference between statements of fact and expressions of opinion is that "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." Id. at 183. Words like "I think" or "I believe" can play a role in demonstrating a lack of certainty, Id. at 187, but their use does not preclude the possibility that the statement as a whole may still mislead as to some fact. Id. at 193. For example, a statement in the form of an opinion ("I believe that the proposed transaction is legal.") may convey three facts: that the speaker has such a belief; that the belief fairly aligns with the facts known to the speaker; and, if stated in the context of the securities market, that the speaker has made the type of inquiry that a reasonable investor would expect given the circumstances. Id. at 188–89.

While the Court finds that many of the alleged misleading statements are merely opinions, some should be construed as statements of fact.

For instance, Defendants claim that the following statements are opinions and therefore cannot be found to be misleading:

- As a franchisor, we have employed an economic model that . . . has been predictable, asset light and cash flow generative and has enabled us to open new studios at an accelerated pace versus the owner-operator model that is common in the studio fitness landscape. (Dkt. # 98 at ¶ 382.)
- Our platform enables the rapid scalability of our model and helps to promote the success of our franchisees. (Id. at ¶ 429 (a).)

The Court finds that these statements can be taken as statements of fact that F45 has employed a certain type of economic model for scalability. The Court finds the following paragraphs are similarly unprotected as containing statements of fact rather than merely opinion-based: ¶¶ 354, 382, 429(a), 468, 489. This can be contrasted with the following statements that demonstrate an opinion rather than a statement of fact:

- We believe the actions described above will be sufficient to remediate the identified material weakness and strengthen our internal controls over financial reporting. (Id. at ¶ 434.)
- So we're feeling really good about the fact that there is an extremely large pipeline. (Id. at ¶ 443.)
- We believe our franchise model is attractive due to its potential for asset-light growth, strong profitability and robust cash flow generation, and has helped to facilitate our rapid growth and strong financial performance prior to the COVID-19 pandemic. (Id. at ¶ 478(f).)
- We sit here today with absolute visibility on being able to open 1,000 franchises this year. (Id. at ¶ 501.)

While the exercise of drawing a distinction between opinion and fact is not always clear, the Court finds that statements about the Company's "potential" and how the Company "feel[s]" regarding the current state of the affairs is distinct from more resolute and firm remarks over the economic model that the Company employs.

Having established that not all of the statements purported by Defendants to be mere opinions, Plaintiffs must now plausibly plead that these statements are misleading.

Plaintiffs contend that statements made by Defendants are misleading because the Company's purported substantial growth were possible only with help from undisclosed and unsustainable business practices and improper revenue recognition that Defendants used to maximize certain key metrics followed closely by market analysts. In order to create the appearance of rapid growth at F45, before and after the IPO, Defendants allegedly (a) manipulated certain key profitability metrics in order to convince franchisees to purchase a franchise license so that F45 could record the deal in its closely watched metric, "Total Franchises Sold;" (b) failed to disclose that F45's largest franchisees already had been granted exclusive rights to most of the key territories in the U.S. fit for an F45 studio, leaving little room for additional growth; (c) conducted little or no due diligence on potential franchisees, including multi-unit franchisees, to ascertain if

they could afford to open and operate one or more F45 franchises, again to juice the number of reported "Total Franchises Sold;" (d) failed to disclose to the market that most of the committed franchise store development was conditional on near-100% external financing, which included F45's guarantee to support novel financing arrangements that ultimately fell through; and (e) failed to properly disclose and account for modified payment terms provided to certain preferential franchisees, resulting in ballooning account receivables for F45 and delayed cash inflows for the Company. (Dkt. # 98 at ¶ 414.)

Again, at this stage of the litigation, Plaintiffs need only explain why the statements were fraudulent. Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 256 (5th Cir. 2005). "Whether or not any of these allegations can be proven during later stages of this litigation" is not relevant to the inquiry. Spitzberg v. Hous. Am. Energy Corp., 758 F.3d 676, 691 (5th Cir. 2014).

The Court finds that the Complaint adequately explains how shareholders could have been misled by some statements made regarding F45's economic model when in fact F45 was allegedly artificially inflating a key growth metric. The Court finds that the Complaint adequately alleges how statements (¶¶ 354, 382, 429, 468, 489) about the economic model and pipeline of franchisees could plausibly be misleading given what Plaintiffs say was actually occurring.

For instance, the Court finds that Paragraph 489 is not protected as an opinion because it is accompanied by statements of fact that are alleged to be plausibly misleading. That statement by Defendant Gilchrist reads,

> "we believe in our ability to deliver the 1,000 openings this year as we have both the equipment packs now available and the contracted franchises moving through the opening process to achieve this target . . . and the demand side, we have approximately 1,100 franchisees that have a contractual obligation to pay for and receive equipment packs by the end of '22 as well as nearly 900 contracted franchises that are in advanced process of securing financing and/or finalizing a lease so they can commence their opening process." (Dkt. # 98 at ¶ 489.)

While it is true that the statement says "we believe," it is followed up with facts that Plaintiffs allege are plausibly misleading. It not solely the "belief" that F45 would be able to deliver the 1,000 openings that Plaintiffs argue is misleading. The Court notes that such a belief would be inactionable. However, Plaintiffs allege that it was misleading to say the contracts were moving through the opening process. Plaintiffs also allege that it was misleading to say "nearly 900 contracted franchises that are in advanced process of securing financing and/or finalizing a lease so they can commence their opening process." (Dkt. # 98 at ¶ 489.) The Court finds that this is the type of statement that could be plausibly misleading especially if such contracts were not in a position to become studios, which is what Plaintiffs allege.

The Court sympathizes with Defendants' argument that the pleading is essentially "fraud by hindsight." At summary judgment or at trial, the Court

may well agree with Defendants' theory of the case. Nevertheless, the Court finds that some of the statements alleged by Plaintiffs are not merely opinions, but contain statements of fact. In doing so, Plaintiffs specified the statements alleged to be fraudulent, identified the speaker, stated where and when the statements were made, and explained why the statements were fraudulent.

iii. Puffery

Defendants argue that many of the comments alleged to be misleading are simply statements of corporate optimism and inactionable as a matter of law.

"[S]tatements that are too vague or general or are merely reflections of corporate puffery are not actionable." Lopez v. Ctpartners Executive Search Inc., 173 F. Supp. 3d 12, 27–28 (S.D.N.Y. 2016). This is because "[t]o be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 185 (2d Cir. 2014). Puffery is defined as "a company's statements of hope, opinion, or belief about its future performance or general market conditions." Shemian v. Research In Motion Ltd., No. 11 Civ. 4068, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013).

Courts have found that statements that generally would be puffery in one context are not puffery in another if made to reassure investors as to "specific risks." Washington State Inv. Bd. v. Odebrecht S.A., 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020); see In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017). For example, in In re Banco Bradesco S.A. Securities Litigation, the court found that while certain statements "may be mere puffery when viewed in isolation, context shows they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern, and that therefore 'a reasonable investor could rely on them as reflective of the true state of affairs at the Company.'" 277 F. Supp. 3d at 660. Similarly, in Odebrecht S.A., the court held that defendant's statements about its "competitive advantage" "were made to reassure investors as to specific risks regarding international competition, and accordingly they cannot be dismissed as 'mere puffery.'" 461 F. Supp. 3d 46, 74. At bottom, a statement of mere puffery is inactionable because it is "too general to cause a reasonable investor to rely upon [it]." Gross v. GFI Grp., Inc., 784 F. App'x 27, 29 (2d Cir. 2019) (summary order). However, where a company makes a statement in direct response to concerns raised by investors about a specific risk, it is fair to read the statement in context. See In re Vivendi, S.A., 838 F.3d at 250 (statements must be read "together and in context").

Defendants assert the following statements are inactionable puffery: ¶¶ 407, 408, 416, 488, 421-23, 429, 442-43, 446, 447, 455, 456(b), 464, 466, 468, 469, 478(e)-(f), 488, 494, 491, 492, 501, 502.

It is certainly the case that some of the statements alleged to be misleading are inactionable as puffery. For instance, Plaintiffs may not prevail by stating that they were misled when told that the Company could be bigger than Starbucks or McDonalds. (Dkt. # 98 at ¶¶ 59, 421.) Moreover, it was mere puffery to state that the Company could be the "world's biggest franchise system in the future." (Id. at ¶ 446.) "I would argue [the balance sheet] is the strongest in this space[,]" was also mere puffery. (Id. at ¶ 422.)

However, as Plaintiffs note, when put into context, statements alleged to be puffery may be considered factual statements about the strength of a company. For example, Defendants represented that F45's business model was "attractive," in part, because "[f]rom June 30, 2020 to June 30, 2021, our Total Franchises Sold increased by 36% and our Total Studios increased by 22%" (Id. at ¶ 151). Moreover, Defendants were "feeling really good about Q1 and Q2," in part, because "we have over 600 franchises in our backlog that are highly sophisticated private equity folks or family offices with incredible balance sheets and great operators" (Id. at ¶ 445). Another statement says F45 has "never had a healthier pipeline," in part, because "[t]his year we've sold over 550 franchises

already." (Id. at ¶ 408.) When put into context, the Court finds the following statements to be unprotected under the puffery exception: ¶¶ 354, 355, 382, 407, 408, 429(a), 445, 468, 478(b), 478(f),[1] 488, 492.

The specific details and the context matters. See Lormand v. US Unwired, Inc., 565 F.3d 228, 249 n.14 (5th Cir. 2009) (rejecting puffery argument because complaint "alleges concrete factual and material misrepresentations and omissions concerning statements that discuss the very specific benefits of" the programs and affiliations); In re SolarWinds Corp. Sec. Litig., 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022) (same); Stone v. Life Partners Holdings, Inc., 26 F. Supp. 3d 575, 599 (material "representations about the strength of [a] company and of its product" are not "mere corporate puffery"); Kurtzman v. Compaq Comput. Corp., 2000 WL 34292632, at *36–37 (S.D. Tex. Dec. 12, 2000) (statements like "[w]e continue to see strong demand . . . and the opportunity for continued market share gains and revenue growths" go "beyond merely generally rosy predictions, especially where those predictions go to the heart of the plaintiffs' complaint.")

Plaintiffs have alleged statements that are more than just aspirational generalized positive goals. This takes the statement outside the box of mere puffery.

---

[1] The Court notes that while ¶ 478(f) might not be protected as puffery, the Court did find that it was protected as an opinion.

For instance, the Court finds Paragraph 445 to be actionable and plausibly misleading. It is true that Defendant Gilchrist stated "we're feeling really good about Q1 and Q2." However, Gilchrist's statement was informed by facts alleged to be misleading. Indeed, Gilchrist said, "we have over 600 franchises in our backlog that are highly sophisticated private equity folks or family offices with incredible balance sheets and great operators. So these are folks that are on the ground now with CBRE executing letters of intent and leases." (Dkt. # 98 at ¶ 445.) Plaintiffs allege that these investors were actually not positioned well and the backlog was not as promising at Defendants made it out to be. Therefore, although Gilchrist's remarks may seem like merely corporate optimism, it is actionable based on the statements of fact that contextualized his beliefs about Q1 and Q2. Later Gilchrist expressed such optimism "particularly given the fact that all 706 of these new franchises are full fee-paying contracts." (Id. at ¶ 488.) Plaintiffs explained that this could be plausibly misleading as "almost all of the 706 franchises purportedly 'sold'" in 1Q22 were, in fact, conditional agreements that contained significant financing contingencies. (Id. at ¶ 518.) Therefore, the Court finds that the Complaint adequately pleads how ¶¶ 354, 355, 382, 407, 408, 429(a), 445, 464, 468, 478(b), 488, and 492 may be misleading by alleging actionable statements that are not merely expressions of corporate optimism.

Because many of the statements are not protected as mere puffery, Plaintiffs must then show that they are plausibly misleading. As the Court articulated above, Plaintiffs plausibly explained how statements about the growth of F45 may be misleading. Specifically, Plaintiffs plausibly stated that the number of franchises at the IPO and in the pipeline were misleading because F45 did not also disclose that its "substantial growth was a result of undisclosed and unsustainable practices." (Dkt. # 98 at ¶ 157.) This includes the fact that F45 (1) "granted exclusive rights to most of the key territories in the U.S.," which Plaintiffs conclude "le[ft] little room for additional growth"; and (2) sold multi-unit franchises "without regard to whether those franchisees . . . would ultimately open those franchises." (Id. at ¶ 157(d), (g).)

iv. Statements in the IPO Documents Were Not False When Made

Lastly, Defendants argue that the remaining challenged statements were not false when made. Defendants assert that Plaintiffs are merely pleading "fraud by hindsight."

This includes statements on F45's results (¶¶ 408, 418, 423, 439–40, 444, 448, 456, 458, 464–67, 488–89, 492, 496, 498). For instance, Defendants argue that the statement, "This year we've sold over 550 franchises already" (¶ 408) and "[a]s of June 30, 2021, approximately 51% of our franchises sold were owned by multiunit franchisees, up from approximately 40% as of the end of

2019" (Dkt. # 98 at ¶ 418) were not false when made. Rather than pleading that F45's statements on its results were false, Defendants say the Complaint conclusorily asserts that (1) F45 could not continue to grow in "key territories" and (2) multi-unit franchisees would not open all of the franchises they purchased.

Similarly, Defendants argue that statements regarding the average franchise performance metrics, including initial start-up costs, membership, and revenue (¶¶ 409, 424, 448, 459, 478(a)) were not misleading even though allegedly a "significant number" of franchises "were in financial distress and were not profitable." (Dkt. # 98 at ¶ 414(e)).

In the same vein, Defendants argue that statements regarding the financing of facilities (Id. at ¶¶ 490, 508(c), 509) were not false or misleading when made. Defendants maintain that at the time the statements were made, it was not misleading that Defendants failed to disclose that F45 had changed the definition of what constituted an open studio.

Plaintiffs challenge statements that F45 typically used some "standard terms and conditions" in its franchise agreements, (Id. at ¶ 169), and that the Company "require[d] [its] franchisees to purchase fitness and technology equipment" from F45 with payment "required to be made prior to the placement of the franchisees' orders," (Id. at ¶ 170.) Plaintiffs claim these statements were false because F45 entered into "modified payment terms" with "certain preferred

franchisees." (Id. at ¶ 157(f).) But F45 fully disclosed in the IPO documents that it entered into modified payment terms, including that it "may from time to time negotiate terms of our franchise agreements with individual franchisees or groups of franchisees." (Dkt. # 101 Ex. 7, at 36 (Registration Statement)). In particular, F45 disclosed that it had made "limited-time promotional offer[s]" to certain existing franchisees with "reduced dollar establishment fee and no franchise fee payments" as part of an effort to "stimulate sales in response to the COVID-19 pandemic." (Id. at 120.)[2]

Finally, Defendants say statements regarding the lack of due diligence (¶ 157(b)), and plans to remediate material weaknesses (¶¶ 432, 434, 447, 481-82, 502) rely on fraud by hindsight.

"To be actionable, a statement or omission must be misleading at the time it was made," and "attempts to plead fraud by hindsight are impermissible and devoid of plausibility." Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn, 53 F. Supp. 3d 882, 897 (E.D. La. 2014).

Plaintiffs argue that the Company's results are misleading because F45 did not also disclose that its "substantial growth was a result of undisclosed

[2] Even setting aside these express disclosures, Plaintiffs fail to plead when F45 entered into those modified payment agreements about which they complain, whether F45 had entered into those agreements at the time of the IPO, or how those agreements rendered the statements false or misleading.

and unsustainable practices." (Dkt. # 98 at ¶ 157.) This includes the fact that F45 (1) "granted exclusive rights to most of the key territories in the U.S.," which Plaintiffs conclude "le[ft] little room for additional growth"; and (2) sold multi-unit franchises "without regard to whether those franchisees . . . would ultimately open those franchises," (Id. at ¶ 157(d), (g)). Therefore, while it was literally true that "[f]rom June 30, 2020 to June 30, 2021, our Total Franchises Sold increased by 36% and our Total Studios increased by 22%," Plaintiffs allege it was misleading because these franchises potentially would never open.

Defendants argue that Plaintiffs do not plead facts showing that it was understood when the IPO occurred that there was limited room for growth. According to Defendants, Plaintiffs fail to plead any facts establishing that F45 would not expect multi-unit franchisees like Club Franchise Group LLC to open the franchises they purchased. The sale of multi-unit franchises involved an upfront payment, (Id. at ¶ 55(b)), and franchisees were typically required to make monthly payments even if they did not open the agreed upon studios. (Dkt. # 101 Ex. 7, at 84 (Registration Statement)). According to Defendants, Plaintiffs identify no reason why multi-unit franchisees would make these payments without planning to open the agreed-upon studios when entering into the agreement with F45. Therefore, Defendants claim that at the time of the IPO it was not clear that the practices were unsustainable.

The Court notes its skepticism regarding many of the statements alleged to be misleading and finds the "fraud by hindsight" theory proposed by Defendants to be persuasive.

As Defendants note, many of the statements purported to be misleading are not alleged to be literally false. For instance, Plaintiffs do not argue that the following declarations are literally false:

- [In 2021], we've sold over 550 franchises already (Dkt. # 98 at ¶ 408)
- As of June 30, 2021, approximately 51% of our franchises sold were owned by multiunit franchisees, up from approximately 40% as of the end of 2019. (Dkt. # 98 at ¶ 418)
- In the third quarter, we sold 210 net new franchises and ended the quarter with 3,011 franchises sold. We also opened 63 net new studios globally and ended the quarter with 1,618 total studios, an 18% increase versus the prior year. (Dkt. # 98 at ¶ 439)
- Our business only costs $300,000 to open up a franchise, and we have over 35% cash on cash returns for those folks across our 2,800 locations . . . we sold 540 franchises last quarter – which is just an incredible effort from what we've seen in comparison to our peers. (Dkt. # 98 at ¶ 448)
- This execution allowed for us to generate revenue growth of 63% compared to the prior period and delivered strong adjusted EBITDA margins of 39% . . . we continue to be encouraged by the strong franchise pipeline of over 1,500 sold franchises as at 12/31, 2021, but not yet open. (Dkt. # 98 at ¶ 464)
- In addition, approximately 65% of our franchises sold were owned by multi-unit franchisees, up from approximately 52% as of December 31, 2020, and 40% as of December 31, 2019, which highlights the strong market demand for multi-unit franchise opportunities. (Dkt. # 98 at ¶ 465)
- During the fourth quarter, we added 160 multi-unit owner-operator franchises across 3 multi-unit franchise groups. (Dkt. # 98 at ¶ 466)

- The major transaction that we completed last year was with Club Franchising Group. That was completed prior to Q4, and that was for a portfolio of 350 locations in Q4. (Dkt. # 98 at ¶ 467)
- During the first quarter, we sold a record 706 net new franchises, which brought the total number of sold but not yet open studios to over 2,200. This is an incredible accomplishment, particularly given the fact that all 706 of these new franchises are full fee-paying contracts. (Dkt. # 98 at ¶ 488)
- And on the demand side, we have approximately 1,100 franchisees that have a contractual obligation to pay for and receive equipment packs by the end of '22 as well as nearly 900 contracted franchises that are in advanced process of securing financing and/or finalizing a lease so they can commence their opening process. (Dkt. # 98 at ¶ 489)
- First quarter total revenues increased 175% to $50 million from $18.1 million, which was driven by a significant increase in both franchise and equipment and merchandise revenues. First quarter franchise revenues increased 51% to $19.9 million from $13.2 million. The increase was due to the growth in our global studio base of franchises sold, which increased by 1,760 units or 78% from 2,247 total franchises sold as of March 31, 2021 to 4,007 total franchises sold as of March 31, 2022. This represents a record 706 net new franchises sold during Q1 2022, which was an increase of 703 net new franchises sold versus Q1 2021. (Dkt. # 98 at ¶ 492)

See also id. at ¶¶ 409; 432; 456(a); 459; 478(a); 481–2; 496; 490.

The Court agrees with Defendants that these statements are not literally false. However, the question is whether the figures are misleading and whether they were misleading at the time in which they were made.

Plaintiffs allege that the figures were misleading because the multi-unit franchisees would not open all of the franchises they purchased. Moreover, the likelihood of expansion was not promising because F45 could not continue to grow in "key territories."

Plaintiffs allege they were told repeatedly of a strong pipeline. Defendant Payne said "[w]e are very pleased with the pace and visibility of our franchisee pipeline." (Id. at ¶ 440.) Moreover, Defendant Payne said "a significant portion of which are part of multiunit deals with well-capitalized franchisee groups." (Id. at ¶ 440.) Payne repeated this statement by saying "over half of the backlog of these large multi-unit operators with contractual opening dates and terms, they're very well capitalized. And from what we're seeing, they're moving ahead, ahead of pace. So we've got a high degree of confidence." (Id. ¶ at ¶ 444.) Once more, Payne allegedly said a, "significant percentage of our backlog is made up of these high-quality, multiunit franchise groups. They're executing ahead of their plans. And there's just this high degree of visibility around the backlog." (Id. at ¶ 458.)

Based on these statements, Plaintiffs have alleged the high degree of confidence in the figures put forward by Defendants when in fact it was allegedly just a facade. The next question is whether the statements were misleading when they were made. According to Defendants, the fact that the financing arrangements ultimately fell through does not make the statements misleading. Rather, Defendants argue the allegations constitute facially improper fraud-by-hindsight pleading.

As just stated, Defendants have argued that there was no reason at the time of the IPO to believe that the pipeline was anything but healthy. Moreover, Defendants say that the Company had no reason to think that the company would fail in opening the number of studios it forecasted.

At this stage of the litigation, Plaintiffs have properly specified the statements contended to be misleading along with an explanation as to why the statements were misleading. Although the Court recognizes the weaknesses in the Complaint, Plaintiffs have alleged facts to adequately plead the statement may be plausibly misleading when made.

For instance, F45 touted long-term development agreements from early 2021 with three financial partners, including an affiliate of Kennedy Lewis Management. One sponsor agreed to develop at least 70 studios over a 7 year period, another to at least 87 studios over 6 years and the sponsor affiliated with KLIM agreeing to at least 300 studios over 36 months. (Dkt. # 98 at ¶ 294.) Based on these numbers alone, F45 allegedly was able to rack up 457 New Franchises Sold from only three franchisees. (Id. at ¶ 295.) However, Plaintiffs claim that unbeknownst to investors, F45 had sold franchise rights without any intention of opening studios because they were more interested in receiving payments for the franchise rights and being able to tout the number of studios that were being planned to be open. Thus, only a small fraction of the 554 franchise rights sold

would develop into studio openings capable of churning recurring revenue. (Id. at ¶ 296.) In fact, an analyst report issued by J.P. Morgan on May 19, 2022 pointed to the fact that "the 'Club Sports' franchisee, as of March 31, 2022, had opened no stores per its June 15, 2021 agreement to open 'at least' 300 stores in the US over 36 months and 150 stores within 18 months of the agreement. (Id. at ¶ 296 n.22.)

Plaintiffs also allege that F45 sought to bolster the number of "new studios" through a promotional event in Las Vegas. According to CW-4, a Franchise Sales Executive at F45 from November 2021 to August 2022, F45 held an "All-Star Event" for its top 100 franchise operators in February 2022 in Las Vegas, Nevada. According to CW-4, any franchise operator who agreed to open 20 studios only had to put $10,000 down. (Id. at ¶ at 308.) According to CW-4, F45 got "commitments" for approximately 600 studios. (Id.) CW-4 said that this promotion was offered "just so [F45] could count the [new studios]." (Id.) Moreover, according to CW-6, F45 was more interested in receiving payments for the franchise rights and being able to tout the number of new studios that planned to open. (Id. at ¶ at 281.) Therefore, Plaintiffs have supplied facts suggesting that the statements were plausibly misleading when made.

Although the Court finds that Plaintiffs have met their pleading burden, the Court notes the limitations of the Complaint. To begin, Plaintiffs' theory of falsity is weakened by its confidential witnesses. CW-4 and CW-7 did

not hold positions at F45 until months after the July 2021 IPO. Moreover, the Complaint lacks details as to how the CWs knew of the information they divulged. For instance, CW-2 claims that F45 failed to conduct proper due diligence, but CW-2 offered no details as to F45's process for identifying and selecting potential franchisees. CW-2, an individual franchisee, gripes about the lack of support the Company provided him, without making any connection to a challenged statement. Other confidential witnesses, including CWs-4 and -5, share their unsupported personal opinions about management's performance or what management should have known, but provide no concrete allegation indicating what management actually knew.

Lastly, the Complaint is weakened by relying on the Restatement to prove falsity. The Restatement did not address the period covered by the IPO—the first two quarters of 2021, (Dkt. # 101 Ex. 7, at 96-97 (Registration Statement)). Rather, the Restatement addressed only year-end results for 2021 and results for the first three quarters of 2022. (Dkt. # 98 at ¶ 325; Ex. 5, at 1 (Oct. 23, 2023 10-K.)) Given this, the Restatement does not provide the necessary support in showing that F45's statements were misleading at the time of the IPO. While the Court does not find these flaws to be fatal in the falsity context at the pleading stage, it is a great limitation for Plaintiffs moving forward.

There is no doubt that Defendants' "fraud by hindsight theory" of what actually occurred has some support. Nevertheless, the Court must decide based on the Complaint whether the allegations are plausible. At the summary judgment stage, the facts may lead the Court to ultimately agree with Defendants. However, the Court finds that the following statements about results (¶¶ 423,[3] 439-40, 444, 448, 458, 464, 465, 466,[4] 467,[5] 488, 489,[6] 492, 496, 498) and facility financing (¶¶ 414(g), 490, 508(c), 509) of the company have been accompanied by a plausible theory as to how the company's financials may have been misleading.

While the Court finds that some of the statements regarding F45's results can be considered plausibly misleading when made, other sets of statements cannot be. Plaintiffs claim it was misleading to state that each franchise license is covered by standard terms and conditions because F45 entered into "modified payment terms" with "certain preferred franchisees." (Id. at ¶ 358(f)). According

---

[3] However, the Court found that ¶ 423 was not actionable because it is forward-looking.

[4] However, the Court found that ¶ 466 was not actionable because it is forward-looking and opinion based.

[5] However, the Court found that ¶ 467 was not actionable because it is forward-looking.

[6] Here, the Court seeks to clarify its position on ¶ 489. The Court finds that the first section discussing its belief in the Company's ability to deliver 1,000 openings is severable as an opinion. However, the Court finds ¶ 489 is actionable for the part stating "we have approximately 1,100 franchisees that have a contractual obligation to pay for and receive equipment packs by the end of '22 as well as nearly 900 contracted franchises that are in advanced process of securing financing and/or finalizing a lease so they can commence their opening process."

to Plaintiffs, the waiver of franchise fees and modified payment terms helped induce franchisees into signing contracts for multiple franchises, but limited F45 revenue and constrained the cash inflows that could be used to support future growth. (Id. at ¶ 282.)

Defendants argue that F45 fully disclosed in the IPO documents that it entered into modified payment terms, including that it "may from time to time negotiate terms of our franchise agreements with individual franchisees or groups of franchisees." (Dkt. # 101 Ex. 7, at 36 (Registration Statement).) In particular, F45 disclosed that it had made "limited-time promotional offer[s]" to certain existing franchisees with "reduced dollar establishment fee and no franchise fee payments" as part of an effort to "stimulate sales in response to the COVID-19 pandemic." (Id. at 120.) Defendants also argue that it is not clear whether the modified agreements were entered into at the time of the IPO.

On this, the Court agrees with Defendants. The Court finds that Defendants properly disclosed that F45 could modify the terms of franchise agreements. Moreover, the Complaint fails to detail whether this was occurring at the time of the IPO. Therefore, the Court finds that statements regarding modified terms (id. at ¶¶ 157(f), 169, and 170) were not plausibly misleading when made.

Plaintiffs also challenge F45's statement that it has "taken and plan[s] to continue to take" certain identified actions "to remediate . . . material

weaknesses" in the Company's internal controls. (Dkt. # 98 at ¶ 196.) Plaintiffs claim this statement was misleading because F45 "fail[ed] to adequately remediate" those material weaknesses. (Id. at ¶ 157(h).) Plaintiffs argue that F45's subsequent Restatement revealed the failure of internal controls at the time of the IPO. Defendants argue that this is fraud by hindsight. On this statement about internal controls, the Court agrees with Defendants. The Complaint fails to plead that the Restatement rendered statements disclosing material weaknesses in financial reporting in the IPO Documents as false or misleading.

Plaintiffs also argue F45 "fail[ed] to conduct proper due diligence on potential franchisees." (Id. at ¶ 157(b).) However, Plaintiffs failed to provide factual support to claim F45 does not conduct due diligence. The Complaint offers no details as to F45's process for identifying and selecting potential franchisees. Therefore, the allegations in ¶¶ 157(h), 186, and 196 are not plausible in stating lack of due diligence.

The Court also agrees with Defendants that statements regarding the "average" franchise performance metrics, including initial start-up costs, membership, and revenue (¶¶ 409, 424, 459, 478(a)) are not plausibly misleading. Even if a significant number of franchises were in financial distress, that does not render F45's reports regarding *average* or *typical* franchise performance misleading.

To conclude this section on falsity, the Court finds that some of the statements alleged in the Complaint regarding F45's results were particularly pled as misleading. While F45 is protected by most of its forward-looking statements, they are not protected by some remarks argued to be opinions or statements of corporate optimism. Lastly, Plaintiffs particularly pled a theory as to how the actionable statements are misleading.

B. Scienter

"Scienter—a mental state embracing intent to deceive, manipulate, or defraud—is an essential element of a securities fraud claim under § 10(b) of the Exchange Act and Rule 10b–5. Section 10(b) proscribes knowing or intentional conduct." Coates v. Heartland Wireless Commnc'ns, Inc., 100 F.Supp.2d 417, 421 (N.D. Tex. 2000). "[T]o survive a motion to dismiss a securities-fraud action, plaintiffs must, *inter alia*, plead specific facts establishing a strong inference of scienter." Fin. Acquisition Partners L.P. v. Blackwell, 440 F.3d 278, 287 (5th Cir. 2006). "For PSLRA purposes, plaintiffs may establish scienter by demonstrating either intent or severe recklessness." Id., at 287 (emphasis omitted).

In this case, Plaintiffs must plead a strong inference that CEO Gilchrist and CFO Payne made each statement with fraudulent intent.

i. Allegations that Gilchrist and Payne would have known because of their access to information.

Plaintiffs allege that Gilchrist and Payne knew their statements were misleading because they would have had access to internal monitoring software and would have known of the Company's revenue stream and pipeline for franchise and studio openings.

Plaintiffs allege that Gilchrist and Payne were privy to confidential information concerning F45's franchisees, studios, operations, and growth. (Dkt. # 98 at ¶ 540.) Similarly, Gilchrist and Payne (i) had access to internal corporate documents, conversations with corporate officers, and employees; (ii) attended management and Board meetings and committees; and (iii) reviewed reports and other information provided to them pursuant to their roles. (Dkt. # 98 at ¶ 540.) Moreover, Gilchrist and Payne participated in the drafting, preparation, and/or approval of F45's filings with the SEC. (Id. at ¶ 538.) Gilchrist and Payne also signed and certified F45's IPO Registration Statements and Prospectuses, as well as the Company's Form 10-K for the year ended December 31, 2021. (Id. at ¶ 537.) Payne was the sole signatory of F45's quarterly reports filed with the SEC during the Class Period. (Id.)

Indeed, Plaintiffs note that in one earnings call, Gilchrist claimed that "nearly on a daily basis, we're aware of where these folks [i.e., franchisees] are up to . . . ." (Dkt. # 98 at ¶ 556.)

Defendants argue that the Complaint contains a gap in the information that Gilchrist and Payne must know in order to adequately plead scienter. According to Defendants, the Complaint fails to state that Gilchrist and Payne knew of information that would have made their statements misleading or information that would have undermined the veracity of their statements. For instance, according to Defendants, the Complaint fails to state that Gilchrist and Payne knew that "that "key" territories were already taken" or that "sold" franchises would "never" open.

The Court agrees with Defendants that there is a gap in the Complaint that fails to adequately address scienter. There is no allegation that any of the omitted information was known to Gilchrist or Payne. It is true that Gilchrist and Payne likely knew of the financial information in the public documents. However, Plaintiffs fail to plead that they would have known the "unsustainable" practices at the time of the IPO, including the fact that many of the sold franchises would never open. This is a gap in knowledge that Plaintiffs fail to fill. Most importantly, Plaintiffs offer no particularized factual allegations of "when and how [Gilchrist or Payne] might have learned of" information that contradicted the challenged statements. Mei Pang v. Levitt, No. 1:22-CV-001191-DAE, 2023 WL 11643704, at *15 (W.D. Tex. Dec. 20, 2023), on reconsideration, No. 1:22-CV-0021-DAE, 2024 WL 2108842 (W.D. Tex. Apr. 22, 2024). "Where a plaintiff seeks to plead

scienter by alleging conscious misbehavior or recklessness, the complaint must 'allege[ ] that defendants . . . had access to non-public information contradicting their public statements.'" Wilbush v. Ambac Fin. Grp., Inc., 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001)). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 196 (2d Cir. 2008); see In re Adient plc Sec. Litig., 2020 WL 1644018, at *27 (concluding that scienter was insufficiently pled where plaintiffs "fail to show what 'specific contradictory information' was available to any Defendant at the time they made any alleged false or misleading statement").

The Complaint is devoid of allegations of specific "facts, reports, or statements" that the Defendants had access to and which contained information contrary to public statements. Pirnik v. Fiat Chrysler Autos., N.V., No. 15-CV-7199 (JMF), 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (quoting Wyche v. Advanced Drainage Sys., Inc., 15-CV-5955 (KPF), 2017 WL 971805, at *14 (S.D.N.Y. Mar. 10, 2017), aff'd, 710 F. App'x 471 (2d Cir. 2017)). While Plaintiffs allege that Gilchrist and Payne were aware of financial information, Plaintiffs fail to specify exactly "how said information 'contradicted Defendants' public statements,' as is required to show scienter." Maloney v. Ollie's Bargain

Outlet Holdings, Inc., 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (quoting In re Adient plc Sec. Litig., 2020 WL 1644018, at *28); see also Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co., 445 F. App'x 368, 370 (2d Cir. 2011) (finding “vague and general averments” that executives had access to “real-time customer and sales information” insufficient to demonstrate scienter); Schaffer v. Horizon Pharma PLC, 16-CV-1763 (JMF), 2018 WL 481883, at *12 (S.D.N.Y. Jan. 18, 2018) (concluding that regular visits by the executives to the pharmacies was insufficient to establish scienter as “there are no allegations that any of the Individual Defendants ever knew or observed any of the abuses”); see, e.g., City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp., No. 19-CV-10825 (JPO), 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021) (holding that scienter not sufficiently alleged where plaintiffs argued that defendants “privy to information about the nature and scope of the CPI program because they were hands-on executives of a company that conducted due diligence and held meetings—before which certain documents were disseminated—regarding the CPI program”); Maloney, 518 F. Supp. 3d at 781 (finding allegations “that Ollie's executives were ‘tight-knit’ and ‘hands-on,’ and therefore must have been aware ‘of the critical inventory and supply chain issues [Ollie's] was experiencing during the Class Period’” were insufficient to show that defendants had access to contrary information).

Plaintiffs' theory seems to be that *if* there were contradictory information, Defendants *should* have noticed it. However, this does not meet the standard of the particularized allegations necessary to support scienter. See Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 535–41 (5th Cir. 2008); see also Alaska Elec. Pension Fund v. Asar, 768 F. App'x 175, 187 (5th Cir. 2019) (SOX certifications insufficient to plead scienter unless the signing officer was aware of "glaring accounting irregularities or other red flags"); Ramirez v. Exxon Mobil Corp., 334 F. Supp. 3d 832, 852–56 (N.D. Tex. 2018) (plaintiffs offered "specific allegations" that the individual defendants "receiv[ed] regular, detailed information" such as contrary cost figures that undermined challenged statements); In re BP p.l.c. Sec. Litig., 843 F. Supp. 2d 712, 757–59, 784 (S.D. Tex. 2012) (scienter alleged for CEO's statements about safety progress where CEO "defined his position" as focused on process safety and admitted to breakdowns in safety plans).

ii. Allegations that Gilchrist and Payne would have known because of their positions

Unless there are special circumstances, a "pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002).

The special circumstances factors are: (i) the company's size; (ii) whether the transaction at issue was critical to the company's continued vitality; (iii) whether the misrepresented information would have been readily apparent to the speaker; and (iv) whether the defendant's statements were internally inconsistent with one another. See Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 959 (5th Cir. 2016).

For the first factor, Defendants argue that F45 is larger than the companies for which special circumstances generally apply. Plaintiffs do not meaningfully argue that this factor supports their position.

However, for the second factor, Plaintiffs argue that F45's ability to maintain substantial growth by selling franchises and opening new studios was critical to the F45's core business. In the years ending December 31, 2020 and 2021, F45 allegedly derived 63.8% and 55.0% of its revenue, respectively, from franchise revenue. (Dkt. # 98 at ¶ 542.)

The Court agrees that the second factor weighs in favor of Plaintiffs. However, the second factor is not outcome determinative.

As to the third and fourth factors, Plaintiffs do not address "internally inconsistent statements," and have not "identif[ied] any [contradictory] fact that would have been "readily apparent" to Gilchrist or Payne.

In reviewing all of the factors, and considering Fifth Circuit precedent, the Court does not find this to be a special circumstance. Plaintiffs' own authority is distinguishable from the facts of the present case. For instance in Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp, plaintiffs alleged that an individual defendant was "directly rela[y]ed" information undermining his public statements. 58 F.4th 195, 216 (5th Cir. 2023). In Six Flags, executives made statements that park construction was continuing despite having received (i) presentations showing "lack of infrastructure, lack of construction workers onsite, and lack of progress" and (ii) reports detailing the lack of construction progress. Id. at 216.

In this case, Plaintiffs fail to identify *any specific fact* known to Gilchrist or Payne that contradicted their public statements. Even Plaintiffs cited cases that illustrate the need for specific allegations of known problematic facts. See In re Netsolve, Inc. Sec. Litig., 185 F. Supp. 2d 684, 691, 693, 697 (W.D. Tex. 2001) (denying motion to dismiss where complaint identified contradictory sales figures known to individual defendants); see also Holzwasser v. Staktek Holdings, Inc., No. A-05-CA-239-LY, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006) (denying motion to dismiss where chip shortage was known and defendants "expressly stated that the supply of [] chips was critical" to the "core business"). In this case, Plaintiffs do not attempt to identify internally inconsistent statements.

The Court finds that this factor weighs heavily on holding that special circumstances doctrine does not apply to the present case.

iii. Confidential Witnesses

Plaintiffs attempt to allege scienter by virtue of confidential witnesses ("CWs"). In doing so, Plaintiffs must plead (i) that the confidential witness had information that contradicted a challenged statement and (ii) how the individual defendant became aware of what the confidential witness knew. See, e.g., In re Key Energy Servs., Inc. Sec. Litig., 166 F. Supp. 3d 822, 862 (S.D. Tex. 2016).

Plaintiffs argue that numerous CWs stated that Gilchrist and Payne had access to F45's internal systems used to track the financial success of F45's franchises, including Oracle NetSuite. (Dkt. # 98 at ¶ 552.)

Defendants argue that Plaintiffs never allege that any confidential witness had contact or otherwise interacted with either Gilchrist or Payne. See Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc., 935 F.3d 424, 434 (5th Cir. 2019) ("[T]hese statements are all from confidential witnesses who do not relate any interaction with [the individual defendants], so we must discount them.")

Defendants also argue that none of the confidential witnesses offers a factual allegation that undermines any challenged statement. For example, CW-2, an individual franchisee, gripes about the lack of support F45 provided him, without making any connection to a challenged statement. (Dkt. # 98 at ¶¶ 256–

57.) CWs-4 and -5, share their personal opinions about management's performance, but provide no concrete allegation indicating what management actually knew. (Id. at ¶¶ 310, 321.)

CW-3, a "contract employee in the role of Accounts Receivable Manager," (Id. at ¶ 93), claims "it was his perception that 'over 50 percent' of F45 franchises were delinquent." (Id. at ¶ 262.) Defendants argue this "perception"—which Plaintiffs do not allege was shared by either Gilchrist or Payne—is "far too indefinite to add to any inference of scienter," and should likewise be ignored. (Dkt. # 103 at 21.)

The Court agrees that the confidential witnesses do not provide sufficient support to plead scienter. For the most part, the statements made by the confidential witnesses are speculative and do not detail facts regarding what Gilchrist or Payne knew. Indeed, many of the confidential witnesses were not in contact with Gilchrist or Payne. Therefore, the CWs do not support scienter.

iv. The Restatement Does Not Support Scienter

"The mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter"; instead, the party must "know" or "be severely reckless" that it is "publishing materially false information." Abrams, 292 F.3d at 432.

In this case, the Restatement does not support scienter. The Restatement did not address the period covered by the IPO—the first two quarters of 2021, (Dkt. # 101 Ex. 7, at 96–97 (Registration Statement)). Rather, the restatement addressed only year-end results for 2021 and results for the first three quarters of 2022. (Dkt. # 98 at ¶ 325; Ex. 5, at 1 (Oct. 23, 2023 10-K.)) Given this, Plaintiffs fail to allege that the weaknesses were known to F45's management such that they could have been disclosed in the IPO Documents. Plaintiffs have failed to meaningfully grapple with this point. Moreover, Plaintiffs do not attempt to link the Restatement to what Gilchrist or Payne knew at the time they made the statements. Abrams, 292 F.3d at 433 ("[P]laintiffs have not pointed to any particular reports or information—available to defendants before the announced financial restatements—that are contrary to the restatements.").

v. Motive

Alleging motive is not necessary to establish a strong inference of scienter. See Tellabs, 551 U.S. at 325 ("absence of a motive allegation is not fatal.") That being said, Plaintiffs do not allege that either Gilchrist or Payne had a motive to defraud investors. When Courts have not found a motive, the strength of Plaintiffs circumstantial evidence of scienter must be correspondingly greater." R2 Invs. LDC v. Phillips, 401 F.3d 638, 644 (5th Cir. 2005). In this case, the Court

finds that the circumstantial evidence is not great enough to find that Plaintiffs sufficiently pled scienter.

C. Loss Causation

Under the PSLRA, "the plaintiff [has] the burden of proving that the act or omission of the defendant alleged ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.A. § 78u-4.

The Supreme Court held in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), that loss causation incorporates traditional elements of proximate causation and economic loss. To establish loss causation under § 10(b), it is not enough for a plaintiff to show that it bought stock at inflated prices and that the stock price declined after negative news was reported. Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330, 340–41 (5th Cir. 2010), vacated on other grounds, 131 S.Ct. 2179 (2011). The loss must result from this truth having "ma[de] its way into the marketplace," not as a result of "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions," or other factors independent of the fraud. Dura Pharmaceuticals, 544 U.S. at 342–43.

The Fifth Circuit requires plaintiffs to allege either (1) a "facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of material misrepresentation or

omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciations of the stock and plaintiff's loss" or (2) "enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." Lormand, 565 F.3d at 258.[7]

In this Circuit, loss causation allegations are subject to Rule 8's liberal pleading standards and need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." See Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc., 769 F.3d 313, 321 (5th Cir. 2014). Plaintiffs must establish at the pleading stage "that it is more probable than not that it was the

[7] The Court notes that the Fifth Circuit has yet to adopt the "materialization of the risk theory." See, e.g., Dawes v. Imperial Sugar Co., 975 F. Supp. 2d 666, 709 (S.D. Tex. 2013) ("The Fifth Circuit has not adopted the materialization-of-the-risk theory."). Under that approach, a plaintiff may plead that the "loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 107 (2d Cir. 2007). A misrepresentation is "'the proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005). The materialization-of-the-risk theory of loss causation differs from the approach requiring a corrective disclosure. "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—i.e., a corrective disclosure." In re Initial Pub. Offering Securities Litig., 399 F.Supp.2d 298, 307 (S.D.N.Y. 2005) (footnote omitted). Without direction from the Fifth Circuit, the Court will refrain from adopting the "materialization of the risk" theory.

corrective disclosure . . . that caused at least a substantial amount of price drop." Amedisys, 769 F.3d at 321; In re SolarWinds Corp. Sec. Litig, 595 F. Supp. 3d at 588-589.

Plaintiffs allege that the Company's "Strategic Update" released on July 26, 2022, revealed the truth concerning F45's unsustainable business model and inability to maintain substantial growth. (Dkt. # 98 at ¶¶ 510–15.) Specifically, several pieces of previously undisclosed information allegedly revealed the falsity of Defendants' prior statements including, among other things: (i) a 60% cut in the number of studios F45 would open in 2022 (from 1,000 to 350-450 studios); (ii) a 70% cut in the number of franchises F45 would sell in 2022 (from 1,500 to 350-450 franchises); (iii) a reduction in the Company's full-year guidance for 2022 from $255-$275 million to $120-$130 million; (iv) the termination of a $250 million credit line for franchisee studio acquisitions; and (v) Gilchrist's departure as CEO. (Dkt. # 98 at ¶ 511.) As a result, F45's stock price fell 60% on July 27, 2022. (Id. at ¶ 512.)

Defendants argue that merely identifying a stock drop driven by some bad news about the Company is not enough; a corrective disclosure must actually reveal the falsity of the defendant's prior representations. (Dkt. # 101 at 44.)

The Court agrees with Defendants that the Complaint fails to plead loss causation. The Complaint fails to provide any explanation of which prior

statements this disclosure allegedly corrected, and what "truth" about those statements the disclosure allegedly revealed.

i. Detroit's Lack of Economic Loss from the July 26 Restatement

Defendants argue Plaintiff Detroit should be dismissed because it has suffered no damages. The only injury Plaintiffs claim is an alleged drop in the market price for F45 stock following the purported corrective disclosure on July 26, 2022. (Dkt. # 98 at ¶¶ 11–12, 81–82, 205–06, 510–512, 571.) However, Detroit had sold the last of its F45 shares two months earlier on May 20, 2022. (Dkt. # 59, Ex. 1, at Ex. A.)

As such, Defendants argue they have met their burden of proving negative causation. See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (stating that if the purchaser sells his stock before the relevant truth begins to leak out, the misrepresentation will not have caused his loss); In re McKesson HBOC, Inc. Secs. Litig., 126 F.Supp.2d 1248, 1262 (N.D. Cal. 2000) (finding that the defendants had an absolute negative causation defense with regards to shareholders who disposed of their stock prior to the date of the corrective disclosures); In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig., 272 F.Supp.2d 243, 255 (S.D.N.Y. 2003) (stating that the decline in price that occurred prior to the disclosure of the allegedly concealed information could not be charged to the defendants); Akerman v. Oryx Communications, Inc., 810 F.2d 336, 342 (2d Cir. 1987) (stating that the

price decline before disclosure could not be charged to the defendants) (citations omitted).

The Court agrees with Defendants. Since Detroit sold all of its stock before the corrective disclosure was made, Detroit has failed to adequately allege that their losses resulted from the cash flow misstatements. Dura, 125 S.Ct. at 342. Therefore, even if the Court found that loss causation existed in this case, Detroit would still be barred from pursuing a claim under Section 10(b) of the Exchange Act.

## II. Securities Act

### A. Section 11 Standing

Unlike its claims under the Exchange Act, the Court finds that Detroit has standing to pursue its claims under the Securities Act. While Detroit could not overcome loss causation under Section 10(b) of the Exchange Act, its pleading obligations are different under Section 11 of the Securities Act.

Defendants argue that Detroit lacks standing because it sold the last of its F45 shares on May 20, 2022, two months before the purported corrective disclosure on July 26, 2022. (Dkt. # 98 at ¶¶ 11–12, 81–82, 205–06, 510–512, 571.) Therefore, Defendants argue that Detroit could not have been injured from the disclosure on July 26; to the contrary, Defendants argue Detroit would have benefited from selling at a higher price.

Under Section 11, a plaintiff need only allege that (i) "he purchased a security pursuant to a false or misleading registration statement," and that (ii) "at the time of the sale of the security or at the end of the class period, the value of the security had declined." Levine v. AtriCure, Inc., 508 F. Supp. 2d 268, 276 (S.D.N.Y. 2007).

Under Section 11, Plaintiffs correctly point out that they have no obligation to plead loss causation as a part of their prima facie case. See In re WRT Energy Securities Litigation, No. 96 Civ. 3610 (JFK), 2005 U.S. Dist. LEXIS 18701, at *4 (S.D.N.Y. Aug. 30, 2005). Therefore, accepting the factual allegations of the Complaint as true and construing them in Plaintiffs' favor, the Court finds that Detroit has standing. Nevertheless, it is worth mentioning the hurdle Detroit must overcome at summary judgment or trial in regards to causation as outlined earlier in this Order.

B. Section 12 Standing

"Section 12(a)(2) only applies to transactions stemming from a public offering of a security and accordingly 'a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary.'" In re BioScrip, Inc. Secs. Litig., 95 F. Supp. 3d 711, 744 (S.D.N.Y. 2015) (citing Yung v. Lee, 432 F.3d 142, 149 (2d Cir. 2005)). "Moreover, the Supreme Court has explained that Section 12(a) 'imposes liability

on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller.'" Pinter v. Dahl, 486 U.S. 622, 644 n. 21 (1988). "Finally, a plaintiff may only bring a claim against a 'statutory seller' from which it 'purchased' a security 'pursuant to' the pertinent offering documents." In re MF Global Holdings Ltd. Secs. Litig., 982 F. Supp. 2d 277 (S.D.N.Y. 2013) (holding that allegations that a named plaintiff "purchased or otherwise acquired stock from" defendant underwriters "pursuant to the Secondary Offering Materials," was sufficient, on motion to dismiss). "In sum, Plaintiffs must allege that they made a direct purchase of a security from a statutory seller as part of a public offering." In re BioScrip, 95 F. Supp. 3d at 744.

Courts have previously dismissed Section 12(a)(2) claims because the complaint merely alleged that the securities were acquired "pursuant or traceable to" the Registration Statement and Prospectus. This is because "[c]ourts [] have been appropriately wary of allegations that a plaintiff purchased a security 'pursuant or traceable to' an offering, as compared to simply 'pursuant to an offering,' because it is ambiguous whether the plaintiff is alleging they were a direct or indirect purchaser." In re BioScrip, 95 F. Supp. 3d at 744 (collecting cases).

Courts have limited the term "any person acquiring such security" to purchasers of shares issued and sold pursuant to the challenged registration statement. See, e.g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975); Corp. v. Parker & Parsley Development Partners, L.P., 38 F.3d 211, 222 (5th Cir. 1994); Klein v. Computer Devices, Inc., 591 F.Supp. 270, 273 (S.D.N.Y.1984), clarified on reh'g, 602 F.Supp. 837 (S.D.N.Y.1985); see also H.R.Rep. No. 85, 73rd Congress, 1st Sess., 5 (1933); Blue Chip Stamps v. Manor Drug Stores, 95 S.Ct. 1917, 1933 (1975) (1933 Act chiefly concerned with disclosure and fraud in connection with offerings of securities, primarily initial distributions of newly issued stock from corporate issuers).

In Gustafson v. Alloyd Co., 513 U.S. 561 (1995), the Supreme Court analyzed the legislative history of the 1933 Act and determined that Congress meant for Section 12 claims to apply only to public offerings. Accord, Lewis v. Fresne, 252 F.3d 352, 357 (5th Cir. 2001) ("The House Report thus states with clarity and specific reference to Section 12 that Section 12 liability is imposed only as to a document soliciting the public.").

However, some courts have also rejected arguments challenging standing when the securities were "acquired or purchased pursuant to the false and misleading Registration Statement and corresponding Prospectus for each Offering." See, e.g., MF Global, 982 F. Supp. 2d 324 (holding that allegations that

named plaintiff "purchased or otherwise acquired stock from" the relevant underwriters "pursuant to the" offering materials was sufficient to withstand a motion to dismiss); In re Lehman Bros. Secs. & ERISA Litig., 799 F. Supp. 2d 258, 311 (S.D.N.Y. 2011) (rejecting standing argument where plaintiffs alleged 12(a)(2) claims on behalf of "all persons and entities who purchased or otherwise acquired [the securities] pursuant to the materially untrue and misleading Structured Note Offering Materials").

The Court finds that Lead Plaintiff Pledge Capital lacks standing under Section 12. It is undisputed they purchased shares on January 10, 2022, after the IPO. Unlike Detroit who purchased shares directly in the IPO from an underwriter Defendant, the Complaint is clear that it only purchased shares traceable to the IPO. The Complaint is unclear as to whether Pledge Capital bought shares pursuant to the defective IPO materials. Plaintiffs amended their allegations to state that Detroit purchased its shares in the "IPO from Goldman Sachs & Co. LLC." (Dkt. # 98 at ¶ 30.) Notably, Plaintiffs could not similarly amend their allegations as to Lead Plaintiff Pledge Capital. This confirms that Plaintiffs cannot plead facts showing Pledge Capital has standing under Section 12. Therefore, the Court dismisses the Section 12 claim asserted by Lead Plaintiff Pledge Capital.

C. Those with Standing Stated Plausible Claims under Sections 11 and 12(a)(2) of the Securities Act.

Unlike claims arising under Section 10(b)(5) of the Exchange Act, claims under Sections 11 and 12(a)(2) of the Securities Act need only satisfy the general pleading standard of Rule 8. In re Fleming Companies Inc. Sec. & Derivative Litig., No. CIVA503MD1530TJW, 2004 WL 5278716, at *46 (E.D. Tex. June 16, 2004); Holzwasser v. Staktek Holdings, Inc., No. A-05-CA-239-LY, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006). Additionally, Sections 11 and 12(a)(2) do not require a plaintiff to plead or prove scienter. Fleming, 2004 WL 5278716, at *46. Plaintiffs specifically allege that their Securities Act claims do not sound in fraud. (Dkt. # 98 at ¶¶ 142–43.) This statement is "sufficient . . . to disavow a pleading of fraud for purposes of Rule 9(b)." In re Franklin Bank Corp. Sec. Litig., 782 F. Supp. 2d 364, 403 (S.D. Tex. 2011); see also Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), aff'd, 347 F. App'x 665 (2d Cir. 2009) (applying Rule 8 pleading standards to Section 11 claims where plaintiffs specifically disclaimed reliance on fraud).

Section 11 of the Securities Act "imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Fleming, 2004 WL 5278716, at *46.

Like Section 11, Section 12 requires that the complaint plead a materially false or misleading statement or omission. See Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1445 (5th Cir. 1993). "Section 12(a)(2) imposes liability on a person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact. Fleming, 2004 WL 5278716, at *46.

Plaintiffs challenge the exact same statements under Section 10(b) of the Exchange Act as they do under the Securities Act. Compare Dkt. # 98 at ¶¶ 150–204, with ¶¶ 351–405.

As with the claims under the Exchange Act, Defendants argue that alleged misleading statements are inactionable because (1) they were protected forward-looking statements, (2) inactionable opinion statements or puffery, or (3) were not false when made.

The Court incorporates its analysis from above and finds that Plaintiffs have alleged statements that were plausibly misleading and were not protected as forward looking, opinion based, or mere puffery. Moreover, the Court finds that some of the statements could be viewed as plausibly misleading when made.

Therefore, the Court DENIES Defendants' motion to dismiss the claims under the Securities Act except as to the Section 12 claim asserted by Lead Plaintiff Pledge Capital.

III. Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303") and Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105")

Item 303 requires F45 to disclose "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.3030(b)(2)(ii).

The Court finds that Plaintiffs fail to identify any trends or uncertainties that F45 omitted.

Item 105 requires F45 to "adequately describe[]" factors that "make an investment in the registrant or offering speculative or risky," 17 C.F.R. § 229.105(a).

The Court finds that Plaintiffs failed to plausibly plead that F45's disclosures were "generic or boilerplate discussions" of risks that are inadequate under Item 105. Emps.' Ret. Sys. of the City of Baton Rouge v. MacroGenics, Inc., 61 F.4th 369, 393 (4th Cir. 2023) (internal quotations and citation omitted); accord Silverstrand Inv. v. AMAG Pharm., Inc., 707 F.3d 95, 103 (1st Cir. 2013) (internal quotation marks and citation omitted).

The IPO Documents identified the relevant material weaknesses, (Dkt. # 98 at ¶ 132), and identified the risk that F45's remediation efforts may not be sufficient, (Dkt. # 101, Ex. 6, at 30, 33 (Prospectus)). The other disclosures detailed the relevant risks and uncertainties F45 faced related to opening and retaining franchises and sustaining the Company's growth. (Dkt. # 98 at ¶¶ 201–03 (listing uncertainties disclosed in the risk disclosures)).

Therefore, the Court GRANTS Defendants' motion to dismiss claims brought under Item 303 and 105.

IV. Control Person Liability

To state a control person claim, a plaintiff must allege a primary violation—in this case of Sections 10(b), 11, or 12(a)(2)—and control of the primary violator. One Longhorn Land I, L.P. v. Defendant FF Arabian, LLC, 2015 WL 7432360, at *2–3 (E.D. Tex. Nov. 23, 2015).

Because Plaintiffs did not state a plausible claim under the Exchange Act, there can be no liability under Section 20(a) of the Exchange Act. In re Alstom SA, 406 F. Supp. 2d 433, at 486. However, the Court found that Plaintiffs with standing have viable Section 11 and 12 claims under the Securities Act.

To establish "control" under Section 15 and Section 20, Plaintiffs must allege "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the

ownership of voting securities, by contract, or otherwise." See Abbott v. Equity Grp., Inc., 2 F.3d 613, 619 n.15 (5th Cir. 1993) (quoting 17 C.F.R. § 230.405(f)) ("The control person sections of both acts are interpreted the same, at least with respect to the definition of 'controlling person.'" (citation omitted)). A plaintiff alleging a control person violation under either statute must "at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." Firefighters' Ret. Sys. v. Citco Grp. Ltd., 855 F. App'x 902, 905 (5th Cir. 2021).

Defendants argue that Plaintiffs have failed to show that MWIG LLC, Kennedy Lewis Management LLC ("KLIM"), and the minority directors are control persons. Both MWIG and KLIM were minority shareholders at all times. (Dkt. # 98 at ¶¶ 245–46, 602–03.) According to Defendants, neither had the ability to direct management solely by virtue of their ownership of voting securities. Defendants concede that MWIG and KLIM each individually had the power to nominate directors. However, they argue that power alone does not translate into control.

Defendants also argue that the Complaint fails to state a claim against the minority directors because one's status as a director alone does not suffice to show "actual power or control." In re Dynegy, Inc. Sec. Litig., 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004).

Plaintiffs plead, "[e]ach of the Director Defendants participated in the preparation of the Registration Statement and in the making of the materially inaccurate misleading, and incomplete statements alleged." (Dkt. # 98 at ¶ 38.) Plaintiffs believe this is enough to satisfy control person liability. See SolarWinds, 595 F. Supp. 3d at 593–594 (finding allegations that two minority shareholders "acted jointly to exercise control over" the company "sufficient to survive a motion to dismiss").

The Court finds that Plaintiffs have not put forward facts showing MWIG, KLIM, or the minority directors exerting control. This case is distinguishable from SolarWinds.

In fact, in SolarWinds, the court stated that "bare allegations that shareholders acted jointly . . . are not sufficient." 595 F. Supp. 3d at 593. Plaintiffs in SolarWinds alleged specific activities that the shareholders engaged in to exert joint control over the company. Id. at 594. Plaintiffs in SolarWinds alleged "*how* the shareholders worked together," not merely *that* they worked together. Id. at 593 (emphasis in original).

Just because minority directors were members of the board that approved F45's Registration Statement does not alone "raise an inference of control over that entity." In re Glob. Crossing, Ltd. Sec. Litig., 2005 WL 1907005, at *13 (S.D.N.Y. Aug. 8, 2005). Plaintiffs plead no other facts demonstrating that

the minority directors had the power to dictate the contents of the Registration Statement or F45's other public filings. Therefore, the Court dismisses the Control Persons claims.

CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss. The Court dismisses claims under the Exchange Act without prejudice. The Court DENIES Defendants' motion to dismiss claims under the Securities Act, except as to the Section 12 claim asserted by Lead Plaintiff Pledge Capital for lack of standing. The Court also dismisses without prejudice claims for the violation of Item 303 and Item 105. The Court also dismisses without prejudice control person claims under Section 20(a) of the Exchange Act and Section 15 and Section 20 of the Securities Act.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, February 21, 2025.

David Alan Ezra
Senior United States District Judge